1   Matthew C. Helland, CA State Bar No. 250451
    helland@nka.com
2   Daniel S. Brome, CA State Bar No. 278915
    dbrome@nka.com
3   NICHOLS KASTER, LLP
    235 Montgomery St., Suite 810
4   San Francisco, CA  94104
    Telephone: (415) 277-7235
5   Facsimile: (415) 277-7238

6
    Rachhana T. Srey, MN State Bar No. 340133*
7   srey@nka.com
    NICHOLS KASTER, PLLP
8   4600 IDS Center
    80 South 8th Street
9   Minneapolis, MN  55402
    Telephone: (612) 256-3200
10  Facsimile: (612) 338-4878
11  *Admitted pro hac vice

12  Benjamin L. Davis, MD Bar No. 29774*
    bdavis@nicholllaw.com
13  The Law Offices of Peter T. Nicholl
    36 Charles Street, Suite 1700
14  Baltimore, MD 21201
15  *Pro hac vice application forthcoming

16  Attorneys for Plaintiff and those similarly situated

17            IN THE UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19

20  Aaron Kudatsky, individually and on behalf of      | Case No.      3:19-CV-07647-WHA
21  all others similarly situated,
                                                         PLAINTIFF'S NOTICE OF MOTION
22                               Plaintiff,               AND MOTION FOR CLASS
                                                         CERTIFICATION PURSUANT TO FED.
23        v.                                             R. CIV. P. 23; MEMORANDUM OF
                                                         POINTS AND AUTHORITIES IN
24  Tyler Technologies,                                  SUPPORT

25                               Defendant.              Date: January 7, 2021
26                                                       Time: 8:00 am
                                                         Courtroom: 12 – 19th Floor
27
                                                         Judge: Hon. William H. Alsup
28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION        3:19-cv-07647-WHA

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ............................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

    I.       INTRODUCTION ......................................................................................... 1

    II.      PROCEDURAL HISTORY ........................................................................... 2

    III.    STATEMENT OF FACTS ............................................................................ 3

        A.  The Parties ............................................................................................ 3

        B.  Implementation Consultants Share the Same Primary Job Duty ................... 4

           i.   Implementation Consultants Operate Under Similar Reporting and Pay Structures and are Assigned Work in a Similar Manner ....................... 4

           ii.  Tyler Expects all Implementation Consultants to Perform the Same Steps in an Implementation ................................................................... 5

           iii. Some Implementation Consultants Spend Small Amounts of Time on Secondary Duties ....................................................................... 7

           iv. All Implementation Consultants Play the Same Role in Tyler's Business ............ 8

           iv. Tyler's Policies and Procedures Uniformly Constrain Implementation Consultants' Discretion ............................................................. 8

        C.  Defendant Classifies Implementation Consultants As Exempt Administrative Employees and Does Not Track Their Hours ............................................ 9

        D.  Tyler's Records Show the Class Size ........................................................ 10

    IV.    ARGUMENT .............................................................................................. 10

        A.  Tyler Asserts the Same Exemption Defense as to All Implementation Consultants. . 11

        B.  Plaintiffs Satisfy The Rule 23(a) Elements ................................................ 13

           i.   The Class is so Numerous that Joinder of all Members is Impracticable ............ 13

           ii.  Questions of Law and Fact are Common to All Members of the Proposed Classes will Drive Resolution of Plaintiff's Claims ............................. 14

           iii. Claims of the Representative Plaintiffs are Typical of the Class ........................ 21

           iv. The Representative Plaintiff and Class Counsel are Adequate Representatives... 22

        C.  Plaintiff Meets The Requirements Of Rule 23(b)(3) ..................................... 23

           i.   Common Questions Predominate Over Individual Ones ..................................... 23

           ii.  A Class Action is Superior to Other Methods of Litigation ............................... 24

        D.  Plaintiff's Proposed Notice is Fair, Accurate and Informative ..................... 25

V.      CONCLUSION ......................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2 **<u>Cases</u>**

3 *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513 (C.D. Cal. 2011) ............................................................ 21

4 *Ambrosia v. Cogent Commc'ns, Inc.*, 312 F.R.D. 544 (N.D. Cal. 2016) ................................. 12, 15

5 *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997)................................................................... 22, 23

6 *Amgen v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455 (2013) ........................ 10

7 *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ....................................................................... 10

8 *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002)...................................................... 12

9 *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066 (9th Cir. 1990).................................................. 12, 18

10 *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2010) ............................................... 15

11 *Clemens v. Hair Club for Men, LLC*, 2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) .............. 21, 23

12 *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009) ................................................ 18

13 *Deluca v. Farmers Ins. Exch.*, 2018 WL 1981393 (N.D. Cal. Feb. 27, 2018) ....................... *passim*

14 *Deluca v. Farmers Ins. Exch*, 386 F. Supp. 3d 1235 (N.D. Cal. 2019) ...................... 13, 16, 18, 19

15 *Duran v. U.S. Bank Nat. Assn.*, 59 Cal. 4th 1 (2014) .................................................................. 15

16 *Eicher v. Advanced Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363 (2007).................................. 12

17 *Encino Motorcars, LLC v. Navarro*, — U.S. —, 138 S. Ct. 1134 (2018)..................................... 11

18 *Errickson v. Paychex, Inc.*, 447 F. Supp. 3d 14 (W.D.N.Y. 2020) ............................................... 13

19 *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ................................................... 22

20 *Gray v. Golden Gate Nat. Recreational Area*, 279 F.R.D. 501 (N.D. Cal. 2011)......................... 14

21 *Hanlon v. Chrysler*, 150 F.3d 1011 (9th Cir.1998) .......................................................... 14, 23, 24

22 *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ...................................................... 21

23 *Harris v. Superior Court*, 53 Cal. 4th 170 (2011) ....................................................................... 12

24 *Jaimez v. DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286 (2010) ................................................... 15

25 *Leyva v. Medline Industries, Inc.*, 716 F.3d 510 (9th Cir. 2013).................................................. 24

26 *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007).......................................... 21

27 *Martino v. Ecolab, Inc.*, 2016 WL 614477 (N.D. Cal. Feb. 16, 2016)............................... 15, 24, 25

28 *Martinez v. Joe's Crab Shack Holdings*, 231 Cal. App. 4th 362 (2014)....................................... 15

*McKeen-Chaplin v. Provident Savings Bank, FSB*, 862 F.3d 847 (9th Cir 2017) ............. 13, 17, 18

*Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593 (E.D. Cal. 2015) ...................................... 15

*Ortiz v. Amazon.com LLC*, 389 F. Supp. 3d 728 (N.D. Cal. 2019*)* ................................................ 11

*Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785 (1999)........................................................ 11

*Saechao v. Landry's Inc*, 2016 WL 1029479 (N.D. Cal. Mar. 15, 2016) ................................ 20, 22

*Sandoval v. M1 Auto Collisions Centers*, 309 F.R.D. 549 (N.D. Cal. 2015) .............. 11, 14, 22, 25

*Staton v. Boeing,* 327 F.3d 938 (9th Cir. 2003)............................................................................. 22

*Strauch v. Computer Scis. Corp.*, 322 F.R.D.157 (D. Conn. 2017) ............................................... 15

*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011)........................................................................ 21

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) .......................................................... 24

*Wal-Mart v. Dukes*, 564 U.S. 338 (2011)........................................................................ 11, 14, 16

*Ward v. United Airlines, Inc.*, 9 Cal. 5th 732 (2020).............................................................. 10, 20

*Wolph v. Acer Am. Corp.*, 272 F.R.D. 477 (N.D. Cal. 2011) ....................................................... 11

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ........................................ 25

**Rules and Statutes**

29 U.S.C. 207 *et seq* ....................................................................................................................... 2

Fed. R. Civ. P. 23............................................................................................................*passim*

29 C.F.R. § 541.200........................................................................................................... 2, 12

29 C.F.R. § 541.201(b) ................................................................................................................. 17

8 C.C.R. § 11040 ..............................................................................................................*passim*

Cal. Bus. Prof. C. § 17200 ............................................................................................................ 21

Cal. Lab. Code §§ 201, 203. .......................................................................................................... 20

Cal. Lab. Code § 226 ..................................................................................................................... 20

Cal. Lab. C §§ 510, 1194, 1198...................................................................................................... 2

**Other**

*Federal Civil Procedure Before Trial,* (Rutter Group 2009) ................................................. 14, 22

7A Wright & Miller, *Federal Practice and Procedure,* § 1777 (2d ed.1986) .............................. 23

Wage Order No. 4–2001................................................................................................................ 12

---

**NOTICE OF MOTION AND MOTION**

Please take notice that on January 7, 2021, at 8:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 12 of the above-captioned Court, Plaintiff Aaron Kudatsky will, and hereby does, move this Court for certification, pursuant to Rule 23 of the Federal Rules of Civil Procedure, of the following class:

> All persons who worked for Defendant as ERP Implementation Consultants, or other positions with similar job duties and/or job titles within the State of California at any time during the four (4) years prior to the filing of this case.

Additionally, Plaintiff seeks certification of a subclass of individuals whose principal place of work was in California as to the wage statement claims. Plaintiff makes this motion on the grounds that the claims meet the requirements of Fed. R. Civ. P. 23(a) (numerosity, commonality, typicality, and adequacy) and 23(b)(3) (predominance and superiority), as set forth in the accompanying brief. This Motion is based on this Notice, the Memorandum of Points and Authorities, supporting evidence filed herewith, the Court's file in this matter, and such other arguments or evidence as may be presented at the hearing on the Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Tyler Technologies ("Tyler") employs hundreds of implementation consultants across the country. Generally, all implementation consultants perform the same type of work for Tyler. Their primary job duty is to "get [Tyler's clients] up and running" with Tyler's software products. (Webster Dep. at 124:10-13.[1]) As one worker explained, this consists of "[t]each[ing] clients how to use the software" and "using the software to give them examples of how to use it." (Void Dep. at 23:2-9.) Because they all perform similar duties, Tyler treats implementation consultants the same for purposes of overtime, without regard to any differences that may exist between them because, as Tyler's own general counsel testified, any differences are immaterial to whether the administrative exemption applies. (Diaz Dep. at 31:1-6.[2])  All implementation consultants are, and have always been, classified as administratively exempt from overtime and paid a salary, in spite of the fact that this is not the first lawsuit filed against Tyler Technologies on behalf of implementation consultants seeking overtime. But implementation consultants' job duties never changed as a result of any of these cases, and Tyler has never considered reclassification. Instead, Tyler has maintained that the position is properly classified. Tyler's position effectively concedes the main point for class certification: that the exemption analysis can be fairly conducted for all implementation consultants at once, making this case is well-suited for class treatment.

This case currently consists of one Named Plaintiff Class Representative and approximately 60 implementation consultants who have opted-in to the conditionally certified Fair Labor Standards Act ("FLSA") collective action (collectively, "Plaintiffs").  They all contend that they have been misclassified, and are actually entitled to overtime premiums under federal and state and law. In addition to pursuing these claims as a collective action, the Named Plaintiff Class Representative also seeks overtime under state law for all implementation consultants who have worked in California. Class certification is appropriate because the fundamental merits question

---

[1] Deposition transcripts are submitted as Exhibits 9 – 18 of the accompanying declaration of Daniel Brome ("Brome Dec."). Chris Webster is the president of the ERP division; he was deposed as a corporate representative.

[2] Abigail Diaz is an in-house attorney who was deposed as a corporate representative.

this Court must answer—whether Tyler has misclassified implementation consultants as exempt from overtime pay under state and federal law—will be answered once for all implementation consultants with common evidence.

Indeed, to show that Tyler cannot prove the elements of its administrative exemption defense,[3] Plaintiffs will rely on the testimony from Tyler's own witnesses, its company documents, and Plaintiffs' testimony, demonstrating that Plaintiffs and the class share the same primary job duty and perform their duties in a substantially similar way, resulting in the same answer to whether the administrative exemption applies to all implementation consultants. *See Deluca v. Farmers Ins. Exch.*, 2018 WL 1981393, at *8 (N.D. Cal. Feb. 27, 2018) (granting class certification and finding commonality and predominance requirements satisfied in administrative exemption misclassification case "as to the issues of whether: (1) their roles were 'directly related' to management policies or business operations; (2) they exercised 'discretion and independent judgment'; and (3) they were primarily engaged in duties that meet the test of the exemption.").

Class certification of Plaintiff's other claims for wage statement and waiting time penalties is also appropriate because they similarly turn on the exemption defense. To explain, if implementation consultants were non-exempt, then their wage statements were defective, and those who have left employment were not paid all wages due at the time and are owed waiting time penalties. Likewise, these claims are predicate violations for—and support certification of— Plaintiff's unfair competition claim.

In short, as explained below, Plaintiff satisfies each element of Rule 23 and their motion should be granted in full.

## II. PROCEDURAL HISTORY

On November 20, 2019, Plaintiff Aaron Kudatsky filed this lawsuit seeking unpaid overtime alleging that Tyler misclassified implementation consultants as overtime exempt in violation of the FLSA, 29 U.S.C. 207 *et seq*. and California law. Cal. Lab. C. §§ 510, 1194, 1198.

---

[3] To satisfy the exemption defense, Tyler must prove, among other things, that implementation consultants' primary duty was "directly related to the management or general business operations" of Tyler or its customers, *and* involved the use of discretion and independent judgment. 29 C.F.R. § 541.200(a); 8 C.C.R. § 11040(1)(A)(2).

(ECF No. 1, Compl.) Plaintiff also seeks waiting time and wage statement penalties. Defendant denies that it misclassified Plaintiffs and other implementation consultants as exempt, and denies that that it owes these employees unpaid overtime compensation or penalties. (ECF No. 17, Answer at ¶¶ 39-46.)

The Parties stipulated to conditional certification under the FLSA on May 13, 2020. (ECF No. 39.) The Court granted the stipulation the same day, and conditionally certified a nationwide group of all current or former ERP implementation consultants who worked for Tyler within the past three years. (ECF No. 40.) During the notice period, the Parties alerted the Court to the fact that the initial notice distribution was incomplete, and stipulated to a schedule for a second notice process. (ECF No. 55.) The Court granted the Parties' joint request for extensions to accommodate this second distribution of notice. (ECF No. 56.) Both notice periods have now closed, and the case currently consists of 59 opt-in Plaintiffs and one Named Plaintiff. (Brome Decl. ¶ 2.)

## III.   STATEMENT OF FACTS

### A.   <u>The Parties</u>

Plaintiff Kudatsky was employed as an implementation consultant from approximately July 2016 to March 2019. (ECF No. 1, Compl. at ¶ 9; ECF No. 17, Answer at ¶ 9.) Plaintiff worked for Tyler's clients in a variety of locations, including Pleasanton and San Ramon, California, as well as remotely from his residences. (ECF No. 1, Compl. at ¶ 10; ECF No. 17, Answer at ¶ 10.) Like other implementation consultants in California (and around the country), Tyler always classified Plaintiff as exempt, and never paid him overtime premiums. (ECF No. 1, Compl. at ¶ 27; ECF No. 17, Answer at ¶ 27.)

Defendant Tyler Technologies provides software solutions primarily to public sector clients. (ECF No. 1, Compl. at ¶ 11; ECF No. 17, Answer at ¶ 11.) Defendant employs implementation consultants to assist its clients. (ECF No. 1, Compl. at ¶ 17; ECF No. 17, Answer at ¶ 17.) Defendant employed Plaintiff Kudatsky and the putative class. (ECF No. 17, Answer at ¶¶ 13, 17.)

Tyler's enterprise division covers several products. When clients purchase these products, they also pay Tyler for implementation work. Most of Tyler's products are large systems, that

would not be usable without implementation work. Munis, the main project in the ERP division, "is the Enterprise Resource Planning software designed specifically for public-sector clients to manage their finances, payroll, utility billing, tax billing, community development departments cities, towns, counties, local authorities, special districts." (Webster Dep. at 68:23-69:3.)

### B.  Implementation Consultants Share the Same Primary Job Duty

Implementation consultant share the same main job duty—to implement Tyler's software products for Tyler's customers. (Webster Dep. at 124:25-125:13 (confirming implementation consultants' "primary duty is to get the client up and running" with Tyler's products; implementation consultants spend "80 to 90 percent" of their time "doing the initial work to get the client up and running"). This is true for implementation consultants in different business units. (*Id*. at 147:25-148:3 (confirming that implementation consultants generally have "the same objective and the same principal duties regardless of what business unit [they are] a part of[.]").) The duties of implementation consultants are consistent throughout the country (*id.* 72:15-18), and have been consistent for the past ten years. (*Id.* at 71:22-72:1.)

Because implementation consultants do the same work, Tyler has historically treated them the same for purposes of overtime eligibility. (Diaz Dep. at 17:8-19 (while Tyler "might have identified differences in some of the functions of implementation consultant roles across the company, those differences did not change the ultimate conclusion as to how that role should be classified from an FLSA perspective").) Tyler reached the same conclusion when considering the position in the context of defending litigation. (*Id.* at 31:1-6 ("to the extent any differences among the implementation consultant roles . . . were identified, they did not impact the overall determination that implementation consultants were properly classified as exempt.").)

### i.  *Implementation Consultants Operate Under Similar Reporting and Pay Structures and are Assigned Work in a Similar Manner*

Implementation consultants also share very similar reporting structures and pay structures. All ERP implementation consultants are assigned to geographic territories. (Webster Dep. at 64:1-11.) Implementation consultants are supervised directly by project managers, who in turn are supervised by an implementation team lead, an implementation manager, or an implementation

director, depending on the specific team. (*Id.* at 66:24-67:14.)

Implementation consultants are paid a base salary plus incentives. (*Id.* at 127:11-13.) Tyler generally issues new incentive plans each year, but they do not change significantly, and all implementation consultants working on a given product team are covered by the year's specific pay plan. (*Id.* at 151:21-152:3; 130:24-131:20.)

Tyler's sales department works with new clients through the point of signing a contract with Tyler. (Webster Dep. at 43:15-44:4.) There are no implementation consultants in the sales department. (*Id.*) Once a contract is signed, the client moves to implementation. (*Id.* at 44:5-7.) The contract will specify how many days of implementation consultants work are included, and how much the client pays for those days. (*Id.* at 31:15-24.) Those terms are based on a price book set by sales and executive management. (*Id.*) After the contract is signed, implementation consultants are assigned to a client by their project manager. (Webster Dep. at 101:4-7.)

### ii. Tyler Expects all Implementation Consultants to Perform the Same Steps in an Implementation

Implementations generally involve six phases: (1) a fundamentals review, (2) analysis, (3) setup and configuration, (4) testing, (5) training, and (6) go-live. (*E.g.*, Choquette Dep. at 36:19-24.) Tyler instructed implementation consultants to present the fundamentals review "so the client can have an understanding of what the [Tyler] system looks like," since it was often "their first time seeing the Munis software." (Kudatsky Dep.at 77:22-78:9.) For the fundamentals review, Tyler provides specific examples for the implementation consultant to demonstrate, including scripts to follow. (Webster Dep. at 76:4-16.) These scripts are quite detailed, ███████████ ████████████████████████████████████████████████. (Brome Dec. Ex. 1 (sample script); Kudatsky Dep. at 72:1-19 ("those scripts were very detailed. . . the script would specify what account number to use, what vendor to use, so it was very specific."); Roth Dep. at 34:2-10; Void Dep. at 31:3-20.)

After the fundamentals review, the next phase is referred to as "analysis," or "present state/ future state." During this phase, the implementation consultant is gathering information from the client, using forms provided by Tyler. (Webster Dep. at 102:15-21.) Generally, clients are sent

1    questionnaires to fill out on their own, even before the implementation consultants are involved,

2    describing their current procedures (the "present state"). (Kudatsky Dep. at 88:9-89:5; Choquette

3    Dep. at 57:15-18.) To the extent the client did not complete the questionnaire, the implementation

4    consultant would help them understand it and complete it. (Kudatsky Dep. at 97:17-25.) The

5    implementation consultants do not decide what information to collect in this phase; rather, they are

6    required by Tyler to collect specific information. As Mr. Webster testified, it "could be pretty

7    detrimental to the overall project [if the implementation consults] fail to collect certain required

8    information[.]" (Webster Dep. at 104:14-24.)

9         After getting the client's answers describing their present state, implementation consultants

10   use another document for the future state, which is set up "to populate settings based on their

11   answers." (Void Dep. at 38:11-18.) During this phase, implementation consultants may provide

12   factual information about how the program works, but they are not deciding what the client should

13   do. (Kudatsky Dep. at 90:7-91:14; Void Dep. at 43:3-44:24.)

14        The information collected in the analysis phase is then used in the configuration stage to

15   set up the Tyler product for the individual client. Based on that information, the implementation

16   consultant works through the setup screens and checks the appropriate boxes and toggle switches.

17   (Kudatsky Dep. at 123:2-13.) Implementation consultants have a limited role: they customize, but

18   do not code, the Tyler product. (Webster Dep. at 105:18-106:4.) Tyler has conversion engineers

19   for the actual data conversion, who "write a conversion program to take the raw data from the

20   legacy system to then map that into the tables that would be needed to be populated for the [Tyler

21   product]." (Webster Dep. at 108:16-23.) Here again, the implementation consultant's role was to

22   answer questions about the Tyler product, but the client always made the decisions about how to

23   configure the product. (Kudatsky Dep. at 53:9-14; Choquette Dep. at 75:1-4; 78:10-13.)

24        After configuration comes testing, to make sure that everything works. As Mr. Kudatsky

25   explained, the implementation consultants are "making sure that every single program opens, that

26   all of the buttons work right[.]" (Kudatsky Dep. at 129:6-22.) The implementation consultants may

27   or may not understand why certain functions work or do not work; they are simply clicking

28   through to check whether they work. (*Id.*) Here again, Tyler specifies what components

1  implementation consultants need to test. (*Id.* at 129:23-130:18; Choquette Dep. at 43:8-19 (went

2  through "each of the processes that we configured the business rules for. So one day we would go

3  through the purchase orders, setting – entering a purchase order and releasing it and posting it and

4  did it go to the proper approvals, the people it was supposed to.").)

5      Next, implementation consultants conduct training for Tyler's clients. Implementation

6  consultants follow an agenda provided to them by their project managers during the training phase.

7  (Choquette Dep. at 69:19-70:9; Roth Dep. at 65:2-16; Costner Dep. at 73:23-74:23; Void Dep. at

8  61:3-18.) Tyler also provides lesson plans that are available for implementation consultants.

9  (Webster Dep. at 110:21-24.) Implementation consultants are expected to check whether the client

10  is grasping the material; if they are not, the implementation consultant may propose additional

11  training to the client or the project manager. Ultimately, however, the client makes the call

12  whether to proceed to go-live. (Costner Dep. at 75:18-77:13.)

13      The last phase of the implementation is referred to as "go-live," when "everything is

14  complete and the client flips the light switch and says we are no longer using our old system,

15  we're using our new system." (Kudatsky Dep. at 150:6-10.) During this final phase, the

16  implementation consultant's role is essentially helping to handle any problems that crop up, since

17  the client has not yet been transitioned to Tyler's support team. (Void Dep. at 71:17-72:2.) Typical

18  errors found during go-live are connected to roles (meaning users' permissions) or workflows

19  (meaning required approvals) within the system. (*Id.* at 71:17-72:2 and 74:4-11.) Go-live is the

20  end of the implementation consultant's work on a project; after that point, the implementation

21  consultant generally has no further involvement. (*E.g.*, Wright Dep. at 36:6-13.)

22
23              ***iii. Some Implementation Consultants Spend Small Amounts of Time on Secondary Duties***

24      There should be no serious dispute that implementing Tyler's software products is the

25  primary duty of all implementation consultants. The record is clear that other duties take up a very

26  small portion of implementation consultants' time. For example, implementation consultants might

27  be called in to help with a prospective client before a contract is signed; Mr. Webster estimates

28  there might be two or three instances of this presale work per year. (Webster Dep. at 74:8-75:8.)

Some senior implementation consultants have had other roles, formal or informal, but those take up a small portion of their overall time. (Costner Dep. at 103:4-104:5 (three hours per week or less mentoring) and 26:14-24 (one day per month updating internal documents); Edinger Dep. at 42:23-43:5 (senior duties, including preparation of templates and peer training, took up ten to fifteen percent of overall work time); Void Dep. at 15:2-19 (involved in creating guides monthly).)

### iv.  All Implementation Consultants Play the Same Role in Tyler's Business

Implementation consultants are revenue generating employees at Tyler. (Webster Dep. at 29:12-14.) Tyler charges its clients for the implementation consultants' time on the client's project. (*Id.* at 29:16-21.) When a client agrees to purchase Tyler's software, the contract provides the rates (*id.* at 29:22-25) and amounts (*id.* at 30:24-31:2) of implementation consultant work. In other words, the more hours of implementation consultant work on a given project, the more Tyler can charge that client. Implementation consultants do not set how much of their time a client can receive (*id.* at 31:3-5), or what rate the client pays for their services (*id.* at 31:1-5); they provide the services they are instructed to provide under the terms of the contract between Tyler and its client. Tyler tracks implementation consultants' billable days, ███████████████████████ ████████████████████████████████████████████████████████. (Webster Dep. at 135:1-3; Brome Dec. Ex. 2.)

On an implementation project, the project manager—not the implementation consultant— is responsible for working with the client to set the "project phasing, the project schedule, [. . .] the scope, . . . all those various implementation project-related documents that will control and guide the overall implementation." (Webster Dep. at 82:18-83:1.) Implementation consultants cannot modify those project plans themselves, they need to go through the project manager. (Roth Dep. at 82:6-17.) On a project, Tyler treats implementation consultants as somewhat fungible—throughout an implementation Tyler can and does "interchange" them. (Webster Dep. at 149:10-18.)

### iv.  Tyler's Policies and Procedures Uniformly Constrain Implementation Consultants' Discretion

Implementation consultants are expected to follow the plan laid out for them in an implementation. The "project plan pretty much has everything listed out in the order it should go.

And there are agendas for each day that we should follow." (Void Dep. at 51:21-52:8.) Implementation consultants have to provide thorough, factual information about the progress to the project manager. (Webster Dep. at 85:4-12; Roth Dep. at 86:12-87:13.) The implementation consultants are responsible for informing the project manager about the progress, but they do not have authority to change the schedule; even small changes need project manager approval. (Roth Dep. at 82:6-17; Void Dep. at 37:10-22.) Other simple acts also need approval, such as if an implementation consultant wanted to use a PowerPoint presentation for a training. (Void Dep. at 62:11-63:14.) If a client is not happy with Tyler's service, Tyler can provide free additional days of implementation consultant work, but the implementation consultants do not have authority to do that—only project managers or implementation directors do. (Webster Dep. at 107:16-108:15.)

Similarly, Tyler provides forms, questionnaires, scripts, and lesson plans, standardizing the implementation process and avoiding inconsistent results. (Choquette Dep. at 39:16-40:3 (asked scripted questions to "fill in . . . the spreadsheet provided by Tyler.") In one ███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████. Brome Dec. Ex. 1 at Tyler 007462 ("████████████████████ ████████████████████████████████████████████████").) Tyler's training documents ████████████████████████████████████████████████████████████████████████████ █████. (Brome Dec. Ex. 3.) Tyler ████████████████████████████████████████████ ███████. (Brome Dec. Ex. 4, 5.) These documents allow Tyler to define exactly how much discretion implementation consultants have, and are provided to all implementation consultants so Tyler can uniformly dictate the level of discretion for all its implementation consultants.

In the actual implementation, implementation consultants do not have discretion to set up the Tyler product however they want. Instead, any choice about different configuration options ultimately lies with the client. (Roth Dep. at 46:18-47:4; Void Dep. at 44:1-45:3; Costner Dep. at 49:25-50:14; Kudatsky Dep. at 53:9-14.)

**C. Defendant Classifies Implementation Consultants As Exempt Administrative Employees and Does Not Track Their Hours**

Implementation consultants routinely work over forty hours per week. (*E.g.*, Kudatsky

Dep. at 178:11-16.) But they are paid a salary and denied overtime compensation for all hours worked over forty and for all hours worked over eight hours a day. Instead, implementation consultants have always been classified as administratively exempt, and are never paid overtime premiums. (ECF No. 1, Compl. at ¶ 27; ECF No. 17, Ans. at ¶ 27.) Accordingly, Tyler does not have records of exactly how many hours implementation consultants worked. (Webster Dep. at 138:2-25.) While implementation consultants track their billable hours, those do not necessarily reflect their exact hours. (*Id.*) Therefore, the implementation consultants themselves are in the best position to know how many hours they worked. (*Id.* 140:17–20.)

### D.  Tyler's Records Show the Class Size

When they are not traveling to the client's location and working on site, some implementation consultants work out of Tyler's office, but most work remotely from their homes. According to Tyler's records, 27 ERP implementation consultants had a home address in California during the four years before this action's filing, and more than 200 other implementation consultants traveled into California to perform work. (Brome Dec. ¶¶ 3-4.)

## IV.   ARGUMENT

Plaintiffs seek certification of the following class for the unfair competition, overtime, and waiting time claims:

> All persons who worked for Defendant as ERP Implementation Consultants,[4] or other positions with similar job duties and/or job titles within the State of California at any time during the four (4) years prior to the filing of this case.

The wage statement claims are limited to the subclass of individuals whose principal place of work was in California.[5] District courts have "broad discretion" to determine whether a class should be certified. *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001). "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen v. Connecticut*

---

[4] "ERP," or "Enterprise Resource Planning" is both a standard industry term for a type of software, and a division within Tyler. Tyler also employs implementation consultants outside of its ERP division, but Plaintiff limits this Motion to ERP implementation consultants. The Parties' stipulation for conditional certification was likewise limited to ERP implementation consultants.

[5] *See Ward v. United Airlines, Inc.*, 9 Cal. 5th 732, 760-61 (2020) ("if the employee's principal place of work is in California. This test is satisfied if the employee works a majority of the time in California or, for interstate transportation workers whose work is not primarily performed in any single state, if the worker has his or her base of work operations in California.").

*Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Moreover, "[a]ny doubts regarding the propriety of class certification generally should be resolved in favor of certification." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 481 (N.D. Cal. 2011) (citing *Gonzalez v. Arrow Fin. Servs., LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007)).

A court may certify a class if the moving party satisfies the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure. The Court must conduct a rigorous analysis of the requirements that apply under Rule 23. *Wal-Mart v. Dukes,* 564 U.S. 338, 351 (2011). Rule 23(a) provides "[o]ne or more members of a class may sue . . . as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative party will fairly and adequately protect the class's interests." Fed. R. Civ. P. 23(a); *Sandoval v. M1 Auto Collisions Centers*, 309 F.R.D. 549, 559 (N.D. Cal. 2015). In addition to these factors, the class must satisfy one of the Rule 23(b) class requirements. Fed. R. Civ. P. 23. Both Rule 23(a) and Rule 23(b)(3) are satisfied here.

## A. <u>Tyler Asserts the Same Exemption Defense as to All Implementation Consultants.</u>

To avoid liability, Tyler must prove its administrative exemption defense, which it claims uniformly applies to all implementation consultants. Tyler bears the burden of proof, and the exemption is narrowly construed against Tyler. *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785, 794 (1999).[6] Tyler must prove that employees' "duties and responsibilities involve . . . the performance of office or non-manual work directly related to the management or general business operations of his/her employer or his employer's customers." 8 C.C.R. § 11040(1)(A)(2)(a)(I). Additionally, the employees must "customarily and regularly exercise discretion and independent

---

[6] While exemptions are no longer narrowly construed under the FLSA, *see Encino Motorcars, LLC v. Navarro*, — U.S. —, 138 S. Ct. 1134, 1142 (2018), this standard has not changed under California law. *See Ortiz v. Amazon.com LLC*, 389 F. Supp. 3d 728, 734 (N.D. Cal. 2019).

judgment, and "perform[ ] under only general supervision work along specialized or technical lines requiring special training" or "execute [ ] under only general supervision special assignments and tasks." *Ambrosia v. Cogent Commc'ns, Inc.*, 312 F.R.D. 544, 553 (N.D. Cal. 2016). Finally, to meet the exemption, the employer must show that employees are "primarily engaged" in exempt work, meaning the workers are "engaged in the activities meeting the test for the exemption at least 50 percent of the time." *Id.* (citing *Eicher v. Advanced Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363, 1371–72 (2007) (quoting Wage Order No. 4–2001)).[7]

"Work qualifies as 'administrative' when it is '*directly related*' to management policies or general business operations." *Harris v. Superior Court*, 53 Cal. 4th 170, 181 (2011) (emphasis in original).) The work "must be *qualitatively* administrative," to be exempt: "work done by 'white collar' employees engaged in servicing a business. Such servicing may include advising management, planning, negotiating, and representing the company." *Id.* at 181–82.

Three Ninth Circuit decisions illustrate why common evidence will show the implementation consultants here do not meet this prong. First, in *Bratt*, the court considered probation officers whose primary duty was to investigate "adult offenders or juvenile detainees and *advise the court* on their proper sentence or disposition within the system." *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066, 1069 (9th Cir. 1990) (emphasis added). The officers' recommendations were used "either to aid in sentencing an adult offender or to determine whether and how to detain a minor who has been arrested." *Id.* at 1069. The court held that the investigators were not administrative, because they are carrying out the day-to-day operations, not running the business. *Id.* at 1067–70. Next, the court reversed summary judgement for an employer as to a field service engineer spent most of his time at, and was the main contact for, one of his employer's largest clients. *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1123 (9th Cir. 2002). The court recognized the plaintiff could be exempt if, for example, he "*not only implemented*, but also developed . . . policy for Phase Metrics;" however, if his role was instead to meet with customers, identify a

---

[7] The administrative exemption under federal law contains the same requirements: an exempt worker's primary duty must be directly related to management or general business operations, and entail discretion and independent judgment. 29 C.F.R. § 541.200. However, the California exemption is tied to the 2004 version of the regulations, and includes an objective requirement that 50 percent of work be spent on exempt duties. *Eicher*, 151 Cal. App. 4th at 1371–72.

1   problem, diagnose a malfunction, formulate a workplan, and carry out repairs, then he was not

2   running the business itself, and therefore not exempt. *Id.* at 1128. Most recently, the Ninth Circuit

3   confirmed the essence of the administrative exemption is "not whether an employee is essential to

4   the business, but rather whether her primary duty goes to the heart of internal administration—

5   rather than marketplace offerings." *McKeen-Chaplin v. Provident Savings Bank, FSB*, 862 F.3d

6   847, 855 (9th Cir. 2017). This prong is inherently suited for class treatment, since the key issue is

7   the nature of the business, and implementation consultants' role within it.

8          As to the "discretion and independent judgment" prong of the administrative exemption,

9   the fundamental role of Tyler's implementation consultants does not entail exercising discretion.

10  *See Deluca v. Farmers*, 386 F. Supp. 3d 1235, 1260-61 (N.D. Cal. 2019) ("*Deluca II*")

11  (recognizing that even though special investigators were afforded discretion in how they conduct

12  the investigations, that does not amount to exempt discretion). Tyler constrains discretion for *all*

13  implementation consultants, through its detailed written materials and the instruction that all major

14  decisions sit with the project manager or the client, not with the implementation consultant.

15         Tyler cannot satisfy either the "management or general business operations" prong or the

16  "discretion and independent judgment" prong. Of course, at this stage the Court need not rule on

17  the merits of Tyler's defense, but only whether the exemption is susceptible to class-wide

18  resolution. Because implementation consultants perform the same tasks, and fulfill the same role

19  in Tyler's business, these questions are suitable to class-wide answer. *See Errickson v. Paychex,*

20  *Inc.*, 447 F. Supp. 3d 14, 21 (W.D.N.Y. 2020) ("Paychex does not contest that Implementation

21  Coordinators all perform the same work."). Plaintiffs contend both prongs can be resolved on

22  class-wide basis, but certification is appropriate if either of the contested prongs can be resolved

23  for the group, since a ruling for Plaintiffs on just one prong would defeat the exemption entirely.

24  *McKeen-Chaplin*, 862 F.3d at 849 n. 1 (administrative exemption is conjunctive).

25         **B.  Plaintiffs Satisfy The Rule 23(a) Elements**

26              ***i.    The Class is so Numerous that Joinder of all Members is Impracticable***

27         The first Rule 23(a) requirement is that the class be "so numerous that joinder of

28  all members individually is impracticable." When evaluating numerosity, courts should consider

the number of class members, whether their identities are known, the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive relief is sought. *See Sandoval*, 309 F.R.D. at 561-62 (citing William W. Schwarzer, et al., *Federal Civil Procedure Before Trial,* §§ 10:260–10:264 (Rutter Group 2009)). No specific numerical threshold is required. *See id*. at 562.

Numerosity is satisfied here. Based on Tyler's records, there are more than 27 implementation consultants who lived in California, and more than 200 implementation consultants who traveled into California during the relevant time period. (Brome Dec. ¶¶ 3-4.)

### ii.  *Questions of Law and Fact are Common to All Members of the Proposed Classes will Drive Resolution of Plaintiff's Claims*

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." "This standard is not strictly construed." *Gray v. Golden Gate Nat. Recreational Area*, 279 F.R.D. 501, 508 (N.D. Cal. 2011). "Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* (quoting *Hanlon v. Chrysler,* 150 F.3d 1011, 1019 (9th Cir. 1998)).

Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. *Wal-Mart*, 564 U.S. at 351. "This does not mean merely that they have all suffered a violation of the same provision of law," but instead that their claims "depend upon a common contention . . . of such a nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Even a single common question may suffice, "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original) (internal quotation omitted).

"In the wage and hour context, the inquiry is whether the entire class was injured by the same allegedly unlawful wage and hour practice." *Millan v. Cascade Water Servs., Inc.*, 310

---

F.R.D. 593, 603-04 (E.D. Cal. 2015). As the California Supreme Court recognized, "[c]laims alleging that a uniform policy consistently applied to a group of employees in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1033 (2010). Classwide liability for misclassification may be established "if it is shown that the employer had a consistently applied policy or uniform job requirements and expectations contrary to a Labor Code exemption, or if it knowingly encouraged a uniform de facto practice inconsistent with the exemption." *Duran v. U.S. Bank Nat. Assn.*, 59 Cal. 4th 1, 37 (2014). Courts routinely find the commonality requirement of Rule 23(a) supports granting certification where plaintiffs' claims are based on an asserted misclassification that is applied to all putative class members. *See, e.g.*, *Deluca*, 2018 WL 1981393, at *8 (class certification warranted where a group of workers have the same main duty since "the focus of the exemption analysis" is on the primary duty. "Any unique or secondary activities that individual special investigators undertake on a given day do not affect the common question of whether their primary duty satisfies the 'directly related' prong."); *Strauch v. Computer Scis. Corp.*, 322 F.R.D.157, 180-85 (D. Conn. 2017) (finding commonality satisfied for two groups of systems administrators, where "most . . . disavowed that they coordinated or oversaw or managed" certain tasks, but not for the more senior group of SAs where some did coordinate those tasks); *Ambrosia*, 312 F.R.D. at 553–54 (commonality satisfied in misclassification case even though defendant asserted that workers performed individualized duties, where all class members sell data services, were covered by the same job description, and paid under the same compensation plan); *Martino v. Ecolab, Inc.*, 2016 WL 614477, at *10 (N.D. Cal. Feb. 16, 2016) (commonality satisfied where employer had uniform exemption policy and plaintiffs performed similar job duties); *Martinez v. Joe's Crab Shack Holdings*, 231 Cal. App. 4th 362 (2014), *review denied* (Feb. 11, 2015) (employees' theory of liability stemming from misclassification presented common question supporting class treatment); *Jaimez v. DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1301 (2010) (finding legal and factual questions in misclassification-based overtime claim were common). Here, numerous common questions concerning all of Plaintiff's claims show why class treatment is appropriate.

a.   <u>Plaintiff's Overtime Claims Are Common to the Class</u>

To prevail on the overtime claim, Plaintiffs must show that they worked overtime (over 40 hours in a week or over 8 hours in a day) and were not paid overtime premiums. Tyler admits it does not pay implementation consultants overtime, asserting it properly classified implementation consultants as exempt administrative employees. Tyler agrees that implementation consultants can work over 40 hours in a week, and do not receive overtime premiums. (Webster Dep. at 141:12-14.) Therefore, unless Tyler can satisfy the affirmative defense of showing that implementation consultants are exempt, Plaintiffs will be entitled to unpaid overtime wages.

The applicability of the administrative exemption is the sort of common question where a class-wide proceeding can "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. 338, 351; *see also Deluca*, 2018 WL 1981393, at *8 (even if some individuals perform "unique or secondary activities," class certification is still appropriate since the focus of the exemption analysis is on the workers' primary duty). Whether implementation consultants' primary duty is "directly related to management policies or general business operations" of Tyler or its customers (8 C.C.R. § 11040(1)(A)(2)(a)(i)) presents common questions of fact (what is the primary duty?) and law (does that duty satisfy the exemption?). Similarly, whether implementing Tyler's software consistent with Tyler's policies entails exercising discretion and independent judgment can (and will) be decided in one stroke.

b.   <u>Whether implementation consultants' primary duty is to implement Tyler's software products is a common fact question</u>

Because the exemption defense focuses on workers' primary duty, the merits inquiry will first require this Court to confirm the obvious proposition that implementation consultants' main duty is to implement. *See Deluca II*, 386 F. Supp. 3d at 1251-53 (exemption begins with examining the workers' primary duty). Here, common evidence will show that implementation consultants' primary duty is to implement Tyler's products. Tyler's exemption defense, therefore, can and will be decided on a class-wide basis in one stroke. Undoubtedly, implementing Tyler's software is not the *only* thing implementation consultants do, but it is the main duty. Common evidence will show that other duties are secondary, and represent minimal amounts of work time.

1    (*See, e.g.*, Webster Dep. at 74:8-75:8 (two or three instances of this presale work per year).)

2                         c.   Whether implementing software is directly related to management is a
3                              common legal question

4        At the merits stage, to satisfy the administrative exemption, Tyler must prove its

5    implementation consultants' primary duty "is the performance of office or non-manual work

6    directly related to the management policies or general business operations of the employer or the

7    employer's customers." 8 C.C.R. § 11040(1)(A)(2)(a)(i). There is no legitimate dispute that this

8    question is common to all implementation consultants. (Diaz Dep. at 31:1-6.) Where a group of

9    allegedly misclassified workers share a common role within an organization, this prong of the

10   exemption often supports class treatment. *See Deluca*, 2018 WL 1981393, at *8 ("the issues of

11   primary duty and whether the primary meets the 'directly related' test are subject to proof by

12   common evidence and a determination of whether these elements of the administrative exemption

13   are met will likely decide the issue for the entire proposed class.").

14       The essence of the administrative exemption is "not whether an employee is essential to the

15   business, but rather whether her primary duty goes to the heart of internal administration—rather

16   than marketplace offerings." *McKeen-Chaplin*, 862 F.3d 847, 855. Plaintiffs will show that all

17   implementation consultants perform the same primary job duties, so the exemption will rise or fall

18   for the group: whether their work goes to Tyler's "marketplace offerings" does not depend on

19   what a given implementation consultants did on a particular day. [8] Implementation consultants are

20   not formulating policy or setting Tyler's strategic course. Instead, Tyler is clear that the

21   implementation consultant role is a "revenue-generating position." (Webster Dep. at 29:12-14.)

22   Tyler charges its clients for the implementation consultants' time connected to the client's project.

23   (*Id.* at 29:16-21.) When a client agrees to purchase Tyler's software, the contract provides the rates

24   and amounts of implementation consultant work. (*Id.* at 29:22-25; 30:24-31:2.) By Tyler's own

25   admission, therefore, implementation work is one of its marketplace offerings. (Webster Dep. at

26   24:18-25:2; 29:7-21.)

27   _____

28   [8] Tyler's corporate representative was clear that implementation consultants do not perform the
     administrative duties listed in 29 C.F.R. § 541.201(b) (such as tax, finance, accounting, etc.).
     (Webster Dep. 34:17–36:14.)

This prong will be resolved for all implementation consultants, since they fill the same role within Tyler's business. *McKeen-Chaplin*, 862 F.3d at 855 (exemption analysis must consider employees' role in the business, and mortgage underwriters are not administrative, rather, "their tasks are related to the production side of the enterprise."); *Bratt*, 912 F.2d at 1067-70 (Ninth Circuit concluding that investigators who advise courts about adult and juvenile offenders' sentencing are not administrative, because they carry out the day-to-day operations); *Deluca II*, 386 F. Supp. 3d at 1256-57 (special investigators at insurance company do not satisfy the "directly related" prong; the fact that their work is "relied upon by administratively exempt employees does not make the investigators administratively exempt as well."). This point applies here as well—even though Tyler's clients may use Tyler's products for administrative purposes, the implementation consultants' primary duty is not administration, it is simply setting up the client with their new software. (Webster Dep. at 125:10-13 (agreeing that "their primary duty is to get the client up and running, not using the product for managing the client's general business").)

Further, Plaintiffs contend that the exemption can be defeated—and therefore liability established—for the class on this first prong alone without analyzing the remaining factors of the administrative exemption. *See Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009) (administrative exemption did not apply to mortgage underwriters because their work was "primarily functional rather than conceptual."). The crucial questions of fact (what implementation consultants did) and law (whether that job meets the exemption) are common to the class, making certification appropriate.

> d. Whether implementation consultants exercise discretion and independent judgment as part of their primary duty is a common question

Common evidence confirms that implementation consultants all had the same primary duty that does not include the exercise of meaningful discretion. While Tyler will no doubt emphasize that implementation consultants work independently, their actual discretion is closely constrained. (*E.g.*, Sinclair Dep. 62:22-63:5 (examples of using her judgment include "I had the discretion to pick which screenshot or put a page break where something belonged" in a training manual).) Moreover, having some autonomy in day-to-day activities does not mean their discretion is legally

significant. *Deluca II*, 386 F. Supp. 3d at 1260-61 (recognizing that the plaintiffs "act independently in planning and carrying out their investigations," but finding that this did not satisfy the exemption). Importantly, it is undisputed that implementation consultants' job is not to advise clients about how to run their governments. Testimony from implementation consultants confirms that Tyler's policies clearly limit how implementation consultants did their work, and that all decisions in configuring the product ultimately sat with the client. (Roth Dep. at 46:18-47:4; Void Dep. at 44:1-45:3; Costner Dep. at 49:25-50:14; Kudatsky Dep. at 53:9-14.)

Tyler will likely argue that implementation consultants must exercise discretion in certain areas, including: (1) guiding a client during configuration if there are multiple ways to achieve a desired outcome using the software; and (2) making informal recommendations if a client appears to not be grasping the material during training. But, these examples show why class certification is appropriate here.

First, to the extent these tasks did entail discretion, the merits stage exemption analysis will still be performed at the group level, since Tyler appears to contend that *all* implementation consultants could do these tasks. For example, Mr. Webster testified that implementation consultants "assist[] our clients in making decisions around . . . configuring the software, the options that they have in terms of configuring the software, the pros and cons of the various options that they have. . . ." (Webster Dep. at 21:8-17.)

Second, these tasks were not part of implementation consultants' primary duty, so they are not significant to the exemption analysis. As the Opt-in Plaintiffs have explained, their role in configuring Tyler's products is to answer client questions so *the client* can make the best decisions—not to push for a specific approach. (Kudatsky Dep. at 97:1-16; Void Dep. at 43:19-45:16; Costner Dep. at 53:15-20; Roth Dep. at 111:13-112:17.) Even those implementation consultants who make recommendations in the future-state phase do so in the context of explaining how they have seen Tyler's products work effectively, and always leave the decisions up to the client. (Costner Dep. at 51:5-53:20; Roth Dep. 46:18-47:4.) Likewise, while the implementation consultant may think a client is not picking up the material, they have limited ability to prevent them from going forward. (Costner Dep. at 76:2-24 ("if they [say they are

1   ready], I can't push the issue. They are the ones making the call."); Roth Dep. 81:3-82:17 (any

2   changes to the go-live date would be up to project manager, not implementation consultant.) The

3   evidence will show that these tasks were not primary duties.

4                   e.   Plaintiff's Waiting Time Penalty Claims Are Common to the Class

5           There are common questions with respect to Plaintiff's claim for Tyler's failure to timely

6   pay wages due. California law provides that an employer must pay an employee all wages due at

7   the time of termination, or with 72 hours of an employee's resignation. Cal. Lab. Code §§ 201,

8   203. Employers who willfully fail to do so are subject to penalties. Cal. Lab. Code § 203. The

9   parties agree that Tyler did not pay any overtime wages to all its implementation consultants

10  because it uniformly classified them as exempt. Therefore, if Plaintiff and the class prevail on their

11  overtime claim, the only merits question on this claim will be whether Tyler "willfully" failed to

12  pay the wages which were due. This is a common question that will be resolved for the entire

13  class.  *See Deluca*, 2018 WL 1981393, at *11 (commonality and predominance requirements

14  satisfied for waiting time, wage statement and UCL claims because they were derivative of

15  certified overtime claim); *Saechao v. Landry's Inc*, 2016 WL 1029479, at *8 (N.D. Cal. Mar. 15,

16  2016 (commonality satisfied for derivative waiting time claims where no employee received any

17  premium wages upon termination or after quitting).

18                  f.   Plaintiff's Itemized Wage Statement Claims Are Common to the Subclass

19          There are also common questions with respect to Plaintiff's wage statement claims.

20  California law obligates employers to include certain information on wage statements, including

21  the hours worked. Cal. Lab. Code § 226(a)(2). Employees suffer injury when an employer fails to

22  include the hours worked on wage statements. Cal. Lab. Code § 226(e)(2)(B)(ii). As the California

23  Supreme Court recently explained in *Ward*, § 226 protects an employee if her "principal place of

24  work is in California. This test is satisfied if the employee works a majority of the time in

25  California or, for interstate transportation workers whose work is not primarily performed in any

26  single state, if the worker has his or her base of work operations in California." 9 Cal. 5th at 760-

27  61. Tyler's records of employee residence, as well as records showing company travel and billable

28

hours by project, will show exactly which implementation consultants fit this test.[9] Tyler admits that it did not track its implementation consultants' hours worked. (Webster Dep. at 139:1-15.) Accordingly, Tyler did not (and could not) include this information on any employees' paystubs, so there are common questions with respect to Plaintiff's wage statement claim which supports certification. *Clemens v. Hair Club for Men, LLC*, 2016 WL 1461944, at *8 (N.D. Cal. Apr. 14, 2016) (commonality satisfied for plaintiffs' wage statement claims where liability would be determined based on a common form of proof, namely, defendants' uniform wage statements); *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 521 (C.D. Cal. 2011) (commonality existed because whether wage statements that failed to include the hourly rate paid and the inclusive dates of the pay period were unlawful raised a common question of fact and law:).

### g.  Plaintiff's Unfair Competition Claims Are Common to the Class

Class certification is appropriate on Plaintiff's unfair competition claim, since the failure to pay wages due, under the FLSA or California law, gives rise to liability under the UCL. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1208 (2011); Cal. Bus. Prof. C. § 17200. The entire proposed class worked in California; therefore, Tyler's failure to pay overtime under the California Labor Code also gives rise to liability under the UCL. *See Sullivan*, 51 Cal. 4th at 1208. The Court should certify Plaintiff's UCL claims and apply a four-year class period for Plaintiff's overtime claims. *See*, *e.g.*, *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735–36 (9th Cir. 2007).

### iii.  Claims of the Representative Plaintiffs are Typical of the Class

The requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted). Although the claims of the purported class

---

[9] For example, Plaintiff Kudatsky sometimes stayed in San Francisco; he also performed "a substantial amount of work in San Ramon, California," and he notified Tyler when he was working from the San Francisco residence. Kudatsky Dep. at 185:6-186:12. Tyler's records show at least two examples of months in which the majority of Mr. Kudatsky's recorded work days were in California. (Brome Dec. ¶ 5.)

representative need not be identical to the claims of other class members, the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982). "That injuries may differ in amount does not defeat typicality." *Sandoval*, 309 F.R.D. at 568 (citing William W. Schwarzer, et al., *Federal Civil Procedure Before Trial,* § 10:293 (Rutter Group 2009) (a plaintiff's claims may be typical although other members of the class suffered less or more injury).

Here, Plaintiff's claims are typical of those of the class members. Plaintiff, like other implementation consultants, was injured by Tyler's failure to pay overtime—the injury happened to all because Tyler refused to pay overtime to all implementation consultants. Indeed, Tyler asserts the same defense to all class members overtime claims—the administrative exemption. Plaintiff's other California claims are typical. Class members have the same or similar injury arising from Tyler's failure to provide accurate wage statements and failure to pay final wages at termination.

### iv. The Representative Plaintiff and Class Counsel are Adequate Representatives

Finally, Rule 23(a) mandates adequacy of representation. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor,* 521 U.S. 591, 625–26 (1997). Representation is adequate if the class representative and counsel: (1) do not have conflicts of interest with other class members; and (2) will prosecute the action vigorously on behalf of the class. *See Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003). A class representative must also suffer the same injury as the class members and be part of the class. *Amchem,* 521 U.S. at 626 (quotation omitted).

Here, Plaintiff satisfies all aspects of the adequacy analysis. There are no conflicts between Plaintiff and the class; Plaintiff does not have any criminal convictions, or a prior history of litigiousness. (Kudatsky Dec. ¶¶ 2-5.) Plaintiff was an implementation consultant, like the class members. Plaintiff has responded to written discovery, appeared for deposition, and has been in frequent contact with counsel. (Brome Dec. ¶ 6.) Plaintiff Kudatsky is an adequate representative. *See Saechao*, 2016 WL 1029479, at *10 (concluding adequacy requirement met despite

1    defendant's attacks on plaintiff's credibility); *Clemens*, 2016 WL 1461944, at *3 (adequacy

2    satisfied where plaintiff pursued the action diligently and zealously and there did not appear to be

3    any conflicts of interest).

4          Plaintiff's counsel is also adequate. Plaintiff's counsel does not have any conflicts with the

5    class, and is well-qualified to represent the proposed class. As outlined in Plaintiff's Counsel's

6    firm resume, Nichols Kaster has been practicing law for over 30 years and is qualified,

7    experienced, and able to conduct this litigation on behalf of the proposed class. (Brome Decl. Ex.

8    6.) The firm has litigated, tried and argued class and collective wage and hour cases across the

9    country, including at the United States Supreme Court. (*Id*.) Plaintiff's counsel has represented

10   workers in other cases alleging misclassification based on the administrative exemption. Here,

11   Plaintiff's counsel has actively and vigorously pursued the claims of the Plaintiff and putative

12   class members in this case, obtaining a stipulation for conditional certification, working diligently

13   in taking depositions of Defendant's executives, defending plaintiff depositions, and conducting

14   written discovery. For these reasons, the Court should not hesitate to appoint Nichols Kaster as

15   class counsel pursuant to Fed. R. Civ. P. Rule 23(g).

16         **C.  Plaintiff Meets The Requirements Of Rule 23(b)(3)**

17         In addition to meeting the requirements of Rule 23(a), Plaintiff's proposed class also

18   satisfies Rule 23(b)(3). Certification under Rule 23(b)(3) is appropriate "whenever the actual

19   interests of the parties can be served best by settling their differences in a single action." *Hanlon*,

20   150 F.3d at 1022 (quoting 7A Wright & Miller, *Federal Practice and Procedure,* § 1777 (2d ed.

21   1986)). Under this rule, a class action may be maintained if: (1) the questions of law or fact

22   common to the class members predominate over any questions affecting only individual members;

23   and (2) a class action is superior to other methods for fairly and efficiently adjudicating the

24   controversy. Fed. R. Civ. P. 23(b)(3). Both of these criteria are met.

25              *i.    Common Questions Predominate Over Individual Ones*

26         The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

27   cohesive to warrant adjudication by representation. *Amchem*, 521 U.S. at 623. Claims need not be

28   identical for common issues of law and fact to predominate, they need only be reasonably co-

extensive with those of absent class members. *Hanlon*, 150 F.3d at 1120. Predominance compares common and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (an individual question requires "evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.").

Plaintiff's overtime claim is the center of this case, and the exemption analysis therefore drives the entire case. As outlined above, the most important questions are common: 1) whether implementing Tyler's software is implementation consultants' primary duty; 2) whether implementation consultants' primary job duties are "directly related to management policies or general business operations" of Tyler or its customers; and 3) whether implementation consultants exercise discretion and independent judgment. 8 C.C.R. § 11040(1)(A). Because implementation consultants share the same primary job duty and perform their jobs in substantially similar ways, these questions are common, will bind the class, and will predominate over the litigation. These questions predominate over individual issues, which generally relate to damages (such as how many hours an implementation consultant worked on a given day). It is well-established that individual damages issues cannot defeat certification. *See Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

The exemption defense also causes common questions to predominate on Plaintiff's waiting time and wage statement claims, both of which Tyler denies based on the exemption, asserting implementation consultants are not owed any unpaid overtime and are not entitled to compliant wage statements. Common questions predominate as to these claims: Did Tyler willfully fail to pay all wages at the time of termination? Was Tyler required to provide compliant wage statements?

### ii.  A Class Action is Superior to Other Methods of Litigation

"Litigation by class action has long been recognized as a superior method of resolving wage and hour claims in California." *Martino*, 2016 WL 614477, at *10. Rule 23(b)(3) lists four factors for courts to consider when determining superiority of proceeding as a class action compared to other methods of adjudication: (1) the interests of the members of the class in

1  individually controlling the prosecution of separate actions; (2) the extent and nature of other

2  pending litigation about the controversy by members of the class; (3) the desirability of

3  concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in

4  management of the class action. Fed. R. Civ. P. 23(b)(3).

5        To Plaintiff's counsel's knowledge, there are currently two other cases pending against

6  Tyler seeking overtime for individual implementation consultants under the FLSA, but those cases

7  do not assert California claims. Class members have not shown an interest in individually

8  controlling litigation. Given the range of potential damages, it is unlikely that class members are

9  interested in pursuing claims for California overtime as separate actions. *See Zinser v. Accufix

10 *Research Inst., Inc.,* 253 F.3d 1180, 1190 (9th Cir. 2001) ("Where damages suffered by each

11 putative class member are not large, this factor weighs in favor of certifying a class action.").

12 Moreover, there would be no reason for an implementation consultant to litigate her California

13 claim separately from this case; Plaintiff's counsel has extensive experience litigating

14 misclassification cases and has moved this litigation forward efficiently. Finally, the Court will not

15 encounter any difficulties in managing this class action. Courts in this district have handled many

16 complex wage and hour class actions. *See Sandoval*, 309 F.R.D. at 559; *Martino*, 2016 WL

17 614477, at *10 (certifying class of 233 employees). This modest class is eminently manageable.

18              **D.  Plaintiff's Proposed Notice is Fair, Accurate and Informative**

19        Plaintiff's proposed class notice is attached as Exhibit 7. This notice was modeled on the

20 Federal Judicial Center's sample class notice (Ex. 8), and is fair, accurate, and informative. The

21 Court should approve Plaintiff's proposed notice in full.

22 **V.    CONCLUSION**

23        Plaintiff has provided sufficient evidence showing that the issues can be decided on a

24 class-wide basis and has satisfied the Rule 23 criteria. Plaintiff respectfully requests that the Court

25 grant this motion certifying a class of California implementation consultants, appointing Plaintiff's

26 counsel as Class Counsel and Named Plaintiff Aaron Kudatsky as the Class Representative.

27

28

1    Dated: November 16, 2020                **NICHOLS KASTER, LLP**

2                                      By:    s/Daniel S. Brome
3                                             Daniel S. Brome
                                              Matthew C. Helland
4                                             Rachhana T. Srey

5                                             Attorneys for Plaintiff and Others Similarly
6                                             Situated

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28