# EXHIBIT 1

[Placeholder- Document filed under seal]

# EXHIBIT 2

[Placeholder- Document filed under seal]

# EXHIBIT 3

[Placeholder- Document filed under seal]

# EXHIBIT 4

[Placeholder- Document filed under seal]

# EXHIBIT 5

[Placeholder- Document filed under seal]

# EXHIBIT 6



# Nichols Kaster, PLLP

## Firm Resume

## | Table of Contents

Firm Overview ........................................................................................................ 2

Accolades ............................................................................................................... 3

Judicial Recognition ............................................................................................. 4

Notable Litigation Results ................................................................................... 11

Nichols Kaster Attorneys ..................................................................................... 26

## Firm Overview

For more than forty-five years, Nichols Kaster has enjoyed a sterling reputation as a top employment and consumer plaintiffs' litigation firm.  We have represented hundreds of thousands of employees and consumers nationwide on a variety of legal issues arising under both state and federal laws.

The Firm's National Wage and Hour team represents employees in class and collective actions seeking to recover unpaid wages in circumstances where employers misclassify workers or otherwise fail to compensate them for all hours worked, pursuant to minimum wage and overtime rates, or as required by contract.  The Firm also represents groups of employees seeking to recover unpaid commissions and unlawfully pooled tips.

### Employee Representation

- Wage & Hour Violations
- 401(k) and Benefit Breaches
- Qui Tam/False Claims
- Wage Fixing
- Equal Pay Violations
- Harassment
- Discrimination
- Retaliation
- Medical leave
- Failure to Accommodate
- Federal Railway Safety Act Violations
- Breach of Contract
- Severance
- Non-Compete Agreements
- Defamation

Nichols Kaster represents workers and consumers who have endured discrimination and who have had their civil rights violated on either an individual or class-wide basis.  The Firm's employment group is also dedicated to assisting individual employees in Minnesota and surrounding states with a variety of legal needs, including addressing discrimination; harassment; retaliation; accommodation and leave issues; contract, severance, and non-compete disputes; as well as defending against licensure complaints.

The Firm also assists employees and retirement plan participants in protecting their 401(k) investments and other benefits.  Nichols Kaster challenges breaches of fiduciary duty relating to excessive fees, underperforming funds, imprudently managed accounts, and failure to properly pay benefits.

### Consumer Representation

- Forced-Placed Insurance
- Credit Reporting
- Improper Background Checks
- Student Loans
- Predatory Lending
- Interest Overcharges and Misapplication of Loan Payments
- Billing Practices
- Deceptive Practices
- Debt Collection Violations

Nichols Kaster is dedicated to protecting consumer rights through its National Consumer Class Action team.  Over the years, the Firm has represented consumers with a variety of violations, primarily on a class-wide basis.  The Firm led the way in forced-placed flood and hazard litigation and with claims under the Fair Credit and Reporting Act.

Nichols Kaster also represents whistleblowers and relators who have "blown the whistle" on illegal activity.  These cases involve the

reporting of possible government fraud, mishandling of toxic substances, violations of tax or securities laws, discrimination in education, failure to provide access to public facilities, and more.  Nichols Kaster represents individuals who have brought claims on behalf of the government against entities who have defrauded the government under the False Claims Act (also known as "qui tam" lawsuits).

No matter the type of claim, Nichols Kaster helps everyday people seek redress against big corporations.

## Accolades

The NATIONAL TRIAL LAWYERS AND ALM have named Nichols Kaster, PLLP the Employment Rights Law Firm of The Year.  According to an ALM spokesperson,

> [T]he lawyers and law firms selected this year from more than 250 submissions have demonstrated repeated success in cutting-edge work on behalf of plaintiffs over the last 15 months.  They possess a solid track record of client wins over the past three to five years. The 2020 Elite Trial Lawyers finalists delivered results for clients across a wide range of cases with some of the most difficult sets of facts, very challenging circumstances, often filing uphill battles for years.  Many were up against some of the most prominent defense firms on the globe… The winners stood out based on the uniqueness and importance of their cases as well as the results delivered for their clients.

The U.S. NEWS & WORLD REPORT has continued to name Nichols Kaster as a Best Law Firm® and honored individual lawyers at the Firm as Best Lawyers®, consecutively since 2012.  LAW360 has listed Nichols Kaster as a top plaintiffs' employment law firm, and MINNESOTA LAWYER has declared it one of Minnesota's top 100 firms.  In 2019, nine of Nichols Kaster's attorneys were named as part of the 500 leading plaintiff employment lawyers on Lawdragon.com's list of the nation's best employment lawyers.  In 2019, nine of Nichols Kaster's attorneys were named Super Lawyers® and eight Rising Stars by SUPER LAWYERS MAGAZINE.  Steve Smith and Matthew Frank were announced as the 2017 Minnesota Lawyers of the Year.  On Martindale Hubbell, the firm has a 5 out of 5 peer rating.

Together the National Law Journal and LAW.COM named Nichols Kaster a top 50 firm for Elite Trial Lawyers "that are doing the most creative and substantial work on the plaintiffs side." *Introducing America's Elite Trial Lawyers,* THE NAT'L LAW J. (Sept. 8, 2014).

In 2009, Nichols Kaster was ranked as one of the top ten busiest FLSA firms in the country by Litigation Almanac 360, which conducted a study of over 500,000 federal cases and received input from more than 200 law firms. Nichols Kaster was the only plaintiffs' firm in the top ten.

## Judicial Recognition

Nichols Kaster provides employees and consumers with significant results, including substantial settlements, trial victories, and ground-breaking determinations on important legal questions. The Firm's attorneys fight hard for their clients, vigorously litigating complex actions against top national defense firms. Courts have recognized Nichols Kaster's successes and extensive experience and have appointed the Firm as lead or co-lead counsel on hundreds of class and collective actions. Below are just a few examples of this recognition.

*Class Counsel displayed skill and determination. It is unsurprising that only a few firms might invest the considerable resources to ERISA class actions such as this, which require considerable resources and hold uncertain potential for recovery.*

The Honorable Judge Catherine C. Eagles
*Sims v. BB&T Corp.*, No. 1:15-cv-841 (M.D.N.C., May 5, 2019).

*[C]lass counsel achieved a strong result through skillful litigation and settlement negotiation. After filing a detailed complaint and amended complaint, working through a substantial discovery process, litigating a motion to dismiss, and undergoing mediation and settlement discussions, class counsel obtained a settlement of $14 million and a mandatory request for proposal that will help ensure quality management of class members' 401(k) funds down the road. Regarding quality of representation, the litigation and settlement appear by all measures to be the work of skillful and experienced attorneys with significant expertise in the ERISA context.*

The Honorable Judge Nathanael M. Cousins
*Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, No. 5:16-cv-03698 (N.D. Cal., May 11, 2018).

*The high quality of Nichols Kaster's representation strongly supports approval of the requested fees. The Court has previously commended counsel for their excellent lawyering. The point is worth reiterating here. Nichols Kaster was energetic, effective, and creative throughout this long litigation. The Court found Nichols Kaster's briefs and arguments first-rate. And the documents and deposition transcripts which the Court reviewed in the course of resolving motions revealed the firm's far-sighted and strategic approach to discovery . . . Further, unlike in many class actions, plaintiffs' counsel did not build their case by piggybacking on regulatory investigation or settlement . . . The*

*lawyers at Nichols Kaster can genuinely claim to have been the authors of their clients' success.*

The Honorable Judge Paul A. Engelmayer

*Hart v. RCI Hospitali Holdings, Inc.*, No. 09 Civ. 3043, 2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015)

*I want to commend all of you for the excellent work that you did in conjunction with the special master and the court's technical advisor . . . I'm satisfied that this settlement is fair and reasonable given all the risk and expense of further litigation . . . .*

Honorable Judge Kathryn Vratil

*Sibley v. Sprint Nextel Corp.*, No. 08-cv-2063 (D. Kan. Dec. 20, 2018)

*[T]he attorneys at Nichols Kaster, PLLP are qualified, experienced, and competent, as evidenced by their background in litigating class-action cases involving FCRA violations. . . . . As noted above, Plaintiffs' attorneys are experienced and skilled consumer class action litigators who achieved a favorable result for the Settlement Classes.*

The Honorable Chief Judge Deborah Chasanow

*Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665 (D. Md. 2013)

*[T]his case's early resolution can partly be attributed to counsel's experience representing thousands of employees in wage and hour cases for thirty years, particularly within the oil and gas industry.*

The Honorable Judge Dale Drozd

*McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.*, No. 1:16-cv-00157 (E.D. Cal. Nov. 2, 2017)

*Plaintiffs retained counsel with significant experience in prosecuting force-placed insurance cases, and other courts in this district have appointed them class counsel in force-placed insurance cases . . . Counsel have worked vigorously to identify and investigate the claims in this case, and, as this litigation has revealed, understand the applicable law and have represented their clients vigorously and effectively.*

The Honorable Magistrate Judge Laurel Beeler

*Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506, 2014 WL 2734953 (N.D. Cal. June 13, 2014)

*Thank you for all of your good work here.  I know that it was really an extraordinarily complex case, and so well done.*

The Honorable Judge Kathryn Vratil
*Harlow v. Sprint Nextel Corp.*, No. 08-2222 (D. Kan. Dec. 10, 2018)

*[Nichols Kaster has] considerable experience in litigating wage and hour class and collective actions.*

*The award . . . follows efficient effort on the part of Class Counsel to achieve a sizeable recovery for the Class Members.*

The Honorable Magistrate Judge Katherine Menendez
*Allen v. All Temporaries, Inc.*, No. 16:cv-04409 (D. Minn. Feb. 14, 2018)

*[T]he quality of representation, as evidenced by the substantial recovery and the qualifications of the attorneys, is high.  As then District Judge Gerard E. Lynch recognized, Nichols Kaster is "a reputable plaintiff-side employment litigation boutique with a nationwide practice and special expertise prosecuting FLSA cases."*

The Honorable Judge Sidney H. Stein
*Febus v. Guardian 1st Funding Grp., LLC*, 870 F. Supp. 2d 337 (S.D.N.Y. 2012)

*[T]his court finds that counsel possess more than sufficient experience to represent Plaintiffs fairly and adequately in reaching a fair and equitable settlement in this FLSA collective action . . . The parties are represented by competent and reputable counsel.*

The Honorable Judge Tony N. Leung
*Mayfield-Dillard v. Direct Home Health Care*, No. 1:16-cv-3489 (D. Minn., Dec. 18, 2017)

*I think it was just some very efficient and good work on the part of the plaintiffs' attorney that brought you to the point [of settlement]."*

The Honorable Judge Josephine L. Staton

*Urakhchin v. Allianz Asset Mgm't of Am., L.P.*, No. 8:15-cv-01614 (C.D. Cal. July 27, 2018)

**Counsel's experience in vigorously litigating class/collective wage and hour actions, plus their *experience with this industry* were essential in obtaining this favorable and efficient result.**

The Honorable Magistrate Judge Jonathon E. Hawley
*Woods v. Club Cabaret, Inc.*, 1:15-cv-01213, 2017 WL 4054523 (C.D. IL, May, 17, 2017)

**The settlement was the result of arm's-length negotiations between experienced counsel. Class Counsel is *well known* by this Court for their expertise in wage and hour litigation.**

The Honorable Judge Michael J. Davis
*Burch v. Qwest Commc'ns Intl.*, No. 06-03523 (D. Minn. Sept. 14, 2012)

**I want to say that both sides here have performed at an admirable level. And I wish that the lawyers of all cases would perform at your level. I say this to both of you, because you have you have been of assistance to the Court.**

The Honorable Judge William Alsup
*Hofstetter v. Chase Home Fin., LLC*, No. 10-01313 (N.D. Cal. Nov. 7, 2011) (transcript)

**The Court finds that counsel is *competent and capable* of exercising all responsibilities as Class Counsel for the Settlement Class.**

The Honorable Judge Richard H. Kyle
*Bible v. Gen. Revenue Corp.*, 12-CV-1236 (D. Minn. Jan. 7, 2014)

**Over the past two years, Class Counsel has been active in all stages of litigation and has particularly benefitted Plaintiffs through *capable handling of motion practice*. For**

*example, Plaintiffs obtained summary judgment on a key issue involving the* <u>*Morillion*</u> *doctrine and defeated summary judgment on Defendants'* <u>*de minimis*</u> *defense.*

The Honorable Judge Virginia A. Phillips
*Cervantez v. Celestica Corp.*, No. 07-729, 2010 WL 11465133, *7 (C.D. Cal. Oct. 29, 2010)

*[T]he combined experience of Plaintiffs' counsel as well as the fact that employment law, particularly the representation of employees, forms a large part of both the firm and counsel's practice persuades this Court that the law firm of Nichols Kaster, PLLP, and its attorneys Steven Andrew Smith and Anna P. Prakash will more than adequately protect the interests of the Class Members.*

The Honorable Magistrate Judge Tony N. Leung
*Fearn v. Blazin' Beier Ranch, Inc.*, No. 11-743 (D. Minn. Jan. 30, 2012)

*Plaintiffs have shown good cause under Rule 16(b) because Plaintiffs' new counsel has shown the necessary diligence. Plaintiffs brought on Nichols Kaster, an experienced employment law firm of high repute as lead counsel in May 2012. Since that time, Plaintiffs have made a concerted effort to comply with this Court's orders and deadlines.*

The Honorable Magistrate Judge Tony N. Leung
*Alvarez v. Diversified Main. Sys., Inc.*, No. 11-3106 (D. Minn. Aug. 21, 2012)

*Plaintiff's counsel are qualified, experienced attorneys that are fully capable of conducting this class action litigation . . . they are highly qualified, knowledgeable attorneys that are willing to invest the resources necessary to fully prosecute this case.*

The Honorable Judge Gary Larson
*Karl v. Uptown Drink, LLC*, No. 27-CV-10-1926 (Minn. Dist. Ct. Nov. 17, 2010)

*Plaintiffs' Counsel are qualified attorneys with extensive experience in class action and wage and hour litigation and are hereby appointed as Class Counsel.*

The Honorable Judge Susan Richard Nelson of the U.S.D.C. D. Minn.:
*Alvarez v. Diversified Main. Sys., Inc.*, No. 11-3106 (D. Minn. Feb. 14, 2013) (appointing class counsel and preliminarily certifying the class for settlement purposes).

*However, the difficulty of the legal issues involved [and] the skill and experience of Plaintiffs' counsel in FLSA cases . . . make an enhancement of the lodestar amount appropriate in this case.*

The Honorable Judge Thomas D. Schroeder
*Latham v. Branch Banking & Trust Co.*, No. 1:12-cv-00007, 2014 WL 464236 (M.D.N.C. Jan. 14, 2014)

*The Court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsels' experience in handling class actions and other complex litigation and claims of the type asserted in the present action, counsels' knowledge of the applicable law, and the resources counsel will commit to representing the class. Fed.R.Civ.P. 23(g)(1)(C). After reviewing the record, the Court is satisfied that the firms of Nichols Kaster, PLLP and Stueve Siegel Hanson LLP satisfy these criteria and will adequately represent the interests of the class as counsel.*

The Honorable Judge Kathryn Vratil
*Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 677 (D. Kan. 2008)

*The Arbitrator also notes that the briefs submitted by Claimant's counsel and the performance at the hearing by Claimant's counsel were of a very high quality.*

Arbitrator Joel Grossman, Esq.
*Green v. CashCall, Inc.*, JAMS Arbitration No. 1200047225 (JAMS Aug. 22, 2014)

*Plaintiffs' counsel are adequate legal representatives for the class. They have done work identifying and investigating potential claims, have handled class actions in the past, know the applicable law, and have the resources necessary to represent the class. The class will be fairly and adequately represented.*

The Honorable Judge Susan M. Robiner
*Spar v. Cedar Towing & Auction, Inc.*, No. 27-CV-411-24993 (Minn. Dist. Ct. Oct. 16, 2012)

*[Defendant] doesn't question whether Plaintiffs are represented by qualified and competent counsel, and it's obvious that they are. Plaintiffs' are represented by a national law firm, Nichols Kaster, that specializes in employment and class action law.*

The Honorable Judge Larry Alan Burns
*Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596 (S.D. Cal. 2010)



# Notable Litigation Results

## | Settlement Results

In *Velazquez v. Massachusetts Financial Services Co.*, No. 1:17-cv-11249 (D. Mass.), the court granted final approval of the parties' $6,895,000 million settlement, resolving plaintiffs' claims against Defendants under the employee Retirement Income Security Act ("ERISA").

In *Bowers v. BB&T Corp.*, No. 1:15-cv-00732 (M.D.N.C. May 6, 2019), the court granted final approval of the parties' $24 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

In *Moreno v. Deutsche Bank Americas Holding Corp.*, 1:15-cv-09936 (S.D.N.Y. March 1, 2019), the court granted final approval of the parties' $21.9 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

In *Sibley v. Sprint Nextel Corp.*, No. 08-cv-2063 (D. Kan. Dec. 20, 2018), the court granted final approval of a commissions settlement for retail store sales employees totaling $30.5 million.

In *Clark v. Oasis Outsourcing Holdings Inc.*, No. 9:18-cv-81101 (S.D. Fla. Dec. 20, 2018), the court granted final approval of the parties' $5.9 million settlement in a case where plaintiffs alleged the defendants breached their fiduciary duties in violation of ERISA.

In *Harlow v. Sprint Nextel Corp.*, No. 08-2222 (D. Kan. Dec. 10, 2018), the court granted final approval of a commissions settlement of $3,650,000 for business channel sales employees.

In *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 8:15-cv-01614 (C.D. Cal. July 30, 2018), the court granted final approval of the parties' $12 million settlement in a case where plaintiffs allege the defendants breached their fiduciary duties in violation of ERISA.

In *Johnson v. Fujitsu Technology Business of America, Inc.*, No. 5:16-cv-03698 (N.D. Cal. May 11, 2018), the court granted final approval of the parties' $14 million settlement, and approved a class of current and former participants in the Fujitsu Group Defined Contribution and 401(k) Plan

In *Vongkhamchanh v. All Temporaries Midwest, Inc.*, 17:cv-00976 (D. Minn. Apr. 27, 2018), the court approved a settlement for health care workers who would receive over 84% of their unpaid overtime wages, explaining that the Firm's "considerable experience litigating wage and hour class and collective actions, and informed opinions of the fairness of the settlement" provided support for approval of the hybrid state and federal action.

In *Main v. American Airlines, Inc.*, 4:16-cv-00473 (N.D. Tex. Feb. 21, 2018), the court granted final approval of the parties' $22 million settlement for a class of current and former participants in the American Airlines, Inc. 401(k) Plan.

In *Allen v. All Temporaries, Inc.*, No. 16:cv-04409 (D. Minn. Feb. 14, 2018), the court granted final approval of a Rule 23 class action and FLSA collective action for settlement of home health workers' overtime claims. The court noted that "Class Members will recover over 99% of their unpaid overtime wages after the deduction for attorneys' fees, costs, and a class-representative service payment."

In *Mayfield-Dillard v. Direct Home Health Care.*, No. 1:16-cv-3489 (D. Minn, Dec. 18, 2017) the court approved the parties' joint motion for settlement approval finding that the settlement was a substantial benefit to the collective as the eligible individuals who accept the settlement will receive all their alleged overtime wage loss. The court found that "counsel possess more than sufficient experience to represent Plaintiffs fairly and adequately in reaching a fair and equitable settlement in this FLSA collective action" and that "[t]he parties are represented by competent and reputable counsel."

In *McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.*, No. 1:16-cv-00157 (E.D. CA, Nov. 22, 2017), the court approved the settlement finding that $3,000,000 was fair and reasonable and reflected a settlement payoff of 92% of the estimated potential value of the class members' claims. The judge commended Nichols Kaster stating, "[T]his case's early resolution can partly be attributed to counsel's experience representing thousands of employees in wage and hour cases for thirty years, particularly within the oil and gas industry."

In *Andrus v. New York Life Ins. Co.*, 1:16-cv-05698 (S.D.N.Y. June 15, 2017), the court granted final approval of the parties' $3,000,000 settlement in a case where plaintiffs alleged that the defendants breached their fiduciary duties in violation of ERISA.

In *Henderson v. 1400 Northside Drive, Inc.*, No. 1:13-cv-03767 (N.D. Ga. Mar. 17, 2017), the Firm achieved a $1,360,000 settlement on the eve of trial on behalf of 37 male exotic dancers who were misclassified as independent contractors and required to pay to work through the imposition of mandatory house fees, fines, and tip-outs of other workers.

In *Vaughan v. M-Enterm't Props., LLC*, No. 1:14-CV-914 (N.D. Ga. May 16, 2017), the court approved a $1,100,000 settlement a week before trial for 28 female exotic dancers who the Court previously found were misclassified as independent contractors and were required to pay to work through fines, fees, and tip-outs to other workers.

In *Febus v. Guardian First Funding Group, LLC*, 90 F. Supp. 3d 240 (S.D.N.Y. Mar. 4, 2015), plaintiffs brought a motion to enforce a wage and hour settlement from which one of the individual defendants defaulted. The court ordered the defendant pay the amount due, imposed an additional thirty percent penalty on the amount due, and awarded interest. The court noted that Nichols Kaster had been

"attempting, in vain, to collect," and emphasized that defendant "cannot avoid his contractual obligations because he has decided that the settlement terms no longer suit his interests."

In *Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043, 2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015). the court granted final approval of a class-wide $15,000,000 gross settlement, finding the settlement to be fair, reasonable, and adequate and further awarding plaintiffs' counsel's attorneys' fees, expenses, and service awards to the named plaintiffs and discovery participants.

In the consolidated lawsuits of *Casey v. Citibank, N.A.*, No. 5:12-cv-0820 (N.D.N.Y. Aug. 21, 2014) and *Coonan v. Citibank, N.A.*, No. 1:13-cv-00353, 2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014), the court granted final approval of an approximately $110,000,000 settlement on behalf of settlement classes who were force-placed with flood or hazard insurance by Citibank, N.A. The settlement also provides substantial injunctive relief, forbidding Citibank and its affiliates from accepting commissions or any other form of compensation in connection with force-placed insurance for a period of six years, places limits on the amount of insurance coverage that Citibank may require borrowers to maintain, and requires Citibank to offer class members the opportunity to reduce their flood insurance coverage if Citibank had increased their coverage amount to an amount in excess of the amount required under federal law. The court found the settlement to be "fair, reasonable, and adequate, in the best interests of the Settlement Classes" and overruled nine objections.

In *Bible v. General Revenue Corp.*, No. 12-cv-01236 RHK (D. Minn. June 27, 2014), the court granted final approval of a $1,250,000 settlement on behalf of approximately 134,000 class members, more than double the statutory cap for a Fair Debt Collection Practices Act class action.

In *Farmer v. Bank of America, N.A.*, No. 5:11-cv-00935 (W.D. Tex. Oct. 18, 2013), the court granted final approval of the parties' multi-million-dollar settlement with significant prospective injunctive relief, finally certifying a class of 25,000 Texas mortgagors who had been sent letters requesting proof of hazard insurance in violation of the language of their deeds of trust, and appointing Nichols Kaster as class counsel.

In *Singleton v. Domino's Pizza, LLC*, No. 8:11-cv-01823 (D. Md. Oct. 2, 2013), the court approved the parties' $2,500,000 million settlement for a class of over 50,000 under the Fair Credit Reporting Act in a case where plaintiffs alleged that the defendant employer had improperly procured consumer reports on employees and applicants and had failed to comply with the pre-adverse action notice requirements of the Act.

In *Ulbrich v. GMAC Mortgage*, No. 11-CIV-62424, 2013 WL 8692404 (S.D. Fla. May 10, 2013), the court granted final settlement approval and appointed Nichols Kaster as class counsel for a 2,000+ nationwide class.  The case involved claims against GMAC Mortgage, LLC and Balboa Insurance Services, Inc. relating to force-placed wind insurance.

In *Eldredge v. City of Saint Paul*, No. 09-2018 (D. Minn. Aug. 29, 2011), plaintiff Eldredge reached a settlement of his case that was the second largest paid by the City of Saint Paul in an employment lawsuit.

In *Hofstetter v. JPMorgan Chase Bank, N.A.*, No. C- 10-01313, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011), Nichols Kaster was appointed class counsel for four classes encompassing approximately 40,000 mortgagors against Chase Bank. In the same case, Nichols Kaster secured an approximately $10,000,000 settlement for the classes. *Hofstetter*, 2011 WL 5545912 (N.D. Cal. Nov. 14, 2011).

| **Appellate Achievements**

In *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018), the First Circuit reversed the district court's grant of defendants' directed verdict motion, holding that plaintiffs had met their burden of proving loss causation, and that plaintiffs' damages model constituted a viable measurement of the losses suffered by Putnam's employees as a result of defendants' fiduciary breaches. The defendant field a writ of certiorari to the U.S. Supreme Court, and in *Putnam Investments, LLC v. Brotherson*, No. 18-926, 2020 WL 129535 (U.S. Jan. 13, 2020), the Supreme Court denied defendants' petition. The case is remanded to the district court for continued trial proceedings under the First Circuit's holding that the burden to prove causation is on defendants and plaintiffs presented sufficient evidence of losses to the plan as a result of defendants' mismanagement.

In *Ray v. County of Los Angeles*, 935 F.3d 703 (9th Cir. 2019), the Ninth Circuit ruled for the plaintiffs on two distinct issues. First, the Court upheld the District Court's ruling that the County of Los Angeles was not entitled to Sovereign Immunity as an arm of the state for its role in implementing the In-Home Supportive Services program for homecare workers in Los Angeles County. In so holding, the Court declined to overturn long-standing Ninth Circuit precedent outlining the "arm of the state" doctrine, and it determined that, under the existing five-factor test, four of the factors weighed against immunity for the County. In the second part of its ruling, the Court reversed the District Court's holding regarding the effective date of Department of Labor regulations governing homecare workers employed by third parties, holding that the regulations at issue were effective January 1, 2015, despite industry challenges to the regulations that were successful at the district court level but ultimately unsuccessful on appeal.

In *Wingate v. Metropolitan Airport Commission* A19-0226 (August 19, 2019), Wingate appealed the district court's summary judgment finding in favor of Metropolitan Airport Commission (MAC) dismissing the whistleblower claim. The court of appeals reversed the district court's decision ruling the evidence presented by Wingate including his positive performance reviews, his supervisor's remarks, MAC's promotion patterns, and a sergeant's similar report of retaliatory conduct support an inference that Wingate's engagement in protective activity was the true reason that MAC did not promote him to sergeant, thus raising a material fact dispute on the issue of pretext.

In *Moore v. City of New Brighton*, A18-2111, (July 29, 2019), the parties filed cross appeals where Moore appealed the district court's summary judgment decision and the city appealed the district court

and the Court of Appeals subject-matter jurisdiction over the case. In a published decision, the Minnesota Court of Appeals reversed the district court's summary judgment decision, finding that the evidence showing the city maintained the administrative, home-bound leave for a period so long and so inconsistent with its purported reason for commencing the leave creates a material fact dispute as to whether the city's actions "penalized" the sergeant under the Minnesota Whistleblower Act and whether the city's reason is pretextual. Further, both the district court and the court of appeals rejected the city's jurisdictional argument and held that both courts have subject-matter jurisdiction over Moore's claim under the Minnesota Whistleblower Act.

*Frost v. BNSF Railway, Co.*, 914 F.3d 1189 (9th Cir. 2019), was tried to a jury in Montana in December 2016. Mr. Frost alleged that he was retaliated against when BNSF terminated his employment after he reported suffering from PTSD. Mr. Frost was diagnosed with PTSD after he was nearly struck by an oncoming train while repairing a section of the track after his supervisor released track authority but failed to inform him and his fellow crew members. Pursuant to the Defendant's request, the jury was provided an honest belief instruction and a defense verdict resulted. Mr. Frost appealed, arguing that the instruction was error because it conflicted with the clear language of the Federal Railway Safety Act ("FRSA") and granted the jury a short-cut to rule for BNSF while ignoring evidence of retaliation. The Ninth Circuit agreed. In a unanimous decision, the Ninth Circuit definitively held there was no requirement that FRSA plaintiffs separately prove discriminatory intent under the FRSA's contributing factor standard, and thus the instruction was error. The Ninth Circuit reversed the trial verdict and remanded for a new trial.

In *McKeen-Chaplin v. Provident Savings Bank, FSB*, 862 F.3d 847 (9th Cir. 2017), the Ninth Circuit reversed the district court's grant of summary judgment to the defendant, finding that the defendant's mortgage underwriters did not fit within the administrative exemption to the Fair Labor Standards Act and remanding for judgment in the plaintiffs' favor on the issue.

In *Clark v. Centene Co. of Texas, L.P.*, 656 F. App'x 688 (5th Cir. 2016) (per curiam), the U.S. Court of Appeals for the Fifth Circuit affirmed a lower court decision that appeals nurses do not fall within the administrative or professional exemptions of the FLSA overtime requirements.

In *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47 (2d Cir. 2016), the U.S. Court of Appeals for the Second Circuit vacated and remanded the district court's dismissal of plaintiff's complaint, finding that plaintiff's had Article III standing to bring this action regarding the excessive fees for providing copies of plaintiffs' medical records charged by defendants, and stating that "because the complaint alleged that each name plaintiff "through [her or his] counsel" had "paid" the charges demanded for the records, and that the "ultimate expense" was borne by the plaintiffs, the complaint plausibly alleged that plaintiffs, as principals acting through their agents, had been injured by the alleged overcharges."

In *Monroe v. FTS USA, LLC*, 815 F.3d 1000 (6th Cir. 2016), the U.S. Court of Appeals for the Sixth Circuit upheld the lower court's denial of defendant's motion to decertify the collective and affirmed the trial verdict in favor of plaintiffs. The Sixth Circuit ruled that Plaintiff's presentation of

representative testimony was appropriate at trial for proving liability for the collective and estimated average approach to calculating damages.

In *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015), *reh'g. en banc denied*, 807 F.3d 839 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1607 (2016), the U.S. Court of Appeals for the Seventh Circuit reversed the district court's dismissal of plaintiff's complaint against a student loan guarantor for wrongfully charging collection fees on a defaulted student loan, finding that plaintiff's claims for breach of contract and for violations of the RICO Act were not preempted by the Higher Education Act, and stating that "a guaranty agency may not impose collection costs on a borrower who is in default for the first time but who has timely entered into and complied with an alternative repayment agreement."

In *Perez v. Mortgage Bankers Assoc.*, 135 S. Ct. 1199 (2015), the United States Supreme Court ruled unanimously in favor of a group of employees represented by Nichols Kaster. The Court upheld a Department of Labor interpretation granting minimum wage and overtime compensation for mortgage loan officers.

In *Karl v. Uptown Drink, LLC*, 835 N.W.2d 14 (Minn. Aug. 14, 2013), the Minnesota Supreme Court ruled that under Minnesota law, employers cannot require employees to reimburse them from their tips for items such as cash register shortages, unsigned credit card receipts, and customer walk outs. The Court also found that employees do not have to show that because of the deductions their wages fell below the minimum wage in order to prove a violation of Minn. Stat. § 181.79. In this case, the plaintiffs were over 750 employees who worked at three different bars/night clubs in Minneapolis. At a jury trial in 2011, the plaintiffs prevailed on their record-keeping and certain minimum wage claims, but lost on the unlawful deductions claims. Nichols Kaster appealed the deductions issue, and took it all the way to the Minnesota Supreme Court, where the Court agreed with plaintiffs and instructed the lower court to enter judgment on the plaintiffs' behalf on this claim.

In *Boaz v. Federal Express Customer Info. Services, Inc.*, 725 F.3d 603 (6th Cir. 2013), the U.S. Court of Appeals for the Sixth Circuit ruled that plaintiff, a FedEx project manager who had claimed that FedEx had failed to pay her overtime wages, in violation of the Fair Labor Standards Act, and paid her less than male coworkers performing the same job, in violation of the Equal Pay Act, could pursue her overtime and gender discrimination claims. The federal laws at issue provide employees three years to file a lawsuit and FedEx had plaintiff sign an application which stated that lawsuits had to be brought within 6 months or claims were lost.  The lower court had dismissed plaintiff's claims, citing the application. The Sixth Circuit unanimously sided with plaintiff, reversed the dismissal and remanded the case for trial.

In *Calderon v. GEICO General Insurance Co.*, 809 F.3d 111 (4th Cir. 2015), the U.S. Court of Appeals for the Fourth Circuit affirmed a district court's grant of affirmative summary judgment in favor of approximately one hundred current and former Security Investigators, finding that they were not covered by the administrative exemption. Specifically, the Appellate Court found that plaintiffs' primary job duty was not the performance of work directly related to general business operations.

In *Lass v. Bank of America, N.A.*, 695 F.3d 129 (1st Cir. 2012), the U.S. Court of Appeals for the First Circuit struck down the district court's ruling that had dismissed plaintiff's claims. The court found that plaintiff's allegations regarding excessive flood insurance and improper kickbacks had been properly alleged and that the case should proceed.

In *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011), the U.S. Supreme Court found in favor of the plaintiff and held that "an oral complaint of a violation of the Fair Labor Standards Act is protected conduct under the [Act's] anti-retaliation provision." This was a huge win for employees all over the country, as the Supreme Court's decision set a new FLSA anti-retaliation standard.

| Trial Verdicts and Arbitration Awards

In *Cummings v. Chevron Corp.*, JAMS Case No. 1100086694 (June 8, 2018), an arbitrator issued a final award in the amount of $511,533.95 in favor of Donnie Cummings, a Well Site Supervisor who worked for Chevron. The arbitrator ruled that Chevron misclassified Cummings as an independent contractor and also misclassified him as exempt from the overtime provisions of state and federal law. The arbitrator awarded Cummings $284,270.15 in unpaid overtime, liquidated damages, and meal and rest period premiums, and awarded attorneys' fees and costs in the amount of $227,263.80.

In *Kaiser v. Gortmaker et al.*, No. 15-cv-01030, (District of South Dakota, Dec. 21, 2017) following a five-day trial in Aberdeen, South Dakota, a six-person jury returned a $1.2 million verdict in favor of former South Dakota Division of Criminal Investigation agent, Laura Zylstra-Kaiser. At the conclusion of trial, the jury found in favor of Kaiser on both her retaliation and gender discrimination claims. The jury awarded Kaiser $311,812.00 in lost wages, $498,929.00 in lost retirement benefits, and $400,000.00 in emotional distress damages.

In *Clark v. Centene Company of Texas, LP*, 104 F. Supp. 3d 813 (W.D. Tex. 2015), upon the conclusion of a bench trial, the court awarded damages to a collective action of utilization review nurses. The court found that plaintiffs submitted sufficient evidence to create a just and reasonable inference as to overtime hours worked by the collective and awarded liquidated damages. This victory followed the court's order on the parties' cross-motions for summary judgment and defendant's motion for decertification last year, holding that the defendant misclassified its utilization nurses. 44 F. Supp. 3d 674 (W.D. Tex. 2014). The court ruled that plaintiffs are not exempt from the Fair Labor Standards Act's overtime laws and are thus eligible for overtime pay. The court further held that defendant's claim that each plaintiff's claim would need to be analyzed individually to determine liability and damages was without merit.

In *Rhodes v. CashCall*, JAMS Ref. No. 1200047475, *Garcia v. CashCall*, JAMS Ref. No. 1200047422, *Good v. CashCall*, JAMS Ref. No. 1200047220, and *Green v. CashCall, Inc.*, JAMS Ref. No. 1200047225 (2014), a JAMS arbitrator ruled that CashCall misclassified Rhodes and Green, loan processers, and Garcia and Good, underwriters, as exempt from the overtime requirements of California and federal law. The arbitrator awarded Rhodes $15,000 in unpaid overtime plus an additional $15,000

in liquidated damages, along with $88,179 in attorneys' fees and costs, Green was awarded $15,067.72 in damages, as well as $54,165.50 in attorneys' fees and costs. The arbitrator also awarded Garcia $10,000 in unpaid overtime plus an additional $10,000 in liquidated damages, along with $98,709 in attorneys' fees and costs, and Good was awarded $43,631 in unpaid overtime, as well as $50,627.49 in attorneys' fees and costs.

In *Walsten v. Shank Power Products Co., Inc.*, No. 19HA-CV-12-1094 (Minn. Dist. Ct., Sept. 9, 2013), a minority shareholder case, an advisory jury returned a $700,000 verdict for the plaintiff, finding for him on his claims for breach of fiduciary duty and violation of his reasonable expectation of continuing employment. The trial judge subsequently issued an order sustaining the $700,000 advisory verdict and awarding $200,000 in attorneys' fees.

In *Monroe v. FTS USA, LLC*, No. 2:08-cv-21 (W.D. Tenn. Oct. 2011), the jury found that defendants willfully violated the Fair Labor Standards Act by failing to pay nearly 300 cable installers for all overtime hours worked. The district court entered judgment with damages for the plaintiffs.

## | Summary Adjudication

In *Deluca v. Farmers Ins. Exchange*, 386 F.Supp.3d 1235 (N.D. Cal. 2019), the court granted in part Plaintiffs' affirmative summary judgment motion and denied Defendant's summary judgment motion. The court found that Farmers could not satisfy either duties prong of the administrative exemption. As a result, the court determined that plaintiffs and class members were misclassified as exempt under state and federal law and are entitled to overtime premiums.

In *Rego v. Liberty Mutual Managed Care, LLC*, 367 F. Supp. 3d 849 (E.D. Wis. 2019), the court found as a matter of law that a defendant insurance company misclassified its utilization management nurses as exempt from overtime protections under the administrative and the professional exemptions. The plaintiffs primary job duty consisted of reviewing medical authorization requests against well-established guidelines to determine whether the criteria for medical necessity are satisfied.  The court held in part that this work involved the performance of routine mental work, likened to inspection-type duties as opposed to bedside nursing.

In *Henderson v. 1400 Northside Drive, Inc.*, No. 1:13-cv-3767, 2016 WL 3125012 (N.D. Ga. June 3, 2016), the district court granted in part Plaintiffs' affirmative motion for summary judgment on the issues of: (1) whether the owner qualified as a joint employer, (2) the viability of the defendants' counterclaims, and (3) whether minimum wage damages includes recovery for fines, fees, and tipouts paid by the employee to the employer.  In an earlier order, the court also the court granted plaintiffs' motion for partial summary judgment on the issues of: (1) the creative professional exemption, finding that defendants misclassified adult entertainers as exempt from the overtime and minimum wage requirements of the FLSA; and (2) offset, finding that defendants could not offset their minimum wage obligations with tips paid by customers to adult entertainers. 110 F. Supp. 3d 1318 (N.D. Ga. 2015).

In *Vaughan v. M-Enterm't Props., LLC*, No. 1:14–CV-914, 2016 WL 7365201 (N.D. Ga. Mar. 15, 2016), the district court granted in part exotic dancer plaintiffs' affirmative motion for summary judgment on the issues of (1) whether entertainers qualify as employees under the FLSA, (2) whether related entity defendants qualified as joint employers, (3) the viability of the defendants' offset defense, and (4) the viability of the defendants' counterclaims.

In *Heaton v. Social Finance, Inc.*, No. 3:14-cv-05191-the, 2015 WL 6003119 (N.D. Cal. Oct. 15, 2015), the court denied defendants' motion for summary judgment, finding that there were triable issues of fact as to whether defendants had violated the statutes at issue, whether the alleged violations were willful, and finding that defendants had failed to meet their burden as to plaintiffs' claims under the California Unfair Competition Law.

In *Hart v. Rick's Cabaret Int'l, Inc.*, the court denied decertification of the FLSA Collective and Rule 23 Class of approximately 2,300 adult entertainers at Rick's Cabaret in New York and granted, in part, plaintiffs' affirmative motion for partial summary judgment on damages, finding that no reasonable jury could conclude the Class was owed less than $10.8 million. No. 09-Civ-3043, 2014 WL 6238175 (S.D.N.Y. Nov. 14, 2014). This significant ruling came approximately one year after the court ruled that the Class and Collective Members are employees as a matter of law under the FLSA and New York Labor Law and that Rick's Cabaret violated both laws by failing to pay wages. The court further held that the money entertainers received from Rick's Cabaret's customers were tips and not service charges that could offset wage obligations and that Rick's Cabaret violated New York Labor Law by charging Class and Collective Members fines and fees as a condition of employment. 967 F. Supp. 2d 901 (S.D.N.Y. Sept. 10, 2013).

In *Wolfram v. PHH Corp.*, No. 1:12-cv-599, 2014 WL 2737990 (S.D. Ohio June 17, 2014), the court granted plaintiffs' motion for partial summary judgment, finding that the assigned real estate offices from where plaintiffs, who are current or former loan officers employed by defendant, worked where all serving as the "employer's place of business" under the outside sales exemption of the Fair Labor Standards Act. This established that an employee may work from multiple sites, not technically owned or operated by the employer, and each of those sites can be considered the "employer's place of business" under the regulations, therefore any work performed at these sites is not "outside" work under the outside sales exemption.

In *MacIntyre v. Lender Processing Services, Inc.*, No. 3:13-cv-89-J-25JBT (M.D. Fla. Apr. 29, 2014), the court granted affirmative summary judgment to plaintiff (a Minnesota resident) on a breach of contract claim for an unpaid bonus and used its discretion to enforce Minnesota state law for defendant's (a Florida company) failure to promptly pay wages. The court simultaneously denied defendant's motion to dismiss plaintiff's gender discrimination claims ruling, in part, that defendant's actions toward plaintiff constituted direct evidence of gender discrimination.

In *Huff v. Pinstripes, Inc.*, 972 F. Supp. 2d 1065 (D. Minn. 2013), the court ruled in plaintiffs' favor on cross-motions for summary judgment, finding that Pinstripes had violated the Minnesota Fair Labor

Standards Act's provisions on tip-pooling by requiring its servers to share their tips with "server assistants," who act as servers' support staff at the restaurant.

In *Ernst v. DISH Network, LLC*, No. 12-8794-LGS (S.D.N.Y. Sept. 22, 2014), the court ruled on plaintiff's and two of the defendants' cross-motions for partial summary judgment, granting plaintiff's motion and denying defendants' motion. The court ruled that the summary report received by two of the defendants was a "consumer report" for purposes of the Fair Credit Reporting Act because it "communicated information bearing on Plaintiff's character, general reputation, or mode of living, and the information was collected and expected to be used for 'employment purposes.'"

In *Kirsch v. St. Paul Motorsports, Inc.*, No. 11-cv-02624, 2013 WL 1900620 (D. Minn. May 7, 2013), the court denied defendants' motion for summary judgment in its entirety, finding that plaintiff had put forth sufficient evidence for a prima facie claim of age discrimination.

In *Bollinger v. Residential Capital*, 863 F. Supp. 2d 1041 (W.D. Wash. 2012), the court granted plaintiffs' motion for partial summary judgment, finding that defendants misclassified the underwriter plaintiffs under the administrative exemption, and rejected defendants' argument that there was no evidence of willful violation of the FLSA, stating that "a jury could conclude that Defendants knowingly and recklessly" misclassified plaintiffs.

In *Clincy v. Galardi South Enterprises, Inc.*, 808 F. Supp. 2d 1326 (N.D. Ga. 2011), the court granted plaintiffs' motion for partial summary judgment on the issue of misclassification, finding that defendants misclassified adult entertainers as independent contractors and that the entertainers were in fact employees covered by the FLSA.

## Class and Collective Certification

In *MacDonald, et al. v. CashCall, Inc., et al.*, No. 2:16-cv-02781-MCA-ESK, Dkt 102 (D. N.J. Oct. 31, 2019) the court granted Plaintiffs' motion for class certification and appointed Nichols Kaster, PLLP class counsel in case involving more than 11,000 borrowers where Defendants are alleged to have violated usury law, the New Jersey Consumer Fraud Act, and RICO.

In *Brotherston v. Putnam Investments, LLC*, No. 1:15-cv-13825 (D. Mass. Dec. 13, 2016), the court certified a class of current and former participants in the Putnam Retirement Plan and appointed Nichols Kaster as class counsel. Plaintiffs alleged that Defendants mismanaged the plan and engaged in prohibited transactions in breach of their fiduciary duties under ERISA.

In *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620 (D. Neb. 2019), Nichols Kaster won class certification and was appointed class counsel for a class of over 7,000 railroad employees who plaintiffs alleged had been removed from their jobs in violation of the Americans with Disabilities Act

In *Ayala v. GEICO*, No. 7:18-cv-03583 (Dec. 5, 2018), the district court certified a collective class under the FLSA for Auto Adjuster Trainees who alleged they were not paid for all their overtime worked during training.

In *Bell v. Michigan Civil Service Commission and Jan Winters, State Personnel Director*, No. 17-003861-CV (Mich. Cir. Ct., Nov. 17, 2018), Nichols Kaster won class certification and was appointed class counsel for a class of over 600 African-American applicants who plaintiffs alleged had been discriminated against by defendants through the use of their entry-level law enforcement examination.

In *Dunham-Sunde v. The Copper Hen Cakery*, No. 27-CV-17-17288 (Minn. Dist. Ct., Aug. 28, 2018), the court certified a class of over one hundred restaurant servers to pursue claims against a local restaurant for its unlawful tip-sharing practices in violation of the Minnesota Fair Labor Standards Act.

In *Deluca v. Farmers Ins. Exch.*, No. 17-cv-00034, 2018 WL 1981393 (N.D. Cal. Feb. 27, 2018), the court granted class certification of California state law overtime claims and related claims for a group of special investigators who allege that Farmers misclassified them as exempt from overtime. The court previously granted conditional certification of the plaintiffs' FLSA overtime claims.

In *Wildman v. American Century Serv., LLC*, 2017 WL 6045487 (W.D. Mo. Dec. 6, 2017), the court certified a class of current and former participants in the American Century Retirement Plan and appointed Nichols Kaster as class counsel. Plaintiffs alleged that defendants breached their fiduciary duties and engaged in prohibited transactions.

In *Ganci v. MBF Inspection Svcs., Inc.*, 323 F.R.D. 249 (S.D. Ohio 2017), the court granted class certification of a class of pipeline inspectors who worked for MBF and were paid based on a day rate, who sought unpaid overtime under Ohio state law. The court had previously granted conditional collective certification of the plaintiffs' FLSA overtime claims. 2016 WL 5104891 (S.D. Ohio Sept. 20, 2016).

In *Moreno v. Deutsche Bank Americas Holding Corp.*, 1:15-cv-09936, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017), the court certified a class of current and former participants in the Deutsche Bank Matched Savings Plan and appointed Nichols Kaster as class counsel. Plaintiffs alleged that Defendants mismanaged the plan in breach of their fiduciary duties under ERISA.

In *Sims v. BB&T Corp.*, No. 1:15-cv-732, 2017 WL 3730552(M.D.N.C. Aug. 28, 2017), the district court certified a class of current and former participants in the BB&T Corporation 401(k) Savings Plan and appointed Nichols Kaster as co-class counsel. Plaintiffs alleged that Defendants breached their fiduciary duties to the Plan.

In *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 8:15-cv-01614, 2017 WL 2655678 (C.D. Cal. June 15, 2017), the district court certified a class of current and former participants in the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan and appointed Nichols Kaster as class counsel. Plaintiffs alleged that defendants improperly managed plan assets and breached their fiduciary duties.

In *Mayfield-Dillard v. Direct Home Health Care, Inc.*, No. 0:16-cv-3489, 2017 WL 945087 (D. Minn. Mar. 10, 2017), the district court granted Plaintiffs' motion for conditional certification, certifying a

group of home health care workers who challenged Defendant's practice of paying straight-time only, for overtime hours worked.

In *McQueen v. Chevron*, No. C 16-02089, 2017 WL 8948943 (N.D. Cal. Feb. 21, 2017), the Court granted conditional certification of an FLSA collective for well site managers and drill site managers who performed services for Chevron throughout the country, rejecting Chevron's arguments that the various intermediary staffing companies and differing contractual terms put the workers on different footing.

In *Tamez v. BHP Billiton Petroleum (Americas), Inc.*, No. 5:15-cv-330, 2015 WL 7075971 (W.D. Tex. Oct. 5, 2015), the court granted plaintiffs' motion for conditional certification, conditionally certifying a class of employees alleging violations of the overtime wage provisions of the Fair Labor Standards Act by a multinational corporation that produces major commodities including oil and gas.

In *Miller v. Fleetcor Technologies Operating Co., LLC*, 118 F. Supp. 3d 1351 (N.D. Ga. 2015), the court denied defendant's motion for decertification, agreeing with plaintiffs that each individual claim and the case as a whole should be kept together, allowing plaintiffs to move forward as a collective group.

In *Pearsall-Dineen v. Freedom Mortgage Corp.*, No. 13-cv-06836-JEI-JS, 2014 WL 2873878 (D. N.J. June 25, 2014), the court conditionally certified the Fair Labor Standards Act overtime case as a collective action. The judge's order authorized notice of the lawsuit to be disseminated to all mortgage underwriters who worked for Freedom Mortgage in the last three years, providing them the opportunity to join the lawsuit and to assert their overtime claims against the defendant for failing to pay them overtime hours.

In *Ellsworth v. U.S. Bank, N.A.*, No. C 12-2506-LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014), the court issued a broad class certification ruling on behalf of plaintiff-borrowers who were force-placed with flood insurance. In its order, the court certified multi-state classes of borrowers spanning forty different states to pursue claims against U.S. Bank for breach of their mortgage agreements stemming from U.S. Bank's force-placed insurance practices. In addition, the court separately certified classes of borrowers in California and New Mexico to pursue claims against U.S. Bank and its force-placed insurance vendor, ASIC, for unjust enrichment, unfair business practices, and/or breach of the covenant of good faith and fair dealing.

In *Arnett v. Bank of America, N.A.*, No. 3:11-cv-01372-SI (D. Or. Apr. 17, 2014), the court preliminarily approved a $31 million settlement for approximately 625,000 class members, the largest common fund settlement ever negotiated in a case involving force-placed flood insurance.

In *Ernst v. DISH Network, LLC*, No. 12-8794-LGS (S.D.N.Y. July 23, 2013), the court appointed Nichols Kaster as interim class counsel for the putative class with claims against Defendant Sterling Infosystems, Inc., finding that Nichols Kaster had "demonstrated it is able fairly and adequately to represent the interests of the putative class.

In *Gustafson v. BAC Home Loan Services, LP*, No. 8:11-cv-00915 (C.D. Cal. Feb. 27, 2013), Judge Josephine Staton Tucker appointed Nichols Kaster as co-lead interim class counsel for multiple putative classes in a force-placed insurance case against Bank of America and other defendants.

In *Spar v. Cedar Towing & Auction, Inc.*, Case No. 27-CV-11-24993 (Minn. Dist. Ct., Oct. 16, 2012), Nichols Kaster won class certification and was appointed class counsel for a class of approximately six thousand Minneapolis consumers who plaintiffs alleged had been charged illegal towing fees by defendant.

| Denial of Motions to Dismiss

In *Intravaia v. National Rural Electric Cooperative Association*, No. 1:19-CV-973, 2020 WL 58276 (E.D. Va. Jan. 2, 2020), the court denied defendants' motion to dismiss in full, holding plaintiffs adequately alleged breaches of fiduciary duty and prohibited transactions under ERISA relating to the administration of the National Rural Electric Cooperative Association's 401(k) plan.

In *Reetz v. Lowe's Companies, Inc.*, No. 518CV00075, 2019 WL 4233616 (W.D.N.C. Sept. 6, 2019), the court denied defendants' motion to dismiss in substantial part, holding plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Lowe's 401(k) plan.

In *Karpik v. Huntington Bancshares Inc.*, No. 2:17-CV-1153, 2019 WL 7482134 (S.D. Ohio Sept. 26, 2019), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management and monitoring of Huntington Bank's 401(k) plan.

In *Belt v. P.F. Chang's*, No. 18-cv-03831 (E.D. Pa. Aug. 15, 2019), the court denied defendant's motion for judgment on the pleadings, holding that the DOL's new interpretation of the FLSA was unreasonable and not subject to deference, confirming that Plaintiffs had stated a claim for minimum wage violations due to P.F. Chang's failing to pay its servers the full minimum wage when they performed related yet untipped labor, such as side work, for more than 20% of their time in a workweek.

In *Nelsen v. Principal Global Investors Trust Co.*, No. 4:18-cv-00115 (S.D. Iowa, Jan. 24, 2019), the court denied defendants' motion to dismiss in substantial part, holding plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of Principal's collective investment trusts.

In *In re M&T Bank Corp. ERISA Litig.*, No. 16-cv-375, 2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018), the court denied defendants' motion to dismiss in substantial part, holding plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the M&T Bank Corporation Retirement Savings Plan.

In *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252 (D. Mass. 2018), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Massachusetts Financial Services

Company MFSavings Retirement Plan and the Massachusetts Financial Services Company Defined Contribution Plan.

In *Beach v. JP Morgan Chase Bank*, No. 1:17-cv-00563 (S.D.N.Y. Mar. 28, 2018), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA.

In *Wildman v. American Century Serv., LLC*, 237 F. Supp. 3d 902 (W.D. Mo. 2017), the court denied defendants' motion to dismiss, finding that plaintiffs adequately alleged breaches of fiduciary duty and prohibited transactions by defendants in connection with the American Century Retirement Plan.

In *Johnson v. Fujitsu Technology Business of America, Inc.*, 250 F. Supp. 3d 460 (N.D. Cal. April 11, 2017), the court denied defendants' motions to dismiss, and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Fujitsu Group Defined Contribution and 401(k) Plan.

In *Moreno v. Deutsche Bank Americas Holding Corp.*, 1:15-cv-09936, 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Deutsche Bank Matched Savings Plan.

In *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 8:15-cv-01614, 2016 WL 4507119 (C.D. Cal. Aug. 5, 2016), the court denied defendants' motion to dismiss in substantial part and held that plaintiffs adequately alleged breaches of fiduciary duty under ERISA relating to the management of the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan.

In *Bowers v. BB&T Corporation*, No. 1:15-cv-732-CCE-JEP (M.D.N.C. Apr. 18, 2016), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Employment Retirement Income Security Act ("ERISA") violations related to defendant's management of plaintiffs' 401(k) Savings Plans are sufficient for litigation to move forward.

In *Brotherston v. Putnam Investments, LLC*, No. 1:15-cv-13825, 2016 WL 1397427 (D. Mass. Apr. 7, 2016), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Employment Retirement Income Security Act ("ERISA") violations related to defendant's management of plaintiffs' 401(k) Savings Plans are sufficient for litigation to move forward.

In *Johnson v. Casey's Gen. Stores, Inc.*, 116 F. Supp. 3d 944 (W.D. Mo. 2015), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Fair Credit Reporting Act violations and the willfulness of defendant's conduct sufficient for litigation to move forward.

In *Lengel v. HomeAdvisor, Inc.*, 102 F. Supp. 3d 1202 (D. Kan. 2015), the court denied defendant's motion to dismiss, finding that plaintiff's allegations regarding Fair Credit Report Act violations and the willfulness of defendant's conduct sufficient for litigation to move forward.

In *Holmes v. Bank of America, N.A.*, No. 3:12-cv-00487, 2013 WL 2317722 (W.D.N.C. May 28, 2013), the court denied four motions to dismiss plaintiffs' claims regarding force-placed insurance and allowing the case to proceed.

In *Walls v. JPMorgan Chase Bank, N.A.*, No. 3:11-cv-00673, 2012 WL 3096660 (W.D. Ky. July 30, 2012), a case regarding force-placed flood insurance, the court denied defendant's motion to dismiss, stating that the plaintiff's mortgage agreement did not explicitly provide that the lender's flood insurance requirement could change at will and that Kentucky contracts contain provisions which can impose limits on discretion afforded by a contract, thus rejecting defendant's interpretation of plaintiff's mortgage agreement for purposes of the motion.

| ### Defeat of Motions to Compel Arbitration

In *Doll House, Inc. v. Tapia*, Nos. 5D16-4235, 5D16-4455 (Fla. DCA Nov. 21, 2017), the Florida District Court of Appeal for the Fifth District affirmed per curium a trial court ruling denying defendant's motion to compel arbitration.  The court of appeals found that the parties never formed a binding agreement, and alternatively that the agreement at issue was unconscionable and therefore unenforceable.

In *Payne v. WBY, Inc.*, 141 F. Supp. 3d 1344 (N.D. Ga. 2015) the court denied defendant's motion to compel arbitration of opt-in plaintiffs in an FLSA conditionally certified collective action. The court held that the defendant's alleged posting of an arbitration agreement on a bulletin board in the breakroom without additional notice to workers of its existence, its terms, or its binding nature was insufficient to establish an offer or acceptance of its terms.



# Nichols Kaster Attorneys

## | Partner Biographies

Don H. Nichols has over 35 years of experience in the practice of law, has tried over 100 cases to verdict and has obtained over $50 million dollars for his class and collective clients. Don is highly respected by the legal community, as seen by his fellowship in The College of Labor and Employment Lawyers. Don was recently selected by his peers for inclusion in *The Best Lawyers in America*® 2015 and 2016 for his work in Litigation-Labor & Employment.  *Education*: B.A. Augsburg College 1968, J.D. University of Minnesota Law School 1971.

James H. Kaster is a Civil Trial Law Specialist who has tried well over 100 cases to verdict or decision.  He has also handled many significant cases on appeal, including a successful case in front of the United States Supreme Court (*Kasten v. Saint-Gobain Performance Plastics Corp.*). He was ranked by Chambers USA as number one among plaintiffs' employment lawyers in Minnesota, was named Lawyer of the Year by Best Lawyers in 2012, and 2016, and has been listed by Super Lawyers of Minnesota as one of the top 10 lawyers in the State.  Jim's success in the courtroom includes earning many million dollar and multi-million dollar recoveries for plaintiffs.  Jim is also a frequent lecturer before local, state, and national organizations on damage recovery and trial skills. He was selected as a Fellow of the American College of Trial Lawyers, a premier professional trial organization in America whose membership is limited to 1% of the trial lawyers in any state or province. He was also selected to be a member of the College of Labor and Employment Lawyers.  *Education*: B.A. Marquette University 1976, J.D. Marquette University 1979.

Paul J. Lukas is one of the co-leaders of the firm's ERISA Class Action Team. Mr. Lukas also has extensive experience litigating class and collective actions and has tried over 50 cases over the course of his career. Mr. Lukas has been recognized by his peers as one of "The Best Lawyers in America" and is frequently named to the Minnesota Super Lawyers list. He also has had many publications and speaking engagements about issues and strategies for plaintiff class action lawyers and the plaintiffs' bar. *Education*: B.A. St. John's University 1988, J.D. William Mitchell College of Law 1991.

Steven Andrew Smith has been named "Attorney of the Year" twice by Minnesota Lawyer for his work protecting employees' rights, named one of "The Best Lawyers in America" for the last seven years, named to the Minnesota Super Lawyers "Top 100" list four times, and named to the Minnesota Super Lawyers list for 17 consecutive years.  In 2020, Steve was elected as a Fellow of the College of Labor and Employment Lawyers. Steve was honored by the Minnesota Chapter of the National Employment Lawyers Association as the recipient of the 2014 Karla Wahl Dedicated Advocacy Award. The Award is given to recipients "for their ceaseless and courageous efforts" to protect and advance the rights of Minnesota employees. Steve was also the recipient of the 2011 Distinguished Pro Bono Service Award from the United States District Court for the District of Minnesota, was selected for the Merit Selection Panel regarding the Re-Appointment of U.S. Magistrate Judge Arthur J. Boylan (D. Minn. 2012), was further recognized in 2014 by the United States District Court and Chief Judge Michael J.

Davis for his involvement in the Pro Se Project, a project by the United States District Court of Minnesota for assisting individuals representing themselves in federal court, and has received the Martindale Hubble AV Preeminent rating. Steve's trial experience includes trials to verdict in sexual harassment, whistleblower, reprisal/retaliation, commission, contract, gender discrimination, marital status discrimination, disability, and wage and hour claims. Steve has also litigated several notable cases having substantial effect on employees' rights under state and federal employment laws. Steve is often invited to lecture on employment issues both nationally and locally. He has also authored a number of articles on employment law issues such as sexual harassment in the workplace. *Education*: B.A. Concordia College 1990, J.D. William Mitchell College of Law 1995 *cum laude*.

Michele R. Fisher is a managing partner, and Chair of the Firm's Business Development and Marketing Groups, which originate class and collective actions and market the firm.  She has dedicated her career to litigating wage and hour cases in an aggressive, creative, and strategic manner. She is one of the leaders of a practice group that has been described as a "powerhouse" for mass wage and hour litigation and arbitration.  Michele has the experience, resources, and staff to take on any company regardless of size.  She has handled several jury trials and arbitrations in her fight for employee rights and prides herself on the firm's reputation as a leader in national wage and hour class and collective action litigation.  Michele has litigated hundreds of class and collective actions involving positions such as home health aides, loan officers, retail salespersons, oil and gas workers, assistant managers, field service engineers, call center representatives, exotic dancers, inside sales representatives, restaurant workers, insurance adjusters, property specialists, property managers, installers, service technicians, and road construction laborers. She is additionally admitted to practice before the United States Court of Federal Claims.

Michele is active in several organizations. She is the current Co-Chair of the Practicing Law Institute's Wage & Hour Litigation & Compliance seminar, and Co-Vice-Chair of the ABA Section of Labor & Employment Law, Annual Conference Planning Committee., She previously served as the Co-Chair of the ABA Section of Labor & Employment Law, Federal Labor Standards Legislation Committee, the Co-Chair of the ABA Section of Labor & Employment Law, Revenue and Partnership Development Committee, Track Coordinator, ABA Section of Labor and Employment Law, Wage & Hour Track for Annual LEL Conference, Co-Chair, ABA Section of Labor & Employment Law, Federal Labor Standards Legislation Committee, FLSA Subcommittee, and Co-Chair, ABA Section Labor & Employment Law, Federal Labor Standards Legislation Committee, WARN Act and Employee Polygraph Protection Act Subcommittee.  She has also served as the Co-Editor-in-Chief, Associate Chapter Editor, and Contributing Author of the ABA Section of Labor & Employment Law Federal Labor Standards Legislation Committee, Fair Labor Standards Act Midwinter Report, an editorial board member for BNA's the Fair Labor Standards Act Treatise, and a chapter editor for BNA's Wage and Hour Laws: A State-by-State Survey. She designed and worked with a web company to develop a website called Arbitratorrater.com, providing a resource at no charge to worker and consumer rights advocates. She has been named one of the Best Lawyers in America, Super Lawyers, Top-Rated Lawyer by Avvo, Rising Star lists repeatedly, is a member of the Top 100 National Trial Lawyers, America's Top 100 High Stakes Litigators, Top 100 Lawyers

National Advocates, Top 10 Wage and Hour Lawyers, Lawdragon 500 Leading Plaintiff Employment Lawyers, and has been named a Lawyer of Distinction. She is a member of the Worker's Rights Advocate Liaisons to U.S. House of Representatives, Committee on Education & Labor, meeting with the House Committee staff in Washington D.C. to discuss potential changes to the Fair Labor Standards Act. Michele is a member of the National Employment Lawyers Association, National Employment Law Project, American Association for Justice, and National Trial Lawyers. Michele volunteers as an attorney for a foster child through the Children's Law Center. *Education*: B.A. St. Cloud State University 1997, J.D. William Mitchell College of Law 2000.

*Matthew H. Morgan* is a managing partner at the Firm and a Minnesota State Bar Association Civil Trial Specialist. Much of Matt's career has focused on litigating class and collective actions on behalf of individuals seeking minimum wage and overtime pay and fighting discrimination. Last fall, Matt first-chaired a nineteen-day age discrimination class action trial on behalf of nearly 1000 people against the federal government. Matt has been recognized as a Super Lawyer every year since 2014, and has been named to the Who's Who in Employment Law by Minnesota Law and Politics. Matt formerly served as an  adjunct faculty member at William Mitchell College of Law (now Mitchell Hamline) teaching representation skills to first-year students and advanced advocacy to second- and third-year students. Matt is a frequent lecturer at legal seminars, focusing on litigation-related topics including trials and taking 30(b)(6) depositions. *Education*: B.A. University of Minnesota 1996, J.D. William Mitchell College of Law 2000.

*Kai H. Richter* is an experienced attorney who has fought for the rights of everyday people throughout his legal career. As one of the leaders of Nichols Kaster's Consumer Class Action Team, Kai has handled numerous cases on behalf of consumers against banks, mortgage servicers, and other large companies, and successfully argued before the First Circuit Court of Appeals in *Lass v. Bank of America, N.A.*, 695 F.3d 129 (1st Cir. 2012). In addition, Kai also is one of the leaders of the firm's ERISA litigation team, and is currently spearheading several cases involving breach of fiduciary duty claims against companies for mismanagement of their employee retirement plans. During his tenure at the firm, Kai has negotiated several class action settlements that have made a combined total of more than $200 million in relief available to consumers nationwide. Prior to joining Nichols Kaster in April 2010, Kai managed the Complex Litigation Division of the Minnesota Attorney General's Office, where he supervised and handled a large number of consumer enforcement cases. For example, in June and September of 2009, Kai co-chaired a three-week trial involving claims for fraudulent sales of annuities and legal plans to over 1,200 Minnesota senior citizens and won a favorable judgment from the trial court. In addition, he also spearheaded a significant enforcement action against Sprint Nextel relating to wrongfully-imposed contracts and early termination fees. Kai also has several years of prior experience representing plaintiffs in private practice, including two landmark class actions. For example, in *Braun v. Wal-Mart Stores, Inc.*, a statewide wage and hour class action against Wal-Mart, Kai briefed and successfully co-argued the issue of class certification and significantly participated in the three-month trial of the case, paving the way for a multi-million-dollar payout to Wal-Mart's Minnesota workers. In addition, Kai was one of only three plaintiff trial attorneys in *Grutter v. Bollinger*, a landmark class action lawsuit against the University of Michigan Law School that was decided by the United

States Supreme Court in 2003.  Kai has taught legal writing at Hamline University and previously served as a co-director of the Robert F. Wagner Moot Court Program at the University of Minnesota Law School.  *Education*: B.A. Dartmouth College 1995 *cum laude*, J.D. University of Minnesota *cum laude*.

Rachhana T. Srey is a Partner at Nichols Kaster, PLLP who has extensive litigation experience, primarily dedicating her legal practice to national wage and hour complex class and collective action employment litigation. She has been a zealous advocate for thousands of employees over her 14-year career, representing a wide variety of workers in many industries including those who work in healthcare, insurance, financial services, communications, retail, manufacturing, and security industries as well as federal sector employees. Rachhana's exceptional case management and advocacy skills, dedication to her clients, strong work ethic and outgoing personality have earned her the respect of her clients and of her colleagues in the legal community. Rachhana has tried several wage and hour cases, most notably obtaining a jury verdict that was upheld by the Sixth Circuit in favor of a group of nearly three hundred cable installers.  In addition to her wage and hour practice, Rachhana is also currently litigating a large age discrimination class case venued at the EEOC. She is active in several organizations, holding leadership positions in a few. Rachhana is currently the Co-Chair of the National Employment Lawyer Association's ("NELA") Wage & Hour Committee and Practice Group and the Co-Chair of the Association of Justice's ("AAJ") Wage & Hour Litigation Group. She is also an active Board Member of Mid-Minnesota Legal Aid. Rachhana is often invited to speak nationally and locally on a wide range of topics including class and collective action litigation strategies, wage and hour litigation, discovery issues, recent developments in the law, and age and gender discrimination.  *Education*: B.A. University of Minnesota 2000, J.D. William Mitchell College of Law 2004 *cum laude*.

Matthew C. Helland is an experienced and tenacious litigator who has fought for workers' and consumers' rights throughout his career. Matt serves as the managing partner of Nichols Kaster's San Francisco office, where he focuses his practice on class and collective wage and hour cases filed in California and throughout the country. Handling both large class actions and individual matters throughout this career, Matt has developed a record of success in significant and complex litigation. Matt litigates each of his cases with the same zealous advocacy and passionate protection of his clients' rights, whether the case involves millions of dollars and thousands of clients, or thousands of dollars and one individual. In addition to representing workers across the country in wage and hour actions, Matt has also handled cases involving WARN Act violations, breach of contract, and severance negotiations. Matt is licensed in both California and Minnesota.  Matt is an active volunteer at Workers' Rights Clinics through Legal Aid Work, where he supervises student attorneys in providing legal assistance to low wage workers. While attending the University of Minnesota Law School, Matt was a staff member and Managing Tribute Editor of the University of Minnesota Journal of Global Trade. He also participated in the Child Advocacy Clinic, representing the interests of children as a student attorney in both Family and Juvenile Court.  *Education*: B.A. Rhodes College 2002 *magna cum laude*, J.D. University of Minnesota Law School 2005 *magna cum laude*.

David E. Schlesinger David Schlesinger is an experienced attorney who has been recognized for the quality of his work for employees. He is an MSBA Certified Employment Law Specialist who has

been selected as a Super Lawyer for the last seven years. He teaches Law in Practice at the University of Minnesota Law School and is the former president of the Minnesota Chapter of the National Employment Lawyers Association. David has successfully litigated a wide variety of employment claims, including several significant cases involving gender discrimination, cases under the Americans with Disabilities Act, and many other claims. His practice also includes an emphasis on the intersection of employment and business disputes, including litigation of breach of fiduciary duty and minority shareholder claims. He has effectively defended employees from non-compete and trade secret claims brought by their former employers. *Education*: B.A. Mary Washington College 2001 *cum laude*, J.D. University of Minnesota Law School 2006 *cum laude*.

Anna P. Prakash is a tough and determined litigator. Her practice focuses on complex class actions on behalf of protected groups and those harmed by corporate or governmental wrongdoing. Whether in the context of civil rights, illegal pay practices, loan issues, insurance coverage, consumer fraud, or other harm to vulnerable communities, Anna seeks out injustices to hold wrongdoers accountable and give all people a voice. She cares about and fights for her clients, brings a high level of skill and intellect to the fight, and has achieved great success for her clients in state and federal courts around the country, including the summary judgment victories referenced above in *Huff*, *Hart*, and *Clincy*, successful appeal in *Bible v. United Student Aid Funds*, and the trial verdict in *FTS*. Anna also serves on the Board of Directors of the Public Justice Foundation, a nationwide charitable organization supporting high-impact lawsuits to combat social and economic injustice and protect the Earth's sustainability. She is a frequent speaker at national legal seminars, an adjunct professor of legal writing at the University of Minnesota Law School, and a past board member of the Minnesota chapter of the National Employment Lawyers' Association. *Education*: B.A. University of Michigan 2002, J.D. Cornell Law School 2005.

Rebekah L. Bailey is a tireless advocate dedicated to civil rights and social justice. She has helped tens of thousands of employees and consumers recover millions of dollars primarily in complex class and collective actions across the country. Rebekah has worked on the firm's wage and hour team and was a founding member of the consumer practice area as well as the firm's civil rights and impact litigation group. Rebekah has been recognized as a Minnesota Super Lawyer every year since 2014. Over the years, she has served on numerous trial and arbitration teams, successfully first-chairing her first bench trial. Rebekah has achieved several affirmative summary judgment determinations and certification decisions, including in *Rego*, *Dunham-Sunde*, *Henderson*, *Vaughan*, *Spar*, and *Norris-Wilson*, mentioned above. Rebekah leads the firm's e-discovery committee. She has spoken at national seminars on various topics, including electronic discovery, class litigation, arbitration, equal pay, and various wage and hour issues. Rebekah is a practical instructor for the University of Minnesota's Law & Practice course. She is a member of the District of Minnesota's Federal Practice Committee, and a board member for the Complex Litigation eDiscovery Forum. She is very involved in the ABA's Labor and Employment Law section. She serves as the employee vice chair of the section's treatise committee; she is an associate editor for the FLSA Committee's Mid-Winter Report; and she serves as a FLSL liaison to the ABA/LEL CLE Coordinating & Resources Committee. *Education*: B.S. Grand Valley State University 2004 *magna cum laude*, J.D. University of Minnesota Law School 2008 *magna cum laude*.

Reena I. Desai is a partner at Nichols Kaster, PLLP, in the firm's Minneapolis office. She is a skilled and meticulous litigator, who has represented thousands of employees in class and collective actions to recover unpaid overtime, minimum wages, commissions, and other types of compensation. Reena has also advocated for employees in cases involving race, age and disability discrimination. She is a board member of a legal non-profit and frequently speaks at legal seminars and conferences across the country. Reena has dedicated the majority of her career to helping employees combat wage theft and recover unpaid overtime compensation, minimum wages, and other unpaid compensation. She has represented employees in a variety of industries, including investigators, home health care workers, loan officers, mortgage underwriters, field service technicians, sales representatives, and restaurant workers. Reena has also litigated discrimination cases on both a class and individual level, advocating for employees whose employers have discriminated against them because of their age, race or disability. Reena has been asked to share her knowledge and experience with her peers, serving as a speaker at several national conferences. She has lectured on topics including wage and hour litigation, electronic discovery issues, attorney-client privilege and mediation/settlement. Reena also serves on the Board of Directors for the Minnesota Justice Foundation, a legal non-profit in Minnesota, and has been named a Rising Star by Minnesota Super Lawyers every year since 2014. *Education*: B.A. George Washington University 2002 *magna cum laude*, J.D. University of Minnesota Law School 2007 *cum laude*.

Robert L. Schug is a partner on Nichols Kaster's Civil Rights and Impact Litigation team. Robert has more than a decade of experience litigating cases through trial in both court and arbitration. He has represented employees across the country on a variety of issues, including race, gender, and disability discrimination, employee misclassification, unpaid overtime, and unpaid wages. Robert previously served as Director of Litigation at the Impact Fund, a nationally recognized non-profit law firm in Berkeley, California devoted to achieving social justice through large scale impact litigation. He has been recognized as a Rising Star by Northern California and Minnesota Super Lawyers. He is licensed in California and Minnesota. *Education:* B.S. Middle Tennessee State University 2003 *summa cum laude*; J.D. William Mitchell College of Law 2006 *summa cum laude*.

Brock J. Specht is a member of Nichols Kaster's national class-action litigation team. He represents consumers, employees, and retirees in lawsuits against some of the country's largest corporations, holding these companies accountable when they fail to deal fairly and honestly with their employees and customers. His recent cases have led to the recovery of millions of dollars in retirement benefits for thousands of participants in 401(k) plans nationwide. Prior to joining the firm, Brock worked with a major Twin Cities law firm, and as a law clerk for two judges on the Minnesota Court of Appeals. Brock also has worked as a Special Assistant State Public Defender, *pro bono*, and as an Adjunct Professor of Law at the University of St. Thomas School of Law. *Education*: B.A. University of Minnesota 2002, J.D. University of St. Thomas School of Law 2007 *magna cum laude*.

Carl F. Engstrom is a subject matter expert on Nichols Kaster's ERISA Litigation Team. As a founding member of the ERISA litigation group, Mr. Engstrom has been counsel of record in every case brought by the group since its inception in 2015. In that time, the ERISA litigation group has negotiated

settlements totaling approximately $80 million on behalf of retirement plan participants shortchanged by excessive fees and imprudent retirement plan investments. Before joining Nichols Kaster, Mr. Engstrom clerked for judges at both the Minnesota Court of Appeals and Hennepin County District Court.  Prior to entering the legal profession, Mr. Engstrom spent six years working as a financial advisor, providing retirement and investment advice to hundreds of clients, and earning the Certified Financial Planner™ designation.  *Education*:  B.A. Harvard College 1998, J.D. University of Minnesota Law School 2012 *magna cum laude*.

| Associate Biographies

Ben J. Bauer is a member of Nichols Kaster's ERISA litigation team where he represents employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement. Prior to joining the firm, Ben clerked for Judge Tom Fraser in Hennepin County District Court. During law school, he interned for the Minnesota Department of Human Rights, the ACLU of Minnesota, and earned the Law School Public Service Award. Prior to law school, Ben taught 7th grade English in Tulsa, Oklahoma and continued to work in schools while completing his law degree in Mitchell Hamline's night program. **Education:** B.A., St. John's University, 2011, *magna cum laude*, J.D., Mitchell Hamline School of Law, 2017, *magna cum laude*.

Caroline E. Bressman is a member of the firm's national wage and hour litigation team where she fiercely advocates for workers' rights. Caroline is dedicated to furthering social justice and equity in the workplace on behalf of employees challenging their employers' unfair practices. Caroline is a contributing editor to the Fair Labor Standards Act Midwinter Report of the ABA Section of Labor and Employment Law. During law school, Caroline served as a staffer, and subsequently Symposium Articles Editor, for the *Minnesota Law Review* and clerked for a nonprofit legal and policy advocacy organization focused on addressing gender inequality. Caroline was also the recipient of the ABA-Bloomberg BNA Award for Excellence in Health Law. *Education:* B.A. St. Olaf College 2015 *magna cum laude*, J.D. University of Minnesota Law School 2018 *cum laude*.

Daniel S. Brome worked with the California Labor Commissioner while in law school and served as the Editor-in-Chief of the Berkeley Journal of Employment and Labor Law, and as Director of the Workers' Rights Clinic. After law school, Daniel worked with a California law firm representing workers and unions in arbitrations and litigation. Daniel continues pursuing his passion for employment law at Nichols Kaster, working with the firm's national wage and hour team out of the San Francisco office. *Education:* B.A. Princeton University 2005, J.D. University of California Berkeley School of Law 2011.

Grace Chanin is a member of Nichols Kaster's ERISA litigation team where she represents employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement.  Prior to joining the firm, Grace clerked for Judge Connolly, Judge Larkin, and Judge Bjorkman at the Minnesota Court of Appeals.  She

graduated *magna cum laude* from the Mitchell Hamline School of Law and received three separate CALI awards for her work as the top-performing student in a class.  During law school, she was a member of the Mitchell Hamline law review, worked as a law clerk for a Minneapolis business law firm, and received the Law School Public Service Award for her work as a pro bono law clerk at a top Minneapolis law firm.  *Education:*  B.A., Minnesota State University 2012 *magna cum laude*, J.D. Mitchell Hamline School of Law 2018 *magna cum laude*

**H. Clara Coleman** is a member of Nichols Kaster's National Wage and Hour litigation Team where she fights for employees' right to hard-earned wages. Prior to joining Nichols Kaster, Clara served an Attorney-Advisor to the Honorable Christopher Larsen at the U.S. Department of Labor, Office of Administrative Law Judges in San Francisco where she collaborated with ALJ Larsen to manage and decide employment-related matters. Clara also focused on the advancement of workers' rights throughout law school. She advocated for employees in her two clerkship positions at plaintiff-side employment firms, and represented a wage and hour client as a student-attorney for the Public Justice Advocacy Clinic.  *Education:* B.A., Loyola University Maryland, *summa cum laude*; J.D., George Washington University School of Law, *with honors.*

**Charles A. Delbridge** is a member of Nichols Kaster's Civil Rights and Impact Litigation Team where Charlie focuses on class actions on behalf of employees, consumers, and other protected groups. Charlie's cases challenge discrimination of all types, fraud, and other unfair practices.  He has nearly a decade of experience as a civil litigator across a broad range of substantive practice areas. Charlie has been recognized as a "Minnesota Rising Star" by *Super Lawyers* magazine, and an "Up & Coming Attorney" by *Minnesota Lawyer.* He is active in professional organizations, having served as a member of the Board of Directors of both the Minnesota State Bar Association and Minnesota Continuing Legal Education. *Education:* B.A. University of Wisconsin-Madison 2003, J.D. William Mitchell College of Law 2006 *magna cum laude.*

**Laura A. Farley** is a member of Nichols Kaster's individual rights litigation team and is dedicated to protecting the rights of current and former employees who face a wide-range of employment-related issues, including discrimination, harassment, retaliation, minority shareholder, and contract disputes. Prior to joining Nichols Kaster, Laura worked as an associate for a Minneapolis litigation firm, focusing on minority shareholder, employment, and contract disputes. During law school, Laura was on the Executive Board of the *Minnesota Law Review*, the board of the Women's Legal Student Association, and volunteered with the Advocates for Human Rights. Prior to attending law school, Laura worked for a Fortune 100 company in business-to-business sales supporting operations and logistics in small businesses.  *Education:* B.A. University of St. Thomas 2010 *magna cum laude*, J.D. University of Minnesota Law School 2015.

**Kate Fisher** is a Case Development Attorney for the Nichols Kaster's Civil Rights and Impact Litigation Practice Group. In this role, she investigates new cases and works with other members of the Group to advance litigation.  Kate formerly served as an Associate Attorney for the firm's Individual Practice Group, where she represented employees in a wide range of employment-related matters,

including but not limited to, allegations of discrimination, harassment, retaliation, violations of the Family and Medical Leave Act, and whistleblower claims. In addition to her practice, Kate has also served as an Adjunct Professor at St. Thomas Law School and Mitchell Hamline School of Law. *Education*: B.A. College of St. Catherine 2006 *summa cum laude*; J.D. University of St. Thomas School of Law 2011 *cum laude*.

Matthew A. Frank was named a 2017 Minnesota Lawyer of the Year.  Matt attended the University of Michigan Law School as a Clarence Darrow Scholar. At graduation, he received the Robert S. Feldman Award for outstanding work in labor and employment law. Prior to joining Nichols Kaster in 2016, Matt clerked for the Hon. Susan N. Burke in Hennepin County District Court and practiced plaintiffs' employment law at another Twin Cities firm. Matt is part of Nichols Kaster's individual rights team.  *Education:* B.A. University of Colorado Boulder 2002 *summa cum laude*, Philosophy Ph.D. (ABD) University of Minnesota, J.D. University of Michigan Law School 2013 *cum laude*.

Melanie A. Johnson is a member of Nichols Kaster's Civil Rights and Impact Litigation team. Prior to joining the firm, Melanie clerked for Judge Matthew E. Johnson at the Minnesota Court of Appeals. During law school, she served as a managing editor of the *Minnesota Law Review*, student director of the Child Advocacy and Juvenile Justice Clinic, research assistant in the ara of juvenile law, and board member of the student chapter of the Minnesota Justice Foundation.  She received the Mondal Hall Engagement Award in 2019. *Education:* B.A University of Oregon 2010 *magna cum laude*, J.D. University of Minnesota Law School 2019 *cum laude*.

Lucas J. Kaster is a skilled and seasoned trial lawyer focused on aggressive advocacy, creative solutions, and responsiveness to clients. As a member of Nichols Kaster's individual rights team, Lucas represents clients in a wide-range of employment matters, including harassment, retaliation and discrimination claims. Lucas also represents clients in civil rights claims, such as police misconduct and prisoner rights.  Over his career, Lucas has tried many cases to verdict or decision. Most recently, Lucas represented a South Dakota law enforcement officer in a retaliation and sexual harassment lawsuit that resulted in a $1.2 million jury verdict. In a separate lawsuit, Lucas represented four golf course employees who were subject to harassment and retaliation in a court trial that resulted in a plaintiff's verdict and treble damages under the Minnesota Human Rights Act ("MHRA"). Lucas uses this unique trial experience to drive litigation strategy and provide his clients the best possible representation. Lucas is also an experienced appellate advocate. In 2018, Lucas successfully argued before the Ninth Circuit Court of Appeals in *Michael Frost v. BNSF Railway Co.*, 9:15-cv-000124-DWM. The Ninth Circuit's decision addressed a hotly debated subject under the Federal Railway Safety Act ("FRSA"). The question before the Court was whether the honest belief instruction was proper because the FRSA's contributing factor standard required plaintiffs to separately prove discriminatory intent. In the opinion, the Ninth Circuit definitively held that there is no requirement that FRSA plaintiffs separately prove discriminatory intent, and thus the instruction was error.  Due to his experience, Lucas is a well-respected and sought-after speaker. Lucas is a frequent presenter at the ABA's Labor and Employment and Employment Rights and Responsibilities conferences. In February 2019, Lucas also spoke at the College of Labor and Employment Lawyer's Regional Program for the 4th and 11th Circuits in

Charleston, South Carolina. Lucas participated in a three-member panel titled: *The #MeToo Movement One Year Later: Where Are We Now?* Lucas is a member Twin Cities Diversity in Practice's Emerging Leaders Group and a contributor to Nichols Kaster's training and marketing committees. *Education:* B.A. Villanova University 2004, J.D. Marquette University Law School 2011.

Kayla M. Kienzle is a member of Nichols Kaster's National Wage and Hour Litigation Team where she advocates on behalf of workers seeking unpaid wages in class and collective actions across the country. Kayla is also a contributing author to the ABA Fair Labor Standards Act Midwinter Report. Prior to joining the firm, Kayla clerked for the Honorable John R. Rodenberg and the Honorable Michelle A. Larkin at the Minnesota Court of Appeals. During law school, she served as Submissions Editor for the University of St. Thomas Law Journal and as President of the Women Law Students Association. She also worked as a law clerk at the Hennepin County Public Defender's Office and a legal intern at the United States Department of Justice, Office of Justice Programs, Office for Civil Rights. Prior to attending law school, Kayla worked in retail management. *Education*: B.A., Iowa State University, J.D., University of St. Thomas School of Law, *cum laude*.

Michelle L. Kornblit is a member of Nichols Kaster's individual rights practice group and assists employees with a wide-range of claims, including discrimination, harassment, retaliation and whistleblower protection. Michelle has been dedicated to employee rights and challenging unfair employment practices her entire career. While in law school, Michelle interned with an Administrative Law Judge of the U.S. Equal Employment Opportunity Commission, and with the Women's Rights Project of the American Civil Liberties Union. Prior to joining Nichols Kaster, Michelle was an associate with a leading employment litigation firm in New York, representing employees in individual, multi-party and class action cases. *Education:* B.A. New York University 2010 *cum laude*, J.D. Benjamin N. Cardozo School of Law 2014 *cum laude*.

Lindsey E. Krause is a member of Nichols Kaster's individual rights practice group, where she is committed to preserving workplace fairness and seeking justice for those employees whose rights have been violated. She represents individuals who have been discriminated against or terminated for unlawful reasons, including their sex, race, age, disability, or for blowing the whistle on illegal activity. Lindsey also assists clients by reviewing and negotiating severance packages and non-competition agreements. She also currently handles the firm's FOIA litigation docket, assisting organizations with obtaining government records to which they are entitled. Prior to joining Nichols Kaster, Lindsey served as a judicial law clerk for the Honorable Frank J. Kundrat in St. Cloud, Minnesota. During law school, Lindsey was a Lead Editor on the *Journal of Law & Inequality* and the President of the Women's Law Student Association. *Education*: B.A. College of St. Benedict 2011 *magna cum laude* and with distinction; J.D. University of Minnesota Law School 2016.

Jennifer K. Lee is a member of the firm's national class-action ERISA team. She is a skilled litigator who has dedicated her legal career to advocating on behalf of the vulnerable. As a member of Nichols Kaster's ERISA practice, she is proud to represent employees whose hard-earned retirement savings have been squandered due to excessive fees, imprudent investments, and

employer self-dealing. Through class action litigation, Jenny has helped recover tens of millions of dollars in retirement savings for her clients. Prior to joining Nichols Kaster, Jenny worked as Pro Bono Counsel at a national law firm, a staff attorney with the American Civil Liberties Union's national office in New York, and as an associate at the corporate law firm Cravath, Swaine and Moore in New York City. During law school, Jenny served as Editor-in-Chief of the *University of Chicago Legal Forum* and interned for New York's Legal Aid Society's Prisoners' Rights Project, Planned Parenthood Federation of America, and the ACLU of Illinois. J *Education*: B.A. Yale University 2010 *cum laude*, J.D. University of Chicago Law School 2006 with honors.

**Brandon T. McDonough** is a member of Nichols Kaster's ERISA litigation team where he represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement.  Prior to joining the firm, Brandon practiced plaintiffs-side consumer and civil rights law. *Education:* B.A. University of Chicago 2007, J.D. University of Minnesota Law School 2012 *cum laude.*

**Chloe A. Raimey** is a member of Nichols Kaster's ERISA litigation team where she represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and other mismanagement. Prior to joining Nichols Kaster, she clerked for Justice Anne McKeig on the Minnesota Supreme Court. During law school, Chloe served as the editor-in-chief of the *University of St. Thomas Law Journal*, worked as a litigation law clerk for the League of Minnesota Cities, interned with the Advocates for Human Rights, and represented consumers in Chapter 7 bankruptcy proceedings. Prior to law school, Chloe gained additional writing experience as well as employee benefits knowledge as a communications specialist with a focus on human resources topics. *Education:* B.A. University of Florida 2008 *summa cum laude*, J.D. University of St. Thomas School of Law 2016 *magna cum laude.*

**Neil Pederson** has been practicing law with the firm since October 2017. Prior to that, he clerked for the Honorable Karen A. Janisch in Hennepin County State District Court.  His practice has focused on national class action employment discrimination litigation and national wage and hour class and collective action litigation. He has represented hundreds, if not thousands, of workers who have been discriminated against or who are seeking to recover lost wages, including overtime pay and minimum wages, through collective, class, and hybrid actions. Since he started at Nichols Kaster, Neil has worked on multiple class and collective actions, involving positions such as railroad workers, home health aides, delivery drivers, oil field workers, and nurses. Neil has handled managing discovery and filing class certification and other motions in these cases. In addition to being a litigation associate at the firm, Neil also works with its Business Development Group, which originates class and collective actions. Neil is also a contributing editor to the ABA Section of Labor and Employment Law's Fair Labor Standards Act Midwinter Report. Neil volunteers as an attorney for the Mid-Minnesota Legal Aid's Housing Section  *Education*: B.A. University of Minnesota 2007 *summa cum laude*, Political Science Ph.D. work University of Chicago 2008-2010, J.D. William Mitchell College of Law 2015 *summa cum laude.*

Nicole J. Schladt is a member of Nichols Kaster's Civil Rights and Impact Litigation group. Prior to joining Nichols Kaster, Nicole served as a judicial law clerk for the Honorable Susan M. Robiner in Minnesota's Fourth Judicial District. During her time in law school, Nicole co-founded Emory LGBTQ Legal Services (ELLS), an organization created to provide pro bono legal assistance to members of Atlanta's queer community. Her work with ELLS led to her receiving the 2018 Marion Luther Brittain Award, Emory University's highest student honor, as well as the 2018 National LGBT Bar Association Student Leadership Award. Nicole's academic research prior to law school explored the intersections of international human rights law, feminist theory, and international politics. *Education:* B.A. University of Kentucky 2014 summa cum laude, M. Phil. University of Cambridge 2015, J.D. Emory University School of Law 2018 *with honors.*

Jacob T. Schutz is a member of Nichols Kaster's ERISA litigation team where he represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement. In law school, Jacob was an editor of the ABA Journal of Labor & Employment Law and published an article on the association provision of the Americans with Disabilities Act. Prior to joining Nichols Kaster, he was an associate in a firm acting as general counsel for Taft-Hartley employee benefit funds. *Education:* B.A. University of Pennsylvania 2010, J.D. University of Minnesota Law School 2013 *magna cum laude.*

Mark E. Thomson is a member of Nichols Kaster's ERISA and consumer litigation teams where he represents current and former employees whose retirement accounts have been shortchanged due to excessive fees, imprudent investments, employer self-dealing, and general mismanagement, as well as consumers who have been harmed by corporate wrongdoing. Prior to joining Nichols Kaster, he clerked for Justice David Lillehaug and Justice Anne McKeig on the Minnesota Supreme Court. During law school, Mark was an editor of the *Harvard Civil Rights-Civil Liberties Law Review* and interned with the Consumer Financial Protection Bureau, the National Consumer Law Center, and the Massachusetts Attorney General's Office. *Education*: B.A. University of Minnesota 2011 *summa cum laude,* J.D. Harvard Law School 2016.

## | Staff Attorney Biographies

Laura A. Baures is dedicated to fighting for employees and applicants who have been discriminated against for unlawful reasons including on the bases of their age, disability, race, color, national origin, religion, and sex. In addition, she helps employees pursue their fair and equal wages owed in the eyes of the law. Her work focuses primarily on representing classes fighting against discrimination. Laura has experience in both federal and private sector matters. During law school, Laura won the MSBA Labor and Employment Law Section Law Student Award in Labor Law. Laura participated in the AAJ Regional Trial Competition, was president of the Women Law Students Association, and volunteered for over 100 hours through the Minnesota Justice Foundation working as certified student attorney for the Washington County Public Defender's Office and at Eldercare Rights Alliance. She also completed an externship with the Honorable Gail Chang Bohr at Minnesota's Second Judicial District. Before law school, Laura worked for a local company that provides residential care for

people with disabilities where she discovered her passion for employment law. *Education:* B.A. University of Wisconsin – Eau Claire *cum laude*, J.D. William Mitchell College of Law.



# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

# As a current or former ERP implementation consultant employed by Tyler Technologies, a class action lawsuit may affect your rights.

*A court authorized this notice. This is not a solicitation from a lawyer.*

- Implementation consultants have sued Tyler Technologies ("Tyler"), alleging that they were misclassified as overtime exempt in violation of the Fair Labor Standards Act ("FLSA") and California law.

- The Court has certified this case as a class action lawsuit for the class's California law claims.

- The California class consists of all persons who worked for Defendant in the State of California as ERP implementation consultants, at any time within four (4) years prior to the date of the filing of this Complaint through the date of final disposition of this action.

- The Court has not decided whether Tyler did anything wrong. There is no money available now and no guarantee there will be.

- **Your legal rights may be affected by this lawsuit. You have a choice to make now.**

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | |
|---|---|
| **DO NOTHING**<br><br>REMAIN A MEMBER OF THE CALIFORNIA CLASS | • If you worked in California for Tyler as an ERP implementation consultant between November 20, 2015 through the final disposition of this action, then you are <u>automatically</u> a part of the California class.<br><br>• If you would like to remain a member of the California class, there is nothing further you need to do.<br><br>• You agree to be represented by the Class Representatives and to be bound by their decisions.<br><br>• By remaining a member of the California class, you retain the possibility of obtaining an award of unpaid overtime wages, other due wages, unpaid meal premiums, wage statement and waiting time penalties, and restitution of wages that may come from a trial or a settlement of this class action lawsuit.<br><br>• If you decide to remain a class member, you give up the right to sue Tyler individually for these claims under California law. You will be bound by any favorable or unfavorable decision of the Court. |
| **EXCLUDE YOURSELF FROM THE LAWSUIT** | • If you do not want to participate in the lawsuit, follow the exclusion procedure explained in Paragraph 9 below.<br><br>• Retain the right to sue Tyler yourself and give up the right to be a class member in this lawsuit and the possibility of obtaining a recovery that may come from a trial or settlement of this lawsuit. |

## **BACKGROUND INFORMATION**

### **1. Why did I get this notice?**

Tyler's records reflect that you worked for Tyler in California as an ERP implementation consultant at some point following November 20, 2015.

The Court has certified a class action lawsuit that may affect you.  A trial may be necessary to decide whether the claims being made against Tyler on your behalf are correct or whether the defenses to those claims are correct.  The Honorable William H. Alsup, a judge in the U.S. District Court, Northern District of California, is overseeing this lawsuit.

### **2. What is this lawsuit about?**

On November 20, 2019, a case was filed against Defendant Tyler Technologies on behalf of the Named Plaintiff and all other similarly situated individuals who worked as implementation consultants at Tyler during the class period.  Specifically, Plaintiffs allege that Tyler misclassified implementation consultants as exempt employees and that Tyler's failure to pay overtime to implementation consultants violated the law.  The case alleges that these individuals are owed overtime pay under the California Labor Code.  Plaintiffs also allege that Tyler is liable for penalties because it did not provide accurate wage statements and did not timely pay all wages due. Plaintiffs allege that Tyler's violations of law amounted to unfair competition.

Tyler denies Plaintiffs' allegations and maintain that the Plaintiffs and class members were properly classified as exempt employees and do not have claims under California law.

### **3. What is a class action and who is involved?**

In a class action lawsuit, one or more individuals called "Class Representatives" sue on behalf of a group of other people who have similar claims.  In this case, Plaintiff Aaron Kudatsky is the Class Representative.  If you work or worked as an implementation consultant during the class period in California, you are automatically included in the class.  You do not have to file any documents to join the class action. You can, however, exclude yourself from the class action, but you must do so by following the instructions in Paragraph 9, below.

### **4. Why is this lawsuit a class action?**

The Court decided that this lawsuit can proceed as a class action because all of the requirements for bringing a class action in court were met. The Court has not yet made any decisions about the merits of the Plaintiffs' claims or Tyler's defenses.

### **5. What are Plaintiffs asking for?**

Under California law, the Plaintiffs and class members are seeking to recover unpaid overtime for hours worked in California over 8 in a day and 40 per workweek, and penalties for inaccurate wage statements and for Tyler's failure to pay overtime wages in a timely manner. Plaintiffs are also seeking attorneys' fees.

## WHO IS IN THE CLASS?

**6. How do I know if I am part of the Class?**

You are a member of the California class if you worked for Tyler in California as an implementation consultant after November 20, 2015.

**7. I am still not sure if I am included.**

If you are not sure whether you are included, you can contact Class Counsel, Nichols Kaster, LLP, at the phone number or address listed on Paragraph 9.

**8. Can Tyler fire me or take other action against me because I am part of this case?**

No. The law prohibits Tyler from retaliating against any class member for being part of this lawsuit. Therefore, Tyler is prohibited from firing you or retaliating against you in any other manner because you choose to participate in this lawsuit.

## YOUR RIGHTS AND OPTIONS

**9. What do I do if I do not want to participate in the lawsuit?**

If you do not want to participate in the California class action, you must send a letter by mail, fax, or e-mail to Class Counsel identified below, stating "I wish to be excluded from the Tyler Technologies implementation consultant overtime class action."

**Nichols Kaster, LLP Attn:**
**Daniel S. Brome**
**235 Montgomery St., Suite 810**
**Toll-Free Telephone: 1-877-448-0492 (no faxes to this number)**
**Fax: (612) 215-6870**
**Email: forms@nka.com**
Website: www.nka.com

**Your letter must be postmarked by  [INSERT DATE.]**

**10. Why would I ask to be excluded?**

If you already have your own overtime lawsuit against Tyler and want to continue to pursue it, you should ask to be excluded from the class as explained in Paragraph 9. If you wish to sue Tyler individually for unpaid overtime wages, you should also ask to be excluded from the class. If you decide to exclude yourself as explained in Paragraph 9, you will not have the right to any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of a trial or from a settlement. You will not be legally bound by the Court's orders and judgments in this action and will retain the right to sue Tyler individually.

If you file an individual lawsuit against Tyler after you exclude yourself, you may have to hire and pay for your own lawyer to represent you. If you wish to exclude yourself in order to file an individual lawsuit against Tyler, you should speak to a lawyer as soon as possible because your claims are subject to a statute of limitations.

4

## YOUR LEGAL REPRESENTATION

### 11.  Do I have a lawyer in this case?

The Court decided that the lawyers at the law firm of Nichols Kaster, LLP are qualified to represent you and all Class Members. These lawyers have been designated as "Class Counsel" in this lawsuit. They are experienced in handling similar cases against other employers.  More information about Nichols Kaster, LLP, their practice, and their lawyers' experience is available at www.nka.com.

### 12.  Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel will be working on your behalf.  It is your decision whether to hire your own lawyer.  If you want to hire your own lawyer, you may have to pay that lawyer.  You can ask your own lawyer to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 13.  How will the lawyers be paid?

The Class Representatives have entered into a contingency fee agreement with Class Counsel. Under this agreement, you are not responsible for paying out of pocket any of the attorneys' fees or costs expended in the lawsuit.  Class Counsel will be paid as follows: (1) if there is a settlement, Class Counsel may ask the Court to award it up to 1/3 of any recovery obtained; (2) if there is a trial and the Plaintiffs prevail, Class Counsel may ask the Court to award it 1/3 of the award and/or may ask the Court to order Tyler to pay their attorneys' fees and costs separately, on top of the award to the Plaintiffs.

## THE TRIAL

### 14.  How and when will the Court decide who is right?

If the lawsuit is not resolved by a settlement or by the Court before trial, the Plaintiffs will have to prove their claims at a trial.  The trial would take place in the U.S. District Court, Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102.  During the trial, the parties will present evidence, including the testimony of witnesses, to help reach a decision about whether the Plaintiffs are right about the claims in the lawsuit.  There is no guarantee that the Plaintiffs will prevail, or that they will be awarded any damages.  The Court has not set a date for the trial.

### 15. Do I have to come to trial?

You are not required to attend the trial unless one of the parties asks you to be a witness at the trial. If Class Counsel or Defendant's counsel believes that your testimony may be helpful to establishing important facts in the litigation, Class Counsel will contact you before the trial to provide more information regarding your participation in the trial.

## GETTING MORE INFORMATION

If you have any questions or would like additional information, please contact Class Counsel, whose contact information is provided in Paragraph 9.

# EXHIBIT 8

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF STATE

# If you are a woman and are or were employed by MNO, a class action lawsuit may affect your rights.

*A court authorized this notice.  This is not a solicitation from a lawyer.*

- Female employees have sued MNO, Inc., alleging discrimination against women.

- The Court has allowed the lawsuit to be a class action on behalf of all women employed by MNO as account executives at any time from June 6, 1996, through July 15, 2003.

- The Court has not decided whether MNO did anything wrong.  There is no money available now, and no guarantee there will be.  However, your legal rights are affected, and you have a choice to make now:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | |
|---|---|
| **DO NOTHING** | **Stay in this lawsuit.  Await the outcome.  Give up certain rights.** <br><br> By doing nothing, you keep the possibility of getting money or benefits that may come from a trial or a settlement.  But, you give up any rights to sue MNO separately about the same legal claims in this lawsuit. |
| **ASK TO BE EXCLUDED** | **Get out of this lawsuit.  Get no benefits from it.  Keep rights.** <br><br> If you ask to be excluded and money or benefits are later awarded, you won't share in those.  But, you keep any rights to sue MNO separately about the same legal claims in this lawsuit. |

- Your options are explained in this notice.  To ask to be excluded, you must act before **Month 00, 0000.**

- Lawyers must prove the claims against MNO at a trial set to start Month 00, 0000.  If money or benefits are obtained from MNO, you will be notified about how to ask for a share.

- **Any questions? Read on and visit www.mnoclassaction com.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**………………………………..……   PAGE 3
1. Why did I get this notice?
2. What is this lawsuit about?
3. What is a class action and who is involved?
4. Why is this lawsuit a class action?

**THE CLAIMS IN THE LAWSUIT**…………..……...……………   PAGE 4
5. What does the lawsuit complain about?
6. How does MNO answer?
7. Has the Court decided who is right?
8. What are the Plaintiffs asking for?
9. Is there any money available now?

**WHO IS IN THE CLASS**………………………………………..   PAGE 5
10. Am I part of this Class?
11. Which current and former employees are included?
12. Are any women who worked at MNO not included in the Class?
13. I'm still not sure if I am included.

**YOUR RIGHTS AND OPTIONS**……………………………………   PAGE 6
14. What happens if I do nothing at all?
15. Why would I ask to be excluded?
16. How do I ask the Court to exclude me from the Class?

**THE LAWYERS REPRESENTING YOU**…………………………...   PAGE 7
17. Do I have a lawyer in this case?
18. Should I get my own lawyer?
19. How will the lawyers be paid?

**THE TRIAL**……………………………………………………….   PAGE 7
20. How and when will the Court decide who is right?
21. Do I have to come to the trial?
22. Will I get money after the trial?

**GETTING MORE INFORMATION**…………………………………   PAGE 8
23. Are more details available?

# BASIC INFORMATION

## 1.   Why did I get this notice?

MNO's records show that you currently work, or previously worked, for MNO, Inc.  This notice explains that the Court has allowed, or "certified," a class action lawsuit that may affect you.  You have legal rights and options that you may exercise before the Court holds a trial.  The trial is to decide whether the claims being made against MNO, on your behalf, are correct.  Judge Jane Jones of the United States District Court for the District of State is overseeing this class action.  The lawsuit is known as *Johnson, et al., v. MNO, Inc.*, Civil Action No. CV-00-1234.

## 2.   What is this lawsuit about?

This lawsuit is about whether MNO discriminated against female account executives based on their gender, by making it harder for them to advance in their careers.  More information about federal laws prohibiting job discrimination can be found at the website of the U.S. Equal Employment Opportunity Commission, www.eeoc.gov.

## 3.   What is a class action and who is involved?

In a class action lawsuit, one or more people called "Class Representatives" (in this case Mary Johnson and Louise Smith) sue on behalf of other people who have similar claims.  The people together are a "Class" or "Class Members."  The women who sued—and all the Class Members like them—are called the Plaintiffs.  The company they sued (in this case MNO, Inc.) is called the Defendant.  One court resolves the issues for everyone in the Class—except for those people who choose to exclude themselves from the Class.

## 4.   Why is this lawsuit a class action?

The Court decided that this lawsuit can be a class action and move towards a trial because it meets the requirements of Federal Rule of Civil Procedure 23, which governs class actions in federal courts.  Specifically, the Court found that:

- There are more than 90,000 women who are or were employed by MNO as account executives;
- There are legal questions and facts that are common to each of them;
- Mary Johnson's and Louise Smith's claims are typical of the claims of the rest of the Class;
- Ms. Johnson, Ms. Smith, and the lawyers representing the Class will fairly and adequately represent the Class' interests;
- The common legal questions and facts are more important than questions that affect only individuals; and
- This class action will be more efficient than having many individual lawsuits.

More information about why the Court is allowing this lawsuit to be a class action is in the Court's Order Certifying the Class, which is available at www.mnoclassaction.com.

# THE CLAIMS IN THE LAWSUIT

### 5.  What does the lawsuit complain about?

In the lawsuit, the Plaintiffs say that MNO discriminated against women account executives.  They claim that these women received less pay than men in similar jobs.  They also say that MNO made promotions to account supervisor positions more difficult for women because they had to demonstrate greater achievements than men.  You can read the Plaintiffs' Class Action Complaint at www.mnoclassaction.com.

### 6.  How does MNO answer?

MNO denies that it did anything wrong and says that opportunities for hiring and promotion are equally available to women and men.  MNO says that its policies are clear and that they neither allow, nor condone, discrimination against women.  MNO says that women advanced as often as men, and that greater achievements are not necessary for women to qualify for a promotion.  MNO's Answer to the Complaint is also at the website.

### 7.  Has the Court decided who is right?

The Court hasn't decided whether MNO or the Plaintiffs are correct.  By establishing the Class and issuing this Notice, the Court is not suggesting that the Plaintiffs will win or lose this case.  The Plaintiffs must prove their claims at a trial starting Month 00, 0000.  (See "The Trial" below on page 7.)

### 8.  What are the Plaintiffs asking for?

The Plaintiffs are asking for changes in MNO's policies to ensure that women are treated fairly and equally in the workplace.   They want MNO's policies to say that discrimination based on gender is banned.  The Plaintiffs also want lost wages and money for emotional distress for Class Members.

### 9.  Is there any money available now?

No money or benefits are available now because the Court has not yet decided whether MNO did anything wrong, and the two sides have not settled the case.  There is no guarantee that money or benefits ever will be obtained.  If they are, you will be notified about how to ask for a share.

# WHO IS IN THE CLASS

You need to decide whether you are affected by this lawsuit.

### 10.  Am I part of this Class?

Judge Jones decided that all women who were employed by MNO, Inc. as account executives (full time or part time) at any time from June 6, 1996, through July 15, 2003, are Class Members.  She also specified that "temp" employees and independent contractors are *not* part of the class.  See question 12 below.

### 11.  Which current and former employees are included?

Former employees are in the Class as long as they were employed by MNO any time from June 6, 1996, through July 15, 2003.  If you were hired after July 15, 2003—even if you are a current employee—you are not included.  In other words, these women are included:

- **Women account executives currently employed by MNO who were hired on or before July 15, 2003.**
- **Women account executives no longer employed by MNO but who were employed by MNO any time from June 6, 1996, through July 15, 2003.**

### 12.  Are any women who worked at MNO not included in the Class?

If you *worked at* MNO during the time period in question 10, but you were not directly *employed by* MNO, you are NOT a Class Member.  Think about whether you were paid for your work at MNO by a temporary staffing service or an independent contractor for MNO.  If so, you were not employed by MNO.  If you were later hired by MNO after a temporary period, you may be part of the Class as long as MNO hired you on or before July 15, 2003.

### 13.  I'm still not sure if I am included.

If you are still not sure whether you are included, you can get free help at www mnoclassaction com, or by calling or writing to the lawyers in this case, at the phone number or address listed in question 23.

# YOUR RIGHTS AND OPTIONS

You have to decide whether to stay in the Class or ask to be excluded before the trial, and you have to decide this now.

| 14.  What happens if I do nothing at all? |
|---|

You don't have to do anything now if you want to keep the possibility of getting money or benefits from this lawsuit.  By doing nothing you are staying in the Class.  If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to apply for a share (or how to ask to be excluded from any settlement).  Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue, or continue to sue, MNO—as part of any other lawsuit—about the same legal claims that are the subject of this lawsuit.  This means that if you do nothing, you may only be able to sue for gender discrimination that occurred *before* June 6, 1996 or occurs *after* July 15, 2003 only.  You will also be legally bound by all of the Orders the Court issues and judgments the Court makes in this class action.

| 15.  Why would I ask to be excluded? |
|---|

If you already have your own gender discrimination lawsuit against MNO and want to continue with it, you need to ask to be excluded from the Class.  If you exclude yourself from the Class—which also means to remove yourself from the Class, and is sometimes called "opting-out" of the Class—you won't get any money or benefits from this lawsuit even if the Plaintiffs obtain them as a result of the trial or from any settlement (that may or may not be reached) between MNO and the Plaintiffs.  However, you may then be able to sue or continue to sue MNO for employment discrimination that occurred or occurs at any time.  If you exclude yourself, you will not be legally bound by the Court's judgments in this class action.

If you start your own lawsuit against MNO after you exclude yourself, you'll have to hire and pay your own lawyer for that lawsuit, and you'll have to prove your claims.   If you do exclude yourself so you can start or continue your own lawsuit against MNO, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

Note that if you exclude yourself from this lawsuit and you are currently employed by MNO, any changes made to MNO's policies about the treatment of women would still apply to you.

| 16.  How do I ask the Court to exclude me from the Class? |
|---|

To ask to be excluded, you must send an "Exclusion Request" in the form of a letter sent by mail, stating that you want to be excluded from *Johnson v. MNO*.  Be sure to include your name and address, and sign the letter.  You must mail your Exclusion Request postmarked by **Month 00, 0000,** to: Johnson v. MNO Exclusions, P.O. Box 0000, City, ST 00000-0000.  You may also get an Exclusion Request form at the website, www mnoclassaction com.

## THE LAWYERS REPRESENTING YOU

### 17.  Do I have a lawyer in this case?

The Court decided that the law firms of Lawfirm One, LLP, of City, ST, and Lawfirm Two, P.C., of City, ST, are qualified to represent you and all Class Members.  Together the law firms are called "Class Counsel."   They are experienced in handling similar cases against other employers.  More information about these law firms, their practices, and their lawyers' experience is available at www.lawfirmone.com and www.lawfirmtwo.com.

### 18.  Should I get my own lawyer?

You do not need to hire your own lawyer because Class Counsel is working on your behalf.  But, if you want your own lawyer, you will have to pay that lawyer.  For example, you can ask him or her to appear in Court for you if you want someone other than Class Counsel to speak for you.

### 19.  How will the lawyers be paid?

If Class Counsel get money or benefits for the Class, they may ask the Court for fees and expenses.  You won't have to pay these fees and expenses.  If the Court grants Class Counsels' request, the fees and expenses would be either deducted from any money obtained for the Class or paid separately by MNO.

## THE TRIAL

The Court has scheduled a trial to decide who is right in this case.

### 20.  How and when will the Court decide who is right?

As long as the case isn't resolved by a settlement or otherwise, Class Counsel will have to prove the Plaintiffs' claims at a trial.  The trial is set to start on Tuesday, Month 00, 0000, in the United States District Court for the District of State, 100 Court Street, City, State, in Courtroom 1.   During the trial, a Jury or the Judge will hear all of the evidence to help them reach a decision about whether the Plaintiffs or Defendant are right about the claims in the lawsuit.  There is no guarantee that the Plaintiffs will win, or that they will get any money for the Class.

### 21.  Do I have to come to the trial?

You do not need to attend the trial.  Class Counsel will present the case for the Plaintiffs, and MNO will present the defenses.  You or your own lawyer are welcome to come at your own expense.

**22.  Will I get money after the trial?**

If the Plaintiffs obtain money or benefits as a result of the trial or a settlement, you will be notified about how to participate.  We do not know how long this will take.

# GETTING MORE INFORMATION

**23.  Are more details available?**

Visit the website, www mnoclassaction com, where you will find the Court's Order Certifying the Class, the Complaint that the Plaintiffs submitted, the Defendant's Answer to the Complaint, as well as an Exclusion Request form.  You may also speak to one of the lawyers by calling 1-000-000-0000, or by writing to: MNO Class Action, P.O. Box 000, City, ST 00000-0000.

DATE:  MONTH 00, 0000.

# EXHIBIT 9

Page 1

1           IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3
4    _____
                                   )
5    Aaron Kudatsky, individually and )
     on behalf of all others similarly)
6    situated,                     )
                                   )
7            Plaintiff,            )
                                   )
8    vs.                          ) No. 3:19-CV-07647-WHA
                                   )
9    Tyler Technologies,           )
                                   )
10           Defendant.            )
                                   )
11   _____)
12
13
14        30(b)(6) DEPOSITION OF CHRISTOPHER WEBSTER
15                North Yarmouth, Maine
16              Thursday, September 10, 2020
17                     Volume I
18
19
20
21   Reported by:
     CATHERINE A. RYAN, RMR, CRR
22   CSR No. 8239
23   Job No. 4245365
24
25   PAGES 1 - 166

1    as-is, to-be states whereby they will understand the

2    current business flows, workflows and requirements, and

3    then help clients translate that into configuring, data

4    conversion and training of the to-be system, the system

5    that they purchased through Tyler to help achieve those

6    business flows and workflows in the business needs that

7    they have.

8         Q    And why is that role important at Tyler, or is

9    it?

10        A    It is an important role.  They -- that role

11   assists our clients in making decisions around best

12   practice decisions around configuring the software, the

13   options that they have in terms of configuring the

14   software, the pros and cons of the various options that

15   they have, helping clients understand the outcomes of

16   those -- those decisions and setup as well as ultimately

17   helping -- in some product lines, helping with the data

18   conversion mapping from their legacy system to the Tyler

19   product that they had purchased.  So those are pretty

20   key, important things to assist clients with in making

21   sure that they get the system up and running and that

22   they're able to pay employees correctly, bill citizens

23   correctly, you know, all the various job functions that

24   you can imagine that would occur at a city, town or

25   school or county.

1    Consultant and senior Implementation Consultant?

2        A    If that structure were to exist and it made

3    sense, yes.

4        Q    At this point, is it your understanding that

5    everyone has been merged into that structure?

6        A    For the appropriate business units, yes.

7        Q    So for today, when we're talking about ERP, if

8    I use the term "Implementation Consultant," or "IC,"

9    I'll be referring to both Implementation Consultants and

10   senior Implementation Consultants unless I say

11   otherwise.

12           Is that -- is that all right with you?

13       A    Yes.

14       Q    And will you let me know if that becomes a

15   problem with any of my questions, and we can break it

16   out?

17       A    Yes.

18       Q    So how does Tyler make money?

19       A    There are a couple of key ways that we make

20   money, which are through software sales, through license

21   sales, through Software-as-a-Service subscriptions,

22   through our maintenance dollars for our on-premise

23   clients as well as revenue through training

24   Implementation project management professional

25   service-type services, as well as some other

Page 25

1  subscription-type business around payments and other

2  transactions.

3      Q     With the Munis product, is that treated as a

4  Software-as-a-Service subscription or a software sales

5  or license sales, or could it be some combination of

6  those three?

7      A     It could be a combination, yes.

8      Q     What's most common?

9            MR. McKEEBY:  Within Munis?

10           MR. BROME:  Yes.

11           THE WITNESS:  Today, the most common

12  deployment is SaaS deployment for -- for new clients.

13  Our existing clients would be on-premise, the majority

14  there.

15  BY MR. BROME:

16     Q     What do you mean by "on-premise"?

17     A     Where they host their own -- they host our

18  software on their own servers.  So it would be

19  on-premise revenue rather than a SaaS or subscription

20  fee.

21     Q     And when you say SaaS, that's S-a-a-S?

22     A     Correct, Software-as-a-Service.

23     Q     Is there a reason that Tyler is shifting to

24  the SaaS model for new clients as opposed to the

25  on-premise model?

Page 29

1   probably not the right word.

2           But does Tyler make the Munis product itself?

3       A   Yes.

4       Q   It doesn't have another company do that for

5   it?

6       A   No.

7       Q   Okay.  When you were describing the key ways

8   that Tyler makes money, one of the things you said was

9   revenue through professional services -- through

10  training, implementation, project management,

11  professional services.

12          Is the Implementation Consultant a

13  revenue-generating role?

14      A   Yes.

15      Q   And what does that mean?

16      A   As they provide service to clients, there are

17  hourly rates that are set forth -- hourly or daily or

18  fixed rates that are set forth that, as those service --

19  so as those services are delivered, those would then

20  become revenue earning based on the payment terms of the

21  contract.

22      Q   Do the contracts that clients sign with Tyler

23  provide for specific rates for Implementation Consultant

24  work?

25      A   Yes.

Page 30

1      Q    Do the Implementation Consultants set those

2  rates?

3      A    No.

4      Q    Do they negotiate those rates?

5      A    No.

6      Q    Do those rates vary significantly by contract,

7  or are they pretty uniform?

8      A    They're uniform by category.

9      Q    What do you mean by that?

10     A    Based on certain metrics of clients, that they

11  would have professional services hours at different

12  rates depending on where they fell within those -- those

13  metrics.

14     Q    And just to make sure that I'm understanding,

15  does that mean, for example, that if they're going to

16  need a hundred hours, there's a different rate than if

17  they're going to need 20 hours?

18     A    No.

19     Q    Okay.  What does it mean, then?

20     A    If I were a client that had a budget of 25

21  million versus if I had a annual budget of 500 million,

22  those rates -- the hourly rates would -- would differ or

23  -- or could differ.

24     Q    Okay.  And do the contracts that clients sign

25  with Tyler provide for a certain quantity of

Page 31

1    Implementation Consultant work?

2         A    Yes.

3         Q    And do Implementation Consultants set those

4    amounts?

5         A    No.

6              MR. McKEEBY:  And just to -- for the record,

7    you're referencing Tyler generally now, and I suspect

8    his testimony is accurate, but he's been designated to

9    testify about ERP.  So I just want to point that out for

10   the record.  I assume he's -- well, I'm not assuming

11   anything, but, again, I haven't heard him to testify

12   about matters that are apart from the ERP division, and

13   I just want to make that clear for the record.

14   BY MR. BROME:

15        Q    For ERP, who determines how many

16   Implementation Consultant days are part of the contract?

17        A    We had a pricing calculator quote engine that

18   sales utilizes based on client size metrics.

19        Q    And my next question I think you may have just

20   answered.

21             But for ERP contracts, who determines how much

22   the client pays for Implementation Consultant days?

23        A    That's generated through our price book set by

24   sales and executive management.

25        Q    Do Implementation Consultants ever advise the

Page 34

1    BY MR. BROME:

2        Q    Okay.  So before we dive into this one, we've

3    covered some of the substance of this already, and this

4    document, I believe, is a little bit -- maybe not quite

5    current.  We have other organizational charts that are

6    more specific to ERP Implementation Consultants, but

7    they are very wide horizontally, and so it's pretty

8    tough to look at them on -- on this screen.  So we may

9    or may not use those.  And we may not be able to do it

10   through Exhibit Share.  We'll see how they -- how they

11   load here.  But I want to look at Exhibit 2 with you,

12   and if there are things that have changed, let me know.

13   I think it will be close enough for our purposes.

14            On the first page of this, we talked about the

15   Enterprise group and the Justice group.  We didn't

16   really talk about corporate.

17            Are you familiar with the -- what's under

18   corporate within Tyler?

19       A    Yes.

20       Q    Is that where Tyler's human resources

21   department sits?

22       A    Yes.

23       Q    Are there any Implementation Consultants

24   within HR?

25       A    No.

Page 35

1       Q     And Implementation Consultants are not

2   performing HR work, right?

3       A     No.

4       Q     Is Tyler's marketing under corporate?

5       A     Yes.

6       Q     Are there any Implementation Consultants

7   within marketing?

8       A     No.

9       Q     Does corporate handle other functions, like

10  Tyler's financial, legal, accounting functions?

11      A     Yes.

12      Q     Are there Implementation Consultants within

13  those sections?

14      A     No.

15      Q     And then I understand that there's also sale

16  -- chief sales officer, a chief technology officer,

17  chief financial officer, chief information officer

18  within corporate.

19            Do you know if there are any Implementation

20  Consultants under those positions?

21      A     I do not.

22      Q     Do you know if there are any Implementation

23  Consultants within corporate at all?

24      A     I do not.

25      Q     Are you aware of any?

Page 36

```
 1       A     No.
 2       Q     Implementation Consultants are not doing
 3  finance work or accounting work for Tyler, right?
 4       A     No.
 5       Q     Or budgeting?
 6       A     No.
 7       Q     Auditing?
 8       A     No.
 9       Q     Insurance?
10       A     No.
11       Q     Quality control?
12       A     No.
13       Q     Purchasing or procurement?
14       A     No.
15       Q     Advertising or marketing?
16       A     No.
17       Q     Safety and health?
18       A     No.
19       Q     Employee benefits?
20       A     No.
21       Q     Labor relations?
22       A     No.
23       Q     Public relations or government relations?
24       A     They may be involved.
25       Q     What do you mean by that?
```

```
                                                    Page 43
 1          Q     And Paul Crowley?

 2          A     Yes.

 3          Q     Let's see.  Still on page 2, is Jeff Green

 4    still the CTO?

 5          A     Yes.

 6          Q     And is Brett Cate still the chief sales

 7    officer?

 8          A     Yes.

 9          Q     And those two are both part of corporate,

10    correct?

11          A     Correct.

12          Q     So let's move down to page 3.  So we're

13    starting to break out ERP and Schools.  So page 3 is ERP

14    sales.

15                What's the role of the ERP sales?

16          A     The role of ERP sales or the vice president of

17    ERP sales?

18          Q     ERP sales overall.

19          A     They're the organization that is charged with

20    working with new opportunities and/or existing clients

21    and selling them software and services.

22          Q     Have you ever worked in sales at Tyler?

23          A     No.

24          Q     Do any Implementation Consultants work in this

25    section?
```

Page 44

1        A     No.

2        Q     Does this department handle a new client

3    through the point of signing a contract with Tyler?

4        A     Yes.

5        Q     Once the contract is signed, does the client

6    move on to implementation?

7        A     Yes.

8        Q     Okay.  So continuing down with Exhibit 2,

9    pages 4 through 7 are development.

10             What's the role of development within ERP?

11       A     Designing and developing and testing the

12   software that we provide to our clients.

13       Q     Do you know how many people work in this

14   group, all together?

15       A     Now?

16       Q     Yeah.

17       A     I would say approximately 200 and -- 250.

18       Q     Has that been roughly consistent over the past

19   five years?

20       A     Roughly.

21       Q     Is this department in Texas?

22       A     No.

23       Q     Where are they?

24       A     All over the US.

25       Q     Do any Implementation Consultants work in

1           So a hundred percent of Implementation

2    Consultants are assigned to some geographic territory?

3        A    Correct.

4        Q    And then for folks who are doing

5    Implementation consulting work, as part of the other

6    groups, is that sort of a temporary assignment thing, or

7    is that they are both within a territory and part of

8    that group?

9        A    Implementation Consultants, for the case of

10   this organizational chart, only report up through those

11   regions.

12       Q    I understand.  Thank you.

13           I'm going to mark Exhibit 3, and we'll see how

14   these will assist.

15           (Exhibit 0003 was marked for

16           identification.)

17   BY MR. BROME:

18       Q    So let me know when you have Exhibit 3.

19       A    I have it.

20       Q    And are you able to read any of it?

21       A    No.

22           MR. McKEEBY:  Counsel, is this an eye test?

23           THE WITNESS:  I've -- I've zoomed in about as

24   far as I can go here.

25           MR. BROME:  Okay.

Page 66

1    circles -- are those telling us the number of direct

2    reports to a given individual?

3         A    I assume so, based -- I don't know what tool

4    produced this.

5         Q    So I'd like to just understand the hierarchy

6    between you, as the president of the ERP division, and

7    an Implementation Consultant.

8              So underneath you there are the vice

9    presidents?

10        A    Yes.

11        Q    And then underneath the vice president of

12   Implementation, we have the senior directors as well as

13   one director, it looks like?

14        A    And an administrative assistant, yes.

15        Q    And then under the senior directors there are

16   Implementation Directors?

17        A    Yes.

18        Q    And so then under the Implementation

19   Directors, it looks like there are Implementation

20   Consultants, senior Implementation Consultants, and

21   Project Managers; is that correct?

22        A    Yes, and Implementation Managers.

23        Q    Thank you.

24              Okay.  So who supervises Implementation

25   Consultants?

Page 67

1          A     Directly would be a Project Manager.

2          Q     Who supervises the Project Manager?

3          A     That could be an Implementation team lead, an

4     Implementation Manager, or an Implementation Director.

5          Q     What determines which of those options

6     applies?

7          A     Based on the size of the team, the type of

8     work that they're -- they're managing.

9          Q     And I'm sort of interpreting your expression

10    from that answer.

11               Is there any particular guiding principle, or

12    it's sort of somewhat ad hoc?

13         A     Somewhat ad hoc.  It primarily would be based

14    on the size of the team.

15         Q     Okay.  About how many of those Implementation

16    team leads do you think there are within Implementation?

17         A     I guess probably six to seven.

18         Q     And about how many Implementation Managers

19    would you say there are?

20         A     Probably five to six.

21         Q     Have those numbers been roughly consistent

22    over the last five years?

23         A     Those are newer roles in the last, probably,

24    two to three years.

25         Q     Is there a reason that those roles have been

Page 69

1    billing, community development departments within

2    cities, towns, counties, local authorities, special

3    districts.

4         Q    And about how many clients are using Munis

5    currently?

6         A    Approximately 1800.

7         Q    What is the sort of smallest chunk of Munis

8    that a client could purchase?

9         A    We have some clients that may have just some

10   of our financial procurement modules.

11        Q    Is it pretty uncommon to sort of just get the

12   financial module?

13        A    Yes.

14        Q    What's a more common sort of suite of modules?

15        A    The majority of our clients would own the

16   financials, the human capital management and a subset of

17   our revenue applications.

18        Q    And then are there additional add-ons beyond

19   those that some clients can elect?

20        A    Yes.

21        Q    What are some examples of those?

22        A    Content management would be one.  ExecuTime

23   could be one.  There might be subsets of modules that

24   they didn't originally purchase that are part of those

25   suites that they could purchase.

Page 71

1        Q     How are you familiar with Mr. Kudatsky?

2        A     He was an employee of the Munis Implementation

3    team.

4        Q     Did you interact with him when he was employed

5    at Tyler?

6        A     Yes.

7        Q     In what way?

8        A     I interacted with him through Implementation

9    meetings that we would have, interacted with him -- I'm

10   sure I had interacted with him through -- via email.

11       Q     Okay.  What was his position at Tyler?

12       A     Implementation Consultant.

13       Q     In your previous role as vice president, did

14   you indirectly oversee Implementation Consultants?

15       A     No.

16       Q     I'm sorry.  Indirectly?

17       A     Indirectly, yes.  Sorry.

18       Q     Okay.  In your current role as president of

19   the ERP, do you indirectly oversee Implementation

20   Consultants?

21       A     Yes.

22       Q     Have the duties of Implementation Consultants

23   within ERP been pretty consistent since 2015?

24       A     Yes.

25       Q     Since 2010?

```
 1        A    Yes.
 2        Q    And have you worked out of Maine consistently
 3   since 2011?
 4        A    Yes.
 5        Q    What's your source of knowledge for the duties
 6   of Implementation Consultants in other parts of the
 7   country?
 8        A    I was employed as an Implementation Consultant
 9   20 years ago.  Being as -- on the operation and
10   administrative side of the Implementation organization,
11   supporting the Implementation staff for a number of
12   years, as well as just by general working knowledge of
13   -- of implementation processes that we have developed
14   throughout the -- the course of my time here.
15        Q    And are the duties of Implementation
16   Consultants consistent throughout the country?
17        A    For Munis?
18        Q    Yeah.
19        A    Yes.
20        Q    So earlier you talked about how there's a
21   sales team who is involved with a new client until they
22   sign the contract, and then that client transitions over
23   to Implementation.
24             Are you or your team involved with that new
25   client in any way before there's a signed contract?
```

1    Consultant spend helping out with that demonstration
2    process before Tyler is selected?
3        A    That would vary based on the procurement
4    process.  Some of those last, you know, a day.  Some
5    last three to four days.  So it varies based on the
6    client as well as the client's consultant that they may
7    have involved in the procurement process.
8        Q    How much of a typical Implementation
9    Consultant's work is for prospective clients or clients
10   who have selected Tyler but had not yet signed a
11   contract as opposed to the implementation once there is
12   a signed contract?
13       A    It would be tough to put a number on it or
14   percentage, but it's sort of those things that, as it
15   comes up, they are generally expected to help get the
16   [inaudible] --
17            THE REPORTER:  I'm sorry.  You cut out.  Can
18   you repeat that?
19            THE WITNESS:  I don't know that I would have
20   an absolute percentage or time, but certainly it is
21   something that is generally expected of them to
22   participate in the sales process and cycle to get a --
23   to win a new deal, you know, to help allay any fears
24   that a -- or perceived roadblocks that a prospective
25   client may have and be comfortable with the team that

Page 75

1  they would be working with.  So, you know, if I had to

2  guess, each month a consultant -- or each year a

3  consultant may be involved with two to three over the

4  course of one to many days.

5  BY MR. BROME:

6      Q    Two to three instances of that presale work

7  per year?

8      A    Correct.

9      Q    Is it fair to say that that presale work is

10  within the scope of the Implementation Consultant's

11  duties that could be assigned by their supervisor just

12  as they could be assigned to any other client?

13      A    Yes.

14      Q    Are you familiar with the term "fundamental

15  review"?

16      A    Yes.

17      Q    What does that mean?

18      A    That's where we have -- for the Munis product,

19  we have the sandbox environment with prepopulated data

20  such that our Implementation Consultants are able to

21  take a client through a process so they are able to see

22  it with -- it may not be their data, but at least

23  workable data to understand the end-to-end process so

24  they can see the transaction going in, being processed,

25  going through various workflow approvals, making its way

Page 76

 1    through the various integrated components of the system,

 2    as well as then making its way out through -- to an end

 3    result being a report or a bill or a check.

 4        Q    Is the fundamental review something that's

 5    done by an Implementation Consultant?

 6        A    Yes.

 7        Q    Is that something that happens before there's

 8    a contract or after or it could be either?

 9        A    Generally after.

10        Q    And does Tyler provide specific examples of

11    the fundamental review for the Implementation Consultant

12    to conduct?

13        A    Yes.

14        Q    Does Tyler provide scripts to use as part of

15    those reviews?

16        A    Yes.

17        Q    And you said there's a sandbox environment.

18             Does that mean that there's sort of dummy data

19    that's not live data?

20        A    Correct, that it's -- it would be data that

21    would be a mock-up data set.

22        Q    And Tyler provides that mock-up data?

23        A    Yes.  There are instances where the

24    implementation itself will have to build data.

25        Q    What do you mean by that?

Page 82

```
 1    resources, transfer resources and/or if there's been

 2    attrition, not to backfill.  So it's ensuring that our

 3    -- our resources are being utilized to the highest

 4    degree that they are, to ensure that our -- you know,

 5    our clients go -- our client project -- client projects

 6    go live.

 7         Q    Anything else?

 8         A    That's the general highest level around it.

 9         Q    I mean, I guess I'm -- we talked a little

10    earlier about how, you know, this is -- the IC role is

11    revenue-generating.  It seems like the more billable

12    days they have, the more potential revenue there is, and

13    so it would make sense to incentivize that for their

14    supervisors; is that fair?

15         A    Certainly that is a component, but the -- the

16    main driver is to make sure that the staffing levels are

17    -- are kept at the appropriate levels.

18         Q    What do Project Managers do?

19         A    Project Managers will work with the clients to

20    develop the project phasing, the project schedule,

21    determine the scope, the -- develop the various

22    management plans, being the project plan, the

23    implementation management plan, the change management

24    plan, all those various implementation project-related

25    documents that will control and guide the overall
```

Page 83

1    implementation.

2           They -- for Munis, they also have a number of

3    Implementation Consultants that report to them that they

4    will manage through their projects, through their

5    day-to-day activities, perform their performance

6    reviews, provide them with their regular feedback from

7    clients and other interaction that they've had with

8    other Tyler employees.

9       Q    Do the Project Managers -- I think you said

10   this.  Do they come up with a timeline for an

11   implementation project?

12      A    They will generally come up with a timeline of

13   the overall implementation schedule.  They'll do that in

14   conjunction -- in collaboration with the client, as well

15   as they will often rely on the Implementation

16   Consultants to help provide feedback in particular areas

17   if clients need to have more time in particular areas of

18   the application than others.

19      Q    And do the Project Managers come up with the

20   budget for a project?

21      A    No.  That is set at the contract signing.

22      Q    Are the Implementation Consultants expected to

23   keep to the budget and a timeline that's set for a

24   project?

25      A    They're expected to assist the Project Manager

Page 85

1   client is not keeping to that schedule or if there are

2   other factors that are contributing to not adhering to

3   that schedule.

4        Q    Still on the topic of what Project Managers

5   do, do they review reports from Implementation

6   Consultants?

7        A    Yes.

8        Q    What sort of reports?

9        A    Generally, they're in the form of something

10  known as a site report whereby the Implementation

11  Consultant will document the daily activities, any

12  issues, any things that need to be followed up on.

13       Q    Do Project Managers review expense reports?

14       A    Yes.

15       Q    When an Implementation Consultant is on site

16  with a client, are there ways that they communicate with

17  the Project Manager in addition to the site reports or

18  expense reports?

19       A    They may contact them directly via cell phone,

20  phone.  They may instant message them.  They may email

21  them.

22       Q    Has Tyler used Skype in the past?

23       A    Yes.

24       Q    Or currently?

25       A    Currently, yes.

Page 101

1   implemented previously, and so they would then get

2   assigned based on their product knowledge, their

3   availability.

4        Q    And I think, at the beginning of that -- that

5   answer, you said that it's the Project Manager who is

6   assigning the Implementation Consultant to a client?

7        A    Correct.

8        Q    How does the Implementation Consultant know

9   what modules a client is getting?

10       A    So through the contract document, there's an

11  investment summary that itemizes the various products

12  that they have purchased, and then, also, they will work

13  with the Project Manager through that planning phase in

14  terms of the scope of work and the scope of the phasing

15  in products that will be implemented in what order.

16       Q    So when you were describing the Implementation

17  Consultant duties, there's sort of some phases in the

18  implementation process.  We talked earlier about the

19  fundamental review, but I want to talk about some of the

20  other -- other parts of that process.

21            In the assessment or analysis phase, what does

22  that mean?

23       A    So during that stage, the -- where we're

24  working with that client to do that current state,

25  future state analysis where that's where we're

1    understanding their current business processes and

2    flows, understanding why they're going out to purchase

3    new software because they certainly didn't go out to

4    purchase software just to do the same thing that they're

5    doing today, so understanding what they're looking for

6    for efficiencies, understanding the requirements that

7    were documented in the -- most -- most of the time

8    documented in the RFP checklist in terms of the

9    functional requirements that the client is looking for,

10   helping them ultimately marry all of that up to the --

11   to the -- in the to-be state or future state, and then

12   walking the client through that and helping them

13   validate that -- the options and decisions that they

14   made on the desired workflow and business flows.

15        Q    And so in this stage, the Implementation

16   Consultant is gathering this information from the

17   client, correct?

18        A    Correct.

19        Q    And Tyler provides forms for Implementation

20   Consultants to fill in that required information?

21        A    For most products, that would be true.

22        Q    For which products is that not the case?

23        A    There may be some ancillary products, like a

24   -- like a Tyler business form -- excuse me -- Tyler

25   ReadyForms or MyCivic or something like that that may

Page 104

1        A    Yes.

2        Q    If an Implementation Consultant doesn't

3    collect all of the required information in the analysis

4    stage, what happens?

5        A    That may be information that will be

6    documented at a later point in time because there's a

7    decision that has to be made.  Maybe there's a policy

8    decision, a change decision for that client to make.  So

9    that might be documented at a future point in time based

10   on whatever local decisions that they make or -- and/or

11   the changes that they elect to make in their business

12   processes.

13       Q    Maybe that was a bad question.

14            If there's certain information that the

15   Implementation Consultant is supposed to collect and

16   they fail to collect it, what happens then?

17       A    That could be pretty detrimental to the

18   overall project, if they fail to collect certain

19   required information, because ultimately they're guiding

20   the client through the baseline configuration of the

21   system, and if something is missed, then the client

22   isn't configured correctly, people don't get paid

23   correctly, utility bills don't go out correctly, and

24   you've got a big problem on your hands.

25       Q    After the analysis stage, is configuration

Page 105

1    sort of the next big-picture stage?

2        A    Yes, configuration and conversion.

3        Q    And is that the stage where the Tyler product

4    is configured based on the information provided by the

5    client?

6        A    Yes, that's where the information from those

7    analysis processes that they've walked the client

8    through, that the system will then be configured based

9    on that, and the client would then run through and

10   validate that with the -- you know, the data as it's

11   converted and mapped to meet those business processes.

12   Oftentimes, clients will then decide that that was not

13   the desired result, and then, therefore, they will work

14   with the consultant to then figure out the other two

15   options that maybe -- that they described, or whatever

16   the case may be, to then make changes to achieve the

17   desired business results.

18       Q    During this configuration conversion, the

19   Implementation Consultants aren't coding or programming

20   Munis, correct?

21       A    Correct.  They are utilizing parameters to

22   guide the client in the various setting options that

23   they may have to achieve those desired business results

24   or educating them and training them in a new way to take

25   various steps to achieve the desired business results.

1       Q    Is it fair to say that Munis is customizable

2   but not programmable by the Implementation Consultant?

3       A    Correct.  By the Implementation Consultant,

4   yes.

5       Q    If there were ever a situation where, in this

6   configuration and conversion stage or in testing, it

7   became apparent that there was a programming change

8   needed, could the Implementation Consultant go to

9   Tyler's software engineering team for a change?

10      A    Through a formal change request process, yes,

11  they would then work with both the client and the

12  developer, development team or teams that are involved

13  to document the desired feature or functionality results

14  and then helping the client guide them through to make

15  sure that they have considered all the various, you

16  know, options and processing points and whether or not

17  it's going to have an impact on their checks or whatever

18  it may be.

19      Q    Is that scenario in which an Implementation

20  Consultant and/or a Project Manager requests a change

21  request -- is that something that happens somewhat

22  regularly? rarely?

23      A    I'd say pretty frequently.

24      Q    Is that something that the Implementation

25  Consultant would need to involve the Project Manager in?

Page 107

1        A     Yes.

2        Q     Would they need to involve the Implementation

3   Director?

4        A     Maybe, depending on the type of contract, the

5   size of the contract, temperature of the client.

6        Q     What do you mean by "temperature of the

7   client"?

8        A     Well, sometimes clients believe that they were

9   sold something that they weren't.  So, therefore, they

10  might be upset with it, that the feature isn't there or

11  that they were promised it was there.  So, therefore,

12  they may be not particularly happy about that situation.

13       Q     In those cases the client concerns could be

14  escalated past the Project Manager?

15       A     Certainly.

16       Q     If a client is upset in that way that you were

17  just describing, what are some of the ways that the

18  Implementation Manager or Implementation Director could

19  try to patch up that relationship?

20       A     Obviously, working -- getting -- you know,

21  making sure that the development team is brought in so

22  that we can get the appropriate features documented,

23  scoped out for the client.  Oftentimes, sales would be

24  brought in, because obviously sales was part of the

25  process, and just to help alleviate the situation or

1   once more details are identified about the particular

2   need to perhaps have the consultant provide alternative

3   mechanisms for them to achieve the same business results

4   maybe through different steps or through the procurement

5   of additive application that they didn't purchase out of

6   the original procurement.

7        Q    Can the Implementation Directors comp the

8   client Implementation Consultant days?

9        A    Certainly.

10       Q    Can the program manager do that?

11       A    The -- which program manager?

12       Q    Sorry.  Sorry.  Project Manager.

13       A    Yes.

14       Q    Can the Implementation Consultant do that?

15       A    No.

16       Q    Once the client data is collected, when it's

17  time to do the actual data conversion, Tyler's engineers

18  are doing that actual conversion, right?

19       A    Yeah, the conversion engineers will write a

20  conversion program to take the raw data from the legacy

21  system to then map that into the tables that would be

22  needed to be populated for the Munis or EnerGov or

23  whatever the solution may be.

24       Q    And we've said it a few times now, but EnerGov

25  is E-n-e-r-G-o-v?

1    as well as the end-user training, yes.

2        Q    The Implementation Consultant doesn't make the

3    determination of what trainings the client needs, right?

4        A    They will heavily work with the Project

5    Manager in determining those end-user training needs,

6    again, making sure that the areas that they're going to

7    need more help with, areas that they have, you know, a

8    larger staff involvement, more client staff that are

9    involved and ultimately designing the training

10   curriculum around the -- you know, what they have

11   learned through the implementation process.

12       Q    Does the contract specify how much training

13   the client gets?

14       A    No.

15       Q    Does the contract ever specify how many people

16   can attend the training?

17       A    There are some -- many contracts will have a

18   provision in there to limit the size or number of client

19   attendees in a particular -- be it a consultant session

20   or -- and/or a training session.

21       Q    Does Tyler have lesson plans available for

22   Implementation Consultants?

23       A    Yes, we have generalized training guides,

24   training plans, lesson plans.

25       Q    Are they stored in SharePoint?

Page 124

1      Q    So who is doing that investment analysis work?

2      A    The Implementation Consultants for Munis.

3   EnerGov might call it something different.

4      Q    How much of a Munis Implementation

5   Consultant's work is that investment analysis?

6      A    That is a role that is primarily assigned to

7   the installed accounts team because those are the ones

8   that work with the existing clients.  And there is --

9   generally, for that population, that's a high percentage

10  of their work.  Oftentimes, if they're busy and they

11  don't have resources, they will pull from those other

12  regions to help cover those -- those client requests,

13  and then -- so any Munis Implementation Consultant

14  should be prepared to have to deliver those investment

15  assessments.

16     Q    Is that billable work?

17     A    It may be.

18     Q    Who would assign an Implementation Consultant

19  to do that investment analysis work?

20     A    Either a Project Manager or somebody higher up

21  the chain.

22     Q    Would that work be recorded in an

23  Implementation Consultant's time records?

24     A    Yes.

25     Q    What percentage of the Implementation

1     Consultants who are not in that installed accounts team

2     -- what percentage of their time is doing the initial

3     work to get the client up and running as opposed to this

4     investment analysis work?

5         A     So are you talking about a regular

6     implementation for a Munis Implementation Consultant?

7         Q     Yeah.

8         A     For those that are assigned to the region,

9     probably, you know -- guessing -- 80 to 90 percent.

10        Q     Is it fair to say that their primary duty is

11    to get the client up and running, not using the product

12    for managing the client's general business?

13        A     Correct.

14        Q     After the implementation is done, if the

15    client is not happy, who handles complaints?

16        A     Any number of people.  It could be the Project

17    Manager, maybe sales.

18        Q     Are there required internal meetings for

19    Implementation Consultants?

20        A     I'm sorry.  Internal meetings?

21        Q     Yeah, like, within Tyler.

22        A     Yes, we have a number of professional

23    development meetings, team meetings, those types of

24    things that are required for consultants to attend.

25        Q     How regularly are there required meetings?

Page 127

1      A    Certain -- we -- Tyler reimburses employees

2    for allowable billable client expenses.

3      Q    Are Implementation Consultants paid overtime?

4      A    They are not.

5      Q    Why not?

6      A    To my knowledge, they're not eligible for

7    overtime in a professional position.

8      Q    Have they ever been eligible for overtime at

9    Tyler?

10     A    Not to my knowledge.

11     Q    Have they always been paid a base salary plus

12   incentives?

13     A    To my knowledge, yes.

14     Q    Have you ever been involved in evaluating

15   potential changes to the methods of compensation for

16   Implementation Consultants?

17     A    Yes.

18     Q    What types of potential changes?

19     A    The incentive employee compensation structures

20   evaluating the -- you know, if they're achieving the

21   desired results, making tweaks to them to meet current

22   business needs around longevity or anything along those

23   lines.

24     Q    Any other types of potential changes?

25     A    Other than meet- -- meeting, you know, current

Page 130

1       Q    Is the base salary ever docked for

2   Implementation Consultants?

3       A    Not that I'm aware of.

4       Q    Are you aware of any PTO policies that could

5   dock base salary for absences if somebody is out of PTO?

6       A    I'm not sure I understand.  The -- could you

7   rephrase that a little?

8       Q    Yeah.  Sorry about that.

9            Do you know whether -- if an Implementation

10  Consultant is out of vacation, sick leave, paid time

11  off, but is out of work, whether they might be docked

12  their base salary when they're out in that situation?

13      A    I don't know that their base salary may be

14  docked, but they may not -- depending on if they're out

15  on -- you're talking about if they're out on FMLA or

16  standard disability or something like that?

17      Q    Let's -- let's move on from that.  I don't --

18      A    Okay.

19           MR. McKEEBY:  Hey, can we go off the record

20  for just a second?

21           MR. BROME:  Yeah.  It's a good time.

22           (Recess.)

23  BY MR. BROME:

24      Q    Are all Munis Implementation Consultants on

25  the same pay plan?

Page 131

1        A    I'm sorry.  On the same -- what?

2        Q    Pay plan.

3        A    I still didn't hear that last word.

4        Q    Compensation plan.

5        A    Oh, compensation plan.

6             Yes.

7        Q    And are all EnerGov Implementation Consultants

8   on the same comp plan?

9        A    To my knowledge, yes.

10       Q    Do you know if the EnerGov and Munis plans are

11  different?

12       A    I believe that they are.  And by stating that,

13  I'm -- the -- Tyler delivers stand-alone EnerGov versus

14  the Munis team that -- that delivers EnerGov.  There are

15  two different delivery teams there as well.

16       Q    And are all ExecuTime Implementation

17  Consultants on the same pay plan?

18       A    Similar answer there for the three groups that

19  deliver the ExecuTime services.  They will have three

20  different incentive plans.

21       Q    Are Implementation Consultants in ERP trained

22  on their --

23            THE REPORTER:  I'm sorry.  "Trained on

24  their" ...?

25  //

Page 135

1      Q    Is the comp plan for Munis effectively

2    incentivizing that schedule?

3      A    Yes.

4      Q    Do Implementation Consultants have a scheduled

5    shift?

6      A    No.

7      Q    Why not?

8      A    They're generally expected to work with

9    clients based on their hours of operation within --

10   within reason, and so in addition to that, they are

11   required to travel on, typically, a Sunday or Monday or

12   Friday or whatnot.  So they're -- they're responsible

13   for the scheduling of that and the management of their,

14   you know, appropriate travel requirements and needs.

15     Q    What is Changepoint PSA?

16     A    That is our time and expense management

17   system.

18     Q    And how do Implementation Consultants use it?

19     A    They will, on a -- likely, a weekly basis,

20   they will be going in to record their billable expenses,

21   be entering in their billable or nonbillable time

22   working with clients.

23     Q    Implementation Consultants are expected to

24   fill out 40 hours per week in there, correct?

25     A    Not all groups require that.  Some business

1          A     I don't believe that there is any.

2          Q     Does Tyler track Implementation Consultants

3     within ERP their exact hours worked?

4                MR. McKEEBY:  Object to the form of the

5     question.

6                You can answer it.

7                THE WITNESS:  I'm sorry.  For ERP?

8     BY MR. BROME:

9          Q     Yeah.

10         A     As I previously stated, the various groups --

11    business units make a policy decision around whether or

12    not they record a full 40 hours or just a billable,

13    nonbillable time per week in PSA.

14         Q     So -- okay.  So what about for Munis?  Do

15    Munis Implementation Consultants record their exact

16    hours worked?

17         A     Some may, but it's not a requirement.

18         Q     Is it a requirement for any ERP Implementation

19    Consultants to record their exact hours worked?

20         A     Not to my knowledge.

21         Q     And apart from that Changepoint PSA, is there

22    any other place where Tyler records the exact hours

23    worked for Implementation Consultants?

24         A     I'm not aware of any system where the exact

25    hours worked are purposely recorded.

Page 139

1      Q    Okay.  So if I asked you how many hours

2   Mr. Kudatsky worked on October 3rd, 2017, for example,

3   is there any way that you could look that up?

4      A    I -- we would be able to look up how many

5   billable or nonbillable hours that he provided to a

6   client, if he provided on that day.  That may or may not

7   correlate with the number of hours that he -- he

8   necessarily worked with that client.  We have a further

9   policy that really restricts billing clients in four- or

10  eight-hour increments.  Some of the other organizations

11  will bill as little as 15-minute increments.

12     Q    So if you wanted to figure out more precisely

13  how many hours he or someone else worked on a specific

14  day, are there other sources that you could look at?

15     A    I'm not aware of any, no.

16     Q    Are there travel records?

17     A    I'm sure that there are travel itineraries

18  that would have dates of travel, hours of flights, that

19  type of thing, but not necessarily on a given day how

20  much time that they worked with a particular client.

21     Q    Are there records of work emails he may have

22  sent or received?

23     A    I'm sorry.  I didn't catch that.

24     Q    Does Tyler have records of work emails he

25  might have sent or received?

Page 140

1      A      Yes.

2      Q      Does Tyler have records of work from calls he

3  may have placed or received?

4      A      I doubt it.

5      Q      Are there other systems that he might have

6  been using in the performance of his job duties?

7      A      Outside of the ones we've talked about?

8      Q      Yeah.

9      A      He may have used the -- our customer

10  relationship management system, our CRM.  He very well

11  could have used our Jira, which is our defect tracking

12  system.  There's probably a half a dozen other type

13  systems like that that he may have accessed or utilized.

14      Q      Is there any individual that you could talk to

15  to ask how many hours he worked on that day?

16      A      Not that I'm aware of, no.

17      Q      Is the Implementation Consultant the best

18  person to be able to say how many hours they typically

19  worked?

20      A      I would assume so, yes.

21      Q      If Mr. Kudatsky had reported overtime hours,

22  would Tyler have paid him time and a half for those

23  hours?

24      A      No.

25      Q      And same for other Implementation Consultants

Page 141

1    within ERP?

2         A    Correct.

3         Q    So even if the Implementation Consultants had

4    logged 42 or 60 or whatever number above 40 hours per

5    week in Changepoint PSA, their pay would have been the

6    same?

7         A    Correct.

8         Q    When you were the vice president of

9    Implementation, you didn't track how many hours

10   Implementation Consultants worked, did you?

11        A    No.

12        Q    Do Implementation Consultants within ERP

13   sometimes work more than 40 hours per week?

14        A    I believe some may.

15        Q    Can you identify any who never worked

16   overtime?

17        A    I don't believe that anybody has worked

18   overtime.

19        Q    So can you identify any Implementation

20   Consultants within ERP who have never worked more than

21   40 hours in a week?

22        A    No, you would not be able to identify that.

23        Q    Can you think of anyone that you know did work

24   more than 40 hours in a week as an Implementation

25   Consultant?

1  whatever that organizational need is, the project work,

2  the geography.  This is a document that is the guiding

3  baseline for the -- you know, the duties,

4  responsibilities, the scope, education requirements of

5  Implementation Consultants.

6      Q    Are you able to tell whether this internal

7  description is connected to any particular product or

8  business unit?

9      A    This one here would appear to be related to

10  ExecuTime because the scope and impact -- they're saying

11  that they're working with groups of up to 25 clients.

12  That group, in particular, if you look at Munis -- they

13  would work, like I had mentioned before, one or five or

14  six clients at a time.  These Implementation Consultants

15  here on the ExecuTime side tend to work with a higher

16  volume of clients at any given point in time, just a

17  different model and setup.

18      Q    Is there anything else about this position

19  description that would distinguish it -- its

20  applicability to ExecuTime versus Munis versus EnerGov?

21      A    That's the only thing that really stands out

22  to me that I can see.  There may be some other --

23  without doing a compare between them, I wouldn't really

24  be able to tell you.

25      Q    And is that because the position has the same

Page 148

1   objective and the same principal duties regardless of

2   what business unit it's a part of?

3        A    Generally, yes.

4        Q    Earlier on we mentioned the associate

5   Implementation Consultant role and the senior

6   Implementation Consultant role.

7             Are the general principal duties of those

8   roles the same, or are there some primary duties that

9   change as one progresses from associate up through

10  senior?

11       A    Those may change slightly, and then also

12  noting that the "associate" is used by the

13  Traversa/Versatrans group, and I don't believe that it's

14  used by anyone else inside of the ERP/Schools during

15  that period of time.

16       Q    In what way would the principals -- principal

17  duties change as one moved up?

18       A    In the -- emphasize more about domain

19  knowledge and expertise as you progress through your

20  career and expectations around some of the -- some of

21  the responsibilities that you lead or take on.

22       Q    In terms of conducting the on-site

23  implementation, is there a difference in what an

24  Implementation Consultant as opposed to a senior

25  Implementation Consultant would be expected to do for a

Page 151

1    ERP been harmonized so that there's not something

2    different for ExecuTime folks?

3         A    No, there still is a difference.

4         Q    What's that difference?

5         A    I believe the main difference would be the --

6    the number-of-days-per-month goal.

7         Q    Got it.

8              Do you know what that -- what those goals are

9    for ExecuTime currently?

10        A    I believe it's 12 --

11        Q    And --

12        A    -- but --

13        Q    -- do you know what --

14        A    Twelve days per month.

15        Q    And do you know what it is for Munis?

16        A    Thirteen.

17        Q    And to be clear, that means to hit the sort of

18   maximum payout, that's the amount?

19        A    Yes.  That would be the pay schedule based on

20   those days.

21        Q    Does Tyler issue a new incentive compensation

22   plan every year?

23        A    Generally, yes.

24        Q    Do the plans change significantly year to

25   year?

Page 152

1       A    I wouldn't say significantly, but the plans

2    may be tweaked and edited, again, based on local

3    business needs and requirements of those business units.

4            MR. BROME:  I'm marking Exhibit 8 now.

5            (Exhibit 0008 was marked for

6            identification.)

7            THE WITNESS:  Okay.

8    BY MR. BROME:

9       Q    This is another document that's been produced

10   by Tyler in this case.

11           What is Exhibit 8?

12      A    This appears to be the transportation -- the

13   Traversa/Versatrans Implementation group as an

14   Implementation Consultant guide, kind of the goals and

15   expectations and helping them on the -- like, an

16   employee handbook type of thing.

17      Q    Is there a version of this document that

18   applies more broadly than to the transportation

19   solutions?  Or let me -- is there a version of this that

20   applies for Munis?

21      A    Yes.

22      Q    What about for EnerGov?

23      A    I'm not sure.

24      Q    What about for ExecuTime?

25      A    Currently, yes, they would fall under the same

Page 166

1      I, the undersigned, a Certified Shorthand Reporter

2   of the State of California, do hereby certify:

3      That the foregoing proceedings were taken before

4   me at the time and place herein set forth; that any

5   witnesses in the foregoing proceedings, prior to

6   testifying, were administered an oath; that a record of

7   the proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing is a true record of the testimony

10  given.

11     Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript [  ] was [ X ] was not requested.

15          I further certify that I am neither

16  financially interested in the action nor a relative or

17  employee of any attorney or any party to this action.

18     IN WITNESS WHEREOF, I have this date subscribed my

19  name.

20  Dated:    09/28/2020    *Catherine A. Ryan*

21

                Catherine A. Ryan, RMR, CRR

22              CSR No. 8239

23

24

25

# EXHIBIT 10

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4                     Case No.:  3:19-CV-07647-WHA

5                          Judge William Alsup

6   _____

7   AARON KUDATSKY, Individually and on

8   behalf of all others similarly situated,

9        Plaintiffs,

10  vs.

11  TYLER TECHNOLOGIES,

12       Defendant.

13  _____

14

15

16

17     REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18     ABIGAIL DIAZ, a 30(b)(6) REPRESENTATIVE

19          Taken Tuesday, October 27, 2020

20           Scheduled for 11:00 a.m.

21

22

23

24  REPORTED BY:  DANA S. ANDERSON-LINNELL

25  Job No.:  MW 4300964

Page 17

1      senior implementation consultants and regular

2      implementation consultants?

3      A.    I don't know.

4      Q.    Do you know whether it distinguished based

5      on the geographic territory in which

6      implementation consultants worked?

7      A.    I don't know.

8      Q.    Do you know if there are other sorts of

9      distinctions between implementation consultants

10     that his analysis found significant?

11     A.    I think the answer to that is no because

12     all Tyler implementation consultants have been

13     consistently identified as exempt.  So while he

14     might have identified differences in some of

15     the functions of implementation consultant

16     roles across the company, those differences did

17     not change the ultimate conclusion as to how

18     that role should be classified from an FLSA

19     perspective.

20                  MR. MCKEEBY:  Could we go off the

21     record for just a second?

22                  MR. BROME:  Sure.

23                  (Recess 11:30-11:35.)

24     BY MR. BROME:

25     Q.    So before we move on to the 2008 time

1           THE WITNESS:  My understanding is

2     that to the extent any differences among the

3     implementation consultant roles that were being

4     evaluated were identified, they did not impact

5     the overall determination that implementation

6     consultants were properly classified as exempt.

7     BY MR. BROME:

8     Q.   After the Beall litigation concluded, are

9     you aware of any discussions within Tyler about

10    whether it made sense to reclassify

11    implementation consultants to a nonexempt

12    position?

13    A.   Specific conversations?

14    Q.   Yeah.

15    A.   I am not aware of specific conversations

16    about someone saying:  We should reclassify the

17    position of implementation consultant as

18    nonexempt.

19    Q.   When you joined Tyler, you started in a --

20    was it a contract specialist role?

21    A.   Correct.

22    Q.   Did you have reason to learn about the

23    Beall litigation as part of that job when you

24    started?

25    A.   Only to the extent I helped prepare bid

Page 106

1                    REPORTER'S CERTIFICATE

2

    STATE OF MINNESOTA    )
3                          ) ss.
    COUNTY OF HENNEPIN    )

4

5         I hereby certify that I reported the
    deposition of Abigail Diaz on October 27, 2020, in
6    Maple Grove, Minnesota, and that the witness was
    by me first duly sworn to tell the whole truth;

7

         That the testimony was transcribed by me
8    and is a true record of the testimony of the
    witness;

9

         That the cost of the original has been
10   charged to the party who noticed the deposition,
    and that all parties who ordered copies have been
11   charged at the same rate for such copies;

12        That I am not a relative or employee or
    attorney or counsel of any of the parties, or a
13   relative or employee of such attorney or counsel;

14        That I am not financially interested in the
    action and have no contract with the parties,
15   attorneys, or persons with an interest in the
    action that affects or has a substantial tendency
16   to affect my impartiality;

17        That the right to read and sign the
    deposition transcript by the witness was reserved.

18

19        WITNESS MY HAND AND SEAL THIS 9th day of
    November, 2020.

20

21

22

23   *Dana Anderson*

24   Dana S. Anderson-Linnell
    Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025

# EXHIBIT 11

```
 1                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2
 3   AARON KUDATSKY, Individually  ) Case No.:  3:19-CV-07647-WHA
     and on behalf of all others   )
 4   similarly situated,           )
                                   ) DEFENDANT'S NOTICE OF TAKING
 5        Plaintiffs               ) DEPOSITION OF PLAINTIFF
                                   ) AARON KUDATSKY
 6   vs.                           )
                                   ) Judge William Alsup
 7   TYLER TECHNOLOGIES,           )
                                   ) Action Filed:  November 20,
 8        Defendant.               )                 2019
 9
10
11          _____
12              ORAL AND VIDEOTAPED DEPOSITION OF
                         AARON KUDATSKY
13                    SEPTEMBER 11, 2020
14          _____
15          ORAL AND VIDEOTAPED DEPOSITION of AARON KUDATSKY
     produced as a witness at the instance of the Defendant, and
16   duly sworn, was taken in the above-styled and numbered cause
     on the 11th of September 2020 from 11:06 a.m. to 6:15 p.m.,
17   before Christie Tawater, CSR, RPR, in and for the State of
     Texas, reported by computerized stenotype machine remotely
18   via Zoom from her home located in Fort Worth, Texas pursuant
     to the California Federal Rules of Civil Procedure and the
19   provisions stated on the record or attached hereto; that the
     deposition shall be read and signed before any notary public
20   pursuant to Rule 30(e)(1).     Job No. 4253180
21
22
23
24
25
                                                        Page 1
```

1    configuring it that way.

2        Q.    Did you have any role in encouraging them

3    to pick one solution or another?  I think we lost you

4    there for a moment, Mr. Kudatsky.

5        A.    Yeah.

6        Q.    Did you hear my last question?

7        A.    I did not.  Could you, please, repeat?

8        Q.    Sure.

9              Did you have any role in helping them

10   make that decision about which of the configuration

11   choices they would proceed with?

12       A.    I answered any questions relative to the

13   Munis system that they may have, but the decision was

14   made by them.

15       Q.    What's an example of the kind of question

16   you would be asked that you would need to answer to

17   help with that decision-making process?

18       A.    They might ask to see a financial, or like

19   a journal entry, within the system based on a certain

20   decision or could you show us what the outcome of

21   that would be if we did things this way.

22       Q.    Going back to that initial training that

23   you received you also mentioned that there was

24   training about life as an implementation consultant;

25   did I hear that correctly?

Veritext Legal Solutions
800-336-4000

1          A.    No.  Most of the -- whatever we were doing

2     that week we were given an agenda, and that agenda

3     usually might have some supporting documentation, or

4     as -- as an example, one of the parts of an

5     implementation process is a fundamental reviews [SIC]

6     where we give a bird's-eye overview of each module

7     and program, and when given an agenda for doing

8     fundamentals review for that week there was also

9     supporting fundamental review scripts, and, thus,

10    those scripts were very detailed in how that

11    fundamental review week was to be presented.  It

12    included, you know, exactly what program to open,

13    here's what you would say.  In those dummy play

14    databases that I mentioned to you before we would be

15    presenting out of those and it would -- the script

16    would specify what account number to use, what vendor

17    to use, so it was very specific.  So going on the

18    topic of presentations they were rarely needed for

19    what we were asked to do.

20               Maybe at times a PowerPoint

21    presentation could have been beneficial during the

22    training, but, again, by the time we became

23    consultants we now had the full excess [SIC], and,

24    you know, at our disposal, and, you know, the Tyler

25    knowledge base and the Tyler document library, and I

Page 72

1   newer step that was adopted by the Tyler, I don't

2   know if you want to call it upper management or

3   project management office, but they -- when they came

4   up with that idea they created all the scripts and

5   then later it was presented before the analysis so

6   the client can have an understanding of what the

7   system looks like.  It was often -- for many of the

8   attendees in the room it was going to be their first

9   time seeing the Munis software.

10      Q.    How long did you spend on a given

11  fundamentals project?

12      A.    So fundamental review sessions, again, in

13  the same one-week increments and there was

14  specific -- you know, from the -- more at the project

15  management level of here's all the lists of the

16  different fundamentals reviews, here's how long each

17  of them should take, and so it was assigned to me or

18  to any consultant based on that.

19      Q.    And -- and, typically, the implementation

20  consultant was on site from Tuesday to Thursday,

21  correct?

22      A.    Correct.

23      Q.    So if you were assigned to do a

24  fundamentals presentation you would do that for three

25  solid days?

Veritext Legal Solutions
800-336-4000

1   review separate.

2            After that came analysis, correct?

3       A.    Correct.

4       Q.    What is the purpose of the analysis phase?

5       A.    It was there for -- to understand what the

6   client was currently doing, and then, essentially,

7   understand and decide what they were going to be

8   doing once they were using the Munis system.

9       Q.    How was the analysis phase conducted?

10      A.    First, the client was sent -- we had,

11  essentially, analysis quenched [SIC] in years, again,

12  one per module area, and they were all sent to the

13  client or posted on the client share point for them

14  to download.  They were asked to fill them out on

15  their own and then a project manager would schedule a

16  [SIC] analysis session.  It was kind of the latter

17  model from when I was at Tyler.  It was known as

18  current state and future state.  And so your first

19  analysis sessions as a consultant with the client

20  would be talking about what they're currently doing,

21  and then basically going over that questionnaire that

22  they answered.  And then if -- they might have some

23  questions on terminology used and so helping them

24  fill that out.  And then following that you would go

25  to the future state part.  And, again, questionnaire

1    for them to fill out, the consultant to help them

2    fill that out, and then at that point, essentially,

3    you would move into that setup and configuration

4    phase which was guided on and decided on what was

5    decided during analysis.

6        Q.    So when you use the word consultant in

7    there is that implementation consultant?

8        A.    Correct.

9        Q.    So client receives these surveys where they

10   identify current state.  And then you said there were

11   separate surveys for future state?

12       A.    I can't recall if it was part of one

13   document where they would only -- I think it was they

14   would only fill out the current state and then they

15   would go through and fill out the future state.

16       Q.    What kinds of information were they putting

17   into the future state portion of the surveys?

18       A.    I would say that you could call them

19   surveys but as much more -- there -- there was a big

20   sell document with a different -- with a large list

21   of questions and each of those questions that was in

22   there.  And this was, again, a standard template

23   provided by Tyler and sent to all clients, and they

24   would decide on -- basically, the questions were

25   linked to different settings and configuration

Page 89

1    options in the Munis software.

2         Q.    And so --

3         A.    So from the answers that they provided that

4    was guiding and deciding how physically in the system

5    you were going to set up that software -- that module

6    or that software or that screen.

7         Q.    So what service, if any, were you providing

8    to the customer as an implementation consultant if

9    they were just filling out these forms and submitting

10   them?

11        A.    Oftentimes they, A, had questions about

12   some of the terminology used and we were walking

13   through the questions together, again, because this

14   terminology could be very new or different.

15   Sometimes they would say we don't understand this,

16   you know, feature or setting or screen, and, perhaps,

17   as a consultant -- as an implementation consultant I

18   would, during that session, show them in Munis what

19   that actually looked like if they needed to see it,

20   but those documents often kind of had some more

21   context to what you were -- what you were deciding

22   on, so really helped them understand the questions so

23   they can make their decision.

24        Q.    Did you provide any advice on the decisions

25   that they were making?

Page 90

1      A.      No.

2      Q.      So you only provided them with definitions

3   of terms and demos of specific things they asked to

4   see?

5      A.      They could -- some asked me what other

6   clients have done and I would share that information,

7   but these were all decisions, and we were

8   specifically, you could say, instructed by Tyler

9   managers that we were not tax professionals, we were

10  not certified public accountants, and this is

11  financial software in the accounting space and

12  decisions that they need to make based on their, you

13  know, certified expertise/knowledge in those areas.

14  Yeah.

15     Q.      Which of these decisions required certified

16  expertise?

17     A.      Many of the decisions, at least in -- I was

18  working on the financial side.

19     Q.      Can you a name decision that required

20  certified expertise?  And -- and let me back up to be

21  clear.  A decision about the Munis product because

22  that's what current future state is, right, is

23  deciding how to implement the future state which

24  would be the Munis product?

25     A.      Correct.

1      Q.    (BY MR. CORRELL)   In an analysis session if

2    a client was confronted with a question they were

3    supposed to answer that would impact the

4    implementation of the Munis software and said to you,

5    what choice should I make, what were you supposed to

6    do as an implementation consultant?

7      A.    Further help them understand the choices

8    that they could make, but it is not in my

9    certifications, skill set, et cetera, or even tasks

10   or duties to make that decision for them or provide

11   any business process, you know, recommendation on

12   that.  There was a very specific group at Tyler that

13   focused on doing business process analysis and

14   actually helping make decisions.  Our tasks as

15   implementation consultants was to give examples, give

16   explanations, share previous experiences.

17     Q.    This current future state questionnaire

18   spreadsheet, was that completed before you arrived on

19   site to conduct the analysis?

20     A.    The client was sent this -- this document

21   by the project manager and asked to complete it to

22   their best entirety, and any parts that they did not

23   understand, that was the purpose of the

24   implementation consultant to help them clarify and

25   understand so they can complete this document.

Page 97

1    the system.

2         Q.    So when you say putting it in the system,

3    is this literally just sitting here with documents

4    and typing them in?

5         A.    No.  So each -- there are lots of different

6    setup screens, and setup screens could involve check

7    boxes, they could involve toggle switches, like on

8    and off, yes or no, that's what a lot of the setup

9    screens are.  And then when it comes to -- there are

10   code cables in the different parts of the setup, so

11   we are literally inputting, creating new codes, and

12   all of the codes, based on the data that the client

13   had provided.

14        Q.    What about during the earlier phase when

15   you were working with the customer, what did that

16   interaction look like?

17        A.    I was there to guide and assist them with

18   that setup, but, ultimately, they were there -- even

19   if I was asked to physically be the one pressing the

20   buttons they were there, it was -- they had decided

21   on it previously, they see the setup being done for

22   them so they can, essentially, quote, unquote, sign

23   off on it and say, yes, like this is set up based on

24   what we talked about before.

25        Q.    And if we go back to your resume, Exhibit

1    I can't recall whether we would then review it after,

2    but, essentially, the purpose of the testing phase

3    was to also confirm that all of the configuration

4    that was done meets their requirements.

5         Q.    Let's move to that phase.

6                What did the testing phase entail?

7         A.    So first, it's making sure that everything

8    works at a very core level.  I couldn't explain to

9    you why, and no consultant understands why, but

10   installed, those should be more uniform, could have

11   very different -- even though it's all the same

12   system, can have different outcomes and different

13   performance outcomes on the client's end.  I've seen

14   where I try to open a specific program and it just

15   doesn't open.  It gives an error.  But it happens to

16   work for every other client.  Right.  So making sure

17   that every single program opens, that all of the

18   buttons work right, that's like the basics.  And some

19   of that -- some of those issues could be discovered

20   during the setup phase, but during the setup phase

21   you're not necessarily getting into the processing

22   pieces and the processing programs of Munis.

23        Q.    So -- and I understand your testimony

24   there, but are you the person who's actually going in

25   and testing the system to see if it works?

Page 129

1      A.    It depends on how the project manager

2    assigned it, but either we are doing it with the

3    client, and they are, again, like on -- they're

4    driving the computer, or we're driving the computer

5    and they're watching, but it's their system for them

6    to own, for them to use, so now they want to see that

7    it all works.  And we were provided with testing

8    scripts for all of the testing phases to --

9    essentially, here's all the different things that you

10   need to test to make sure it works.  And then, again,

11   a Tyler project manager could tell you all of the

12   different milestones that existed for the client.

13   But I recall hearing conversations, and, you know,

14   talking to project managers where they say each of

15   these, basically, phases and steps that we're talking

16   about have some sort of sign-off where the client

17   confirms that it was done to their liking, to their

18   satisfaction.

19      Q.    Are you -- are you demonstrating these

20   tests to client?  I mean, how -- how would the client

21   know from your understanding that you have

22   satisfactorily tested the system?

23      A.    We are actually going through and testing

24   this, yes.

25      Q.    With the client sitting right there?

Page 130

```
 1    it was the same, fundamentals review, all the same
 2    implementation steps.
 3        Q.    So the last phase on parts of the
 4    projects -- and then we can take a break -- that we
 5    haven't covered yet is go-live.
 6                    What is go-live?
 7        A.    So go-live is when now everything is
 8    complete and the client flips the light switch and
 9    says we are no longer using our old system, we're
10    using our new system.
11        Q.    What is your role in that part of the
12    project as an implementation consultant?
13        A.    It's really just being back up -- at that
14    point, again, as we've been, you can say guided, by
15    the project managers is we are there on site in case
16    something -- you know, something comes up, something
17    goes wrong, but at that point everything should be
18    properly set up and tested and everything and up and
19    running that our involvement is very minimal.  We are
20    there -- now, the project managers, and I remember
21    Jennifer Cardinally actually presenting it on one of
22    the weekly meetings, is that -- that there are
23    pre-live checklists that exist out there as to make
24    sure all the -- everything that is needed for a
25    customer to, you could say, officially go-live and
```

Page 150

1      Q.     But I'm asking what was typical.  Not for

2    (unintelligible).  Just -- just an average.

3      A.     That -- that -- that is a large time

4    average.  We were traveling home on Thursday night.

5    I would say 85, even more like 90 percent, of my

6    travel was done Thursday night rather than Friday

7    morning.

8      Q.     And then how many hours would you say you

9    worked on a typical Friday?

10     A.     Eight to ten hours.

11     Q.     So your sworn testimony today is that on

12   the low end you worked 56 hours per week on the low

13   end?

14     A.     Yes.

15     Q.     And on the high end it could be well over

16   60?

17                 MR. BROME:  Sorry.  Did you say 56 or

18   50 to 60?

19                 MR. CORRELL:  Fifty-six.

20                 MR. BROME:  Thanks.

21     Q.     (BY MR. CORRELL)  Did you work on Saturdays

22   and Sundays?

23     A.     When -- you could say when needed or

24   when -- when the situation arose.

25     Q.     How -- and on average, over the course of

Page 178

1          A.     Yes.

2          Q.     Did you ever claim the travel premium based

3     on that provision as opposed to overnight?

4          A.     I don't think I had any clients that

5     were -- I don't think so, no.

6          Q.     So when you were performing work and --

7     you -- you performed a substantial amount of work in

8     San Ramon, California, correct?

9          A.     Correct.

10         Q.     Did you claim the travel premium for that

11     work in San Ramon, California?

12         A.     I was staying at hotels in Pleasanton,

13     California.

14         Q.     So you were not staying at your secondary

15     residence in California as you've described it?

16         A.     Correct.

17         Q.     San Ramon's only 40 miles from San

18     Francisco, correct?

19         A.     Correct.

20         Q.     So under this plan if the -- if your San

21     Francisco address was your actual residence you would

22     not have been entitled to travel premium pay for

23     those trips, correct?

24         A.     Two parts to that.  One is staying in San

25     Francisco with family as a secondary place, as Reno,

                                        Page 185

```
 1    Nevada remained my primary residence and the location
 2    that a majority of the time I was traveling back to.
 3         Q.    So you, in your own opinion, do not regard
 4    San Francisco as having been your place of residence
 5    in -- during your time at Tyler?
 6         A.    It was a place that I was, you could say,
 7    secondary -- almost secondary but spending a lot of
 8    time in with family, but...
 9         Q.    Did you ever notify Tyler that you were
10    working out of this location in San Francisco and
11    that it might impact your travel premiums?
12         A.    Yes.
13         Q.    When did you --
14              MR. BROME:  I was just --
15         Q.    (BY MR. CORRELL)  -- notify them?
16              MR. BROME:  -- kicked out of the Zoom
17    meeting.  I'm sorry guys.  I missed a bunch of what
18    just happened.  I just got disconnected and
19    reconnected.
20              MR. CORRELL:  We have not made it far.
21    You -- you -- Mr. Kudatsky just testified that he did
22    notify Tyler that he was working out of his San
23    Francisco residence in a way that could impact his
24    travel premium and the question pending was how did
25    he notify Tyler.
```

Veritext Legal Solutions
800-336-4000

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
 2
 3    AARON KUDATSKY, Individually ) Case No.:  3:19-CV-07647-WHA
      and on behalf of all others  )
 4    similarly situated,          )
                                   ) DEFENDANT'S NOTICE OF TAKING
 5         Plaintiffs              ) DEPOSITION OF PLAINTIFF
                                   ) AARON KUDATSKY
 6    vs.                          )
                                   ) Judge William Alsup
 7    TYLER TECHNOLOGIES,          )
                                   ) Action Filed:  November 20,
 8         Defendant.             )                 2019
 9
10               REPORTER'S CERTIFICATION
11    THE STATE OF TEXAS:
      COUNTY OF TARRANT:
12
13         I, Christie L. Tawater, Shorthand Reporter in and for
14    the State of Texas, hereby certify to the following:
15         That the witness, AARON KUDATSKY, was duly sworn by the
16    officer and that the transcript of the oral deposition is a
17    true record of the testimony given by the witness;
18         That the deposition transcript was submitted on October
19    12, 2020, to the attorney for the witness, for examination,
20    signature, and to Veritext Legal Solutions, by November 11,
21    2020;
22         That the original deposition was delivered to Mr.
23    Michael A. Correll, Custodial Attorney;
24
25
```

                                              Page  223

```
 1        That the amount of time used by each party to the
 2    deposition is as follows:
 3        Mr. Michael A. Correll - 5 hours and 7 minutes
          Mr. Paulo McKeeby - 00:00
 4        Mr. Daniel S. Brome - 6 minutes
          Ms. Abigail Diaz - 00:00
 5
 6        I further certify that I am neither counsel for,
 7    related to, nor employed by any of the parties or
 8    attorneys in the action in which this proceeding was
 9    taken, and further that I am not financially or
10    otherwise interested in the outcome of the action.
11        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this
12    the 12th day of October, 2020.
13
14
15
16
                     Christie L. Tawater, CSR, RPR
17                   Expiration Date:  12/31/2022
                     VERITEXT LEGAL SOLUTIONS
18                   Veritext Registration No. 571
                     300 Throckmorton Street
19                   Suite 1600
                     Fort Worth, Texas 76102
20                   (817) 336-3042
                     (800) 336-4000
21
22
23    Job No. 4253180
24
25

                                          Page  224
```

# EXHIBIT 12

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4                    Case No.:  3:19-CV-07647-WHA

5                       Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9          Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12          Defendant.

13   _____

14

15

16

17     REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                 CINDY CHOQUETTE

19        Taken Wednesday, October 21, 2020

20           Scheduled for 11:00 a.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297272

                                        Page 1

1        California, is that correct?

2        A.    That's correct.

3        Q.    Okay.  And this Santa Monica job

4        shadowing, was this similar to the other two

5        job shadowings you did in Arizona?

6        A.    Yes.  But I had hands-on this time where I

7        literally was helping to set up there.

8        Q.    Okay.  What were you doing that was

9        hands-on at Santa Monica?

10       A.    We were setting up all the business rules

11       for all the various workflows for the different

12       departments at Santa Monica.

13       Q.    Do you recall what phase of the

14       implementation this would have been?

15       A.    I don't recall the names anymore, but it

16       was during the implementation, so it was

17       towards the end when you're setting it up

18       before you go live.

19       Q.    Okay.  I believe these are the six phases,

20       and let me know if you recall them.  So there's

21       fundamentals review, analysis, also known as

22       current state/future state, setup and

23       configuration, testing, training and go live.

24       A.    Right.

25       Q.    Is that what you recall?

Page 36

1    journal entries, payroll entries.

2    Q.   Okay.  Perfect.  Now, were there ever

3    times where you were setting up something for

4    the City of Santa Monica where the process

5    could be done in multiple ways under the Munis

6    software?

7    A.   No.

8    Q.   There was always just one way to get

9    something done?

10   A.   Yeah.  You had to have access to the admin

11   under setup and set up the business rules.

12   Q.   Okay.  So while you were on site you said

13   you had to talk to the department members to

14   get the information to do this setup?

15   A.   That's correct.

16   Q.   What kind of questions were you asking the

17   clients while on site?

18   A.   We were asking them what their approval

19   levels were for each of the various processes

20   and the thresholds and who could approve within

21   those thresholds.  And then we would come up

22   with -- we would fill in the chart that we had,

23   the spreadsheet provided by Tyler.  And then

24   from there we would configure the system with

25   those particular business rules.

Page 39

```
 1       and configuration you just explained?
 2       A.   That and we were doing the next phase, the
 3       testing.
 4       Q.   Okay.
 5       A.   Because once we configured it, we needed
 6       to test them and then test those processes to
 7       make sure it did what they had wanted.
 8       Q.   Okay.  And so can you explain to me what
 9       you did in your role as an implementation
10       consultant testing?
11       A.   Yes.  Let's say it was -- we would have to
12       go through each of the processes that we
13       configured the business rules for.  So one day
14       we would go through the purchase orders,
15       setting -- entering a purchase order and
16       releasing it and posting it and did it go to
17       the proper approvals, the people that it was
18       supposed to.  If not, we had to revisit the
19       setup and determine why it didn't.
20       Q.   And for this testing you said it was on
21       site?
22       A.   That's correct.
23       Q.   Is there any reason that the clients
24       couldn't have done this testing?
25       A.   Well, you would have had -- a couple of
```

Page 43

1      need to address.

2      Q.    And would you just stick to that list of

3      questions, or did you have follow-up questions

4      on your own?

5      A.    Yeah, I had follow-up questions on my own.

6      Q.    And how did you know what follow-up

7      questions to ask?

8      A.    Because I'm an accountant and I had worked

9      with the software, so I knew how it operated so

10     I could ask those questions.

11     Q.    So it was your knowledge and experience

12     that allowed you to know what questions to

13     follow up with, correct?

14     A.    Yes.

15     Q.    During the analysis phase, was there a

16     questionnaire that the clients were given and

17     asked to fill out?

18     A.    Yes.

19     Q.    Do you recall with Coconino County, had

20     they completed that questionnaire?

21     A.    Yes.

22     Q.    And did they have it fully completed, or

23     was it unfinished?

24     A.    There were some areas that were

25     unfinished, yes.

Page 57

1    Q.   Okay.  So you only recall calling your

2    project manager with an issue one time?

3    A.   Correct.

4    Q.   Okay.  Now, you just mentioned that your

5    project manager would come on site at times.

6    Would that be just to supervise you, or would

7    that be to meet with the client?  Can you

8    explain why the project manager was there?

9    A.   Meet with the client to make sure the

10   project was going according to, you know, the

11   schedule, were there any questions that, you

12   know, they could help with, anything not being

13   done by the implementation consultant.  And

14   then they would come and check on us as well.

15   Q.   Okay.  But your project manager wasn't

16   supervising you the whole day while you were

17   working?

18   A.   No.

19   Q.   Okay.  Going back to the training, was

20   there an agenda set for the training?

21   A.   Yes.

22   Q.   And who created that agenda?

23   A.   Those were scripted ones.

24   Q.   Okay.  And what do you mean by the agenda

25   being scripted?

Veritext Legal Solutions
800-336-4000

1      A.   Well, if we were training on, say,
2      entering -- setting up projects, we would go on
3      the Tyler website and the agendas were out
4      there already.  Actually, I'm going to back up
5      and say they were already in the client folder.
6      The project manager puts them there for us to
7      go and download --
8      Q.   Okay.
9      A.   -- to go out to client.
10     Q.   Okay.  And did you review those agendas
11     prior to conducting the training?
12     A.   Yes.
13     Q.   Did you ever give feedback to your project
14     manager saying:  I don't think a certain part
15     of the agenda would be necessary?
16     A.   No.
17     Q.   During a training, did you ever have to
18     change the agenda?
19     A.   No.
20     Q.   So everything always just progressed just
21     as the agenda had set forth?
22     A.   Well, on our side, yes.  I mean, the
23     client side they might have additional
24     questions during the training that we would
25     have to go and revisit or, you know, do because

Veritext Legal Solutions
800-336-4000

1      Q.   And during this setup and configuration,
2      did you make any recommendations to the client
3      on best practices?
4      A.   They asked me how the system -- no.  No.
5      Q.   Okay.  And during the end-user training,
6      what did that consist of for the City of
7      Corvallis?
8      A.   I believe we trained on setting up
9      accounts payable and accounts receivable and
10     purchase orders if I'm not mistaken.
11     Q.   Okay.  And can you go into a little more
12     detail on what those trainings entailed?
13     A.   For accounts payable, the business
14     processes, how to enter an invoice, how to do a
15     check run, and then how to run reports, look at
16     your AP aging, and then how to tie it back to
17     the general ledger.
18     Q.   Okay.  And when those trainings were over,
19     did you again report to your project manager on
20     how you thought the client was progressing?
21     A.   Yes.
22     Q.   Okay.  And do you recall how you thought
23     they were progressing during those trainings?
24     A.   They were great.
25     Q.   Okay.

Veritext Legal Solutions
800-336-4000

1        specific configuration of a workflow?

2        A.   Meeting with the various people in the

3        department and asking them questions, what the

4        approvals were, who signed off on what, what

5        the thresholds were, the approval levels, how

6        many people had to approve until it got to the

7        very end of the process.

8        Q.   So it wasn't just simple data migration?

9        A.   No.

10       Q.   Once you had the information from the

11       client, did you make any recommendations to

12       them on the best way to set up the system?

13       A.   No.

14       Q.   No?

15       A.   No.

16       Q.   And did you do anything else then for the

17       City of Glendale?

18       A.   Not that I can recall, no.

19       Q.   Okay.  So then after covering those three

20       clients, have we then discussed all of the

21       implementation work you did for clients while

22       at Tyler?

23       A.   Yeah.  I wasn't there that long.

24       Q.   Okay.  We did talk about your schedule

25       during the job shadowing.  What was your

Page 78

```
 1                REPORTER'S CERTIFICATE
 2
     STATE OF MINNESOTA    )
 3                         ) ss.
     COUNTY OF HENNEPIN    )
 4
 5         I hereby certify that I reported the
     deposition of Cindy Choquette on October 21st,
 6   2020, in Maple Grove, Minnesota, and that the
     witness was by me first duly sworn to tell the
 7   whole truth;
 8         That the testimony was transcribed by me
     and is a true record of the testimony of the
 9   witness;
10         That the cost of the original has been
     charged to the party who noticed the deposition,
11   and that all parties who ordered copies have been
     charged at the same rate for such copies;
12
           That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
           That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the
16   action that affects or has a substantial tendency
     to affect my impartiality;
17
           That the right to read and sign the
18   deposition transcript by the witness was reserved.
19
           WITNESS MY HAND AND SEAL THIS 4th day of
20   November, 2020.
21
22
23
     Dana S. Anderson-Linnell
24   Notary Public, Hennepin County, MN
     My commission expires 1/31/2025
25
```

Page 98

# EXHIBIT 13

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4                Case No.:  3:19-CV-07647-WHA

5                  Judge William Alsup

6  _____

7  AARON KUDATSKY, Individually and on

8  behalf of all others similarly situated,

9      Plaintiffs,

10  vs.

11  TYLER TECHNOLOGIES,

12      Defendant.

13  _____

14

15

16

17     REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18            PAMELA M. COSTNER

19       Taken Monday, October 19, 2020

20        Scheduled for 2:30 p.m.

21

22

23

24  REPORTED BY:  DANA S. ANDERSON-LINNELL

25  Job No.:  TX 4297248

                               Page 1

1      calculations to the system in order for the

2      product to work properly for them.

3      Q.   And you used the word "configure" a moment

4      ago.  What does it mean for you to configure

5      the system for the client?

6      A.   Munis is a table-driven system, and so you

7      have to populate the tables with codes, be it

8      alpha codes or numeric codes, that will then

9      drive the calculation piece.

10     Q.   Have you ever been given instruction by

11     Tyler on how to describe what an implementation

12     consultant is to third parties?

13     A.   No.

14     Q.   Now, what about a senior implementation

15     consultant, how is that different from what

16     you've just described as an implementation

17     consultant?

18     A.   It means that previously one Friday a

19     month we would attend a meeting, a conference

20     call web meeting, and we would be assigned

21     additional documents to either update, review

22     or create that would help the client better

23     understand the Munis system with the

24     implementation process.

25     Q.   But no other differences between

Page 26

1      might need, so only one way to process payroll,

2      only one way to process benefits, et cetera?

3      A.   In some areas, yes; but in other areas,

4      no, that there are multiple ways to do -- to

5      get the same end result.  And a lot of times we

6      might present them with both options, and then

7      the client makes the choice as to which option

8      they want, and then that's how we move forward.

9      Q.   Is that presentation of the different

10     options something you would be doing as part of

11     this between current state and future state

12     phase?

13     A.   It is.  If it's something where they could

14     have multiple choices, then yes.

15     Q.   Do you always show the client every

16     possible way of doing something in Munis if

17     there's multiple ways to do it?

18     A.   Not always, no.

19     Q.   Why wouldn't you show them every possible

20     way?

21     A.   Sometimes we as implementers don't even

22     know every single possible way.  We only know

23     the ways that we've come across in our

24     implementations.

25     Q.   Let me ask a better question then.  Do you

Page 49

1       show the client every way you know how to do a

2       given task if you're doing this demo, or are

3       there times when you only present some of the

4       ways Munis can perform a given task?

5       A.   If I know multiple ways, I -- whether I

6       show it or at least describe it to them because

7       then that way they can make a better informed

8       decision and I can note that on the spreadsheet

9       so that way the next implementer coming in,

10      whether it's myself or someone else, that they

11      will be able to pick up the ball and go help

12      the client configure the system the way that

13      they have decided to do, the choice that they

14      have picked.

15      Q.   How do you decide whether to show

16      different methods versus describing different

17      methods to a given client?

18      A.   If -- a lot of times clients want to

19      configure Munis exactly like their current

20      system without using the advanced functionality

21      that Munis offers.  And so sometimes we have to

22      show them something different versus just

23      trying to configure Munis to mirror what their

24      current legacy system is.  And sometimes they

25      are very firm on the way they want to do it.

Page 50

1    And so I will verbally tell them how it could

2    also be done.  But if they are really stuck on

3    that's the way they want to do it, then that's

4    what we go with.

5    Q.    A moment ago in your testimony you

6    mentioned that after you've completed this

7    question-and-answer period, it moves to a phase

8    of recommendations.  Did I understand that

9    correctly?

10   A.    Correct.

11   Q.    Tell me about those recommendations.

12   A.    So we recommend the order that you put

13   your items called pay codes or deduction codes

14   so it will make it easier for them as they grow

15   those items within their system.  We help

16   recommend when they build tables maybe not to

17   use alpha because then if something comes up

18   later, they can't alphabetically fit things in

19   the right order, so we have them do things

20   numerically because they want to look at, you

21   know, absence and, you know, out of office, and

22   then they can't put something in between that

23   they wanted to, so numerically they can easily

24   do that.  So it's small little things like that

25   since, again, they don't know the system and we

Page 51

1     can help them, you know, build the system
2     that's going to meet their needs today and down
3     the road.
4     Q.   And you said "we."  Is "we" implementation
5     consultants?
6     A.   "We" as in Tyler, yes, implementation
7     consultants, that we want to have them be
8     satisfied when they get the product.
9     Q.   So you're sitting there, you're working
10    with a client on current state/future state,
11    you get to this recommendation phase, are you
12    utilizing any information that you've learned
13    about the client in this process to make these
14    recommendations?
15    A.   Absolutely, because they are telling you
16    their current process and you are asking them
17    how they want -- what do they want to see in
18    the future.  And so once they tell me what they
19    want to see in the future, then I can make a
20    recommendation of how we can best set up Munis
21    to meet the need of how they want to see their
22    system in the future.
23    Q.   At any point have you been told by a
24    project manager or other Tyler leadership that
25    you're prohibited from making recommendations

Veritext Legal Solutions
800-336-4000

1      to clients about how to configure the system?

2      A.    No.

3      Q.    When you were doing this current

4      state/future state analysis, have you ever had

5      a customer ask if Munis can do something and

6      the answer is that it can't?

7      A.    Absolutely.

8      Q.    What do you do in response to that kind of

9      inquiry?

10     A.    I tell them that that's not a current

11     function that Munis handles.  They have an

12     option of putting in an enhancement request, or

13     they can look at changing their internal policy

14     to meet the system capabilities.

15     Q.    Do you have a responsibility as an

16     implementation consultant to encourage one of

17     those two choices, either the enhancement

18     request or changing their internal operations?

19     A.    Nope.  We leave that up to the client to

20     make that decision.

21     Q.    If the client decides they want a new

22     solution, they want to do the enhancement

23     request -- and by the way, is that fair to say

24     new solution enhancement request --

25     A.    Yeah.

Veritext Legal Solutions
800-336-4000

1      as you're sitting there observing?

2      A.    They are running a payroll.  So maybe this

3      payroll we now have 40 people in the payroll.

4      And they are running through the same steps I

5      did previously, but now they are pushing the

6      buttons and referring to their notes to

7      complete the process.

8      Q.    Is it a real payroll, or is it drawing on

9      simulated data?

10     A.    It's drawing on simulated data.  It could

11     be based upon a previous prior real payroll.

12     We're just not running it in a production

13     environment.

14     Q.    With the training, is that broken out by

15     module?

16     A.    Yes, it usually is.

17     Q.    So typically you would expect that you're

18     training assignment for the week would be to do

19     the payroll module or to do the benefits

20     module, but you wouldn't expect them to be

21     mixed in together?

22     A.    Correct.

23     Q.    Going into a given module of training, how

24     do you know what tasks to confirm the staff

25     knows how to perform?

Veritext Legal Solutions
800-336-4000

1      A.    With every session, there's an agenda.

2      And the agenda has high-level bullet points of

3      what needs to be accomplished during the

4      session.  And that's our checkpoint list that

5      we use and verify that the client has an

6      understanding of those checkpoints.

7      Q.    And you said that the bullet points are

8      high level.  What type of detail is not

9      included under them that would be more

10     granular?

11     A.    It's not saying click on this button, go

12     to this screen, click here, go there.  It's

13     just saying run a payroll, did the payroll

14     balance, those types of things, but it's not

15     giving you the step-by-step instructions on how

16     to run the payroll.

17     Q.    How is that training agenda set?

18     A.    They are standardized agendas that

19     Tyler -- I'm assuming PMs -- put together.  And

20     then the PMs when it's time for payroll

21     processing training, they go pull that agenda

22     and send that to the client for the upcoming

23     session.

24     Q.    Do you review the agenda prior to showing

25     up for the training?

Veritext Legal Solutions
800-336-4000

1    A.    Yes, I do.

2    Q.    Have you ever given any feedback to a PM

3    about an agenda before going to a training?

4    A.    Absolutely.

5    Q.    Can you tell me a little bit about that?

6    A.    If it's a client I've been to on previous

7    occasions and I know we're ahead of where that

8    agenda is, I will let the PM know that we've

9    already covered that in a previous session

10   and/or the reverse.  If they are behind, I'm

11   going to tell the PM they are not ready for

12   this module because we haven't completed the

13   previous module or the previous session that

14   they should have had completed.

15   Q.    In providing that feedback, have you had a

16   PM change the agenda to reflect those issues?

17   A.    Yes.

18   Q.    Have you had PMs refuse to change the

19   agenda despite those issues?

20   A.    I wouldn't say refuse, but I've just had

21   PMs that just don't update the agenda.

22   Q.    So when you are training and you are on

23   one of the agenda items and you decide they

24   have got it or alternatively you decide they

25   are not getting it, how do you decide when to

Veritext Legal Solutions
800-336-4000

1       move on?

2       A.   A lot of times the client will actually

3       make that decision.  They will say:  Can I run

4       through this again?  Because I need to make

5       better notes or I'm confused.  And so we just

6       pause and say:  Well, let's do it again.  And,

7       you know, let's take a look at your notes and

8       run through it again.  It's not necessarily my

9       call.  I ask them how comfortable they are.

10      And they let me know whether they are ready to

11      move on or whether we need to do it again.

12      Q.   Have you ever dealt with a client where

13      they thought they knew how to do it and you

14      knew they didn't?

15      A.   Absolutely.

16      Q.   What do you do in those circumstances?

17      A.   I again ask them and say:  Are you sure?

18      Would you like to do it again to make sure?  I

19      try to rely back on the notes and just say:

20      I'm not going to be here next week.  And you

21      are going to do this next week.  Are your notes

22      sufficient for you to do this without me on

23      site?  And if they answer yes, I can't push the

24      issue.  They are the ones making the call.

25      Q.   So if you complete a training week and you

1     are worried that the client's not ready to
2     proceed, has that ever happened?
3     A.   Yes.
4     Q.   What do you do with that information?
5     A.   One of the requirements of our job is
6     completing what we call a site report with our
7     visit.  And that site report is published to a
8     place where the client can review it of all the
9     subjects that we covered during the week.  And
10    a lot of times I will send that to the project
11    manager in an email with my own private notes
12    that aren't published so he or she can address
13    it with the client.
14    Q.   In this training process, just for my
15    reference, is it all done through this demo or
16    use of the system, or is there also slide decks
17    or other presentation materials presented?
18    A.   When I first started with Tyler, there
19    were PowerPoint presentations.  Those at least
20    for myself have kind of gone by the wayside and
21    tried to get the clients into the system
22    because I think they have discovered that most
23    of us learn better when we actually do it.  So
24    I personally don't use PowerPoints anymore.  I
25    know that some other implementers on certain

Page 77

1      you given specific instructions on tasks to

2      complete with that mentee?

3      A.    Yes.

4      Q.    What types of tasks are you instructed to

5      complete with them?

6      A.    Have a conference call with them once a

7      week and check in with them to make sure things

8      are going well and be available to them.

9      Sometimes they do shadow -- you know, my mentee

10     would shadow me.  And sometimes it's just a

11     random person that's shadowing me, not someone

12     that I am a mentor to.  So again, it's just

13     additional training for them without being in a

14     classroom at Tyler.

15     Q.    Are you given instruction on what to talk

16     about on the calls with the implementation

17     consultants, or is it more of mentee-driven

18     discussion?

19     A.    It's more of a mentee-driven discussion.

20     Q.    How much of your time would you say you

21     spend on this task?  Is it a very small piece

22     of it, or is it a pretty substantial

23     responsibility?

24     A.    Since it's a six-month program for six

25     months I'm with them, the first three months I

Page 103

1      would say it's probably an extra three hours a

2      week that I work with them.  And then that

3      starts to go down.  As they become more

4      experienced, they have less questions along the

5      way.

6      Q.   Do the project managers play any role in

7      your mentoring process with the mentees?

8      A.   Usually not my project manager but the

9      project manager of the mentee.  They call and

10     ask how the mentee is doing.

11     Q.   Do they give you any instruction on things

12     you need to be working on the mentee with?

13     A.   No.

14     Q.   Also on your résumé, the second bullet

15     there says, "Provide professional training to

16     clients on Tyler products."

17          Did I read that correctly?

18     A.   Yes.

19     Q.   When you include the word "professional"

20     there, are you distinguishing that from some

21     other type of training?  What do you mean?

22     A.   Meaning that we are professionals when we

23     show up.  We are not, you know, wearing gym

24     shorts and a tank top and that we carry

25     ourselves in a professional manner, we are

Page 104

```
 1                    REPORTER'S CERTIFICATE
 2
     STATE OF MINNESOTA    )
 3                         ) ss.
     COUNTY OF HENNEPIN    )
 4
 5         I hereby certify that I reported the
     deposition of Pamela M. Costner on October 19,
 6   2020, in Maple Grove, Minnesota, and that the
     witness was by me first duly sworn to tell the
 7   whole truth;
 8         That the testimony was transcribed by me
     and is a true record of the testimony of the
 9   witness;
10         That the cost of the original has been
     charged to the party who noticed the deposition,
11   and that all parties who ordered copies have been
     charged at the same rate for such copies;
12
           That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
           That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the
16   action that affects or has a substantial tendency
     to affect my impartiality;
17
           That the right to read and sign the
18   deposition transcript by the witness was reserved.
19
           WITNESS MY HAND AND SEAL THIS 2nd day of
20   November, 2020.
21
22
23   Dana Anderson
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025
```

Page 139

EXHIBIT 14

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4                        Case No.:  3:19-CV-07647-WHA

5                            Judge William Alsup

6   _____

7   AARON KUDATSKY, Individually and on

8   behalf of all others similarly situated,

9          Plaintiffs,

10  vs.

11  TYLER TECHNOLOGIES,

12          Defendant.

13  _____

14

15

16

17      REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                  SANDRA L. EDINGER

19          Taken Friday, October 23, 2020

20              Scheduled for 2:30 p.m.

21

22

23

24  REPORTED BY:  DANA S. ANDERSON-LINNELL

25  Job No.:  TX 4297303

                                          Page 1

1        well.  Do I have that right?

2        A.   Yes.  An agenda, a PowerPoint as well as

3        additional materials, usually, like I said,

4        anything from a glossary of terms as well as

5        different mappings that were important.  And

6        mappings meaning if I add this hearing type to

7        the case, it's going to report as this specific

8        hearing type or this result on their state

9        reporting or DMV or whatever the case may be.

10       Q.   And those things in connection with the

11       peer review you created the training classes,

12       correct?

13       A.   Correct.

14       Q.   Okay.  How did you go about doing that,

15       just based on kind of your knowledge of the

16       system and your experience or some other way?

17       A.   It was usually based on my knowledge and

18       my experience.

19       Q.   So you were a senior implementation

20       consultant for approximately not quite a year

21       then?

22       A.   Correct.

23       Q.   And during that period of time, what

24       percentage of time -- while you were working,

25       what percentage of your work time was devoted

1          to these other tasks, the preparation of

2          templates, the peer training and the few other

3          things that you weren't sure of, was that half

4          of the time?

5     A.    I would say ten to 15 percent of the time.

6     Q.    These additional functions that you

7          performed as a senior implementation consultant

8          that you just described, are they indicated on

9          your résumé?

10    A.    I'm checking now.  No.  I have training

11         for the client's subject-matter experts, but

12         usually internal training is not something that

13         I would list on my résumé.

14    Q.    Okay.  No, I was just curious if there was

15         something on here that was -- described what we

16         just discussed.  It sounds like the answer is

17         there is not, correct?

18    A.    Correct.

19    Q.    Okay.  Let me ask you about what is on

20         this résumé.  Underneath the job title of

21         Senior Implementation Consultant it indicates

22         that you orchestrated consultation efforts in

23         mapping business procedures.  What business

24         procedures do you mean or what are you talking

25         about there?

```
 1                  REPORTER'S CERTIFICATE
 2
     STATE OF MINNESOTA    )
 3                         ) ss.
     COUNTY OF HENNEPIN    )
 4
 5          I hereby certify that I reported the
     deposition of Sandra L. Edinger on October 23,
 6   2020, in Maple Grove, Minnesota, and that the
     witness was by me first duly sworn to tell the
 7   whole truth;
 8          That the testimony was transcribed by me
     and is a true record of the testimony of the
 9   witness;
10          That the cost of the original has been
     charged to the party who noticed the deposition,
11   and that all parties who ordered copies have been
     charged at the same rate for such copies;
12
            That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
            That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the
16   action that affects or has a substantial tendency
     to affect my impartiality;
17
            That the right to read and sign the
18   deposition transcript by the witness was reserved.
19
            WITNESS MY HAND AND SEAL THIS 6th day of
20   November, 2020.
21
22
23   Dana Anderson
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025
```

Page 76

# EXHIBIT 15

1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4                      Case No.:  3:19-CV-07647-WHA

5                          Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9         Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12        Defendant.

13   _____

14

15

16

17      REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                   IAN M. ROTH

19          Taken Tuesday, October 20, 2020

20             Scheduled for 2:30 p.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297263

Veritext Legal Solutions
800-336-4000

```
 1          covered.
 2          Q.   And can you give me a sense of the level
 3          of detail of the outlines you used contained?
 4          A.   So we have something called req to check,
 5          which is requisition to format a printed check,
 6          steps through probably about five different
 7          modules or more.  And it got down to the detail
 8          of receiving an item -- developing a
 9          requisition, receiving an item -- it's very
10          detailed.
11          Q.   So -- and I guess I'm trying to get a
12          sense about this outline, how comprehensive it
13          was in terms of -- was it as comprehensive as:
14          Good morning, we're here for fundamentals
15          review, all the way through:  Have a nice
16          evening, or at the opposite of the spectrum
17          high level:  Make sure you show them how this
18          works, this works and this works, and then
19          underneath it you're doing the tasks based on
20          your training.  So that's the spectrum as best
21          I can articulate it that I'm trying to
22          identify.  How would you describe the way in
23          which the outline guided your activities in
24          between those extremes?
25          A.   So it was never scripted as to:  This is
```

Page 34

1       the information from the current stateside of

2       the analysis phase?

3       A.   So that goes to:  You're doing it this way

4       now.  Do you want to keep doing it that way, or

5       do you want to do it differently?  A lot of

6       times their current software constrained them

7       to do things a certain way and the

8       functionality of Munis would allow them

9       multiple options beyond what they were allowed

10      to do.  So then they got to consider:  Is this

11      an efficiency?  Is this something we want to

12      embrace?  Do we want to change what we've been

13      doing before?  Do we want to stay the same?

14      Q.   Did you play any role helping them make a

15      decision between the options available in

16      Munis?

17      A.   Yes.

18      Q.   What role did you play?

19      A.   They would ask questions, I would give

20      them answers.  They would --

21      Q.   What do you mean by that?

22      A.   They would say:  Well, if we did it this

23      way, what does that mean?  How would that

24      change things?  And if I saw efficiencies, I

25      would recommend them.  If the client decided

Page 46

1    not to adopt them, that's the client's choice.

2    It was not my place to tell them they had to do

3    it a certain way unless it was a functionality

4    limitation by Munis software.

5    Q.   Were you ever told by Tyler that you were

6    prohibited from making recommendations to a

7    client about one modality versus another for

8    accomplishing tasks in Munis?

9    A.   No.

10   Q.   Would you say making recommendations was a

11   pretty common occurrence to bring your work on

12   the future stateside of analysis?

13   A.   Yes.

14   Q.   Did Tyler encourage you to make any

15   specific types of recommendations between given

16   choices that might be available for a

17   particular task that needs to be performed?

18   A.   No.  Tyler as a business, no.  We did have

19   back and forth between ICs.  We had sessions

20   where we came together and worked through

21   issues.  We shared knowledge, but that's --

22   nothing that the company said:  This is what

23   you need to do.

24   Q.   And when you talk about this

25   knowledge-sharing among ICs, was that through

Page 47

1        of click here, then click there, you probably

2        shouldn't be at the client site.

3        Q.   Why do you say that?

4        A.   Because you have to have a knowledge of

5        the software.  Again, it's that trust issue.

6        If you can demonstrate that you know the

7        product and you can -- I always was taught if

8        you know the answer, give it.  If you don't,

9        don't BS them.  Either say:  I'll research it,

10       I'll find out and I'll get back to you.  And

11       then always close that loop.  And I found that

12       if you do that, you gain the trust and respect

13       of your client.  And life is a whole lot more

14       pleasant.

15       Q.   Did you ever do the testing phase

16       completely off site?

17       A.   No.

18       Q.   Are you aware of the testing phase ever

19       being done completely off site?

20       A.   No.  But I've been gone for just over two

21       years, so I don't know what practices are now.

22       Q.   Sure.  And as we go through this again,

23       it's just your experience that I'm concerned

24       about.  If it's beyond what you know, then it's

25       beyond what you know.

                                         Page 62

```
 1        A.    Okay.
 2        Q.    So the next phase that we listed at the
 3        beginning of the deposition today that would
 4        come after testing would be training, is that
 5        right?
 6        A.    Yes.
 7        Q.    And I know we've talked a little bit about
 8        training along the way.  Do you make a
 9        distinction between an informal training
10        earlier in the process and this phase that's
11        actually labeled as training?
12        A.    Yes.
13        Q.    What's the distinction?
14        A.    During the prior phases before training
15        you're working with the functional leaders, the
16        decision-makers to conform, build the system as
17        desired.  There's not -- if you have a larger
18        organization, City of Berkeley; El Paso, Texas,
19        you can't have all the players in the room
20        because you'll never get anything done.  And
21        it's just not feasible.  So the training is
22        rolling it out to the functional users at
23        different levels.
24        Q.    And when you say "functional users," what
25        do you mean?
```

Page 63

1       based on module.

2       Q.   Would that apply to both functional users

3       and end users?

4       A.   Yes.  We would -- I'm digging deep here.

5       The agenda would be given to the project

6       manager in advance on the site.  The project

7       manager -- the Tyler project manager would send

8       the agendas in advance to the city or county,

9       the client project manager.  And if there was

10      modification to that agenda, the PM on the

11      client side would make recommendations, work

12      with the project manager.  So basically the

13      agenda is the list of things they're going

14      through.  And it's the project manager's

15      responsibility to take this sort of generic

16      agenda and tailor it to the individual client.

17      Q.   So on the agenda for the training, can you

18      give me a sense of what the topics would be or

19      how they would be presented for you as an IC so

20      you know what you're going to go in and train

21      on?

22      A.   Yeah.  So when you're looking for accounts

23      payable and you have the clerks who need to

24      select the items to be paid, it's a

25      step-by-step process.  I'm just thinking back

Page 65

1           If the client is not feeling confident about

2           the process, it could mean a delay.

3           Q.   Did you play any role at any point when

4           you were working as an IC in helping decide

5           whether or not the client was ready to go live?

6           A.   No.

7           Q.   Did you ever make a recommendation to a

8           project manager that a client was not ready to

9           go live?

10          A.   No.  If a client wasn't ready to go live,

11          it was very apparent from the prior sessions

12          about the client -- so client acts -- I won't

13          name them.  We have lots of interaction with

14          them.  There is some politics that were going

15          on where one manager was pointing fingers at

16          the other manager.  This was very clear.  It

17          was a commonality that we had seen throughout

18          the process.  It was a known issue.  So it

19          wasn't surprising when the client said:  We

20          can't do this.  And it wasn't my role to push

21          back and say we have to.  But rather my

22          project -- the project's project manager --

23          when I say "project manager," I'm talking about

24          the project's project manager, not mine.

25          Q.   Understood.

Veritext Legal Solutions
800-336-4000

```
1        A.    So when the client pushed back and said:

2        We need to delay, then it's the project

3        manager -- our -- my -- Tyler project manager

4        that steps in and does what they can do,

5        whatever they feel appropriate.

6        Q.    Throughout the implementation process, did

7        you ever have occasion as an implementation

8        consultant to be providing any recommendations

9        on adjustments to the go-live date?

10       A.    No.

11       Q.    Were you ever told not to make

12       recommendations about adjustments to the

13       go-live date to your project manager?

14       A.    No.   There's a clear delineation about the

15       role of an IC versus a PM.   And we were told

16       that as an IC, you do not directly go to the

17       client's PM, you go to your PM.

18       Q.    And I apologize.   My question was unclear.

19       I was talking about recommendations to change

20       the go-live date to a Tyler PM.   Were you ever

21       told you shouldn't do that?

22       A.    No, not explicitly.

23       Q.    Looking at the full six steps that we've

24       talked about today, how was your work

25       distributed among these steps?   Did you do some
```

Page 82

```
 1        get an estimate, if you don't know, you don't
 2        know.  My goal is to not be surprised later to
 3        have you show up and say:  Oh, yes, on every
 4        single client I was calling the project manager
 5        five times a day.  So that's what I'm driving
 6        here.  As you sit here today testifying, are
 7        you able to give me an average or something of
 8        that nature telling me how frequently you were
 9        contacting the project manager across your
10        portfolio of work with Tyler?
11        A.    No.
12        Q.    As part of your job as an implementation
13        consultant you completed site reports each
14        week, correct?
15        A.    Correct.
16        Q.    What did that entail?
17        A.    Writing up the -- I'm sorry.  Typically
18        the agendas were one morning agenda, one
19        afternoon agenda.  So you're going through and
20        you're writing up your experiences.  Any
21        decisions that were made by the client, you
22        document that.  Any support calls, you document
23        that.  It's a synopsis of how that week went by
24        half-day segments.
25        Q.    Did you provide any opinions on the status
```

1    of the implementation in the site report?

2    A.   It's more observations and decision

3    points.

4    Q.   What do you mean by "decision points"?

5    A.   If the client saw some sort of

6    functionality and they changed their mind or

7    they had to make a decision to be able to

8    figure out whether they want to go to the right

9    or to the left, document it.

10    Q.   Did you make any recommendations for the

11    project manager to consider in your site

12    reports?

13    A.   No.

14    Q.   You've talked about agendas a couple of

15    times.  When would you receive the agenda for a

16    given week?

17    A.   Depends on the project manager.

18    Q.   What were the different possibilities?

19    A.   You never receive it.  In which case you

20    know what you're supposed to be working on that

21    week and you go into the library and you grab

22    the generic one and you just do it.

23    Q.   How often did that happen?

24    A.   Too often.  Once is too often.  Some PMs

25    were known to exhibit -- the behaviors of the

Page 87

```
1        A.    No.
2        Q.    Did you have any occasion to observe other
3        ICs performing work on EnerGov?
4        A.    No.
5        Q.    Have you made any effort to calculate the
6        amount of money you believe through this
7        lawsuit Tyler should pay you?
8        A.    No.
9        Q.    As you sit here today, do you have an
10       estimate of how much you believe Tyler should
11       pay you?
12       A.    No.
13       Q.    Have you discussed this lawsuit with
14       anyone besides your attorney?
15       A.    My wife.
16       Q.    Have you discussed this lawsuit with
17       anyone who joined the lawsuit?
18       A.    No.
19       Q.    Have you discussed this lawsuit with
20       anyone who currently works for Tyler?
21       A.    No.
22       Q.    Did you encourage anyone to join this
23       lawsuit?
24       A.    No.
25                     MR. CORRELL:  Let's take a
```

Page 111

```
1          five-minute break for me to collect my notes,
2          and then I may just be ready to pass the
3          witness.
4                    THE WITNESS:  Okay.
5                    (Recess 5:12-5:17.)
6                    MR. CORRELL:  I'm just going to pass
7          the witness.  I don't know if Mr. Brome has
8          anything or not.
9                    MR. BROME:  Yeah, I just have a
10         couple quick things to follow up on.
11                         EXAMINATION
12         BY MR. BROME:
13         Q.   Mr. Roth, earlier today you said that
14         there are a million decisions in putting
15         together Munis.  Do you recall that?
16         A.   Yes, I do.
17         Q.   How many of those decisions are you
18         making?
19         A.   Zero.  These are all the client decisions
20         on how they want the software to work.
21                    MR. BROME:  I have no further
22         questions.
23                    FURTHER EXAMINATION
24         BY MR. CORRELL:
25         Q.   How does the client go about making those
```

Page 112

```
 1                  REPORTER'S CERTIFICATE
 2
     STATE OF MINNESOTA    )
 3                         ) ss.
     COUNTY OF HENNEPIN    )
 4
 5          I hereby certify that I reported the
     deposition of Ian M. Roth on October 20, 2020, in
 6   Maple Grove, Minnesota, and that the witness was
     by me first duly sworn to tell the whole truth;
 7
            That the testimony was transcribed by me
 8   and is a true record of the testimony of the
     witness;
 9
            That the cost of the original has been
10   charged to the party who noticed the deposition,
     and that all parties who ordered copies have been
11   charged at the same rate for such copies;
12          That I am not a relative or employee or
     attorney or counsel of any of the parties, or a
13   relative or employee of such attorney or counsel;
14          That I am not financially interested in the
     action and have no contract with the parties,
15   attorneys, or persons with an interest in the
     action that affects or has a substantial tendency
16   to affect my impartiality;
17          That the right to read and sign the
     deposition transcript by the witness was reserved.
18
19          WITNESS MY HAND AND SEAL THIS 1st day of
     November, 2020.
20
21
22
23
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025

                                            Page 115
```

EXHIBIT 16

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4                    Case No.:  3:19-CV-07647-WHA

5                    Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9          Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12          Defendant.

13   _____

14

15

16

17      REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18               PAMELA SINCLAIR

19          Taken Thursday, October 22, 2020

20             Scheduled for 3:00 p.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297291

                                        Page 1

1        cut and paste from the Tyler job description?

2        A.    That is my assumption.  I most likely copy

3        and pasted from the job description and then

4        changed the tense of these to where it wasn't,

5        like:  You would work under general

6        supervision.  I changed, like, the tense of it.

7        So I did some modification to it.

8        Q.    How did you have access to the Tyler job

9        description?  Is that something that you -- is

10       this something that you did while you were

11       still employed with Tyler, or did you just

12       happen to have the job description?

13       A.    I had access to the job descriptions while

14       working at Tyler.  I don't know that I have

15       gone back and tried to find them online or

16       anything like that.

17       Q.    Well, my question is:  When you drafted

18       this LinkedIn profile, you would have been

19       employed with Tyler for you to be able to cut

20       and paste from a job description, right?

21       A.    Yes.

22       Q.    Okay.  When you say you had independent

23       judgment and decision-making authority, over

24       what kinds of things did you mean?

25       A.    So if I were building out a training

Page 62

```
 1          manual for a customer, I had the discretion to
 2          pick which screenshot or put a page break where
 3          something belonged.  But as long as I was
 4          working within the scope of the project, I kind
 5          of had the ability to make game-time decisions.
 6     Q.   Okay.  Do you have an estimate of -- well,
 7          let me ask you this first:  Did you work -- if
 8          I asked you this before, I apologize.  Do you
 9          believe that you worked more or less hours as
10          an implementation consultant while you were
11          supporting Munis or while you were supporting
12          Odyssey?
13     A.   I worked more while supporting Munis.
14     Q.   How many hours -- do you have an estimate
15          of the number of hours, average number of hours
16          that you worked while supporting the Munis
17          software?
18     A.   I would estimate around 50 a week.
19     Q.   And what about Odyssey?
20     A.   Including travel time and hotel work, I
21          would say it would be between 45 to 50.
22     Q.   And when you were giving your estimate of
23          50 a week while you were supporting Munis, you
24          were including everything, correct, including
25          travel --
```

Page 63

```
 1                   REPORTER'S CERTIFICATE
 2
     STATE OF MINNESOTA    )
 3                         ) ss.
     COUNTY OF HENNEPIN    )
 4
 5          I hereby certify that I reported the
     deposition of Pamela Sinclair on October 22, 2020,
 6   in Maple Grove, Minnesota, and that the witness
     was by me first duly sworn to tell the whole
 7   truth;
 8          That the testimony was transcribed by me
     and is a true record of the testimony of the
 9   witness;
10          That the cost of the original has been
     charged to the party who noticed the deposition,
11   and that all parties who ordered copies have been
     charged at the same rate for such copies;
12
            That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
            That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the
16   action that affects or has a substantial tendency
     to affect my impartiality;
17
            That the right to read and sign the
18   deposition transcript by the witness was reserved.
19
            WITNESS MY HAND AND SEAL THIS 5th day of
20   November, 2020.
21
22
23      Dana Anderson
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025
```

Page 65

# EXHIBIT 17

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4                    Case No.:  3:19-CV-07647-WHA

5                         Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9           Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12           Defendant.

13   _____

14

15

16

17      REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                  TRAVIS E. VOID

19           Taken Friday, October 23, 2020

20             Scheduled for 10:00 a.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297303

                                      Page 1

1       having someone shadow you on a job.

2       Q.   And then one thing I have heard from other

3       senior implementation consultants is that there

4       is a task involving creating guides and other

5       documents and information that supports the

6       implementation process.  Is that something

7       that's part of your role as a senior

8       implementation consultant?

9       A.   Yes.

10      Q.   Did you have that responsibility before

11      you were a senior implementation consultant?

12      A.   Every now and then.

13      Q.   Is it more frequent now?

14      A.   Yes.

15      Q.   Can you give me a sense of how much more

16      frequent it is?

17      A.   At least monthly.

18      Q.   How much was it before?

19      A.   Probably quarterly.

20      Q.   When did you become a senior

21      implementation consultant at Tyler?

22      A.   A senior implementation consultant?

23      Q.   Yes.

24      A.   Give me a minute to think of the dates

25      from project management to senior implementer.

Veritext Legal Solutions
800-336-4000

1       as opposed to people in other roles at Tyler?

2       A.    I do not.

3       Q.    Can you give us a description of how much

4       the script controls your presentation of

5       fundamentals review?  Is it everything from

6       "Good morning, class" to "Have a nice evening"

7       scripted all way through, or is it something

8       else less specific than that?

9       A.    It's very well scripted to last the whole

10      session.

11      Q.    What kind of information does the script

12      provide to you as a senior IC?

13      A.    Questions to ask the client.  For some

14      there is a story that goes along with the

15      questions to ask.

16      Q.    What do you mean by that?

17      A.    We have a scenario for a school system and

18      how it will process things in Munis.  So to

19      back up, the questions we ask, the story kind

20      of gives them a background.

21      Q.    Do you know who creates that story?

22      A.    The story was developed by a team of

23      senior implementers.

24      Q.    So is it the same story every time?

25      A.    No.

Page 31

1       Q.    Why?

2       A.    The script has a flow that should be

3       followed that makes sense.  If they can wait

4       until the end, it may answer some of those

5       questions.

6       Q.    Do you always wait until the end to show

7       those things or answer those questions?

8       A.    I couldn't say always.  I'm trying to

9       recall every session.  I couldn't say always.

10      Q.    Under what circumstances would you deviate

11      from that and demonstrate something right then

12      in response to a question?

13      A.    Depends on the pushiness of the client.

14      Q.    When that occurs, do you just make that

15      decision, or do you call your project manager

16      before deviating from the script to show

17      whatever is necessary to respond to the client?

18      A.    We generally would alert our PMs of the

19      client's behavior.

20      Q.    Before or after you made that

21      demonstration to answer their question?

22      A.    Typically before.

23      Q.    So you would go get permission from your

24      project manager to make that demonstration in

25      the middle of your presentation?

Page 37

1          A.    Parking lot.   That's why we use the
2     parking lot.
3          Q.    The next stage after fundamentals is the
4     analysis or current state/future state phase,
5     correct?
6          A.    Correct.
7          Q.    What does that phase entail?
8          A.    Learning what the client currently does
9     and asking questions to see what they will be
10    able to do.
11         Q.    As an implementation consultant, what
12    specific tasks do you perform when you are
13    assigned an analysis phase implementation.
14         A.    There's a document for current state where
15    we ask questions.   And there's a document for
16    future state where we ask questions.   The
17    future state sets us up to populate settings
18    based on their answers.
19         Q.    Starting with current state, you mentioned
20    that you're asking questions to understand
21    their system, correct?
22         A.    Correct.
23         Q.    How are you doing that mechanically?
24         A.    There's a spreadsheet with a
25    questionnaire.

Veritext Legal Solutions
800-336-4000

1        populate the settings with some of the answers

2        from that questionnaire.

3        Q.    There's multiple ways to perform tasks in

4        Munis quite frequently, correct?

5        A.    Correct.

6        Q.    And clients have to make choices between

7        different ways of doing a given task, correct?

8        A.    Correct.

9        Q.    Do you play any role in helping the client

10       make those choices?

11       A.    Not in helping them make the choices but

12       showing their options.

13       Q.    Do you ever make recommendations to

14       clients about how one route through Munis might

15       be better than another route through Munis?

16       A.    Whether or not a route is better is up to

17       them for their processes.  We show them what's

18       available.

19       Q.    And my question is:  Do you ever make

20       recommendations to the client?

21       A.    I show them what's available.  So my

22       recommendations aren't of:  You should do it

23       this way.  It's:  You can do it this way and

24       get this result or do it this way and get this

25       result.  Which is going to work better for you?

Page 43

1      Q.   Has a client ever asked you:  What should

2      I do with respect to one of these choices?

3      A.   They have, yes.

4      Q.   What do you say in response?

5      A.   "What do you feel is best?"

6      Q.   So your testimony is you have never made a

7      recommendation to a client on which option they

8      should select ultimately as part of future

9      state?

10     A.   I wouldn't say I've never made a

11     recommendation, but I have presented multiple

12     options and given them multiple outcomes for

13     them to make a better decision.

14     Q.   And I understand that piece.  I totally

15     understand the information you're presenting.

16     What I'm trying to determine is the extent to

17     which you play any role at all in their actual

18     decision-making process by providing a

19     recommendation.  So from your answer a moment

20     ago, it sounded like you have on some occasions

21     made a recommendation to a client in the past,

22     is that correct?

23     A.   I've offered multiple solutions for them

24     to make a choice.

25     Q.   Have you ever expressed to a client that

Page 44

```
 1          their vendors.  And we send it to our
 2          conversion team.  And they convert it and put
 3          it into their database.
 4     Q.   And the acronym AP you used there, is that
 5          accounts payable?
 6     A.   Yes.  Sorry.  Acronym.  Accounts payable.
 7     Q.   So what are you actually doing for the
 8          client as they're populating that spreadsheet
 9          to be sent to the conversion team, if anything?
10     A.   If they have a question about what a field
11          is, we may explain that field in Munis and what
12          it could be used for.
13     Q.   Since conversions are spread across
14          different phases in your testimony, how do you
15          know when you're going to be doing
16          conversion-related work?
17     A.   The project manager puts it within the
18          project plan.
19     Q.   And when you say "project plan," I've
20          heard the term "agenda" from a lot of folks, is
21          that the same thing, or is that something
22          different?
23     A.   How can I put this?  I would say agendas
24          are born from a project plan.  That's the best
25          way I can describe it.
```

Page 51

1    Q.   Okay.  Can you describe that in a little

2    more detail?

3    A.   So the project plan pretty much has

4    everything listed out in the order it should

5    go.  And there are agendas for each day that we

6    should follow.  So at some point during your

7    visit, you're going to have an agenda that

8    talks about conversions.

9    Q.   So you wouldn't expect to go to the

10   project plan document to know when you're doing

11   conversions, you would expect to go to the

12   agenda for your site visit?

13   A.   Correct.  Yes.

14   Q.   Do you typically do setup and

15   configuration on site or off site outside of

16   COVID?

17   A.   In my experience, it's been on site.

18   Q.   Do you know, is there a benefit in your

19   experience to being on site to perform setup

20   and configuration?

21   A.   If there is a future-state question that

22   was answered kind of unclear, then we may need

23   to ask them is this what they meant by

24   answering this question this way.

25   Q.   How would that happen given that an

Veritext Legal Solutions
800-336-4000

1        implementation in your experience?

2        A.   Not typically.

3        Q.   What are your responsibilities with

4        respect to the train the trainer piece of the

5        training phase?

6        A.   Basically to train the person that's going

7        to train the end users how to go take a process

8        or a record from A to Z.

9        Q.   How do you do that?

10       A.   We have an agenda.  And throughout the

11       agenda, it will list you need to create a

12       requisition, you need to convert it to a PO,

13       you need to receive on it, you need to do an

14       invoice and you need to write a check.  And you

15       pretty much show them that process.

16       Q.   How do you know what process you're going

17       to show them?

18       A.   It's in the agenda.

19       Q.   And in terms of what you actually present

20       and say to the clients while you're training

21       them in this context, do you develop that

22       yourself, do you get that from some other

23       source?

24       A.   What do you mean, like, what I say to

25       them?  Do I develop what I say to them?

1    Q.   Do you use slide decks as part of this

2    training?

3    A.   No, I don't.

4    Q.   Do other people use slide decks as part of

5    this training based on your experience?

6    A.   I believe some may, but I don't.  I

7    haven't seen anyone that does it, but I've

8    heard other clients say they have seen a

9    slideshow.  And it's interesting to hear what

10   clients say what other people do.

11   Q.   If you wanted to use a slide presentation,

12   do you believe you would be allowed to do so?

13   A.   I believe so.  As long as the slides are

14   approved to be used.  It has to be approved to

15   be used.

16   Q.   Who approves the slides?

17   A.   Could be the PM, could go further up than

18   the PM, could be we've gotten something from

19   development.

20   Q.   What's your basis for claiming that you're

21   required to get approval for slides?  How do

22   you know that?

23   A.   What's my basis?

24   Q.   Yeah.

25   A.   I'm not sure I understand the question.

Page 62

```
 1      Q.   Did someone ever tell you that you have to

 2      get approval to use slides?

 3      A.   No, I don't think no one's ever told me

 4      that.

 5      Q.   Why do you believe you would need to get

 6      permission to use slides?

 7      A.   Anything that would have the Tyler brand

 8      on it, that typically would come from either

 9      marketing or from someone that has looked at it

10      to say:  Yes, this is something that's client

11      facing.  So that's what led me to believe that

12      if we wanted to develop slides, it would have

13      to be approved before we actually get to use

14      it.

15      Q.   So you used two different terms recently.

16      I want to make sure that I'm getting the full

17      gamut of training here.  Train the trainer and

18      functional lead, are those two groups of

19      people?

20      A.   They could be.

21      Q.   When they are two different groups of

22      people, do you conduct your training

23      differently in terms of how you proceed?

24      A.   I would say no.  The training is still the

25      same.  It's a standard train the trainer.  So I
```

Page 63

1      teaching?

2      A.   How do I know we've completed training?

3      Q.   Let me ask that differently.  How do you

4      decide it's time to move on to the next topic

5      in training, if you do?

6      A.   During my trainings I constantly ask:

7      Does that make sense?  Does that make sense?

8      And that kind of gives me the go-ahead for the

9      next topic.

10     Q.   The last phase of an implementation is go

11     live, correct?

12     A.   Correct.

13     Q.   What does go live entail?

14     A.   For financials, it's pretty much if they

15     can write a check to a vendor, they're live in

16     a nutshell.

17     Q.   So if you have been assigned a go-live

18     week of an implementation, what are you as an

19     implementation consultant doing?

20     A.   I am assisting in errors with roles,

21     errors with workflow, anything that pops up,

22     kind of facilitating or being a facilitator

23     between support and the client because they

24     have not been transitioned to support yet, so

25     there's a lot of support calls for different

Veritext Legal Solutions
800-336-4000

1          issues that pop up when users are entering

2          data.

3          Q.    How is the go-live date determined?

4          A.    Generally that's determined on the

5          contract initially when they're going to go

6          live.  And that's put in the project plan.

7          Q.    Does the go-live date ever change?

8          A.    Yes.

9          Q.    What kinds of things can cause changes in

10         the go-live date?

11         A.    COVID.  Could be changes in end users,

12         functional leads, people changing jobs, people

13         quitting, new hires coming on, things like

14         that.

15         Q.    Have you ever made -- actually, have you

16         ever contacted a project manager to tell them

17         you were concerned that the client wasn't going

18         to meet the go-live date?

19         A.    I have not.

20         Q.    Are you aware of other implementation

21         consultants doing that?

22         A.    I'm not aware of them doing it.  Project

23         managers usually tell us that during, like,

24         they've had calls with the client and the

25         client is pushing them to say:  We want to

Veritext Legal Solutions
800-336-4000

1          consultants making recommendations to change

2          implementation milestones?

3          A.   I am not aware of that.

4          Q.   You mentioned two error issues that you

5          handle during go live.  One was error roles and

6          one was error workflows.  What are those?

7          A.   So roles are the permissions that you give

8          users to operate within the system.  And

9          workflow is who is approving items.  So that's

10         the design of why someone should be approving

11         something.

12         Q.   And what are you specifically doing with

13         those errors?

14         A.   Looking for setup flaws where someone did

15         not create a workflow business rule for a

16         record.  They're saying:  My manager didn't get

17         this record to approve.  Why didn't they get

18         this record?  So we have to take them to the

19         record, look at the information, and then look

20         at the business rules to see why it was skipped

21         in workflow or why it went to someone when they

22         thought it should bypass someone.

23         Q.   And you used a term there that I didn't

24         quite catch.  It was something flaws?  What was

25         the term you used for the type of flaws they

Page 74

1                    REPORTER'S CERTIFICATE
2
     STATE OF MINNESOTA    )
3                          ) ss.
     COUNTY OF HENNEPIN    )
4
5            I hereby certify that I reported the
     deposition of Travis E. Void on October 23rd,
6    2020, in Maple Grove, Minnesota, and that the
     witness was by me first duly sworn to tell the
7    whole truth;
8            That the testimony was transcribed by me
     and is a true record of the testimony of the
9    witness;
10           That the cost of the original has been
     charged to the party who noticed the deposition,
11   and that all parties who ordered copies have been
     charged at the same rate for such copies;
12
             That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
             That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the
16   action that affects or has a substantial tendency
     to affect my impartiality;
17
             That the right to read and sign the
18   deposition transcript by the witness was reserved.
19
             WITNESS MY HAND AND SEAL THIS 6th day of
20   November, 2020.
21
22
23   *Dana Anderson* (signature)

24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025

                                           Page 110

EXHIBIT 18

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4                    Case No.:  3:19-CV-07647-WHA

5                         Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9          Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12          Defendant.

13   _____

14

15

16

17      REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                  JAY WRIGHT

19          Taken Tuesday, October 20, 2020

20             Scheduled for 10:00 a.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297263

                                    Page 1

1     Q.   So I guess that -- does on-site and

2     remote go-live -- okay.  So you're talking

3     about go-live support in the first clause of

4     that bullet, correct?

5     A.   Correct.

6     Q.   Okay.  What does the term "go live" mean?

7     A.   That is when the client would transition

8     from whatever previous system they were using

9     and going to EnerGov.

10    Q.   And would you agree with me that that's

11    kind of at the end of the implementation

12    process, correct?

13    A.   Yes, sir.

14    Q.   And would you be on site at the client as

15    an implementation consultant when they went

16    live?

17    A.   Yes, sir.

18    Q.   And what type of support would you provide

19    as an implementation consultant while they were

20    going live?

21    A.   Typically helping them through the process

22    of using EnerGov with the public.

23    Q.   How long would you be at the client site

24    providing go-live support?

25    A.   It depended on the project plan and how

Page 36

```
1                    REPORTER'S CERTIFICATE
2
     STATE OF MINNESOTA     )
3                           ) ss.
     COUNTY OF HENNEPIN     )
4
5           I hereby certify that I reported the
     deposition of Jay Wright on October 20, 2020, in
6    Maple Grove, Minnesota, and that the witness was
     by me first duly sworn to tell the whole truth;
7
            That the testimony was transcribed by me
8    and is a true record of the testimony of the
     witness;
9
            That the cost of the original has been
10   charged to the party who noticed the deposition,
     and that all parties who ordered copies have been
11   charged at the same rate for such copies;
12          That I am not a relative or employee or
     attorney or counsel of any of the parties, or a
13   relative or employee of such attorney or counsel;
14          That I am not financially interested in the
     action and have no contract with the parties,
15   attorneys, or persons with an interest in the
     action that affects or has a substantial tendency
16   to affect my impartiality;
17          That the right to read and sign the
     deposition transcript by the witness was reserved.
18
19          WITNESS MY HAND AND SEAL THIS 2nd day of
     November, 2020.
20
21
22
23
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025

                                                Page 77
```