1   Brian K. Morris (SBN 281409)
    BMorris@reedsmith.com
2   REED SMITH LLP
3   101 Second Street
    Suite 1800
4   San Francisco, CA 94105-3659
    Telephone: 469.680.4200
5   Facsimile:  469.680.4299

6   Paulo B. McKeeby (Admitted *Pro Hac Vice*)
7   PMcKeeby@reedsmith.com
    Michael A. Correll (Admitted *Pro Hac Vice*)
8   MCorrell@reedsmith.com
    REED SMITH LLP
9   2501 N. Harwood St, Suite 1700
    Dallas, TX 75201
10  Telephone: 469.680.4200
    Facsimile:  469.680.4299
11

12  ATTORNEYS FOR DEFENDANT

13              UNITED STATES DISTRICT COURT
14             NORTHERN DISTRICT OF CALIFORNIA

15  AARON KUDATSKY, Individually and on    )  Case No.:        3:19-CV-07647
16  behalf of all others similarly situated,  )
                                           )  **TYLER TECHNOLOGIES' OPPOSITION**
17                          Plaintiffs     )  **TO PLAINTIFF'S MOTION FOR CLASS**
                                           )  **CERTIFICATION PURSUANT TO FED. R.**
18  vs.                                    )  **CIV. P. 23**
                                           )
19  TYLER TECHNOLOGIES,                    )
                                           )
20                          Defendant.     )
                                           )
21                                         )  Action Filed: November 20, 2019
22  _____

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 1

        A.      Tyler's Product and Organization. ........................................................ 2

        B.      Implementation Services and The Tyler Professionals Who Deliver
                Them. ..................................................................................................... 2

        C.      Tyler's ERP Implementations in California. ......................................... 7

        D.      Procedural History and Plaintiff's 7.5 Percent California-Related Opt-In
                Rate. ..................................................................................................... 11

III.    OVERVIEW OF THE ADMINISTRATIVE EXEMPTION ............................ 11

IV.     PLAINTIFF CANNOT SATISFY RULE 23 ................................................... 12

        A.      Plaintiff Has Not Identified a Sufficiently Numerous or Ascertainable
                Class. .................................................................................................... 12

        B.      Plaintiff Has Not Established Commonality Or Predominance. ........... 13

                1.      Plaintiff's Overtime Claim Is Not Suitable for Class Treatment .............. 14

                2.      Application of The Administrative Exemption Cannot Be
                        Resolved on A Class-wide Basis .............................................. 16

        a.      Class-wide Exempt Classification Does Not Support Certification ......... 17

        b.      Plaintiff Fails to Raise Common Issues Related to Exempt Status .......... 17

                3.      Plaintiff's Waiting Time Penalties Claim and Wage Statement
                        Claims Are Not Suitable for Class Treatment ........................... 21

        a.      Application of California Law to Non-resident Putative Class Members ......... 21

        b.      Plaintiff's Waiting Time Claim Cannot Be Uniformly Adjudicated ......... 23

        c.      Plaintiff's Wage Statement Claim Cannot Be Uniformly Adjudicated. ......... 23

                4.      Plaintiff's Failure to Provide a Trial Plan or Method of Assessing
                        Damages Renders the Putative Class Unmanageable ................. 24

        C.      Plaintiff Is Not An Adequate Class Representative. ............................. 24

        D.      Class Treatment Is Not A Superior Method Of Resolving This Case. ......... 25

V.      CONCLUSION ................................................................................................. 25

US_ACTIVE-156775228.9
**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alakozai v. Chase Inv. Servs. Corp.*,
  2014 U.S. Dist. LEXIS 185329 (C.D. Cal. Oct. 6, 2014) ..................................................... *passim*

5

6

*Amaral v. Cintas Corp. No. 2*,
  163 Cal. App. 4th 1157 (Cal. App. Ct. 2008) ...............................................................................23

7

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ......................................................................................................................13

8

9

*Campbell v. PricewaterhouseCoopers, LLP*,
  642 F.3d 820 (9th Cir. 2011) .......................................................................................................12

10

*Casida v. Sears Holdings Corp.*,
  2012 WL 3260423 (E.D. Cal. Aug. 8, 2012) ................................................................................19

11

12

*Coleman v. Jenny Craig, Inc.*,
  2013 U.S. Dist. LEXIS 176294 (S.D. Cal. Nov. 27, 2013) ..........................................................16

13

*Cotter v. Lyft, Inc.*,
  60 F. Supp. 3d 1059 (N.D. Cal. 2014) ......................................................................................15, 21

14

15

*Cruz v. Lawson Software, Inc.*,
  764 F. Supp. 2d 1050 (D. Minn. 2011) .........................................................................................19

16

*Deane v. Fastenal Co.*,
  2012 U.S. Dist. LEXIS 191570 (N.D. Cal Sept. 26, 2012) ..........................................................17

17

18

*Delgado v. MarketSource, Inc.*,
  2018 U.S. Dist. LEXIS 214603 (N.D. Cal. Dec. 20, 2018) ..........................................................24

19

20

*Diacakis v. Comcast Corp.*,
  2013 U.S. Dist. LEXIS 64523 (N.D. Cal. May 3, 2013) ..............................................................12

21

*Doyle v. Chrysler Grp., LLC*,
  663 F. App'x 576 (9th Cir. 2016) .................................................................................................24

22

23

*Federico v. Overland Contracting, Inc.*,
  2013 U.S. Dist. LEXIS 144146 (N.D. Cal. Oct. 4, 2013) ............................................................12

24

25

*Gonzalez v. Millard Mall Servs.*,
  281 F.R.D. 455 (S.D. Cal. 2012) ..................................................................................................23

26

*In re Taco Bell Wage & Hour Actions*,
  2011 U.S. Dist. LEXIS 109169 (E. D. Cal. Sept. 26, 2011) .......................................................23

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  268 F.R.D. 604 (N.D. Cal. 2010) ..........................................................................17, 18

*Lee v. Pep Boys-Manny Moe & Jack*,
  2015 U.S. Dist. LEXIS 171912 (N.D. Cal. Dec. 23, 2015) ............................................12

*Linscheid v. Natus US Med., Inc.*,
  2015 U.S. Dist. LEXIS 40255 (N.D. Ga. Mar. 30, 2015) ..............................................20

*Lucas v. Michael Kors (USA) Inc.*,
  2018 U.S. Dist. LEXIS 78510 (C.D. Cal. May 9, 2018) ................................................12

*McPherson v. EF Intercultural Found., Inc.*,
  47 Cal. App. 5th 243 (2020) ........................................................................................22

*Mevorah v. Wells Fargo Home Mortg.*,
  571 F.3d 953 (9th Cir. 2009) .......................................................................................17

*Oman v. Delta Air Lines, Inc.*,
  230 F. Supp. 3d 986 (N.D. Cal. 2017) ..........................................................................15

*Oman v. Delta Air Lines, Inc.*,
  9 Cal.5th 732 (2020) ...................................................................................................22

*Patel v. Nike Retail Servs.*,
  2016 U.S. Dist. LEXIS 45588 (N.D. Cal. Mar. 29, 2016) ............................................20

*Paul v. One Touch Techs. Corp.*,
  2007 Cal. App. Unpub. LEXIS 5015 ............................................................................19

*Pavloff v. Cardinal Logistics Mgmt. Corp.*,
  2020 U.S. Dist. LEXIS 221745 (C.D. Cal. Oct. 7, 2020) ....................................13, 15, 16, 25, 26

*Perry v. U.S. Bank*,
  2001 U.S. Dist. LEXIS 25050 (N.D. Cal. Oct. 16, 2001) ..............................................16

*Poehls v. ENSR Consulting & Eng'g*,
  2006 U.S. Dist. LEXIS 102873 (C.D. Cal. Aug. 28, 2006) ............................................22

*Risinger v. SOC LLC*,
  2019 U.S. Dist. LEXIS 124779 (D. Nev. July 26, 2019) ................................................24

*Rosenberg v. Renal Advantage, Inc.*,
  2013 U.S. Dist. LEXIS 88468 (S.D. Cal. June 24, 2013) ..............................................17

*Sanchez v. Capital Contractors, Inc.*,
  2017 U.S. Dist. LEXIS 87585 (N.D. Cal. June 7, 2017) ................................................14

*Schachter v. Citigroup, Inc.*,
  47 Cal.4th 610 (2009) .................................................................................................22

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

*Sullivan v. Oracle Corp.*,
  51 Cal.4[th] 1191 (2011) ...................................................................................14, 15, 21

*Swamy v. Title Source, Inc.*,
  2018 U.S. Dist. LEXIS 57048 (N.D. Cal. Apr. 2, 2018) ...........................................14

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S.Ct. 1036 (2016) ..............................................................................................13

*Verkuilen v. MediaBank, LLC*,
  2010 U.S. Dist. LEXIS 77407 (N.D. Ill. July 27, 2010)..........................................20

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................................................................12

*Ward v. United Airlines*, *Inc.*,
  9 Cal.5[th] 732 (2020) ..........................................................................................21, 24

*Xavier v. Philip Morris USA Inc.*,
  787 F. Supp. 2d 1075 (N.D. Cal. 2011) ....................................................................13

*Zinser v. Accufix Rsch. Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ............................................................................12, 20

**Statutes**

CAL. LAB. CODE § 203 ..............................................................................................................22

CAL. LAB. CODE § 203(a)...........................................................................................................25

CAL. LAB. CODE §§ 203(a), 226(e)(1) .......................................................................................25

CAL. LAB. CODE § 226 ..............................................................................................................25

**Rules**

FED. R. CIV. P. 23(a)(3)–(4) ......................................................................................................25

FED. R. CIV. P. 23(b)(3) ......................................................................................................14, 25

**Other Authorities**

29 C.F.R. § 541.205(c)(5) ..........................................................................................................19

29 C.F.R. § 541.205(d) ..............................................................................................................19

29 C.F.R. § 541.205, *et seq.*......................................................................................................19

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## I.    **INTRODUCTION**

Plaintiff Aaron Kudatsky ("Plaintiff" or "Kudatsky") asks this Court to certify a diverse group of Defendant Tyler Technologies' ("Defendant" or "Tyler") Enterprise Resource Planning ("ERP") Implementation Consultants ("ERP ICs"), ERP Senior Implementation Consultants ("ERP Senior ICs"), and perhaps other unspecified employees who have ever travelled to California for even a single day to do any type of implementation work into a single Rule 23 class for the purpose of applying multiple California wage-and-hour laws.  But such a homogenized class is not possible here.  This case does not involve the typical wage-and-hour claims of a group of individuals performing one type of work in one location in one way.  Instead, the putative class consists of a group of professionals who travel to clients' places of business in several different states for differing amounts of time.  They undertake that travel to work unsupervised, helping clients transform their management and business operations structures by implementing Tyler software—an implementation process conducted at a financial loss to Tyler.

The daily functions and duties of the putative class members vary in every possible manner, ranging from the particular services they provide to clients, to how they provide them, to where and when they provide them.  As a result, the Court would be required to adjudicate as to every single member of the putative California class : (1) whether the class member was properly classified as exempt; (2) whether the class member worked in California for a sufficient time and in a manner that creates liability under California law; and (3) the individualize amount of any resulting liability .

Consequently, class adjudication here is neither legally proper nor—given the *less than 8 percent opt-in rate* by ERP ICs and ERP Senior ICs who would qualify for the California class—warranted.  Accordingly, Plaintiff's Motion For Class Certification should be denied.

## II.    **BACKGROUND**

Tyler Technologies, Inc. is the largest U.S. provider of software exclusively to public sector entities.  *See* Webster Dep. 15:24-7, Ex. 6. [1]  Based in Plano, Texas, Tyler employs more than 5,000 employees living and working across the United States and multiple international locations.  *Id.* at 16:8-23.  Tyler defines its mission as partnering with public sector entities to find the best technology solutions

---

[1] All deposition transcripts are attached as Exhibit A to the Declaration of Michael Correll and are referenced by their individual exhibit numbers (e.g., Exhibit 1 – Deposition of Cindy Choquette).

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

to connect citizens and communities to their governments and schools. Webster Decl. ¶ 2, Ex. D.

### A.    Tyler's Product and Organization

Tyler charges its clients fees for software licenses, professional services, and support services. *See* Declaration of Carrie Giesy ¶¶ 4-5, Ex. C.  Tyler's software offerings include dozens of different products that are made up of an even greater number of modules that a client may purchase within a given platform.  Webster Decl. ¶ 3, Ex. D.  This broad offering is driven by the wide variety of public sector clients serviced by Tyler.  *See* Webster Dep. 15:24-16:7, Ex. 6.  Tyler's clients range from small towns with just a few employees, to counties, school districts, states, federal agencies, and court systems that interface with millions of residents and thousands of civil servants.  *Id*.

Tyler organizes its product offerings as follows: Public Administration; Courts and Public Safety; Health & Human Services; K-12 Education and Transformative Technology.  Webster Decl. ¶ 4, Ex. D.  The only product suites relevant to this Motion are Public Administration and K-12 Education, each of which offer ERP solutions.  *Id*.  During the relevant timeframe, those ERP solutions were licensed, implemented, and supported by Tyler's ERP division.  The flagship product out of that division, Munis, includes financial management and human capital management modules, but the division offers other products, each with their own modules.  *Id*.  Implementation teams are organized around specific products, and sometimes around certain modules within those products.  *Id*.

Tyler's ERP software products allow government entities and school districts to perform all of the financial management, revenue management, human capital management, and other functions required of any business.  Webster Decl. ¶ 5, Ex. D.  Among other things, products like Tyler's Munis software facilitate proper tracking of accounts payable and receivable; payroll processing; revenue accounting; procurement activity; recruiting; employee time tracking; and tax and utilities billing.  *See* Webster Dep. 21:19-25, 68:22-69:3, Ex. 6; *see also* Costner Dep. 17:8-18:6, Ex. 2.  Each of these activities is unique for each Tyler client based on variations in client size, location, applicable law, and responsibilities and the corresponding business processes at that client location.  Ultimately, Tyler's ERP software is the technology behind its clients' day-to-day operations.  *See* Webster Dep. 21:19-25, Ex. 6.

### B.    Implementation Services and The Tyler Professionals Who Deliver Them

Transitioning to Tyler's ERP software is transformational for Tyler clients.  Clients often

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

implement Tyler software after years of using another third-party system, or a home-grown system that has been highly customized over time.  Webster Decl. ¶ 6, Ex. D. In fact, in some circumstances, some Tyler clients license ERP software to abandon decades of paper-driven operations and replace those practices with state-of-the-art digital solutions that improve efficiency and reduce costs.  *See, e.g.*, Costner Dep. 47:5-23 (describing example of transitioning client from paper to digital), Ex. 2.

To facilitate this transformation, Tyler "implements" the software that it licenses to its clients. An ERP implementation encompasses the entire post-sale process, from contract signing through the date when the client begins using the software in live production and transitions to a Tyler support team. Webster Dep. 20:20-21:7, Ex. 6; Costner Dep. 25:14-26:2, Ex. 2; *see also* Kudatsky Dep. 144:7-145:4, Ex. 3.  Implementation generates revenue for Tyler, but it does so at a loss.  Webster Decl. ¶ 7, Ex. D. Tyler contracts with clients for a certain amount of implementation time, and ERP ICs and ERP Senior ICs track their "billable hours" to ensure that the contracted-for time is not exceeded for providing this ancillary service as well as ensuring that the correct hours of service are provided to the client.  *Id.*  Tyler offers implementation services to help clients' managers and support personnel perform core administrative functions through Tyler software in a manner properly adapted to their unique needs.

A standard ERP implementation generally consists of six discrete phases:

1.  **Fundamentals Review**:  To start, Tyler presents a software overview to a client's staff prior to tailoring it for the client to help the client understand the software and familiarize it with the available features and functionality.  *See* Webster Dep. 75:18-76:3, Ex. 6; Costner Dep. 36:1-20, Ex. 2; Kudatsky Dep. 77:17-78:9, Ex. 3.

2.  **Current State/Future State**: Next, Tyler works side-by-side with the client to examine how the client currently performs tasks that will be performed using the Tyler software. The goal of this deeply analytical process is to help the client evaluate what it does now and, then, how Tyler's software can and should perform the same task.  That background allows for the ERP IC or ERP Senior IC to identify and recommend specific software options to ensure performance according to the identified workflows and best practices. *See* Webster Dep. 101:21-102:14, Ex. 6; Costner Dep. 46:9-47:4, Ex. 2; Kudatsky Dep. 88:4-8, 108:24-109:6, Ex. 3; Roth Dep. 43:20-44:4, Ex. 4.

3.  **Setup and Configuration**:  Armed with the resulting "future state" data, Tyler next works alongside the client to actually begin to conform the extraordinary number of settings and options within Tyler's product to align the software with the agreed-upon future-state workflows.  *See* Webster Dep. 105:6-25, Ex. 6; Roth Dep. 50:16-22, Ex. 4; *but see* Kudatsky Dep. 128:5-16 (claiming that, in his work, setup and configuration was automatic and required no client aid), Ex. 3.

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

4.    **Testing**: Once the software is configured, Tyler next works with the client to make sure that the configured results meet the required specifications identified in the earlier phases. This phase often marks the first time that the client takes control of the software and, as a result, requires simultaneous informal training performed by the ERP IC or ERP Senior IC. *See* Webster Dep. 109:3-11, Ex. 6; Roth Dep. 56:18-57:9, Ex. 4; *see also* Costner Dep. 70:13-15 (testing is completely unscripted), Ex. 2; *but see* Costner Dep. 65:21-66:6 (stating she normally controls the software during testing with the client), Ex. 2.

5.    **Training**: Tyler begins formal training once the software functionality has been set and has been confirmed through testing. Training takes a variety of forms and can look very different from client to client. Among the variations, sometimes Tyler trains the client's own trainers, who will in turn train the client's end users, and other times Tyler directly trains the end users. Still other times, Tyler trains both. Additionally, the pace and approach to training often varies based on the mood and receptiveness of the client's employees. *See* Webster Dep. 109:23-110:11, Ex. 6; Void Dep. 67:12-24, Ex. 5; Roth Dep. 63:14-23, Ex. 4; Costner Dep. 71:13-23, 72:18-22, 84:13-20, 85:4-17, Ex. 2.

6.    **Go Live**: After months (and sometimes years) of work, go live is the big day when the client fully and finally makes the switch to Tyler's software for operational purposes. But the client does not go it alone—again, Tyler works hand-in-hand with the client to make sure go live is successful. *See* Webster Dep. 111:6-112:6, Ex. 6; Roth Dep. 78:2-6, Ex. 4; Void Dep. 71:17-72:2, Ex. 5; Costner Dep. 95:10-20, Ex. 2.

This implementation process varies in length and complexity from client to client. Some shorter ERP implementations may last a few months. Longer ERP implementations have lasted as long as several years. Webster Decl. ¶ 8, Ex. D; Giesy Decl. ¶ 6, Ex. C. Further, the amount of time spent on each phase of an implementation is not equal. Webster Decl. ¶ 8, Ex. D. Some of that variation is inherent in the differences between the phases, but sometimes the amount of time allocated to each phase varies dramatically from client to client because of a client's particular needs. Webster Decl. ¶ 8, Ex. D

Tyler utilizes several different groups of employees to deliver ERP implementations, including project managers, ERP ICs, and ERP Senior ICs. These employees have one common goal—helping the client transition to their new Tyler software. *See* Webster Dep. 20:20-21:7, Ex. 6; Roth Dep. 27:6-8, 28:4-9, Ex. 4. Yet, while their goal is shared, their responsibilities vary widely in a number of material ways and based on a number of different factors. Meanwhile, they do not make Tyler's product, they do not sell Tyler's product, and they do not provide support for Tyler's product once it is in use by the client. *See* Webster Dep. 20:20-21:7, Ex. 6. Instead, their job concerns assisting each client's management and administrative personnel with implementing new software-based means of conducting general business operations. *See, e.g.*, Webster Dep. 123:10-25, Ex. 6; Costner Dep. 25:14-26:2, 51:5-

- 4 -

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

53:2 (describing role as recommending configuration and other implementation strategies to clients), Ex. 2; Void Dep. 24:11-17, 44:6-13, 45:4-46:5, Ex. 5; Choquette Dep. 66:22-67:10 (describing duty to ask clients questions she created to gauge understanding and shape implementation), Ex. 1.

ERP project managers have responsibility for organizing and coordinating the overall implementation process. Webster Dep. 82:18-83:11, Ex. 6. They typically work with the client to draft the overall schedule for the implementation; they confer with on-the-ground ERP ICs and ERP Senior ICs on project issues as needed; and they liaise with client's own project manager to facilitated communication and ensure progress. *Id.* at 82:18-83:18   Given these responsibilities, project managers also operate as the direct supervisors of Tyler's ERP ICs and ERP Senior ICs. *Id.* at 66:24-67:1.

ERP ICs—and not their project managers or other Tyler personnel—serve as the face of Tyler to the vast majority of client personnel who are trained on and who will use Tyler's product. *See* Costner Dep. 33:25-34:8 (typically alone and not supervised on site), Ex. 2; Kudatsky Dep. 58:5-9 (typically on site alone), Ex. 3; Void Dep. 77:22-24 (typically on site with no Tyler project manager), Ex. 5. The ERP IC is responsible for delivering the tasks that drive one or more of the implementation phases described above. These responsibilities are particularly well-described by Plaintiff's current LinkedIn profile:



Declaration of Michael Correll, Ex. I at Ex. B[2]; *see also* Webster Dep. 92:21-94:3, Ex. 6; Kudatsky Dep.

---

[2] Kudatsky attempted to assert at his September 11, 2020, deposition that some of the statements he included on his own LinkedIn profile may be false and misleading. Nonetheless, the attached screenshot reflects Kudatsky's public LinkedIn profile as of December 6, 2020. Further, as cited, Tyler concurs in Kudatsky's published description of his job functions.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

144:7-145:4, Ex. 3; Roth Dep. 27:6-8, Ex. 4.[3]  As Plaintiff's own description of his former job confirms, ERP ICs perform an incredibly complex job that requires them to be flexible, use good judgment, and apply critical thinking skills to handle the thousands of variations created by each client as they navigate the implementation process.  They help guide clients through hundreds of critical decisions about how their organization will operate within the new software.  Roth Dep. 112:25-113:17, Ex. 4; Costner Dep. 25:14-26:2, Ex. 2; *see also* Roth Dep. 45:24-47:18, Ex. 4; Kudatsky Dep. 52:3-9, Ex. 3; Costner Dep; 48:1-4 (stating that information gathering is completed "zero percent" of the time before she arrived), Ex. 2.  They serve as a bridge between the client's practical knowledge and Tyler's technical experts to get that job done.  Costner Dep. 67:15-68:7, Ex. 2; Roth Dep. 28:4-9, 48:8-49:22, Ex. 4; Kudatsky Dep. 110:5-111:5, 152:7-153:4, Ex. 3.  They provide constant, extremely detailed feedback to project managers to ensure that deadlines are met and that the implementation stays on schedule.  *See* Kudatsky Dep. 157:2-158:10, 160:2-4-7, Ex. 3; *see also id.* at. 104:7-18.  Most importantly, they utilize critical soft skills to help the client complete a sometimes difficult transition to a new way of doing business.  *See* Roth Dep. 79:1-5 (describing "Go Live" role as providing client "moral support"), Ex. 4; Kudatsky Dep. 74:15-76:8, Ex. 3; Costner Dep. 41:8-42:4 (explaining the importance of in-person personal engagement and frequently addressing client questions), Ex. 2.

ERP Senior ICs do everything that ERP ICs do and more.  In addition to all of the tasks described above, ERP Senior ICs have two additional responsibilities that are critically important to achieving successful client results.  First, given the complexity of Tyler's products, it maintains a vast library of information to help its employees efficiently guide clients through Tyler's software and the choice each client must make as they drive towards "go live."  Costner Dep. 26:14-24, 27:21-28:10, 31:21-33:3, Ex.

---

[3] Plaintiff makes much of Tyler's corporate testimony that all ERP ICs and ERP Senior ICs are covered by the administrative exemption.  Not only is this testimony legally unremarkable, Plaintiff omits the accompanying testimony that "[i]mplementation is the broad tent" that is examined "holistically" and that there are aberrations in each employee's actual experience.  Diaz Dep. 64:3-16, 68:10-11, Ex. 7.  Such variation requires individualized analysis and treatment of claims.  .

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

2; Kudatsky 113:18-20, 141:15-23, Ex. 3; Declaration of Gail Franzen ¶ 4, Ex. G.  Much of that material is written by ERP Senior ICs without oversight from project managers or anyone else on the implementation team.  Void Dep. 15:2-19, 28:21-29:16, 30:11-13, Ex. 5; Kudatsky Dep. 188:18-189:8, Ex. 3.  Second, ERP Senior ICs are tasked with providing direct, formal mentoring to new and more junior implementation consultants.  Void Dep. 14:9-13, Ex. 5; Franzen Decl. ¶ 4, Ex. G.  While they are provided certain minimum expectations, ERP Senior ICs are expected to independently take responsibility for how to best mentor and develop Tyler's newest members of the implementation team.  Costner Dep. 101:18-102:12, 103:4-19, Ex. 2; Void Dep. 14:21-15:1, Ex. 5.  Additionally, ERP Senior ICs tend to be assigned to the more challenging implementations and the more difficult phases.  *See* Costner Dep. 98:18-99:19, Ex. 2; Void Dep. 14:1-8, Ex. 5; *see also* Webster Dep. 32:23-33:2 (ERP Senior ICs more responsible for helping set schedule and approach client about securing more billable time), Ex. 6.  As a result, their time, while not uniform among ERP Senior ICs, tends to include less work on easier phases like Fundamentals Review.  *See, e.g.*, Costner Dep. 39:21-40:1, Ex. 2.

## C.   Tyler's ERP Implementations in California

Tyler serves clients across the United States, including in California.  Webster Decl. ¶ 10, Ex. D.  The ERP division staffs California projects with a combination of those California-based consultants as well as  ERP ICs and ERP Senior ICs from a wide variety of other states, who themselves work out of home offices in their states of residence part of each week.  *Id.*; Cole Dec ¶ 2, Ex. H; Irish Dec ¶ 2, Ex. A.  However, ERP ICs and ERP Senior ICs do not all have the—or even similar—contact with California or perform the same or similar work in California.  Webster Decl. ¶ 10, Ex. D.

Before turning specifically to California, it is important to understand how, when, and where ERP ICs and ERP Senior ICs perform their work for a given client.  Implementations are broken down into weeks.  Each week, an ERP IC or ERP Senior IC will follow a roughly consistent schedule.  Webster Dep. 134:11-14.  On Monday, they prepare for the week at their home and travel to the location of the client if it is not close enough to allow for travel on Tuesday morning.  Declaration of Mason Sieling ¶ 4, Ex. J; Roth Dep. 93:11-94:8, Ex. 4; Kudatsky Dep. 158:15-159:6, Ex. 3.   On Tuesday and

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Wednesday, they work at the client's offices from approximately 8:30 a.m. to 4:30 p.m.  Sieling Decl. ¶ 4, Ex. J; Kudatsky Dep. 171:10-16, Ex. 3; Roth Dep. 95:13-96:7, 100:3, Ex. 4.  On Thursday, they work at the client's offices and then travel home unless flight schedules require a Friday morning departure. Roth Dep. 100:19-101:19, Ex. 4.  On Friday, they work at their home office.  Sieling Decl. ¶ 4, Ex. J; Kudatsky Dep. 179:20-180:7, Ex. 3.  On occasion, a client may desire additional work that carries over into Friday, thereby pushing travel to Friday afternoon and cancelling Friday at-home work.  *See* Webster Dep. 134:11-14, Ex. 6; Void Dep. 90:12-91:3, Ex. 5; Roth Dep. 100:24-101:19 (describing changes to schedule caused by Friday site visits), Ex. 4.  Further, as with most exempt roles, the prevalence of weekend work can be dramatically different from person to person.  *Compare* Void Dep. 93:12-25 (claiming 1-2 hours only 1-2 times per quarter), Ex. 5 *with* Kudatsky Dep. 178:25-179:5 (claiming 4-6 hours every single weekend), Ex. 3.  This schedule can vary in many instances.  Some ERP ICs and ERP Senior ICs may be close enough to the client that they do not need to travel on Monday or Thursday.  *See* Declaration of Cam Miles ¶ 2, Ex. B.  Moreover, some parts of implementation were conducted remotely even before COVID-19 prevented in-person activity.  Webster Decl. ¶ 9, Ex. D.

In addition to variations in travel schedules, there are also variations in how ERP ICs and ERP Senior ICs are assigned to projects. Some bounce between implementations from week to week, focusing on delivering a particular phase of an implementation, and they deliver tasks within that phase across various projects.  *See* Giesy Decl. ¶¶ 7-9, Ex. C.  Alternatively, a given consultant may handle Fundamentals Review under Project Manager A for Client 1 in California one week, and the same consultant may assist with go-live under Project Manager B for Client 2 in Arizona the next.  *See* Giesy Decl. ¶¶ 7-9, Ex. C; Roth Dep. 23:3-4 ("Start to finish I did two.  If you add up all the rest of them, 40 to 50."), 24:1-6, Ex. 4; Void Dep. 9-19, Ex. 5.  Similarly, ERP ICs and Senior ICs may be dedicated to just a handful of projects for an extended period of time.  *See* Void Dep. 21:2-9 (4-5 projects in four years), Ex. 5.  Others do not move across projects at all, and are dedicated to a single project until go-live. See, e.g. Costner Dep. 22:6-10 (previously handled 4-5 projects at a time but now dedicated to a single project), Ex. 2; Declaration of Lynn Kazlousky ¶ 2 (handles only one project for extended periods), Ex. F; Declaration of Cindy Williams at ¶¶ 2-3 (same), Ex. E.

This structure has a number of consequences.  First, ERP ICs and Senior ICs do not each have

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

the same depth of experience on all phases of the implementation process. *See* Kudatsky Dep. 143:13-17 (mostly training, testing, and setup and configuration), Ex. 3; Roth Dep. 83:3-13 (cannot even guess the distribution because of varying assignments), Ex. 4; Declaration of Amanda Irish ¶ 4 (primarily performs configuration and testing), Ex. A; Webster Dep. 94:7-20, Ex. 6; *see also* Costner Dep. 19:22-20:1 (describing variation in experience handling different modules), Ex. 2.  For instance, one ERP Senior IC has almost exclusively done Current State/Future State for several years.  Declaration of Gail Franzen ¶ 5, Ex. G.  Another ERP IC has primarily done Fundamentals Review and training for her entire tenure.  Sieling Decl. ¶ 5, Ex. J.  Another consultant has been staffed on a single implementation for years, and worked on each phase all the way through to completion.  Miles Decl. ¶ 2, Ex. B.

Second, the variation in project managers can materially impact what work looks like for ERP ICs and ERP Senior ICs from week to week.  Giesy Decl. ¶ 8, Ex. C.  Some project managers seek more constant feedback than others, thus requiring more regular interaction.  *Compare* Roth Dep. 49:6-22, 72:9-25, 31:5-11 (describing interactions with project managers to solve problems collaboratively), Ex. 4 and Kazlousky Decl. ¶ 5, Ex. F *with* Kudatsky Dep. 161:15-22 (disclaiming any collaborative work with project managers), Ex. 3.  Some project managers do not provide weekly agendas; while other project managers provide detailed guidance for the week.  Roth Dep. 87:14-22 (identifying one project manager who never provided agendas accounting for 10% of his work), Ex. 4.  Some project managers look to implementation consultants and senior implementation consultants for input on scheduling and implementation planning, while other project managers are less solicitous of such advice.  *Compare* Costner Dep. 75:2-21, Ex. 2; Roth Dep. 49:6-22, 72:9-25, 31:5-11, Ex. 4 *with* Kudatsky Dep. 154:22-155:14, Ex. 3; *see also* Costner Dep. 94:15-23 (describing voicing opinions about project problems as part of her job), Ex. 2; Kazlousky Decl. ¶ 5, Ex. F.  As a result, the expectations of an ERP IC or ERP Senior IC may vary significantly depending on the project manager on a given project.

These variations are magnified for California-based work.  Tyler has employed only 32 ERP ICs and 8 ERP Senior ICs who resided in California for any period of time since November 1, 2016.  Webster Decl. ¶ 11, Ex. D.[4]  For context, Tyler has employed more than 550 ERP ICs and ERP Senior ICs

---

[4] The putative representative plaintiff, Plaintiff, is himself not a California resident.  Kudatsky Dep. 17:15-23, Ex. 3  Instead, he is a Nevada resident who occasionally lived with and worked from his

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

nationally during the same period.  *Id.*  All other ERP ICs and ERP Senior ICs who have worked in California during the statutory period have done so while based and residing in another state.  *Id.*  Moreover, there is significant variance among the group of 252 ERP ICs and ERP Senior ICs who do not reside in California but have performed work in California.  Some have travelled to California for a single project for less than two days.  *See* Kazlousky Decl. ¶ 3, Ex. F; *see also* Declaration of Cindy Williams ¶ 3 (traveled to California for two days and has performed all California work remotely since that time), Ex. E; Choquette Dep. 35:11-36:2 (travelled to California to shadow an ERP IC as part of her training, performed no billable work there, and never returned to California), Ex. 1.  Others have worked in California for between 30% to 40% of their total implementations.  *See* Declaration of David Cole ¶ 2 (describing annual fluctuations ranging from 25% to 50% year-over-year), Ex. H.  Further, determining if ERP ICs and ERP Senior ICs worked more than 40 hours *in* California is even more inscrutable because of the travel schedule described above.  *See* Cole Decl. ¶ 4, Ex. H; Sieling Decl. ¶ 4, Ex. J.

But the complexity does not stop there.  Some of the California implementation work done by non-residents has been performed remotely—both during and before the COVID-19 pandemic.  Webster Decl. ¶ 9, Ex. D.  So merely identifying the percentage of implementations involving a California client does not establish the amount of time a given consultant has worked in California.  Further, as noted above, the amount of a consultant's work on a particular implementation is not consistent across the putative class.  As a result, a non-resident California consultant may have done 60% of their project work in connection with a California implementation but, under the three-day site-visit schedule or remote arrangements, performed well less than 60% of their actual work in California.  *See* Williams Decl. ¶ 3 (performs dedicated California work from outside California), Ex. E.  Further, Tyler does not dictate where and when ERP ICs and ERP Senior ICs must perform their work other than the on-site time spent at client sites.  *See* Webster Dep. 135:4-14, Ex. 6.  As a result, a given consultant could perform the majority of his or her hours out-of-state (or on an airplane) in a given week despite spending three days in California, or he or she may perform the vast majority of their work in California (or on an airplane) and work less at home on Monday, Friday, and the weekend.  *See id.* (stating ERP ICs and

---

parents' California home and other times commuted to clients from his Nevada residence.  *See* Kudatsky Dep. 187:7-20, Ex. 3.  These facts present yet another unique scenario.

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

ERP Senior ICs have discretion to schedule their own working hours on non-client days).  These variations are so nuanced that they would require a daily (and sometimes hourly) assessment for each and every ERP ICs and ERP Senior ICs to determine daily and weekly liability under California law.

### D.   Procedural History and Plaintiff's 7.5 Percent California-Related Opt-In Rate

This lawsuit was originally filed on November 20, 2019.  Compl., ECF No. 1.  In May 2020, Tyler stipulated to conditional certification to avoid the costs of contesting such a motion until the decertification stage given the applicable conditional certification standards.  *See* Stip. Mot. Conditional Cert. at 1, ECF No. 39.  Thereafter, notice of conditional certification was sent to approximately 559 ERP ICs and ERP Senior ICs.  Declaration of Michael Correll ¶ 6, Ex. I.  That group included approximately 32 ERP ICs and 8 ERP Senior ICs residing in California, and approximately 163 ERP ICs and 89 ERP Senior ICs who do not reside in California but have performed work on at least one California implementation.  *Id.*

By the close of the notice period, Plaintiff's notice only yielded an opt-in rate of barely 8 percent. *Id.* at ¶ 9.  Among the California residents, the opt-in rate was 10 percent, or 4 out of 40.  *Id.* at ¶ 7. Among the non-California residents who had done work on a California implementation, the opt-in rate was just over 7 percent, or approximately 18 out of 252.  *Id.* at ¶ 8.  In other words, approximately 92.5 percent ERP ICs and ERP Senior ICs who would fall within the putative class have already elected not to participate in this case.

## III.   OVERVIEW OF THE ADMINISTRATIVE EXEMPTION

The California administrative exemption applies to an employee who:

a)   performs work "directly related to management policies or general business operations" of either the employer **or** the employer's clients;

b)   "customarily and regularly exercises discretion and independent judgment";

c)   works "under only general supervision" while either:

  i.   performing work along specialized or technical lines requiring special training, experience, or knowledge, or
  ii.   executing special assignments and tasks;

d)   is "primarily engaged" in exempt work; and

e)   meets a minimum salary requirement.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

*Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 830–31 (9th Cir. 2011).[5]   Exempt work includes "all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions." *Federico v. Overland Contracting, Inc.*, 2013 U.S. Dist. LEXIS 144146, *25–26 (N.D. Cal. Oct. 4, 2013).

## IV.   PLAINTIFF CANNOT SATISFY RULE 23

Plaintiff has not met the heavy burden of showing that certification is proper.  The standard for certification is a high one.  A court may only certify a class if, after a "rigorous analysis," the plaintiff demonstrates that the proposed class meets all Rule 23(a) requirements—numerosity, commonality, typicality, and adequacy.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  The Plaintiff must also satisfy Rule 23(b)(3) by showing that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).  Plaintiff fails to satisfy any of these requirements.

### A.   Plaintiff Has Not Identified a Sufficiently Numerous or Ascertainable Class

Plaintiff is obligated to show that the putative class is sufficiently numerous and ascertainable. *See Lee v. Pep Boys-Manny Moe & Jack*, 2015 U.S. Dist. LEXIS 171912, *15 (N.D. Cal. Dec. 23, 2015). Plaintiff claims these requirements are satisfied because there are "more than 27 implementation consultants who lived in California, and more than 200 implementation consultants who traveled into California during the relevant time period."  Plaintiff's Motion to Certify Class ("Memo.") at 20, ECF No. 78.  Plaintiff's showing is insufficient.

Plaintiff's argument regarding numerosity and ascertainability relies on speculation with respect to the number of putative class members.  Plaintiff does not proffer any method to identify the putative class members who travelled into California during the class period, nor who did so during the limitations period applicable to each of his claims.[6]  *See, e.g.*, *Diacakis v. Comcast Corp.*, 2013 U.S.

---

[5] Plaintiff's salary of more than $50,000 exceeds the minimum requirement.  Compl. ¶ 28.

[6] Unlike Plaintiff's overtime claim (which, in conjunction to the UCL is subject to a four-year statute of limitation), his waiting time and wage statement claims are subject to a three-year and one-year statute of limitations, respectively.  *See Lucas v. Michael Kors (USA) Inc.*, 2018 U.S. Dist. LEXIS 78510, *22, 26 (C.D. Cal. May 9, 2018).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Dist. LEXIS 64523, *3, 5 (N.D. Cal. May 3, 2013).  Furthermore, Plaintiff does not articulate any mechanism to properly identify which, if any, of the non-resident putative class members may have been subject to California law with respect to any of their causes of action during their time in the state. Recently, a court in the Ninth Circuit denied class certification of a wage and hour case on this very basis.  *See Pavloff v. Cardinal Logistics Mgmt. Corp.*, 2020 U.S. Dist. LEXIS 221745 (C.D. Cal. Oct. 7, 2020).  It reasoned that, because "'[s]taying in' California, and 'performing work in' California are two different things," an "estimate that 'at least 100 non-California based [employees] travel to California … where they stay at least one day'" does not demonstrate numerosity.  *Id.* at *10–11 (denying certification on numerosity grounds).  Like Plaintiff here, the *Pavloff* class representative's assertion of "possible class membership" was deemed "not evidence of actual numerosity."  *Id.* at *11.

Plaintiff has not satisfied his burden to demonstrate numerosity or articulated a reasonable method of ascertaining the class.  Thus, the Court should deny certification.  *See Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) ("the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists.").

## B.     Plaintiff Has Not Established Commonality Or Predominance

The multiplicity of legal issues, complex underlying facts, and diversity of the putative class make it impossible for Plaintiff to establish commonality and predominance in this case.  **For commonality**, a plaintiff does not meet his burden "merely by 'the raising of common questions – even in droves.'" *Dukes*, 564 U.S. at 350 n.6.  "Rather, the class members' claims must depend upon a common contention … that [] is capable of class-wide resolution[.]"  *Id.*  Thus, "what matters to class certification … [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (emphasis in original).  As the Supreme Court has noted, "[d]issimilarities within the proposed class … have the potential to impede the generation of common answers." *Id.*  **For predominance**, as defined under Rule 23(b)(3), the rule "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case[,]" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016), and is "far more demanding" than the commonality requirement of Rule 23(a)." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24 (1997).  Predominance requires that the questions common to all class members "predominate over any questions affecting only

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

individual members." FED. R. CIV. P. 23(b)(3).  Plaintiff's Motion fails as to both elements.

1.     Plaintiff's Overtime Claim Is Not Suitable for Class Treatment

The Court can resolve Plaintiff's Motion without addressing Plaintiff's argument that Tyler's allegedly misclassified ERP ICs and Senior ERP ICs.  *See* Memo. at 31.  Even if Plaintiff could demonstrate misclassification, he still must "provide a common method of proving that such employees are entitled to overtime pay."  *Swamy v. Title Source, Inc.*, 2018 U.S. Dist. LEXIS 57048, *17 (N.D. Cal. Apr. 2, 2018).  Plaintiff cannot meet this standard and, as a result, certification is improper.

"Adopt[ing] an erroneous classification policy is not unlawful in the abstract."  *Sullivan v. Oracle Corp.*, 51 Cal.4th 1191, 1208 (2011).  Rather, the employer violates the law when it actually fails to pay overtime to a misclassified employee.  Thus, for purposes of class certification, it is not enough to show that that putative class members are misclassified.  *See Swamy*, 2018 U.S. Dist. LEXIS 57048, *17 (denying class certification because "[e]ven if members of the putative class *were* non-exempt employees, [plaintiff] still fails to provide a common method of proving that such employees are entitled to overtime pay").  Instead, a plaintiff must show that answers to shared questions will fully dispose of the issue of whether overtime is due to each putative class member.  A plaintiff cannot meet this standard merely through class member testimony regarding hours worked.  *See id.* *14.

Plaintiff argues that ICs "*can* work over 40 hours in a week" without receiving overtime.  *See* Memo. at 22.  He then discusses allegedly common questions related to the administrative exemption. But Plaintiff avoids the required task of identifying a common method whereby he can demonstrate that each putative class member worked unpaid overtime under California law.  Plaintiff does not meet this burden by raising common questions regarding misclassification.  Rather, Plaintiff must show that Tyler has a "uniform policy or practice that has the effect of requiring [class members] to work for … more than eight hours a day or more than forty hours in a week[.]"  *Sanchez v. Capital Contractors, Inc.*, 2017 U.S. Dist. LEXIS 87585, *17–18 (N.D. Cal. June 7, 2017).  To make this showing, Plaintiff cannot simply proffer testimony about the experiences of individual ERP ICs or ERP Senior ICs.  *See id.* (use of testimony about individual's overtime work thwarts certification because it requires the court to "consider testimony from each class member in order to determine whether he/she worked" overtime).  "Such testimony is the *exact opposite* of common proof."  *Swamy*, 2018 U.S. Dist. LEXIS 57048. *14.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Even if Plaintiff had common proof demonstrating that Tyler policy resulted in ERP ICs and

2    ERP Senior ICs working overtime, that determination would simply begin the inquiry.  The vast majority

3    of the putative class members do not reside in California and work mostly outside the state.  Thus,

4    California overtime laws could apply to the non-California-resident putative class members only when

5    they worked full days in excess of eight (8) hours or full workweeks in excess of forty (40) hours in the

6    state.  *See Sullivan*, 51 Cal.4th at 1199.  Moreover, some putative class members are California residents

7    but work principally outside the state, and thus would often not be subject to California overtime laws.

8    *See Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1062 n.1 (N.D. Cal. 2014).  Given the numerous states in

9    which the putative class members work, live, and travel, resolving these issues requires evaluating

10   numerous factors that may vary for each class member based on their residence and state law of their

11   residence, the regularity with which they enter California, and in what state they receive wage payments,

12   among others.    As other courts in this Circuit have recently recognized, the complexity and

13   individualized inquiries required to undertake such an analysis defeats commonality:

14       [D]etermining whether California law applies [] would require an individualized inquiry
15       into whether each potential class member had sufficient contacts with California to
         suggest that California law should apply.  For example, if one potential class member
16       worked in California for "full days and weeks" at a time, California's minimum wage
         laws could apply to this driver.  However, if another class member only worked
17       sporadically in California, but rarely for "full days or weeks," then California's minimum
         wage laws may not apply to them.  Answering this question would require the Court to
18       make an individualized inquiry into the contacts each proposed class member had in
         California to determine whether California's minimum wage laws applied to them.
19
20   *Pavloff*, 2020 U.S. Dist. LEXIS 221745, *15; *see also Oman v. Delta Air Lines, Inc.*, 230 F. Supp. 3d

21   986, 992–93 (N.D. Cal. 2017) (discussing various factors relevant to determining what law applies).

22       Taken together, it will not be enough for Plaintiff to come forward with a common method of

23   proving putative class members worked overtime, which, Tyler notes, he has not even attempted to do

24   in his Motion.  He must also present a common question that the Court can collectively and manageably

25   resolve showing that *all* of the putative class members worked overtime in a manner that qualifies for

26   coverage under and represents a violation of California law.  This requirement cannot be met here

27   because Plaintiff will have to proffer individualized evidence for each putative class member—proof of

28   presence in California, proof of work done in California, proof of the applicability California law to the

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

hours worked in California—for every single day and week worked to determine overtime liability.[7]

Importantly, Plaintiff cannot use records showing the number of hours a putative class member bills to a particular customer to accomplish this goal because, as Plaintiff himself testified, these records may only reflect a portion of the total work performed. *See* Memo. at 16 (noting that Tyler records do not show the hours worked). Witnesses testified that because much of their work is not billed to a client, the billing records do not illustrate the number of hours worked. *See* Memo. at 16:4-8. More importantly, the billing records do not illustrate the *location* where an *employee's work* took place; they merely indicate where the client is located. Aside from the few days per week an employee may spend at a client site, Tyler allows employees to reside and work where they wish. Further, even client site-visit work is performed remotely with some frequency—even more so now given the COVID-19 pandemic. Webster Decl. ¶ 9, Ex. D. Thus, work a putative class member bills to a California client could have taken place at home, on a plane, in a hotel room, or somewhere else that is unknown and unrecorded. Stated simply, there is no method whereby Plaintiff can demonstrate that employees worked overtime that is compensable by California law for the entire class. *See, e.g., Alakozai v. Chase Inv. Servs. Corp.*, 2014 U.S. Dist. LEXIS 185329, *51 (C.D. Cal. Oct. 6, 2014) (denying certification because, *inter alia*, class member did not have time records that would illustrate overtime worked).[8]

### 2. The Administrative Exemption Cannot Be Resolved on A Class-wide Basis

Even setting aside Plaintiff's threshold commonality/predominance failure, Plaintiff has not shown that Tyler's application of the administrative exemption to putative class members can be resolved on a class-wide basis. Plaintiff wrongly contends that Tyler's decision to classify all ERP ICs and ERP Senior ICs as exempt justifies certification. This argument is contrary to settled law. Determining exempt status involves a "detailed, fact-specific determination." *Perry v. U.S. Bank*, 2001

---

[7] Plaintiff's reliance on the number of ERP ICs who "travelled into California" (Memo. at 16) to define the scope of the class illustrates the problem. Merely having traveled into California does not mean that California law governs the compensability of that travel time, or, even if it did, that the time was *in fact* compensable hours worked. *See Pavloff*, 2020 U.S. Dist. LEXIS 221745, *16–17 (fact that a driver "logged time" in California does not "does not necessarily mean he or she is entitled to compensation for that time under California law" and would "require an individualized inquiry into how each proposed class member" spent their time).

[8] Without an overtime class, the derivative waiting time, wage statement, and UCL claims also fail. *See, e.g., Coleman v. Jenny Craig, Inc.,* 2013 U.S. Dist. LEXIS 176294, *35 (S.D. Cal. Nov. 27, 2013).

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

U.S. Dist. LEXIS 25050, *20 (N.D. Cal. Oct. 16, 2001). "This is because job duties, and therefore eligibility for exemption, may vary *even among class members with the same job title*." *Alakozai*, 2014 U.S. Dist. LEXIS 185329, *21–22 (emphasis added). Thus, "when an employer asserts an exemption as a defense, … the resolution of which depends upon how employees spend their time at work," certification is generally not appropriate "unless plaintiff proposes some form of common proof, such as a standard policy governing how and where employees perform their jobs[.]" *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 611 (N.D. Cal. 2010) ("*In re Wells Fargo*"). Here Plaintiff's attempt to shortcut this obligation fails as a matter of law, and the available evidence shows that assessing exempt status will require detailed, individualized inquiries into each class member.

a.   <u>Class-wide Exempt Classification Does Not Support Certification</u>

Plaintiff contends that, by treating ERP ICs and ERP Senior ICs as exempt, Tyler "effectively concedes … that the exemption analysis can be [] conducted for all … at once, making this case well-suited for class treatment." Memo. at 7. But courts repeatedly have held that a "blanket exemption policy does nothing to facilitate common proof[.]" *Mevorah v. Wells Fargo Home Mortg.*, 571 F.3d 953, 959 (9th Cir. 2009); *see also Deane v. Fastenal Co.*, 2012 U.S. Dist. LEXIS 191570, *18–19 (N.D. Cal Sept. 26, 2012) (policy of treating all putative class members as exempt "tells us little or nothing about whether their status as exempt or non-exempt can be determined by collective proof."). That is because a blanket exemption policy "may [] accurately classif[y] some employees and misclassify[y] others." *Mevorah*, 571 F.3d at 959.

In all cases, the analysis does not turn on group-wide classification. Rather, it turns on the job duties of employees in the putative class, and whether those duties are sufficiently common to support certification. *See generally Rosenberg v. Renal Advantage, Inc.*, 2013 U.S. Dist. LEXIS 88468, *21 (S.D. Cal. June 24, 2013) (finding insufficient commonality because "the record shows differing evidence as to how the [employees] actually spend their time on the job," and "variations in how the [employees] performed their duties [and] managed their tasks"). Plaintiff's "uniform classification" argument is a non sequitur that does not support certification and contravenes well-settled case law.

b.   <u>Plaintiff Fails to Raise Common Issues Related to Exempt Status</u>

Separately, Plaintiff contends that the administrative exemption raises three common questions

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

sufficient to satisfy Rule 23: (a) whether ERP ICs' and ERP Senior ICs' primary duty is implementing Tyler's software; (b) whether implementation is "directly related" to management; and (c) whether ERP ICs and ERP Senior ICs exercise discretion and independent judgement.  *See* Memo. at 22–32.  The testimony from Plaintiff and that of other opt-ins confirms that these essential questions cannot be answered through a single adjudication.  Thus, these questions do not satisfy the commonality requirement, nor can they establish that class-wide issues predominate.

*Primary Duty*:  Plaintiff's reductionist construction of the word "implementation" wholly omits the complexity and diversity of work experiences and job expectations of ERP ICs and ERP Senior ICs. In reality, the implementation process as described above makes certain that it is not a common experience that can generate common answers that will "drive [] resolution of the litigation." *Dukes*, 564 U.S. at 350 n.6.  Implementation consists of various functions, some of which even Plaintiff concedes can constitute exempt duties.  *See supra* II.B; Memo. at 11.  Importantly, the implementation task an ERP IC or ERP Senior IC performs can vary based on a variety of factors, such as the phase of implementation, that nature of the client and its software suite, the employee's seniority and expertise, and the supervising project manager, among other things.  An employee's specific implementation duties can also vary from workweek to workweek, and even day to day.  Lumping all the of the ERP ICs' and ERP Senior ICs' duties under this overbroad umbrella will tell the Court nothing about their day-to-day tasks and the amount of time spent doing each of them.

*Independent Judgment*:  Plaintiff cannot satisfy commonality with respect to the discretion and independent judgment prong.  Plaintiff contends that the Court can universally resolve this issue due to Tyler policies describing how ERP ICs perform their duties.  In assessing the independent judgment prong, Plaintiff cannot—as he attempts to do—rely only on the Tyler's manuals, procedures, and related documents.  It is well-settled that such policies are not sufficient to support certification.  *See, e.g.*, *In re Wells Fargo*, 268 F.R.D. at 611 (finding that "fact intensive inquiries into how individual [employees] performed their job" were necessary, precluding class certification, despite the putative class members' "common job descriptions, uniform training, the same primary goal… uniform job expectations, similar compensation plans, and standardized employee evaluation standards"); *Alakozai*, 2014 U.S. Dist. LEXIS 185329, \*44 (declining to certify class despite "uniform policies and procedures" because

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

employees "were subject to varying levels of supervision and performed different job duties from day-to-day"); *Casida v. Sears Holdings Corp.*, 2012 WL 3260423, *17 (E.D. Cal. Aug. 8, 2012) (finding that "despite the corporate standardization and the uniformity of tasks to be performed … evidence would be needed to prove misclassification of the class as to each prospective class member").

As discussed above, there is significant variation in the tasks ERP ICs and ERP Senior ICs perform that the written materials do not capture.  Those variations are reflected in the deposition testimony and submitted declarations—and even Plaintiff's own LinkedIn description of his work.  *See* Correll Decl., Ex. B.  This evidence shows that ERP ICs and ERP Senior ICs exercise substantial independent judgment to different degrees on critical issues related to helping clients' manage and operate their businesses through the implementation process.  Given the variation within the class, the cited policies do not support certification.  *See Alakozai*, 2014 U.S. Dist. LEXIS 185329, *44.

***Directly Related to Management or Business Operations***:  Plaintiff also makes an abbreviated argument that the court can determine whether the ERP ICs and ERP Senior ICs satisfy the "directly related" prong of the administrative exemption on a class-wide basis.  *See* Memo. at 23–24.  Plaintiff's argument on this point also is incorrect.

To be administratively exempt, an employee's duties must relate to the management policies or general business operations of either the employer **or the employer's clients**.  *See* 29 C.F.R. § 541.205, *et seq.*  Duties and functions that satisfy this prong include, but are not limited to "[a]dvisory specialists and consultants of various kinds," (29 C.F.R. § 541.205(c)(5)), including those "employed by a concern engaged in furnishing such services for a fee" (29 C.F.R. § 541.205(d)).  Thus, contrary to Plaintiff's contention, the ERP ICs and ERP Senior ICs alleged (but disputed) status as a Tyler "marketplace offering" does not resolve the "directly related" prong of the analysis.  In fact, courts have repeatedly held that employees performing similar functions to those performed by the ERP ICs and ERP Senior ICs while working for employers similar to Tyler meet the requirements of exemption on this element. *See, e.g.*, *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050 (D. Minn. 2011) (consultants who advise employer's clients on how to use the employer's software to assist in running the business qualify for administrative exemption); *Paul v. One Touch Techs. Corp.*, 2007 Cal. App. Unpub. LEXIS 5015 (Cal. Ct. App. June 21, 2007) (unpublished) (administrative exemption applied to employee who acted as

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

consultant to employer's clients in configuring an employer's software to fit customer needs); *Linscheid v. Natus US Med., Inc.*, 2015 U.S. Dist. LEXIS 40255, *23–24 (N.D. Ga. Mar. 30, 2015) ("Courts have previously found employees to qualify for [administrative] exemption where their 'primary duties' consisted of serving 'as a consultant to [the employers] clients' and worked with those clients 'to help them make their businesses run more efficiently,' including by 'implement[ing] and install[ing] software programs for their employers clients and customers.'"); *Verkuilen v. MediaBank, LLC*, 2010 U.S. Dist. LEXIS 77407 (N.D. Ill. July 27, 2010) (directly related prong satisfied where plaintiffs facilitated customer's use of employer's software and provided customer "training and support").  The job of ERP ICs and, in the same and additional ways, ERP Senior ICs, is to facilitate a smooth transition of the client's unique business processes onto the Tyler software that will drive those processes  after go-live.

Finally, variation in the ERP ICs' and ERP Senior ICs' duties will disaggregate this part of the exemption analysis.  As discussed, the putative class members' job duties differ substantially each week based on the client, the particular implementation function performed, and the individual's seniority. For example, more experienced ICs, including ERP Senior ICs, conduct more complex implementations. Moreover, some implementations are short-term engagements, whereas others are go on for years. Putative class members interface with subject-matter experts at Tyler's clients to, for example, identify business processes, recommend software configurations, and assist with best practices recommendations in a variety of ways that will render their business operations more efficient.   In sum, this prong, like the administrative exemption analysis as a whole, turns on the duties of each individual class member. *See Alakozai*, 2014 U.S. Dist. LEXIS 185329, *18–19 (finding a lack of commonality under the "directly related" prong due to variations "in terms of whom the Advisors serviced, the level of supervision to which they were subject, and how the Advisors performed their duties and managed their tasks").

Even if Plaintiff raised some common questions applicable to the class, they do not predominate. *See Zinser*, 253 F.3d at 1189.  *Individualized* questions regarding the amount of time employees spent engaged in exempt duties, the regularity with which they used their independent judgment in performing those duties, and whether California's wage and hour law applied (and if so, during which periods) to the putative class members will predominate.  *See Patel v. Nike Retail Servs.*, 2016 U.S. Dist. LEXIS 45588, *29 (N.D. Cal. Mar. 29, 2016) ("[T]he varying evidence of the extent to which [class members]

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

exercise discretion in practice reflects individualized inquiries are required."). Plaintiff has not proffered any viable method to address these questions on a class-wide basis. Moreover, the deposition testimony and other record evidence shows that there is variation in the complexity and kind of duties putative class members perform. *See id.* at *32 (individual issues predominate where plaintiff cannot point to common proof permitting exempt status to "be resolved with a 'yes' or 'no' answer for the class.").

### 3. Plaintiff's Waiting Time Penalties Claim and Wage Statement Claims Are Not Suitable for Class Treatment

Plaintiff appears to assert that commonality exists with respect to his waiting time penalties claim because "Tyler did not pay any overtime wages to all its implementation consultants" and whether it willfully failed to pay wages owed at termination is a "common question." Memo at 26:8-13. But Plaintiff does not substantively analyze the viability of these claims at all, which means Plaintiff has not carried his burden. Regardless, Plaintiff's waiting time and statement claims should not be certified.

### a. Application of California Law to Non-resident Putative Class Members

The putative class is comprised of all Tyler ERP ICs and ERP Senior ICs, including non-residents, who spent any time (whether a partial day or the entire class period) working in California. *See* Memo. at 16:12-19. Only 32 ERP ICs and 8 ERP Senior ICs resided in California at any time during the class period. Webster Decl. ¶ 11, Ex. D. The remaining putative class members travelled to California for project work at some point and for unknown durations during the class period. Because Plaintiff seeks to certify a California class and brings California claims, the applicability of the Labor Code to out-of-state employees temporarily working in the state is critical to the Court's analysis. In *Sullivan v. Oracle Corp.*, the California Supreme Court held that the state's overtime laws apply to non-resident employees of a California employer "for *entire days and weeks* worked in California." 51 Cal.4th at 1199 (emphasis in original). In contrast, non-residents are generally not entitled to California's overtime protections for work performed outside the state, or for partial days worked in the state. *See, e.g.*, *Cotter*, 60 F. Supp. 3d at 1062 n.1.

Thus, different rules govern the application of wage statements (Lab. Code § 226) and waiting time penalties (Lab. Code § 203) to non-residents. In *Ward v. United Airlines*, Inc, the California Supreme Court recently held that the application of wage statement requirements to a given employee "depends on whether their principal place of work is in California." 9 Cal.5th 732, 740 (2020). Thus,

- 21 -

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

the waiting time penalties do not apply to a California resident who primarily works in another state. *Id.* at 759. Additionally, an employee "who does not work more than half the time in any one state" is entitled to a compliant itemized wage statement only if he or she "performs some work [] and is based in California, meaning that California serves as the physical location where the worker presents himself or herself to begin work." *Id.* at 755. The quantum and location of an employee's work for purposes of assessing statement liability is the pay period. *Id.* at 753-54.

Meanwhile, waiting time penalties are assessed differently. Waiting time penalties are not available to a non-resident who spends the majority of his or her time working outside California. *See Poehls v. ENSR Consulting & Eng'g*, 2006 U.S. Dist. LEXIS 102873, *33–34 (C.D. Cal. Aug. 28, 2006) (even if the employer decided to terminate the employee in California, "any application of Labor Code §§ 201-203 would violate the presumption against extraterritoriality because [the employee] was going to perform all or a majority of her work outside the state."). The California Court of Appeal implicitly affirmed this in a recent decision addressing an analogous provision of the Labor Code. In *McPherson v. EF Intercultural Found., Inc.*, 47 Cal. App. 5th 243 (2020), the California Court of Appeal concluded that section 227.3, which requires payment of all accrued but unused vacation[9] to a terminated employee, did not apply to vacation pay a non-resident employee earned while working in California. *Id.* at 271–72. In reaching this conclusion, the court emphasized the difference between entitlements that arise at termination (*e.g.*, waiting time penalties), and those which "apply as the employee performs work within the state." *Id.* at 274. Labor Code section 203 on which Plaintiff relies, like section 227.3, regulates wage payment at separation. Thus, like section 227.3, section 203 does not apply to a non-resident employee who does not spend the majority of his or her time working inside the state at the time of separation. *Id.*; *see also Oman v. Delta Air Lines, Inc.*, 9 Cal.5th 762, 770 (2020) (laws regarding the "timing of wage payments" only apply to employees based in California).

Thus, the Court will be obliged to assess how all of these coverage variations and differing California legal standards apply to each and every ERP IC and ERP Senior IC in the putative class.

---

[9] Note that accrued vacation is considered wages (and thus fairly compared to overtime) under California law. *See, e.g.*, *Schachter v. Citigroup, Inc.*, 47 Cal.4th 610, 618 (2009).

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

b.     Plaintiff's Waiting Time Claim Cannot Be Uniformly Adjudicated

As already discussed, Plaintiff cannot demonstrate, on a class-wide basis, that Tyler misclassified ERP ICs and ERP Senior ICs who were terminated or resigned during the class period, or that these employees were entitled to California overtime pay.  Even if he could, his waiting time argument still fails.  Under Labor Code Section 203, an employee who is terminated or resigns is entitled to payment for all owed wages upon termination.  *See* CAL. LAB. CODE § 203(a).  "If an employer willfully fails to pay…any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date" for up to thirty days.  *Id.*  As discussed above, the putative class members are located mostly outside of California and entered California for an individualized reasons for inconsistent durations.  Thus, the threshold question is whether section 203 applies to the putative class, and whether that can be determined on a class-wide basis.  *See Oracle*, 51 Cal.4th at 1201 (noting that while California *overtime* law applied to non-residents, "one cannot necessarily assume the same result would obtain for any other aspect of wage law," such as the wage statement requirements).

Finally, the existence of a "good faith dispute" regarding an employee's entitlement to wages defeats a waiting time claim.  *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1201 (2008).  "A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover on the part of the employee."  *Id.*  Importantly, courts recognize that "willfulness" (*i.e.*, good faith dispute) "raises an inherently fact intensive inquiry focusing on state of mind and surrounding circumstances."  *In re Taco Bell Wage & Hour Actions*, 2011 U.S. Dist. LEXIS 109169, *15 (E. D. Cal. Sept. 26, 2011); *see also Delgado v. MarketSource, Inc.*, 2018 U.S. Dist. LEXIS 214603, *19–20 (N.D. Cal. Dec. 20, 2018) ("evaluating whether Defendant 'willfully' paid final wages late . . . would require individualized inquiries").  Thus, if the Court were to certify a waiting time class, "mini-trials would be required for each class member to determine whether waiting time penalties should be imposed . . . ."  *Gonzalez v. Millard Mall Servs.*, 281 F.R.D. 455, 465 (S.D. Cal. 2012).

c.     Plaintiff's Wage Statement Claim Cannot Be Uniformly Adjudicated

The same is true as to Plaintiff's itemized wage statement claim.  As discussed above (*see supra* IV.B.3.a*), the applicability of section 226 to non-residents turns on the amount of work they perform in

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

California compared to other states. *See Ward*, 9 Cal.5[th] at 740. Thus, demonstrating putative class members' non-exempt status and unpaid overtime say nothing about the class-wide application of section 226. Furthermore, the determination of whether section 226 applies to a non-resident employee is a determination made *each pay period*. *See id.* at 754 n.8. This leaves no method for the Court to resolve a class-wide section 226 claim other than by conducting mini trials regarding the amount of time each employee spent working in every state they visited for *each week* during the limitations period. *See Pavloff*, 2020 U.S. Dist. LEXIS 221745, *24-25.

4.    <u>Plaintiff's Failure to Provide a Trial Plan or Method of Assessing Damages Renders the Putative Class Unmanageable</u>

Plaintiff makes no effort to satisfy his obligation to provide a trial plan or method of class-wide assessing damages. This failure is fatal. Courts will only certify a class where damages are "capable of measurement on a class-wide basis." *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016). While courts have stated that damage calculation issues will not defeat certification, they have "applied this understanding in cases where there existed a common methodology for calculating damages." *Id.* Thus, even if Plaintiff could show class-wide misclassification with common proof, individual issues would still predominate because Plaintiff cannot offer a "reliable method for calculating damages." *Alakozai*, 2014 U.S. Dist. LEXIS 185329, *51. Hence, certification is improper.

Further, as discussed above, Tyler does not have employee time entries because putative class members are exempt, and the only time-related records it maintains are for contract tracking purposes. *See* Memo. at 16; *Risinger v. SOC LLC*, 2019 U.S. Dist. LEXIS 124779, *23 (D. Nev. July 26, 2019) (denying certification based on lack of a "methodology for calculating damages on a class-wide basis" and emphasizing the absence of computer time records). Thus, not only has Plaintiff failed to provide a trial plan or model for calculating the alleged damages as the law requires, creating such a model is not possible. *See Doyle*, 663 F. App'x at 579 ("Because [plaintiff] has not demonstrated that … damages can be measured on a class-wide basis, the predominance requirement is not satisfied.").

**C.    <u>Plaintiff Is Not An Adequate Class Representative.</u>**

Plaintiff – as a non-resident of California – cannot adequately and fairly represent the interests of absent class members. Proposed class representatives must establish that their claims are typical of

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

the putative class and that they will fairly and adequately represent their interests.  *See* FED. R. CIV. P. 23(a)(3)–(4). In particular, here, for California resident class members who can be identified as having spent the bulk of their time working in the state, there is clarity with respect to what law applies and what is required to demonstrate liability.  In contrast, Plaintiff's claims hinge upon his ability to satisfy the requirements for coverage under each separate requirement of the California Labor Code.  Further, Plaintiff is unique in that he resided in Nevada but occasionally worked from his parents' home in California for extended periods during the relevant timeframe.  This factor makes him materially different than other non-resident putative class members who only travelled to California for their allotted client visit and then left.  Thus, Plaintiff is subject to defenses that are inapplicable to a subset of the class.  *See Pavloff*, 2020 U.S. Dist. LEXIS 221745, *19–20 (claims atypical because plaintiffs resided in California and class members resided in other states).

### D.     Class Treatment Is Not A Superior Method Of Resolving This Case

Plaintiff has not shown that class proceedings are superior to individual adjudications.  Courts will only grant certification if class proceedings are "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).  The only argument Plaintiff proffers in this regard is the bald assertion that individual potential damages are minimal.  *See* Memo. at 31.  This argument is factually wrong.  Plaintiff claims that he worked at least 52 hours in a workweek.  Compl. ¶ 31.  Extrapolating across a four-year class period, that figure results in nearly 2,500 hours of alleged unpaid overtime.  That is not an insignificant sum given Plaintiff's $50,000+ salary.  *See* Compl. ¶ 28. If Plaintiff prevailed on his Labor Code section 203 and 226 claims, he could also receive an additional 30 days of wages as a waiting time penalty and up to $4,000 for non-compliant wage statements.  CAL. LAB. CODE §§ 203(a), 226(e)(1).  The substantial sums at stake are yet another reason why class proceedings are not superior.  *Alakozai*, 2014 U.S. Dist. LEXIS 185329, *53-54 (plaintiffs claimed to have worked substantial overtime, hence potential for substantial recovery weighs against certification).

### V.     CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Class Certification should be denied.

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

DATED:  December 7, 2020                    REED SMITH LLP


                                            By: */s/ Paulo B. McKeeby*
                                                Brian K. Morris
                                                Paulo B. McKeeby
                                                Michael A. Correll

                                                *Attorneys for Defendant*

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## CERTIFICATE OF SERVICE

I, Michael A. Correll, an attorney, hereby certify that on December 7, 2020, I caused a true and correct copy of Tyler Technologies, Inc.'s Notice of Appearance to be served via the CM/ECF system, which will send notification of such filing to the e-mail address of all counsel of record.

*/s/ Paulo B. McKeeby* _____

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156775228.9

**TYLER TECHNOLOGIES' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# EXHIBIT A

1  Brian K. Morris (SBN 281409)
   BMorris@reedsmith.com
2  REED SMITH LLP
3  101 Second Street
   Suite 1800
4  San Francisco, CA 94105-3659
   Telephone: 469.680.4200
5  Facsimile:  469.680.4299

6  Paulo B. McKeeby (Admitted *Pro Hac Vice*)
7  PMcKeeby@reedsmith.com
   Michael A. Correll (Admitted *Pro Hac Vice*)
8  MCorrell@reedsmith.com
   REED SMITH LLP
9  2850 N. Harwood St., Suite 1500
   Dallas, TX 75201
10 Telephone: 469.680.4200
11 Facsimile:  469.680.4299

12 ATTORNEYS FOR DEFENDANT

13              UNITED STATES DISTRICT COURT
14              NORTHERN DISTRICT OF CALIFORNIA

15 AARON KUDATSKY, Individually and on        )  Case No.:        3:19-CV-07647-WHA
16 behalf of all others similarly situated,    )
                                               )  **DECLARATION OF AMANDA IRISH IN**
17                          Plaintiffs          )  **SUPPORT OF DEFENDANT'S**
                                               )  **OPPOSITION TO PLAINTIFF'S RULE 23**
18 vs.                                          )  **MOTION FOR CLASS CERTIFICATION**
                                               )
19 TYLER TECHNOLOGIES,                          )
                                               )
20                          Defendant.          )
21 _____ )

22

23 I, Amanda Irish, declare:

24         1.      I am an Implementation Consultant for Defendant Tyler Technologies ("Tyler") in this

25 matter and have been in that position since June of 2019.  I make this declaration based upon my

26 personal knowledge, and could so testify if called to do so.

27

28                                    - 1 –
                         **DECLARATION OF AMANDA IRISH**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

2.      Since I have been employed at Tyler, I have resided and worked out of my home office in Colorado Springs, Colorado.  Prior to March of 2020, I primarily performed my services on the road and traveled to different client locations, mostly in California.  After March of 2020, as a result of the COVID 19 pandemic, I have worked exclusively out of my home in Colorado Springs.  While I was traveling, my typical work week would involve traveling to the client location on Monday, performing consultant work in connection with the implementation of Tyler's Munis Human Capital Management software module on Tuesday, Wednesday and Thursday, and traveling back to my home base in Colorado Springs on Friday.

3.      Although I often worked more than 40 hours a week as an implementation consultant, based on the weekly schedule outlined above, because I would travel on Mondays and work in my home office on Fridays, it would be unusual for me to have worked more than 40 hours in California during any one work week.

4.      Because I was a junior Implemention Consultant, I performed only some of the functions of an implementation consultant during the time in which I was traveling to client locations. For example, prior to March 2020, I had performed only one fundamentals review, which involves providing a high-level overview to the client team of the Munis software and its functionalities, and had never performed a "current state/future state" analysis, which involves assessing the client's legacy software system and advising the client how to best perform software functions with the Munis system.  Rather, from June of 2019 through February 2020, I mainly performed software configuration and parallel testing to validate the accuracy of client data and processes.

5.      I understand that this declaration is being provided in connection with lawsuits brought against Tyler by current and former employees who claim that they and other current and former employees were not properly paid overtime.  I understand that the plaintiffs are seeking to represent current and former Tyler employees, including me, in a collective action and class action lawsuit.  I

- 2 –

**DECLARATION OF AMANDA IRISH**

US_ACTIVE-156713870.3

understand that I may be invited to join the lawsuit as a plaintiff and I would be eligible to participate as a member of the class if the case is certified. What I say in this declaration is the truth.  I also understand that the lawyer who interviewed me and prepared this declaration for me represents Tyler and does not represent me.  I am providing this statement voluntarily and without any duress, threats, intimidation or coercion.  I understand that I did not have to give this declaration, can provide or refuse to provide a declaration or testimony, and know that giving information in this declaration is not a condition of my employment with Tyler.  I attest to the information in this declaration voluntarily and of my own free will.

The foregoing statement is made under penalty of perjury and is true and correct to the best of my knowledge and belief.

DATED:  December 5, 2020

By: *Amanda BT Irish*
Amanda Irish

**DECLARATION OF AMANDA IRISH**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156713870.3

# EXHIBIT B

Brian K. Morris (SBN 281409)
BMorris@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94105-3659
Telephone: 469.680.4200
Facsimile:  469.680.4299

Paulo B. McKeeby (Admitted *Pro Hac Vice*)
PMcKeeby@reedsmith.com
Michael A. Correll (Admitted *Pro Hac Vice*)
MCorrell@reedsmith.com
REED SMITH LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75201
Telephone: 469.680.4200
Facsimile:  469.680.4299

ATTORNEYS FOR DEFENDANT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| AARON KUDATSKY, Individually and on behalf of all others similarly situated, | ) ) ) | Case No.:    3:19-CV-07647-WHA |
|---|---|---|
| Plaintiffs | ) ) ) ) | **DECLARATION OF CAM MILES IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION** |
| vs. | ) ) | |
| TYLER TECHNOLOGIES, | ) ) | |
| Defendant. | ) ) ) | |

I, Cam Miles, declare:

1.      I am an Implementation Consultant for Defendant Tyler Technologies ("Tyler") in this

matter and have been in that position since August of 2011.  I make this declaration based upon my

personal knowledge, and could so testify if called to do so.

- 1 –

**DECLARATION OF CAM MILES**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

2.   I am a resident of California and have lived in California during the entirety of my employment as an Implementation Consultant with Tyler. From January 2016 to July of 2020, my job was different from other Tyler Implementation Consultants in that I was "dedicated" to a single client—Marin County—and worked only for that client to implement a module from Tyler's Munis software platform: the Human Capital Management module. During this timeframe, I moved my residence to Marin County and commuted by car to the client worksite on a daily basis. I did not have "travel" days like other Tyler Implementation Consultants.

3.   As a fully dedicated Implementation Consultant to Marin County, I had a significant degree of autonomy in terms of my day-to-day duties. Although I reported to different Tyler Project Managers during the time period identified above, I did not regularly take direction from them and, more often, they would ask me for guidance given my tenure on the project and my knowledge of the client. As a dedicated Implementation Consultant, I was responsible for creating and drafting agendas and schedules that determined daily tasks, necessary client resources, and the overall schedule of upcoming events and deadlines. I also was responsible for creating the training programs necessary to teach and configure the Munis software module. These responsibilities at times required me to direct and assign training classes to both members of the internal client team and to other Tyler Implementation Consultants. I was primarily responsible for determining the training agendas, the topics on which client team members would be trained, and the order of training.

4.   It was also very common for me to make software recommendations to the client as an Implementation Consultant. For example, I would regularly be required to analyze how to best set up a particular function within the system, advise the client on different software configuration choices, and assess and recommend software customization as necessary to meet client needs and expectations.

5.   I understand that this declaration is being provided in connection with lawsuits brought against Tyler by current and former employees who claim that they and other current and former

- 2 –

**DECLARATION OF CAM MILES**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

employees were not properly paid overtime.   I understand that the plaintiffs are seeking to represent current and former Tyler employees, including me, in a collective action and class action lawsuit.   I understand that I may be invited to join the lawsuit as a plaintiff and I would be eligible to participate as a member of the class if the case is certified. What I say in this declaration is the truth.   I also understand that the lawyer who interviewed me and prepared this declaration for me represents Tyler and does not represent me.  I am providing this statement voluntarily and without any duress, threats, intimidation or coercion.  I understand that I did not have to give this declaration, can provide or refuse to provide a declaration or testimony, and know that giving information in this declaration is not a condition of my employment with Tyler.  I attest to the information in this declaration voluntarily and of my own free will.

      The foregoing statement is made under penalty of perjury and is true and correct to the best of my knowledge and belief.

DATED:  December 3, 2020

By: _____
Cam Miles

**DECLARATION OF CAM MILES**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156713697.4

# EXHIBIT C

1   Brian K. Morris (SBN 281409)
    BMorris@reedsmith.com
2   REED SMITH LLP
3   101 Second Street
    Suite 1800
4   San Francisco, CA 94105-3659
    Telephone: 469.680.4200
5   Facsimile:  469.680.4299

6   Paulo B. McKeeby (Admitted *Pro Hac Vice*)
7   PMcKeeby@reedsmith.com
    Michael A. Correll (Admitted *Pro Hac Vice*)
8   MCorrell@reedsmith.com
    REED SMITH LLP
9   2850 N. Harwood St., Suite 1500
    Dallas, TX 75201
10  Telephone: 469.680.4200
11  Facsimile:  469.680.4299

12  ATTORNEYS FOR DEFENDANT

13              UNITED STATES DISTRICT COURT
14             NORTHERN DISTRICT OF CALIFORNIA

15  AARON KUDATSKY, Individually and on       )   Case No.:        3:19-CV-07647-WHA
16  behalf of all others similarly situated,  )
                                              )   **DECLARATION OF CARRIE GIESY IN**
17                           Plaintiffs        )   **SUPPORT OF DEFENDANT'S**
                                              )   **OPPOSITION TO PLAINTIFF'S RULE 23**
18  vs.                                        )   **MOTION FOR CLASS CERTIFICATION**
                                              )
19  TYLER TECHNOLOGIES,                        )
                                              )
20                           Defendant.        )
21  _____        )

22

23  I, Carrie Giesy, declare:

24          1.      I am the Senior Director of Implementation for Defendant Tyler Technologies

25  ("Tyler") in this matter and have been in that position since August of 2019.  I make this declaration

26  based upon my personal knowledge, and could so testify if called to do so.

27
                                            -1-
28  _____
                          **DECLARATION OF CARRIE GIESY**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

2.      I have worked in Tyler's Enterprise Resources Planning (ERP) division since my employment with Tyler beginning in May of 2006.  Within the ERP division, I have held several different jobs other than my current role, including implementation consultant, project manager, and implementation manager.  In those roles, as well as in my current position in which I generally oversee the implementation process, I have personal knowledge of the job duties and functions of implementation consultants within Tyler's ERP division.

3.      Since 2011, I have been a resident of California and currently reside in Santa Barbara, California.  In addition, many of the implementation consultants with whom I have worked or who I have supervised have worked in or resided in California.

4.      Tyler markets and licenses proprietary software to primarily state and municipal governments.   Tyler's ERP division supports a variety of software applications for the public sector, including financial software, human capital management software (which involves payroll-related applications), utility billing software, and tax software.

5.      In addition to the software that Tyler licenses to its customers, Tyler's contracts with its customers to provide support and maintenance services, as well as implementation services. "Support" refers to addressing technical or other issues after the software has been installed for the customer, and maintenance refers to developing and then making available updates and upgrades to the licensed software.  "Implementation" refers to the work performed primarily by implementation consultants to ensure that Tyler's software meets the contract specifications and the business processes that are identified during the implementation process, are installed and configured consistent with those specifications and business processes, and that the customer's end users are trained to use Tyler's software at the end of the implementation process.

6.      While implementation consultants within the ERP division are all involved with the implementation, as a general term, of Tyler's software, and are covered by the same general job

- 2 –

**DECLARATION OF CARRIE GIESY**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156615656.5

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

description, "implementation" refers more to a process than a single, discrete job duty. Indeed, implementation often takes several months, and sometimes years, from kick-off to go-live, and a particular client implementation may involve multiple implementation consultants who work on different phases of, or tasks within, the same project. As such, the day-to-day job duties of implementation consultants, even within the ERP division, and even for the same product within the ERP division, can vary significantly depending on a variety of factors.

7.     One of those factors is the seniority of the particular implementation consultant. As implementation consultants become more familiar with the software they are supporting, or a particular module of that software, and as they become more comfortable assessing client needs and answering client questions about the software or the module, they are even more involved in the consultative aspect of the implementation process than they were at the beginning of their role. For example, more experienced implementation consultants meet with customer representatives to understand their software needs in more depth and nuance, to evaluate their legacy systems and how Tyler's software might differ in the performance of various functions, and to make recommendations regarding configuration and other options within Tyler's software. These types of functions—which generally occur during the "current state/future state" phase of the implementation process—are less frequently performed by more junior implementers with less experience. Another job function not typically performed by more junior implementation consultants is conversion mapping, which involves reviewing legacy system client data and assessing how that data needs to fit, or "map", within the Munis software module.

8.     Another factor that contributes to the variances between implementation consultant job duties involve project manager assignments and regional considerations. Implementation consultants who implement the Munis product within the ERP division work closely with and report to Munis project managers. From my experience, different Munis project managers have different expectations

**DECLARATION OF CARRIE GIESY**

US_ACTIVE-156615656.5

and requirements as to the division of responsibilities during an implementation.  For example, some Munis project managers will draft the implementation schedule or agenda on their own, whereas others will delegate that duty to varying degrees to the implementation consultant.   Similarly, some project managers delegate managing other aspects of the project agenda more significantly than others.  For example, some project managers will ask Implementation Consultants on a project to post documentation to the client "Sharepoint" site, which is a database that summarizes and tracks the progress of a project and to which the client has access.  Some Implementation Consultants may be asked to manage newly identified tasks, issues or needed actions, and to "post" those to the Sharepoint site, that are not part of the original project plan where, in other instances, project managers perform this function.

9.      Another factor that results in varying job responsibilities between implementation consultants relates to the software module in which the implementation consultant has expertise. Because the software applications (noted above) within the Munis platform are so different in many respects, they require different skills, and different job functionalities, in connection with the implementation process.  For example, implementation consultants who primarily work with Munis' financial management software spend a significant amount of time configuring the actual software. On the other hand, they perform less testing and work that involves functional comparisons to the client's legacy system.  On the other hand, implementation consultants who work within the Munis human capital management software are more heavily involved with testing and validation, which requires a greater understanding of the client's legacy software.  Implementation Consultants who work with the human capital management application spend a lot of their time parallel processing between Munis and the legacy system to validate payroll results.  Implementation Consultants who work with the financials application spend the majority of their time training on how to perform various processes and don't perform parallel process validation between Munis and the legacy system.

**DECLARATION OF CARRIE GIESY**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

US_ACTIVE-156615656.5

1    The foregoing statement is made under penalty of perjury and is true and correct to the best of

2  my knowledge and belief.

3

4  DATED:  December 4, 2020                    By: _____
                                                    Carrie Giesy
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 5 –
**DECLARATION OF CARRIE GIESY**

US_ACTIVE-156615656.5

# EXHIBIT D

1  Brian K. Morris (SBN 281409)
   BMorris@reedsmith.com
2  REED SMITH LLP
3  101 Second Street
   Suite 1800
4  San Francisco, CA 94105-3659
   Telephone: 469.680.4200
5  Facsimile:  469.680.4299

6  Paulo B. McKeeby (Admitted *Pro Hac Vice*)
7  PMcKeeby@reedsmith.com
   Michael A. Correll (Admitted *Pro Hac Vice*)
8  MCorrell@reedsmith.com
   REED SMITH LLP
9  2850 N. Harwood St., Suite 1500
   Dallas, TX 75201
10 Telephone: 469.680.4200
11 Facsimile:  469.680.4299

12 ATTORNEYS FOR DEFENDANT

13                UNITED STATES DISTRICT COURT
14               NORTHERN DISTRICT OF CALIFORNIA

15 AARON KUDATSKY, Individually and on        )  Case No.:      3:19-CV-07647-WHA
16 behalf of all others similarly situated,   )
                                              )  **DECLARATION OF CHRIS WEBSTER IN**
17                            Plaintiffs        )  **SUPPORT OF DEFENDANT'S**
                                              )  **OPPOSITION TO PLAINTIFF'S RULE 23**
18 vs.                                        )  **MOTION FOR CLASS CERTIFICATION**
                                              )
19 TYLER TECHNOLOGIES,                        )
                                              )
20                            Defendant.       )
21 _____   )

22

23 I, Chris Webster, declare:

24        1.    I am the President, ERP Division for Defendant Tyler Technologies ("Tyler") in this

25 matter and have been in that position since 2019.  I make this declaration based upon my personal

26 knowledge, and could so testify if called to do so.

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156746766.6

2.     Tyler defines its mission as partnering with public sector entities to find the best technology solutions to connect citizens and communities to their governments and schools.

3.     Tyler's software offerings include dozens of different software products that, in turn, are made up of a variety of modules that a given client may purchase within a given product platform.  This enormously broad offering is driven by the wide variety of public sector clients serviced by Tyler.  Tyler's clients range from small towns with as little as a few dozen employees to entire counties, school districts, states, federal agencies and court systems interfacing with millions of residents and thousands of civil servants.

4.     Functionally, Tyler organizes its product offerings as follows: Public Administration; Courts and Public Safety; Health & Human Services; K-12 Education and Transformative Technology.  The Public Administration and K-12 Education product suites offer ERP solutions.  Those solutions were licensed, implemented, and supported by Tyler's ERP division during the relevant timeframe. The flagship product out of that division, Munis, includes, for example, financial management and human capital management modules, but the division offers other products, each with their own modules, as well.  Implementation teams are organized around specific products, and sometimes around certain modules within those products, as is the case with Munis.

5.     In practice, Tyler's ERP software products allow government entities to perform all of the financial management, revenue management, and human capital management functions required of any business.

6.     Transitioning to Tyler's ERP software is transformational for Tyler clients.  Those clients are often implementing Tyler software after years of using another third-party system or a home-grown system that has been highly customized over time.

7.     Implementation does generate revenue for Tyler, but it does so at a loss.  ERP ICs and ERP Senior ICs internally report their "billable hours."  Clients are billed for the hours of services

US_ACTIVE-156746766.6

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

delivered, unless the contract is a fixed-price contract or a fixed-price service is delivered. In any event, the internally reported "billable hours" tracking ensures that the contracted-for time is not exceeded, and/or ensures that the appropriate hours of services are billed to the client for a time and materials project and/or service.

8.      The implementation process varies in length and depth from client to client.  Some shorter ERP implementations may only last a few months.  Longer ERP implementations have lasted as long as three years.  Further, the amount of time spent on each phase is not equal.   Some of that variation is inherent in the differences between the phases, but sometimes the amount of time allocated to each phase can vary dramatically from client to client simply because of a client's different needs.

9.      Additionally, some of the phases of implementation may be conducted remotely for a wide variety of reasons.  This utilization of remote implementation services existed before COVID-19 forced widespread remote interface with clients.  Any ERP IC or ERP Senior IC could be tasked with providing a client remote implementation services at any time.

10.      Tyler serves clients all around the United States, including in California.  The ERP division has a small number of ERP ICs and ERP Senior ICs based in California, working out of their respective home offices.  The ERP division staffs California projects with a combination of those California-based consultants as well as ERP ICs and ERP Senior ICs from a wide variety of other states.  However, ERP ICs and ERP Senior ICs do not all have the same—or even similar—contact with California, do all the same or similar work in California, or otherwise have the same or similar experience working in California.

11.      Tyler has only employed 32 ERP ICs and 8 ERP Senior ICs who resided in California for any period of time since November 1, 2016.  Tyler has employed more than 550 ERP ICs and ERP Senior ICs nationally during the same period.  All other ERP ICs and ERP Senior ICs who have done work in California have done so while primarily based and residing in another location.

**DECLARATION OF CHRIS WEBSTER**

US_ACTIVE-156746766.6

DATED:  December 04, 2020

By: _____

Chris Webster

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF CHRIS WEBSTER**

US_ACTIVE-156746766.6

# EXHIBIT E

1  Brian K. Morris (SBN 281409)
   BMorris@reedsmith.com
2  REED SMITH LLP
   101 Second Street
3  Suite 1800
4  San Francisco, CA 94105-3659
   Telephone: 469.680.4200
5  Facsimile: 469.680.4299

6  Paulo B. McKeeby (Admitted *Pro Hac Vice*)
   PMcKeeby@reedsmith.com
7  Michael A. Correll (Admitted *Pro Hac Vice*)
8  MCorrell@reedsmith.com
   REED SMITH LLP
9  2850 N. Harwood St., Suite 1500
   Dallas, TX 75201
10 Telephone: 469.680.4200
11 Facsimile: 469.680.4299

12 ATTORNEYS FOR DEFENDANT

13            UNITED STATES DISTRICT COURT
14          NORTHERN DISTRICT OF CALIFORNIA

15 AARON KUDATSKY, Individually and on      )   Case No.:      3:19-CV-07647-WHA
16 behalf of all others similarly situated,  )
                                             )   **DECLARATION OF CINDY WILLIAMS**
17                        Plaintiffs          )   **IN SUPPORT OF DEFENDANT'S**
                                             )   **OPPOSITION TO PLAINTIFF'S RULE 23**
18 vs.                                        )   **MOTION FOR CLASS CERTIFICATION**
                                             )
19 TYLER TECHNOLOGIES,                        )
                                             )
20                        Defendant.          )
21 _____            )

22

23 I, Cindy Williams, declare:

24      1.      I am an Implementation Consultant for Defendant Tyler Technologies ("Tyler") and

25 have been in that position since August of 2015. I make this declaration based upon my personal

26 knowledge, and could so testify if called to do so.

27

28

– 1 –

DECLARATION OF CINDY WILLIAMS

US_ACTIVE-158714074.1

2.      I reside in St. Louis, Missouri and have lived there since my employment with Tyler. While I previously was assigned to what Tyler referred to as the Southeast Region and then the Gulf State Region, I am now assigned to the "Strategic Team" which focuses on larger projects and typically utilizes "dedicated" Implementation Consultants who are assigned to only one implementation at a time.

3.      For example, since May of 2020, I have been assigned to an implementation for Napa County, California. Because of the COVID 19 pandemic, all of my work on the project has been performed remotely from my home office in St. Louis. The only time I have traveled to California for the project was in August of 2019 in connection with a demonstration of Tyler's Munis software prior to the award to Tyler of the contract with Napa County. That trip lasted a day and a half and I was part of a team of Tyler employees who presented on different aspects of the software. My role was to discuss the implementation process and explain to the representatives of the county how an implementation generally is conducted. The trip was the only time I have traveled to California on behalf of Tyler.

4.      As an implementation consultant, my job touches on all aspects of the implementation process and requires me to make recommendations, both internally and to clients, about Tyler's software and the implementation process, on a regular basis. For example, I regularly give best practices recommendations to clients on how to best and most efficiently use Tyler's software to perform the finance related functions in the Munis modules I support. Because there are so many different options with Munis to perform particular tasks, I am required to work with the client, understand their current practices and procedures, and advise them how to best achieve their desired results within Munis.

5.      In addition, my job requires me to ensure that the overall implementation is on schedule. While I do not draft the schedule, I am responsible for assessing how client training is going

DECLARATION OF CINDY WILLIAMS

US_ACTIVE-55671409.1

1  and the progress of the overall implementation to ensure that deadlines within the implementation

2  schedule are or can be met. If I determine that those deadlines cannot be met, it is my responsibility

3  as an Implementation Consultant to make recommendations to the Project Manager or the client as to

4  steps to take to adjust deadlines or provide additional training such that the original deadlines can be

5  met.

6      6.      I understand that this declaration is being provided in connection with lawsuits brought

7  against Tyler by current and former employees who claim that they and other current and former

8  employees were not properly paid overtime.  I understand that the plaintiffs are seeking to represent

9  current and former Tyler employees, including me, in a collective action and class action lawsuit.  I

10  understand that I may be invited to join the lawsuit as a plaintiff and I would be eligible to participate

11  as a member of the class if the case is certified. What I say in this declaration is the truth.  I also

12  understand that the lawyer who interviewed me and prepared this declaration for me represents Tyler

13  and does not represent me.  I am providing this statement voluntarily and without any duress, threats,

14  intimidation or coercion.  I understand that I did not have to give this declaration, can provide or refuse

15  to provide a declaration or testimony, and know that giving information in this declaration is not a

16  condition of my employment with Tyler. I attest to the information in this declaration voluntarily and

17  of my own free will.

18      The foregoing statement is made under penalty of perjury and is true and correct to the best of

19  my knowledge and belief.

20  DATED:  December 3, 2020         By: _____

21                                       Cindy Williams

– 3 –

US_ACTIVE-15871424.1

# EXHIBIT F

Brian K. Morris (SBN 281409)
BMorris@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94105-3659
Telephone: 469.680.4200
Facsimile:  469.680.4299

Paulo B. McKeeby (Admitted *Pro Hac Vice*)
PMcKeeby@reedsmith.com
Michael A. Correll (Admitted *Pro Hac Vice*)
MCorrell@reedsmith.com
REED SMITH LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75201
Telephone: 469.680.4200
Facsimile:  469.680.4299

ATTORNEYS FOR DEFENDANT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON KUDATSKY, Individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs<br><br>vs.<br><br>TYLER TECHNOLOGIES,<br><br>                              Defendant. | Case No.:        3:19-CV-07647-WHA<br><br>**DECLARATION OF LYNN KAZLOUSKY IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION** |

I, Lynn Kazlousky, declare:

1.      I am a Senior Implementation Consultant for Defendant Tyler Technologies ("Tyler") in this matter and have been in that position since 2016.  I make this declaration based upon my personal knowledge, and could so testify if called to do so.

**DECLARATION OF LYNN KAZLOUSKY**

US_ACTIVE-156714101.3

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

2.     Since around the beginning of 2019, I have been part of Tyler's "Strategic Accounts Team" in its ERP division.  Clients serviced by that team generally are larger accounts that utilize implementation consultants dedicated solely to that project.  As such, as a dedicated Senior Implementation Consultant, it would be unusual for me to work on more than one project at a time.

3.     I currently am a resident of Saint Augustine, Florida and have lived there since 2016. I have never been a resident of the state of California and have visited California on behalf of Tyler on only one occasion.  That trip occurred in August of 2019 in connection with a presentation for Napa County.  I was part of the team that presented Tyler's Munis software to the county and, specifically, I provided a presentation covering the implementation process.  The presentation lasted approximately one and a half days and, during the trip, I was in California for a total of two days.  That is the only time I traveled to California in connection with my employment with Tyler.

4.     As a Senior Implementation Consultant, I am regularly asked to provide consulting on best business practices related to Tyler's Munis software.  Such responsibilities involve coordinating with client representatives to understand their policies and procedures and to advise them how to best accomplish their software goals on the Munis platform.

5.     I am also responsible for ensuring that the implementation is on schedule and that deadlines can be met.  As such, I regularly assess the progress of the implementation to ensure that project deadlines are achievable, which includes ensuring that training is being performed consistent with project deadlines and that the client representatives are being trained on the software and understand the training provided to them.  If I do not think the client representatives are understanding a particular module, I make a recommendation that they needed more training time with respect to that module.

6.     While I do not always create implementation agendas and schedules as part of my duties as an implementation consultant, I have performed those functions in connection with the Napa

- 2 –

**DECLARATION OF LYNN KAZLOUSKY**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156714101.3

1  County implementation. For that project, I was responsible for drafting the training agenda and
2  schedule in consultation with client representatives.

3      7.      I understand that this declaration is being provided in connection with lawsuits brought
4
5  against Tyler by current and former employees who claim that they and other current and former
6  employees were not properly paid overtime. I understand that the plaintiffs are seeking to represent
7  current and former Tyler employees, including me, in a collective action and class action lawsuit. I
8  understand that I may be invited to join the lawsuit as a plaintiff and I would be eligible to participate
9  as a member of the class if the case is certified. What I say in this declaration is the truth. I also
10 understand that the lawyer who interviewed me and prepared this declaration for me represents Tyler
11 and does not represent me. I am providing this statement voluntarily and without any duress, threats,
12 intimidation or coercion. I understand that I did not have to give this declaration, can provide or refuse
13
14 to provide a declaration or testimony, and know that giving information in this declaration is not a
15 condition of my employment with Tyler. I attest to the information in this declaration voluntarily and
16 of my own free will.

17      The foregoing statement is made under penalty of perjury and is true and correct to the best of
18 my knowledge and belief.
19
20 DATED: December 5, 2020                    By: _____
                                                 Lynn Kazlousky
21
22
23
24
25
26
27
28
                                   - 3 -
                    **DECLARATION OF LYNN KAZLOUSKY**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-156714101.3

# EXHIBIT G



Brian K. Morris (SBN 281409)
BMorris@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94105-3659
Telephone: 469.680.4200
Facsimile: 469.680.4299

Paula B. McKeeby (Admitted *Pro Hac Vice*)
PMcKeeby@reedsmith.com
Michael A. Correll (Admitted *Pro Hac Vice*)
MCorrell@reedsmith.com
REED SMITH LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75201
Telephone: 469.680.4200
Facsimile: 469.680.4299

ATTORNEYS FOR DEFENDANT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| AARON KUDATSKY, Individually and on behalf of all others similarly situated, | Case No.: 3:19-CV-07647-WHA |
|---|---|
| Plaintiffs | **DECLARATION OF GAIL FRANZEN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S RULE 23 MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| TYLER TECHNOLOGIES. | |
| Defendant. | |

I, Gail Franzen, declare:

1. I am a Senior Implementation Consultant for Defendant Tyler Technologies ("Tyler") in this matter and have been in an implementation Consultant role since 2012. I make this declaration based upon my personal knowledge, and could so testify if called to do so.

– 1 –
DECLARATION OF GAIL FRANZEN

2.    Since my employment with Tyler, I have been a resident of California and have worked primarily out of my home office in Orange County.  Until January of 2020, I worked in Tyler's Western region, which consists of the states west of the Mississippi River.  Between January 2017 and January 2020, I traveled to a variety of states in the region to perform implementation consulting services for Tyler's clients.  During that time, out of approximately 35 clients I visited, 11 were in California, 8 were in Texas and rest were in a combination of other states.  I estimate that I spent approximately a third of my work time in California between January 2017 and January 2020.

3.    My typical weekly schedule would be travel to the client location on Monday, performance of implementation consultant services at the client site on Tuesday, Wednesday and Thursday, and return travel to California on Friday.

4.    Around 2016, I was elevated to the position of Senior Implementation Consultant, which resulted in me taking on new tasks and responsibilities.  These tasks included participating in meetings with other Senior Implementation Consultants to discuss redesigning the analysis phase of the implementation process and creating documentation to be used by other Implementation Consultants.  In addition, as a Senior Implementation Consultant, I trained Implementation Consultants in the Western region about the new processes and documentation that I and the other Senior Implementation Consultant team had developed.

5.    Since January 2017, my worked as a Senior Implementation Consultant has focused almost exclusively on the analysis phase of the implementation process, and I estimate that approximately 90% of my time has consisted of performing analysis functions.  These functions, which fit within the "current state/future state" phase of the implementation process, involve assessing client software needs, asking clients questions about their current processes and systems, making recommendations to clients as to ways to improve those processes within the Munis financial software

1  module, and guiding them as to the most efficient means to achieve particular results within the

2  software.

3    6.    I understand that this declaration is being provided in connection with lawsuits brought

4  against Tyler by current and former employees who claim that they and other current and former

5  employees were not properly paid overtime.  I understand that the plaintiffs are seeking to represent

6  current and former Tyler employees, including me, in a collective action and class action lawsuit.  I

7  understand that I may be invited to join the lawsuit as a plaintiff and I would be eligible to participate

8  as a member of the class if the case is certified. What I say in this declaration is the truth.  I also

9  understand that the lawyer who interviewed me and prepared this declaration for me represents Tyler

10 and does not represent me.  I am providing this statement voluntarily and without any duress, threats,

11 intimidation or coercion.  I understand that I did not have to give this declaration, can provide or refuse

12 to provide a declaration or testimony, and know that giving information in this declaration is not a

13 condition of my employment with Tyler.  I attest to the information in this declaration voluntarily and

14 of my own free will.

15    The foregoing statement is made under penalty of perjury and is true and correct to the best of

16 my knowledge and belief.

17

18 DATED: December 3, 2020          By: _____
                                          Gail Franzen

19

20

21

22

23

24

25

26

27

28

- 3 -

**DECLARATION OF GAIL FRANZEN**

# EXHIBIT A

# EXHIBIT B

# EXHIBIT C

# EXHIBIT D

# EXHIBIT E

# EXHIBIT F

# EXHIBIT G

# EXHIBIT H

# EXHIBIT H

# EXHIBIT I

# EXHIBIT I

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  Brian K. Morris (SBN 281409)
   BMorris@reedsmith.com
2  REED SMITH LLP
3  101 Second Street
   Suite 1800
4  San Francisco, CA 94105-3659
   Telephone: 469.680.4200
5  Facsimile:  469.680.4299

6  Paulo B. McKeeby (Admitted *Pro Hac Vice*)
7  PMcKeeby@reedsmith.com
   Michael A. Correll (Admitted *Pro Hac Vice*)
8  MCorrell@reedsmith.com
   REED SMITH LLP
9  2850 N. Harwood St., Suite 1500
   Dallas, TX 75201
10 Telephone: 469.680.4200
   Facsimile:  469.680.4299
11
12 ATTORNEYS FOR DEFENDANT

13           UNITED STATES DISTRICT COURT
14           NORTHERN DISTRICT OF CALIFORNIA

15 AARON KUDATSKY, Individually and on    ) Case No.:       3:19-CV-07647-WHA
16 behalf of all others similarly situated,     )
                                                )  **DECLARATION OF MICHAEL**
17                              Plaintiffs       )  **CORRELL IN SUPPORT OF**
                                                )  **DEFENDANT'S OPPOSITION TO**
18 vs.                                          )  **PLAINTIFF'S RULE 23 MOTION FOR**
                                                )  **CLASS CERTIFICATION**
19 TYLER TECHNOLOGIES,                          )
20                                              )
                                Defendant.      )
21                                              )

22 ──────────────────────────────────

23 I, Michael A. Correll, declare:

24        1.      I am an attorney with the law firm of Reed Smith LLP, counsel of record for Defendant

25 Tyler Technologies.  I make this declaration based upon my personal knowledge, and could so testify

26 if called to do so.
27
                                      - 1 –
28                        **DECLARATION OF MICHAEL A. CORRELL**

rlstanbe-156780012.1.doc

2.      I submit this declaration consistent with Local Rule 7-5(a) to authenticate the deposition excerpts and documentary evidence submitted in support of Defendant's Opposition to Plaintiff's Rule 23 Motion for Class Certification.

3.      Attached hereto as Exhibit A is a true and correct copy of Exhibits 1 through 6, consisting of excerpted deposition transcripts for the following individuals:

Exhibit 1:  Deposition Testimony of Cindy Choquette;

Exhibit 2:  Deposition Testimony of Pamela M. Costner;

Exhibit 3:  Deposition Testimony of Aaron Kudatsky;

Exhibit 4:  Deposition Testimony of Ian M.  Roth;

Exhibit 5:  Deposition Testimony of Travis E. Void; and

Exhibit 6:  Deposition Testimony of Christopher Webster.

4.      Attached hereto as Exhibit B is a true and correct copy of Plaintiff Aaron Kudatsky's LinkedIn profile, including the portion of Plaintiff's LinkedIn profile describing his role at Defendant.

5.      I gathered Exhibit B from Plaintiff's publicly available profile.  The copy provided to the Court was collected from Plaintiff's publicly available profile December 6, 2020.


The foregoing statement is made under penalty of perjury and is true and correct to the best of my knowledge and belief.

DATED:  December 6, 2020                    By:*/s/ Michael A. Correll*
                                                                 Michael A. Correll

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

rlstanbe-156780012.1.doc

# EXHIBIT  A

# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4                    Case No.:  3:19-CV-07647-WHA

5                      Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9         Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12        Defendant.

13   _____

14

15

16

17      REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                 CINDY CHOQUETTE

19        Taken Wednesday, October 21, 2020

20             Scheduled for 11:00 a.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297272

                                        Page 1

```
1        job shadowed or did implementation work on your
2        own at the four clients that you have
3        identified, is that correct?
4        A.    That's correct.
5        Q.    Okay.
6        A.    I take it back.  I job shadowed -- oh,
7        yeah.  On my own, yes.
8        Q.    Okay.  No.  Please.  Go ahead.  You job
9        shadowed where?
10       A.    City of Santa Monica, California.
11       Q.    Okay.  Is that the only place that you
12       worked in California was City of Santa Monica?
13       A.    Yes.
14       Q.    Okay.  And how long was that job shadowing
15       at the City of Santa Monica?
16       A.    I went on two different occasions to Santa
17       Monica.  So the first time was a week.  And
18       then the second time was another week.
19       Q.    When you say "a week," do you mean just a
20       five-day workweek, or do you include the
21       weekend as well?
22       A.    Five-day workweek.  Go there on Monday,
23       come back on Friday.
24       Q.    Okay.  So those two five-day occasions
25       were the only times that you spent working in
```

Page 35

1       California, is that correct?

2       A.    That's correct.

3       Q.    Okay.  And this Santa Monica job

4       shadowing, was this similar to the other two

5       job shadowings you did in Arizona?

6       A.    Yes.  But I had hands-on this time where I

7       literally was helping to set up there.

8       Q.    Okay.  What were you doing that was

9       hands-on at Santa Monica?

10      A.    We were setting up all the business rules

11      for all the various workflows for the different

12      departments at Santa Monica.

13      Q.    Do you recall what phase of the

14      implementation this would have been?

15      A.    I don't recall the names anymore, but it

16      was during the implementation, so it was

17      towards the end when you're setting it up

18      before you go live.

19      Q.    Okay.  I believe these are the six phases,

20      and let me know if you recall them.  So there's

21      fundamentals review, analysis, also known as

22      current state/future state, setup and

23      configuration, testing, training and go live.

24      A.    Right.

25      Q.    Is that what you recall?

Page 36

```
 1      A.   Yes.  Usually end-user training is
 2      training them initially on the processes.  And
 3      then later on you would go back and you would
 4      do a refresher of training to your staff after
 5      you've gone live usually.
 6      Q.   Okay.  So for Coconino County, you only
 7      conducted end-user training, is that correct?
 8      A.   That's correct.
 9      Q.   Okay.  What were your responsibilities
10      during the end-user training?
11      A.   You would have to be prepared to go
12      through the processes with them.  So you would
13      give them a demo of those processes, like, you
14      know, you're entering an invoice, so you would
15      do a demo on the board of that and go through
16      everything.  And then you would actually have
17      them try it at their computer terminals or have
18      them come up and do it from the podium.
19      Q.   And how did you know when a client had an
20      understanding of whatever module or function
21      you were training them on?
22      A.   We would ask them questions throughout or
23      ask them to go through the process on their own
24      while we kind of watched them do it.  And
25      that's how we gauged that they had an
```

Page 66

1       understanding of it.

2       Q.    And the questions you asked to gauge their

3       understanding, were those scripted questions

4       that Tyler provided you?

5       A.    No.

6       Q.    How did you know what questions to ask?

7       A.    Well, we had gone through the training

8       ourselves for this training or it was our prior

9       experience.  Mine was my prior experience that

10      I relied on.

11      Q.    Okay.  And did you ever have a client or

12      employees of the client get frustrated during

13      one of your trainings?

14      A.    A couple.

15      Q.    Okay.  Can you give us some details on

16      that?

17      A.    It might have been someone in, just an

18      example, public works that's not used to doing

19      the -- using the computer that much, but we had

20      to bring him in because he is an approver of

21      electronic workflow and he might have trouble

22      getting into the software.  Those were the only

23      types that I have ever come across.

24      Q.    Okay.  And how would you handle the

25      individuals that were frustrated?

Page 67

```
 1                 REPORTER'S CERTIFICATE
 2
    STATE OF MINNESOTA     )
 3                         ) ss.
    COUNTY OF HENNEPIN     )
 4
 5        I hereby certify that I reported the
    deposition of Cindy Choquette on October 21st,
 6  2020, in Maple Grove, Minnesota, and that the
    witness was by me first duly sworn to tell the
 7  whole truth;
 8        That the testimony was transcribed by me
    and is a true record of the testimony of the
 9  witness;
10        That the cost of the original has been
    charged to the party who noticed the deposition,
11  and that all parties who ordered copies have been
    charged at the same rate for such copies;
12
          That I am not a relative or employee or
13  attorney or counsel of any of the parties, or a
    relative or employee of such attorney or counsel;
14
          That I am not financially interested in the
15  action and have no contract with the parties,
    attorneys, or persons with an interest in the
16  action that affects or has a substantial tendency
    to affect my impartiality;
17
          That the right to read and sign the
18  deposition transcript by the witness was reserved.
19
          WITNESS MY HAND AND SEAL THIS 4th day of
20  November, 2020.
21
22
23
    Dana Anderson
24  Dana S. Anderson-Linnell
    Notary Public, Hennepin County, MN
25  My commission expires 1/31/2025
```

Page 98

# EXHIBIT 2

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4                           Case No.:  3:19-CV-07647-WHA

5                              Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9          Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12         Defendant.

13   _____

14

15

16

17        REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                  PAMELA M. COSTNER

19            Taken Monday, October 19, 2020

20               Scheduled for 2:30 p.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297248

                                            Page 1

```
1        Q.   You mentioned that you were in the HR and
2        payroll section.  And I see on your résumé that
3        there's a reference to Human Capital
4        Management.  Were you ever involved with any
5        other aspect of Munis in terms of providing
6        implementations to customers?
7        A.   No.
8        Q.   What does the Munis software do for
9        customers in the Human Capital Management
10       space?
11       A.   It allows them to process their payroll
12       and manage their employees for different human
13       resource modules.
14       Q.   And when you say it allows them to manage
15       their employees, what kinds of data are we
16       talking about in this specifically Human
17       Capital Management section?
18       A.   I just -- I'll clarify.  Human Capital
19       Management is a term that Tyler changed the HR
20       Payroll division to probably about two or three
21       years ago.  So they were updating the acronym
22       to match what is going on countrywide.  So
23       we -- we're trying not to use HR Payroll
24       anymore but HCM for Human Capital Management as
25       a broader term.  Some of the modules there
```

Page 17

1     would be the recruiting module so applicants

2     can apply over the Internet versus filling out

3     a piece of paper.  Also, evaluations can be

4     done electronically and benefit enrollment;

5     items that are not payroll related that it

6     takes to manage an employee's record.

7     Q.   And just so I make sure I'm using the same

8     terms you're using, so ERP, is that a division

9     of Tyler, or what word would you use to

10    describe it relative to the other big groups at

11    Tyler?

12    A.   Yeah, ERP is a division within Tyler.

13    It's a big division.

14    Q.   And then what term do you use to

15    characterize Human Capital Management, is that

16    a subdivision, or do you have a different word

17    for that?

18    A.   Well, under ERP, they have broken the

19    implementers down into two, meaning Financial

20    and HCM.  And I am on the HCM side versus the

21    Financial side.

22    Q.   The term you just used was "module."  So

23    what is a module?

24    A.   It is a portion of the Munis system.

25    Q.   What I have down from your testimony just

Page 18

1      now is that within HCM there's payroll,

2      recruiting, evaluations and benefit enrollment.

3      Do I have that correct?

4      A.    Correct.   There are others, but I can't

5      list them all off the top of my head.   But

6      there are many other sections as well too.

7      Q.    Without trying to recall all of them by

8      name, do you have a sense of how many more

9      there are?

10     A.    Probably about five or six on the HCM

11     side.

12     Q.    So would it be fair to say then we're

13     looking at nine or ten different modules?

14     A.    Yes.

15     Q.    Have you done implementations on all nine

16     or ten of those modules or just some of them?

17     A.    All of them.

18     Q.    Have you done any implementations of

19     modules on the financial side that are outside

20     of HCM?

21     A.    No.

22     Q.    Are there some modules that you have done

23     more often than others, or is it pretty evenly

24     distributed?

25     A.    Yes, there are some modules that I have

Page 19

```
 1      A.   I would say I have worked on over 60
 2      clients.  And it could be different modules at
 3      each of the clients.
 4      Q.   How many different implementations are you
 5      supporting at a given time?
 6      A.   It varies.  Right now I am supporting one
 7      client strongly in California.  And I am
 8      working with another client, I would say,
 9      probably five percent of the time in another
10      state.
11      Q.   Is that the low end then?
12      A.   Right now -- yeah, right now due to the
13      fact that the California client is taking up a
14      large portion of my time.  In previous years, I
15      could be working with three to four clients on
16      any given time frame depending upon where they
17      are in their implementation.
18      Q.   In a given week, how many different
19      implementations are you working on usually?
20      A.   Currently one.
21      Q.   In the past when you've had three or four
22      clients, did you work on multiple
23      implementations in a single week?
24      A.   Sometimes up to two, but usually it was
25      one client one week, one client the next week,
```

Page 22

1       the previous week, whichever week out of that
2       two-week period.
3       Q.   Does that mean some months there's two
4       weeks in the month that you work and some
5       months there's three weeks because the pay
6       periods straddle on that biweekly system?
7       A.   Correct.  We put a calendar together and
8       pick the weeks.  And then that would be my
9       schedule for -- and we do that in six-month
10      intervals.  So my schedule for the first six
11      months of next year has already been determined
12      which weeks I will be working.
13      Q.   And I know we have your time records and I
14      can go through those, but I would rather get
15      your kind of generalized view of it.  Since
16      March of '19, has that generally been what
17      you've actually done where you have worked one
18      week and not worked the following week on a
19      repeating pattern?
20      A.   In general.  Sometimes I'll work two weeks
21      in a row and have two weeks off in a row
22      depending how it piggybacks with those payroll
23      periods.
24      Q.   Have you done work or been asked to do
25      work during your off weeks since March of 2019?

Page 24

1       A.   No.

2       Q.   So since you've had both roles, we're

3       going to talk about both what an implementation

4       consultant means and what a senior

5       implementation consultant means.  I understand

6       the distinction between the internal-facing

7       titles and the external-facing titles.  So when

8       I say senior implementation consultant, I mean

9       the internal-facing title.  Is that fair?

10      A.   That's fair.

11      Q.   So starting off, just at a high level, how

12      would you describe the role of an

13      implementation consultant at Tyler?

14      A.   It is a person that will go out to a

15      client site based upon the territory that they

16      are assigned to and help that client implement

17      the Munis product that they have purchased.

18      And based upon the client's direction, we

19      configure the system to meet their needs.

20      Q.   And what does it mean to implement

21      software?

22      A.   In Tyler's situation it means that the

23      client is purchasing a very shell of a system,

24      it's a functioning system, but they -- the

25      client has to add their own unique codes and

Page 25

1        calculations to the system in order for the

2        product to work properly for them.

3        Q.   And you used the word "configure" a moment

4        ago.  What does it mean for you to configure

5        the system for the client?

6        A.   Munis is a table-driven system, and so you

7        have to populate the tables with codes, be it

8        alpha codes or numeric codes, that will then

9        drive the calculation piece.

10       Q.   Have you ever been given instruction by

11       Tyler on how to describe what an implementation

12       consultant is to third parties?

13       A.   No.

14       Q.   Now, what about a senior implementation

15       consultant, how is that different from what

16       you've just described as an implementation

17       consultant?

18       A.   It means that previously one Friday a

19       month we would attend a meeting, a conference

20       call web meeting, and we would be assigned

21       additional documents to either update, review

22       or create that would help the client better

23       understand the Munis system with the

24       implementation process.

25       Q.   But no other differences between

Page 26

1          implementation consultant, senior
2          implementation consultant besides this document
3          creation and updating feature?
4          A.    There is also a different pay scale for a
5          senior implementation consultant.  I don't know
6          the exact pay scales for where they are.  But
7          when I was promoted to a senior implementation
8          consultant, there was a raise involved with
9          that particular change in job title.
10         Q.    Did you regard the move from
11         implementation consultant to senior
12         implementation consultant as a promotion?
13         A.    I did.
14         Q.    Why?
15         A.    The -- that I have more experience.  I
16         received a raise for it.  It's not something
17         that you apply for.  They actually ask if you
18         would like to take on the extra duties of
19         those -- of completing the forms -- or not the
20         forms, the documents.
21         Q.    What types of documents are you
22         referencing as this additional senior
23         implementation consultant responsibility?
24         A.    There are documents that the clients can
25         download from a page on the Tyler website

Veritext Legal Solutions
800-336-4000

```
 1        called the knowledge base.  And a lot of these
 2        documents are outdated due to prior versions or
 3        newer versions or new functionality.  And so we
 4        help get those items updated to help the client
 5        so when they download it they've got something
 6        more up to speed for them to use.
 7   Q.   And you mentioned a moment ago, I think,
 8        that sometimes you're actually creating these
 9        documents in the first instance, correct?
10   A.   Correct.
11   Q.   So let's walk through those separately.
12        You're assigned to update a document for a
13        client implementation.  Now, first of all, is
14        this a document specific to this client, or is
15        this a generalized knowledge document that just
16        goes with Munis in general?
17   A.   It's a generalized document.
18   Q.   Once you are signed the document, what is
19        your process inventory updating it?
20   A.   The process would be verifying if any new
21        functionality is present and new screenshots
22        because sometimes with new versions the screens
23        are rearranged or new -- if new functionality
24        is there, there's new buttons to push.  So we
25        update all of that information on the document.
```

Page 28

```
 1      very, very inundated with trying to learn the
 2      basics of the system and would not have the
 3      time to learn the new functionality while
 4      they're still trying to learn the basic
 5      functionality.  So us that are more senior have
 6      the ability to work on the new functionality.
 7      Q.   What about the circumstances where you're
 8      called upon to create a new document because
 9      there's not one to update, how do you go about
10      that?
11      A.   We look at maybe something that is similar
12      and we use the same formatting and then just
13      update it with the unique subject matter that
14      might need to be.  For example, we just had
15      Retro Pay get introduced recently.  And that
16      has taken quite a while for even us senior
17      folks to get the understanding of it because
18      there was no detailed documents that were given
19      to us.  So it's been by hit and miss that we
20      have learned that particular module on our own.
21      Q.   When you are asked to create a new
22      document, are you given a template, are you
23      directed to specific ones you should reference,
24      or are you using your own judgment to decide
25      which versions to pull from to make your new
```

Page 31

1     document?

2     A.   We're given a template because all the

3     knowledge base documents are in the same format

4     that, you know, the header is this size font

5     and bold and the buttons below it are this and

6     the title looks like that.  But other than

7     that, then we would fill it in with the

8     appropriate verbiage that matches the module

9     we're working on.  And we tend to work in small

10    groups since there are numerous senior

11    implementation consultants in each region.  So

12    on those Fridays we work together as a group.

13    It's not individual.

14    Q.   Once you've completed an update or

15    creating a new document, what happens to it?

16    A.   It gets sent off to the training

17    department, and I am not exactly sure the

18    official name, but the training department, and

19    then they would review it, make any changes

20    before it is published to the knowledge base.

21    Q.   Have you ever had it come back to you for

22    additional work after you've sent off the

23    draft?

24    A.   No.

25    Q.   Does your project manager play any role in

Veritext Legal Solutions
800-336-4000

1       this process?

2       A.   Just blocking that day for me not to get

3       booked with another client.

4       Q.   When you were working on individual

5       implementations in a given week, how many

6       implementation consultants were there to

7       perform services for the client?

8       A.   Usually you're the only one on site.  Very

9       rarely would there be a second person on site,

10      whether it's within the same module like HCM,

11      or if maybe there happens to be a financial

12      implementer.  But in general there wouldn't be

13      two financials or two HCMs on site at the same

14      time unless the client requested it.

15      Q.   What would cause two implementation

16      consultants to need to be on site for a single

17      module?

18      A.   Usually it's for a very shortened go live.

19      So if the client purchases the product in July

20      and has to go live in October, that's not

21      feasible with one implementer, so they will

22      bring on two implementers to help speed up that

23      process versus taking the normal nine months to

24      one year to go live.

25      Q.   Is your project manager ever on site with

Veritext Legal Solutions
800-336-4000

```
1        salary table.  So it's just helping them not
2        have to dig through the weeds when they're
3        presenting.
4        Q.   Is it possible to use the script not in
5        exactly the order that it's written, so demo
6        one piece of information that might appear
7        second in the script and then come back to
8        something else, or does it necessarily have to
9        be done exactly in the order that it's
10       presented?
11       A.   It can be used in any particular order
12       because sometimes the client doesn't have the
13       proper staff on the proper day, and so you have
14       to be flexible and rearrange the agenda to
15       match the client's needs once you get on site
16       and they tell you:  Oh, our HR department isn't
17       available today, we need to move that module to
18       tomorrow, so that way they can -- they'll be
19       here for it.  And so yes, you can move things
20       around easily.
21       Q.   Have you actually done the fundamentals
22       review presentation for clients?
23       A.   I have, but not since this new process has
24       been put in place because they tend to have the
25       newer implementers go out and have the more
```

Page 39

```
 1      senior folks do more complicated sessions.
 2      Q.   With those circumstances where the agenda
 3      has to change because of some client-driven
 4      need, who makes the decision about whether to
 5      do what the client is asking, is it the
 6      implementation consultant, or do they have to
 7      go back to the project manager?  What's the
 8      flow there?
 9      A.   It can vary.  Sometimes if it's a small
10      enough change, the implementer can, you know,
11      dance and say:  Yeah, we could do that tomorrow
12      afternoon versus this morning.  If it's a major
13      change like I went in for a particular module
14      and they wanted to change to a totally
15      different module, that's when we would have to
16      check with the project manager to make sure
17      that that fits into their go-live schedule.
18      Q.   Back when you were doing the fundamentals
19      review presentations, did you ever have to make
20      any changes of either category that you just
21      described?
22      A.   No, because the fundamentals review, the
23      way I kind of look at it is that it's a
24      glorified or more detailed sales pitch.  Again,
25      they are just looking at the screens again and
```

Page 40

1     getting the lay of the land to again refresh

2     them of what the process is going to be because

3     the next step is going to be analysis where

4     we're going to ask them lots of questions and

5     for them to understand how the screens link to

6     one another.

7     Q.   So one of the questions kind of broadly

8     about this then is:  Do you have a sense of

9     whether it's beneficial to actually have

10    someone present this in person as opposed to

11    just showing them a video that conveys the same

12    information?

13    A.   It is good to have it in person, or

14    nowadays with COVID, over Internet, same thing,

15    because they like to ask questions.  Because,

16    again, it's foreign to them.  It doesn't look

17    like their current system.  Our Tyler verbiage

18    is different than their current system.  And so

19    they are trying to determine where their codes

20    are going to fit into Tyler codes.  And so them

21    seeing the screen and asking questions, they --

22    I think they would get frustrated if it was

23    just a video.

24    Q.   So what is an implementation consultant

25    supposed to do during the fundamentals review

Page 41

1    A.   They need to be able to know how to
2    control the crowd, so to speak, that if they
3    start to try to jump to a subject that they're
4    passionate about instead of the subject that's
5    being discussed, to be able to say:  That's a
6    great subject and we'll discuss that in a
7    little bit, but be able to have some training
8    skills to monitor the conversation.
9    Q.   Let's move to the next stage, analysis or
10   current state/future state.  What is that phase
11   about?
12   A.   So that phase comes after the fundamental
13   review.  And that's when you start asking the
14   client questions from things to what modules
15   are they going to use and what is their current
16   process of doing certain tasks to see if there
17   is a way that Munis will be able to meet their
18   requirement to allow them to be more efficient.
19   Q.   How do you know what questions to ask?
20   A.   There is an analysis spreadsheet that is
21   sent to the client before the implementer
22   arrives so that hopefully the client has
23   reviewed it and started filling it out.  That's
24   not always the case.  And so sometimes we start
25   with a blank spreadsheet and we just start

Page 46

1      asking the different questions that are on the

2      spreadsheet and having a discussion as their

3      current state and then recommendations for

4      future state.

5      Q.   So if a client were to completely fill out

6      the spreadsheet, answer all the questions

7      before you got there, is there any reason for

8      you to go in person to work with them?

9      A.   Yes, because they are going to have lots

10     of questions about how that's going to change

11     with the Munis system.

12     Q.   What do you mean by that?

13     A.   Currently they enter their -- their time

14     sheet is a piece of paper that the employee

15     fills out.  Going forward they are going to

16     either use ExecuTime module or they are going

17     to use what we call ESS, Employee Self-Service,

18     and fill out a time sheet electronically.  They

19     have to tell us which way they are going to go

20     so we can set up the system correctly.  So

21     that's not something that you can do based upon

22     a spreadsheet that just says:  We fill time

23     sheets out by paper.

24     Q.   So when you are meeting with clients who

25     haven't completed the full spreadsheet in

Page 47

1    And so I will verbally tell them how it could

2    also be done.  But if they are really stuck on

3    that's the way they want to do it, then that's

4    what we go with.

5    Q.   A moment ago in your testimony you

6    mentioned that after you've completed this

7    question-and-answer period, it moves to a phase

8    of recommendations.  Did I understand that

9    correctly?

10   A.   Correct.

11   Q.   Tell me about those recommendations.

12   A.   So we recommend the order that you put

13   your items called pay codes or deduction codes

14   so it will make it easier for them as they grow

15   those items within their system.  We help

16   recommend when they build tables maybe not to

17   use alpha because then if something comes up

18   later, they can't alphabetically fit things in

19   the right order, so we have them do things

20   numerically because they want to look at, you

21   know, absence and, you know, out of office, and

22   then they can't put something in between that

23   they wanted to, so numerically they can easily

24   do that.  So it's small little things like that

25   since, again, they don't know the system and we

Page 51

1      to conduct that phase of the analysis?

2      A.    No.

3      Q.    Testing, what does that entail for you as

4      an implementation consultant?

5      A.    We come on site and we start what we call

6      a mini payroll with a few folks in the payroll

7      and run it through and see what -- where there

8      might be errors or what works.

9      Q.    Is this a task that needs to be performed

10     on site, or do you sometimes do it remotely?

11     A.    I -- usually you don't do it remotely

12     because you don't have access to their system.

13     Q.    So at the time that you're doing the

14     testing, you're actually using an installation

15     of Munis on the hardware of the client?

16     A.    Yes.

17     Q.    Whose data are you using to do the mini

18     payroll example you gave?

19     A.    We're using the client's data that we have

20     set up during that configuration piece.

21     Q.    What does this phase of implementation

22     look like?  Are you sitting in a classroom with

23     other people?  Are you sitting one-on-one with

24     subject-matter experts?  Just kind of what's a

25     general description of how this actually plays

Page 65

```
1        out over the course of a given testing phase?
2        A.   It usually is myself doing the steps with
3        it being broadcast onto a projector and other
4        employees in the room, which can vary, and
5        walking through the different items that we
6        discover throughout the testing process.
7        Q.   What kinds of things are you likely to
8        discover in this process per your last answer?
9        A.   A codes not calculating or deduction codes
10       not calculating.
11       Q.   Why is this done in front of an audience
12       as opposed to you just sitting at a terminal
13       with a client?
14       A.   In essence we are sitting at a terminal.
15       We are sitting at a computer.  And I would not
16       be able to do the correction without the
17       client's input to tell me that it's not
18       calculating correctly and how it should be
19       calculating.
20       Q.   So you're sitting there, you're steering
21       the software, it's providing an output and the
22       client is saying:  That's wrong.  It should be
23       this.  Is that fair?
24       A.   That's fair.
25       Q.   Then what happens?
```

1      A.    Then I ask them what it should be.  And so

2      then we kind of try to back into how Munis is

3      calculating it to determine where the missing

4      piece is to get it to the number that they are

5      looking to achieve.

6      Q.    How do you go about identifying what the

7      problem is in a given testing failure?

8      A.    You look at how the codes were originally

9      set up with something that we call a

10     calculation code and see if that's accurate.

11     If it's a percentage, is the percentage

12     accurate.  And again, seeing where something

13     might not have been completed.  And that's

14     usually the case.

15     Q.    When you are testing, do you ever find

16     breakages in the system that you're unable to

17     resolve while you're sitting there with the

18     client?

19     A.    Sometimes, yes.

20     Q.    What do you do in those circumstances?

21     A.    I take screenshots and submit a ticket to

22     support.

23     Q.    Once it goes to support, do you have any

24     continuing role in resolving that issue?

25     A.    I do.  I would be the point of contact and

Page 67

1     they would contact me, and depending upon if I
2     was going to be on site again or if I need to
3     forward that to the client or change the
4     contact to the client.
5     Q.   And just so I am clear, the "they" there
6     is support?
7     A.   Is support.  I'm sorry.  Yes, support.
8     Q.   Have you ever encountered scenarios where
9     you're there testing with the client and they
10    just don't like the functionality they have
11    elected and that's what the testing is -- the
12    testing is not showing a failure, but it's
13    showing that they just don't like what you're
14    presenting to them?
15    A.   Absolutely.
16    Q.   What do you do in those circumstances?
17    A.   I discuss with them, again, like I
18    mentioned previously, that they can look at
19    changing their internal process or put in an
20    enhancement request and work with the project
21    manager to get that accomplished.
22    Q.   At that point, can you revisit any of the
23    current state/future state analysis and say:
24    Well, there is a different process to do this,
25    or is it past that point and you can't do that

Page 68

```
 1        go back and forth between customer and client.
 2        I know client is the right word.  If the client
 3        does say:  You know what, I don't like it on
 4        the right, I want it on the left, and the
 5        system can do it, are you allowed to make that
 6        change?
 7        A.   Yes, because it's driven by the client.
 8        The client -- again, we are doing what the
 9        client is requesting.  And so I would show them
10        where the setting is that moves it from the
11        right to the left.  And if that's what they
12        want, then that's the change we would make.
13        Q.   With testing, how much of the process is
14        scripted?
15        A.   Zero.
16        Q.   Would you expect or do you know if
17        non-senior implementation consultants are
18        instructed to perform testing in a different
19        way than what you've described?
20        A.   At Tyler there's no direction given to us
21        implementers, be senior or non-senior, to do
22        things differently.
23        Q.   Is that just true across all of the
24        implementation phases?
25        A.   It's true across all of them.
```

Veritext Legal Solutions
800-336-4000

1     Q.    Then I won't have to ask that question

2     again.

3           Next phase after testing would be

4     training, correct?

5     A.    Correct.

6     Q.    And there was a little confusion earlier

7     when we were first going through the phases.

8     Is there just one type of training that

9     implementation consultants do, or do you

10    differentiate between end user training and

11    other types of training?

12    A.    I differentiate the two.

13    Q.    Okay.  Let's take those in separate pieces

14    then.  So what is the not-end-user training?

15    What would you call that?

16    A.    I would call that more staff training.

17    I'm training the payroll processor on how to

18    process the payroll versus I'm showing you as

19    an employee how to complete your electronic

20    timecard in front of a kiosk or a computer.  I

21    would refer to you as an end user versus an

22    employee actually performing a function within

23    the system.

24    Q.    So are the people in that first phase more

25    like the administrators who are running

Page 71

1      payroll, running benefits, running leave, and
2      the people in the second category are your
3      rank-and-file people who are getting the output
4      of the system whether that's a pay statement or
5      they're putting in their elections, things like
6      that?  Am I understanding that correctly?
7      A.   Yes.  That's a good definition of it.
8      Q.   So with that first phase, the staff
9      training, does that come before or after the
10     end user training?
11     A.   Before.
12     Q.   Can you tell me a little bit about what
13     your responsibilities are in that phase?
14     A.   So when we get to that stage -- in the
15     previous stage we were doing the testing.  Now
16     when we get to the training, I'm no longer
17     driving the computer with it up on the monitor.
18     Now the staff person is the driver.  And I am
19     just helping them through the process of
20     whatever notes they have taken to get to the
21     same end result as what we did during the
22     testing phase.
23     Q.   What are they driving through?  Is there a
24     set number of tasks they are performing, or
25     what is it they are supposed to be showing you

Page 72

1      A.    Yes, I do.

2      Q.    Have you ever given any feedback to a PM

3      about an agenda before going to a training?

4      A.    Absolutely.

5      Q.    Can you tell me a little bit about that?

6      A.    If it's a client I've been to on previous

7      occasions and I know we're ahead of where that

8      agenda is, I will let the PM know that we've

9      already covered that in a previous session

10     and/or the reverse.  If they are behind, I'm

11     going to tell the PM they are not ready for

12     this module because we haven't completed the

13     previous module or the previous session that

14     they should have had completed.

15     Q.    In providing that feedback, have you had a

16     PM change the agenda to reflect those issues?

17     A.    Yes.

18     Q.    Have you had PMs refuse to change the

19     agenda despite those issues?

20     A.    I wouldn't say refuse, but I've just had

21     PMs that just don't update the agenda.

22     Q.    So when you are training and you are on

23     one of the agenda items and you decide they

24     have got it or alternatively you decide they

25     are not getting it, how do you decide when to

Veritext Legal Solutions
800-336-4000

```
1        after go-live training?
2        A.   End-user training is usually before go
3        live because we have to train the users before
4        they -- it's time to enter your time sheet.
5        And if you've had zero training, that's not
6        going to go very well.
7        Q.   We'll plan to go to that next.  One of the
8        phrases that I have heard a lot in documents
9        and from other people is the phrase "train the
10       trainer."  Does that fit more in the staff
11       training or the end user training or both?
12       A.   The end-user training.
13       Q.   Good.  That's where I thought that would
14       go.  What's your responsibility in the end
15       user?
16       A.   Usually it's to observe and ask any
17       questions or answer any questions that might
18       come up when the train the trainer gets stuck
19       and isn't quite sure how to answer the
20       question.
21       Q.   So what does the phrase "train the
22       trainer" mean to you?
23       A.   It means that we have trained the staff to
24       conduct the end-user training because it will
25       mean a lot more coming from an internal person
```

Page 84

```
 1        than a Tyler employee so they will have a
 2        direct contact with the staff member that
 3        conducted the training.
 4        Q.    So in your implementation experience, do
 5        all implementations involve training the
 6        trainer and training the end users directly?
 7        A.    No.
 8        Q.    What's the breakdown there in terms of
 9        what you typically see, is it mostly one or the
10        other, pretty evenly distributed?
11        A.    For myself, I would say the train the
12        trainer is for the larger clients, and we
13        usually are not on site for that, that we
14        actually have trained the trainer so they don't
15        need us on site.  So then when it comes to
16        training end users, it's usually a smaller
17        client, and we are on site to help with that.
18        Q.    Let's take those in pieces then.  So
19        training the trainer, how do you go about doing
20        that as an implementation consultant?
21        A.    It is making sure that the employee -- I
22        can't really say making sure because we can't
23        read someone else's mind -- the person doing
24        the process is comfortable with how to run a
25        payroll, if she has to show a payroll clerk, or
```

Page 85

1     Q.    Anything else?

2     A.    Not that I can think of.

3     Q.    Have you ever recommended to a PM that the

4     go-live date change?

5     A.    No.

6     Q.    Are you aware of any implementation

7     consultant doing that?

8     A.    I can't speak for the other

9     implementations that I am not involved with.

10    Q.    Oh, sure.  I'm just asking if you're aware

11    of it.  If you're not aware of it, that's fine.

12    A.    Yeah, not that I'm aware of.

13    Q.    Would there be a reason you wouldn't make

14    that recommendation if you observed problems?

15    A.    If it was a client that I was working

16    with, I would voice my opinion to recommend

17    because I want the client to have a good

18    experience.  And then I would leave it up to

19    the project manager to, like I said, discuss it

20    with the client.

21    Q.    Do you view it as part of your job to

22    voice that to your project manager?

23    A.    I do.

24    Q.    So what are you actually doing in the

25    go-live phase as an implementation consultant?

Veritext Legal Solutions
800-336-4000

```
 1      A.   I am trying to keep the team calm because
 2      they are usually pretty anxious.  Just helping
 3      them through the steps and correcting any
 4      last-minute changes that come around.  And, you
 5      know, again, trying to pump them up and have it
 6      be successful.
 7      Q.   And this is going to sound like a silly
 8      question, but what do you do to help keep them
 9      calm?
10      A.   Sometimes I -- you know, certainly I will
11      jump in and work shoulder to shoulder with them
12      and help them out if we find a big issue that
13      needs a lot of data entry and help them out in
14      that regard, and then certainly show them what
15      I did after the fact or just kind of make light
16      of it:  Well, when this is over, we'll go out
17      and celebrate, that kind of thing.  So just try
18      to keep it as lighthearted as possible when
19      it's an intense moment, when they know that
20      they want to get these employees paid properly.
21      Q.   So just for reference then -- I mean, is
22      adopting Munis a significant institutional
23      change in your experience?
24      A.   Yes, it is.
25      Q.   Why?
```

Page 95

```
 1          usually three days.
 2          Q.   I know we talked earlier about how Tyler
 3          doesn't provide different instruction to
 4          non-seniors versus seniors on how to do these
 5          things.  In your experience, are these phases
 6          allocated differently based on seniority?
 7                    MR. BROME:  Objection, vague as to
 8          "allocated."
 9                    You can answer if you understand.
10                    THE WITNESS:  They are -- the module
11          does not dictate who shows up because, again,
12          the client has no idea whether I'm senior or
13          whether I'm just an implementation consultant.
14          BY MR. CORRELL:
15          Q.   But Tyler knows who the senior
16          implementation consultants are, correct?
17          A.   Yes, they do.
18          Q.   In your experience, are senior
19          implementation consultants staffed on certain
20          phases more than others?
21          A.   Yes.
22          Q.   Which phases are more frequently assigned
23          to senior implementation consultants in your
24          experience?
25          A.   The analysis and salary and benefit
```

Veritext Legal Solutions
800-336-4000

1    projections.

2    Q.    What are salary and benefit projections?

3    A.    That is a module that allows the finance

4    department to put their budget together for the

5    upcoming fiscal year or two years or six months

6    or whatever their fiscal year happens to be for

7    budgeting.

8    Q.    So then just so I understand your

9    testimony correctly, it's mostly senior

10   implementation consultants who would do the

11   entire implementation of salary and benefit

12   projections?

13   A.    For that particular module, seniors get

14   assigned to that more so than regular

15   implementation consultants.

16   Q.    Are there any phases that seniors

17   typically just don't get assigned to in your

18   experience?

19   A.    Fundamental review.

20   Q.    Has that always been the case?

21   A.    No, because we haven't always had senior

22   implementation consultants.

23   Q.    Was that the case prior to January 2019

24   when the materials you previously testified

25   about were assembled?

Page 99

1     Q.   Yes.  Would you say you did it once a

2     week, twice a week, ten times a week?

3     A.   I would call my project manager -- I

4     would -- the only time I would call them on

5     site is if we had a technical difficulty that I

6     needed him or her to push to get an escalated

7     ticket through quicker than what I was able to

8     get it through.  Other than that, there would

9     be no conversation with the project manager.  I

10    should clarify that too.  Unless the project

11    manager asked me because they knew there was an

12    issue on site and wanted me at lunchtime to

13    follow up and let me know how things were going

14    because either they were way behind and wanted

15    to clarify how things were on site.

16    Q.   How commonly did that occur?

17    A.   Maybe twice.

18    Q.   One of the things listed on your résumé

19    that we previously marked as Exhibit 1 is,

20    "Mentor other implementers on the Tyler

21    systems."

22         Did I read that correctly?

23    A.   Yes.

24    Q.   What do you mean by that bullet?

25    A.   That when a new employee is hired and

Page 101

1          after they have finished their initial training

2          with Tyler, they are assigned a mentor/buddy

3          and we are their first point of contact instead

4          of support for the first six months that they

5          are out there billable with a client.  And when

6          I say "Tyler systems," that's not just Munis

7          but also ExecuTime, which is our timekeeping

8          system because both of those systems fall under

9          us as implementers to implement.

10    Q.    So this is a formal pairing through the

11    company?

12    A.    Yes, it is.

13    Q.    And we've heard some testimony previously

14    about the shadowing process.  Is there a role

15    in the shadowing process for you with respect

16    to these new implementation consultants?

17    A.    There is.  When we were on site with

18    clients, I could have someone that is new

19    shadowing me and they would still be within

20    their standardized Tyler training period so

21    that way they could see how training is

22    conducted and we could visit after hours or

23    during lunches as to questions they might have

24    regarding the Munis product.

25    Q.    Once you've been assigned your mentee, are

Page 102

1      you given specific instructions on tasks to
2      complete with that mentee?
3      A.   Yes.
4      Q.   What types of tasks are you instructed to
5      complete with them?
6      A.   Have a conference call with them once a
7      week and check in with them to make sure things
8      are going well and be available to them.
9      Sometimes they do shadow -- you know, my mentee
10     would shadow me.  And sometimes it's just a
11     random person that's shadowing me, not someone
12     that I am a mentor to.  So again, it's just
13     additional training for them without being in a
14     classroom at Tyler.
15     Q.   Are you given instruction on what to talk
16     about on the calls with the implementation
17     consultants, or is it more of mentee-driven
18     discussion?
19     A.   It's more of a mentee-driven discussion.
20     Q.   How much of your time would you say you
21     spend on this task?  Is it a very small piece
22     of it, or is it a pretty substantial
23     responsibility?
24     A.   Since it's a six-month program for six
25     months I'm with them, the first three months I

Page 103

1  Q. Are you familiar with the acronym NBCQT?

2  A. Yes.

3  Q. What does that stand for?

4  A. Not billable counts towards quota.

5  Q. What is encompassed within that category

6  of time?

7  A. When I work for a client and they haven't

8  purchased a day, Tyler will give them kind of a

9  free day.  And so Tyler absorbs that.  But the

10  quota again on that sliding scale, if I do more

11  than 12 billable days, I get bumped up so it

12  counts towards that quota.

13  Q. Have you ever had an occasion where you

14  get to 4:30 and you are done for the day and

15  the client asks you to stay because there's

16  more that needs to get done that day?

17  A. Yes.

18  Q. What, if anything, do you do with that

19  time in terms of reporting it?

20  A. Usually I tell the client that I can stay

21  for a few moments, but I can't stay much longer

22  than that and we can cover that in -- the

23  remainder of it in the morning.  So I kind of

24  limit it to about a half hour.  So if I do stay

25  later, I only stay until about 5:00.  And then

Page 124

```
1                    REPORTER'S CERTIFICATE
2
   STATE OF MINNESOTA    )
3                        ) ss.
   COUNTY OF HENNEPIN    )
4
5         I hereby certify that I reported the
   deposition of Pamela M. Costner on October 19,
6  2020, in Maple Grove, Minnesota, and that the
   witness was by me first duly sworn to tell the
7  whole truth;
8         That the testimony was transcribed by me
   and is a true record of the testimony of the
9  witness;
10        That the cost of the original has been
   charged to the party who noticed the deposition,
11 and that all parties who ordered copies have been
   charged at the same rate for such copies;
12
          That I am not a relative or employee or
13 attorney or counsel of any of the parties, or a
   relative or employee of such attorney or counsel;
14
          That I am not financially interested in the
15 action and have no contract with the parties,
   attorneys, or persons with an interest in the
16 action that affects or has a substantial tendency
   to affect my impartiality;
17
          That the right to read and sign the
18 deposition transcript by the witness was reserved.
19
          WITNESS MY HAND AND SEAL THIS 2nd day of
20 November, 2020.
21
22
23
   Dana S. Anderson-Linnell
24 Notary Public, Hennepin County, MN
25 My commission expires 1/31/2025
```

Page 139

1    Kudatsky, Aaron Et Al. v. Tyler Technologies

2    Pamela Costner Job No. 4297248

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____      _____

24   Pamela Costner                                  Date

25

                                           Page 140

1    Kudatsky, Aaron Et Al. v. Tyler Technologies

2    Pamela Costner 4297248

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Pamela Costner, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____      _____

12   Pamela Costner                          Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

                                            Page 141

1   dbrome@nka.com

2                        November 2, 2020

3   Kudatsky, Aaron Et Al. v. Tyler Technologies

4   DEPOSITION OF: Pamela Costner 4297248

5        The above-referenced witness transcript is

6   available for read and sign.

7        Within the applicable timeframe, the witness

8   should read the testimony to verify its accuracy. If

9   there are any changes, the witness should note those

10  on the attached Errata Sheet.

11       The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18                        Yours,

19                        Veritext Legal Solutions

20

21

22

23

24

25

                                    Page 142

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 3

```
 1                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
 2
 3    AARON KUDATSKY, Individually ) Case No.:  3:19-CV-07647-WHA
      and on behalf of all others   )
 4    similarly situated,           )
                                    ) DEFENDANT'S NOTICE OF TAKING
 5         Plaintiffs               ) DEPOSITION OF PLAINTIFF
                                    ) AARON KUDATSKY
 6    vs.                           )
                                    ) Judge William Alsup
 7    TYLER TECHNOLOGIES,           )
                                    ) Action Filed:  November 20,
 8         Defendant.               )                 2019
 9
10
11         _____
12              ORAL AND VIDEOTAPED DEPOSITION OF
                         AARON KUDATSKY
13                    SEPTEMBER 11, 2020
14         _____
15         ORAL AND VIDEOTAPED DEPOSITION of AARON KUDATSKY
      produced as a witness at the instance of the Defendant, and
16    duly sworn, was taken in the above-styled and numbered cause
      on the 11th of September 2020 from 11:06 a.m. to 6:15 p.m.,
17    before Christie Tawater, CSR, RPR, in and for the State of
      Texas, reported by computerized stenotype machine remotely
18    via Zoom from her home located in Fort Worth, Texas pursuant
      to the California Federal Rules of Civil Procedure and the
19    provisions stated on the record or attached hereto; that the
      deposition shall be read and signed before any notary public
20    pursuant to Rule 30(e)(1).     Job No. 4253180
21
22
23
24
25
                                                        Page 1
```

1          A.      What happens during the setup and

2     configuration portions.

3          Q.      But what are the options?  What -- what --

4     what could be different from one customer to the next

5     in how they receive the Munis product once it's been

6     configured?

7          A.      There are literally hundreds, if not

8     thousands, of different ways that this can be

9     configured.

10         Q.      Can you give me a couple of examples of

11    common configuration issues that you would present or

12    discuss with a client?

13         A.      As an example, in the inventory module you

14    say what inventory -- I don't know the right term to

15    this, but costing you're doing, so one example is

16    first-in, first-out or average costing, and that was

17    decided by -- or that answer was decided by the

18    client based on their organizational operations.

19         Q.      So is that a configuration that would be

20    set exclusively based on what they were previously

21    doing?

22         A.      They could have decided if they wanted to

23    change it and we just told them this is their option,

24    this is the decision they need to make and then would

25    show them and help them with setting it up,

Page 52

1     implementation at least one-half day per week?

2         A.    At least 60 percent of the time.

3         Q.    Did that entail travel?

4         A.    No.

5         Q.    For your one part per week that you were

6     doing for your primary implementation did any other

7     implementation consultant also do that work alongside

8     you for that part?

9         A.    No.  No.  It was very rare.

10        Q.    Did it ever happen?

11        A.    If there was a second person on site then

12    they were tasked with a whole separate agenda or

13    different tasks, otherwise, we were alone on site.

14        Q.    So, for instance, you never would have had

15    an occasion where you and another person would both

16    be doing testing for this customer on this project on

17    the same week?

18        A.    No.  Very rare.  If so it would be two

19    different classrooms with two different modules or

20    topics or areas.

21        Q.    You mentioned there were 30 days of remote

22    training after you finished the initial one week.

23                   What was the 30 days -- or what did

24    the 30 days of remote training cover?

25        A.    It was covering that wrecked [SIC] check

                                          Page 58

1      Q.    So you never went to your supervising
2  managers and said, hey, here's the way I think I
3  should do this, is this okay?
4      A.    So Scott and Jennifer are examples of --
5  they were my supervising managers, but I had also
6  worked on some of their projects, and, yes, there
7  were times when I would go to them and say this is,
8  you know, what I want to do, and if it's a more
9  uniform decision -- sorry -- if it -- that could have
10  been more client specific or something that the
11  client could have been sensitive to, or it could have
12  worked or not worked with that client, then I was
13  suggested, recommended, referred to that client's
14  project -- to the project manager for that project.
15      Q.    You mentioned client sensitivities a couple
16  of times; was that something you ever were able to
17  observe yourself while working with the client?
18      A.    Yes.
19      Q.    Did you ever change how you were
20  approaching a client because of their sensitivities
21  after you made that observation?
22      A.    Yes.
23      Q.    Can you give us an example?
24      A.    Some clients referred and asked for much
25  more visual mode of instruction or presentation,

1    thus, I would -- you know, if there was a report that
2    we could have produced out of Tyler Munis then some
3    clients were very big and specific on me running that
4    report and showing it to them on the screen for them
5    to discuss.  Other examples, some clients asked that
6    you as the consultant were navigating the screen and
7    navigating the computer in the front of the room
8    while others, the project manager -- and this is
9    another example where you refer or go to the project
10   manager of that project for recommendations of
11   instruction method, but other clients -- or the
12   project managers would recommend that you have
13   them -- one of the people from their group in the
14   room to sit at the front computer and navigate the
15   screen and you would be providing them instruction,
16   essentially, from the side.  So instead of me
17   navigating the mouse and computer and showing all the
18   steps, I would say, go here, click here, do this, do
19   that, but they would be at that front computer.
20            And these are not things I would know
21   about that project or client until I either asked the
22   project manager or if I show up on site and choose
23   and decided to do it the usual way.  And the common
24   way was when we as individuals drove at the front of
25   the room and navigated that computer sometimes they

Page 75

1      Q.     You were allowed to do that without talking
2    to the project manager first?
3      A.     Usually if it was okay -- so their project
4    managers were oftentimes sitting in on these
5    sessions, so if it was asked by their project manager
6    then that would be okay, too.  Again, it was all
7    dependent on what the project manager from the Tyler
8    side kind of gave you a heads-up warning of, you
9    know, hey, if this -- if this project manager, like,
10   whatever they ask you to do, this group is sensitive,
11   whatever -- they know their group well, whatever they
12   ask you to do, follow that, or I've had problems with
13   this client in the past, for these reasons, I'm
14   giving you specific requests or instruction or
15   whatever to do things the specific way or a certain
16   way.
17     Q.     You mentioned a fundamentals presentation
18   earlier?
19     A.     Yep.
20     Q.     What was the proper name of that?
21     A.     Fundamentals review.
22     Q.     And we talked earlier about the five parts
23   of an implementation, where does that fit in the five
24   parts of an implementation?
25     A.     It was technically presented.  That was a

Veritext Legal Solutions
800-336-4000

1    newer step that was adopted by the Tyler, I don't

2    know if you want to call it upper management or

3    project management office, but they -- when they came

4    up with that idea they created all the scripts and

5    then later it was presented before the analysis so

6    the client can have an understanding of what the

7    system looks like.  It was often -- for many of the

8    attendees in the room it was going to be their first

9    time seeing the Munis software.

10        Q.    How long did you spend on a given

11   fundamentals project?

12        A.    So fundamental review sessions, again, in

13   the same one-week increments and there was

14   specific -- you know, from the -- more at the project

15   management level of here's all the lists of the

16   different fundamentals reviews, here's how long each

17   of them should take, and so it was assigned to me or

18   to any consultant based on that.

19        Q.    And -- and, typically, the implementation

20   consultant was on site from Tuesday to Thursday,

21   correct?

22        A.    Correct.

23        Q.    So if you were assigned to do a

24   fundamentals presentation you would do that for three

25   solid days?

Veritext Legal Solutions
800-336-4000

1    approximately?

2        A.    So there was a separate fundamentals review

3    script for each module area and I remember them --

4    some of them being 30, 40, 50 pages.

5        Q.    And how many different modules were there?

6    I'm trying to get a different sense of how many

7    scripts -- how many pages of script you were using

8    from memory because you said you weren't reading

9    them.  So how many pages of script were you

10   presenting in a given week without consulting the

11   script?

12       A.    Well, we would still be consulting the

13   script and having the document in front of us.  We

14   just had to become familiar with the document that we

15   weren't, essentially, reading it word for word, yet

16   there were still consultants that would read it word

17   for word.  We were just encouraged to prepare and

18   become familiar with it that we weren't reading it

19   word for word to have a better presentation style.

20       Q.    Other than walking through the script did

21   you do anything else during the sessions?

22       A.    No.

23       Q.    So would there be any difference if they

24   just videotaped the presentation and shown it to the

25   customers?

Veritext Legal Solutions
800-336-4000

1      A.      Essentially not.  But we were only going

2   through and showing the modules or the programs that

3   this client was to be using, so you didn't want to,

4   essentially, waste their time and show them things

5   that they did not purchase.

6      Q.      Did the fundamentals presentation change at

7   all from customer to customer assuming they were

8   buying the same modules?

9      A.      No.

10     Q.      Did the customers ask any questions during

11  these sessions?

12     A.      Some would ask questions, but the

13  general -- we were told to basically start that

14  session off with, and the general kind of notion was,

15  that they were not asking questions and all the

16  questions would be saved for the analysis sessions.

17  If they were asking questions then we would just

18  write these questions down and save them for the

19  analysis sessions.

20     Q.      So during fundamentals presentations you

21  never answered client questions?

22     A.      If it was a simple shorter question that I

23  knew the answer to I would, but otherwise, again, we

24  were asked to stick -- stick with the script and save

25  any questions to analysis because many of those

Page 84

1    review separate.

2             After that came analysis, correct?

3        A.    Correct.

4        Q.    What is the purpose of the analysis phase?

5        A.    It was there for -- to understand what the

6    client was currently doing, and then, essentially,

7    understand and decide what they were going to be

8    doing once they were using the Munis system.

9        Q.    How was the analysis phase conducted?

10       A.    First, the client was sent -- we had,

11   essentially, analysis quenched [SIC] in years, again,

12   one per module area, and they were all sent to the

13   client or posted on the client share point for them

14   to download.  They were asked to fill them out on

15   their own and then a project manager would schedule a

16   [SIC] analysis session.  It was kind of the latter

17   model from when I was at Tyler.  It was known as

18   current state and future state.  And so your first

19   analysis sessions as a consultant with the client

20   would be talking about what they're currently doing,

21   and then basically going over that questionnaire that

22   they answered.  And then if -- they might have some

23   questions on terminology used and so helping them

24   fill that out.  And then following that you would go

25   to the future state part.  And, again, questionnaire

1      Q.     And this was another task that took a full
2   billable week, so approximately 24 business hours?
3      A.     It could take more than that.  Again, it
4   was per module area, so I could be tasked as a
5   consultant to come in and say I am doing -- like, you
6   will be doing analysis for accounts payable, and
7   let's say accounts receivable, and that could be my
8   one specific week, and then I can go away to work on
9   a different project.  The following week or maybe the
10  week before a different consultant was tasked to do
11  analysis for charter accounts and general ledger.
12     Q.     So most of the time that you showed up for
13  these projects had the clients already answered all
14  the questions or most of the questions I'll say?
15     A.     Yes.
16     Q.     So then what were you doing --
17     A.     We were --
18     Q.     -- during those billable days?
19     A.     So we were reviewing those documents and
20  that was their opportunity to ask any questions and
21  to make sure that everything was answered properly in
22  its entirety.
23     Q.     Did you use a script to answer their
24  questions?
25     A.     No.  I was using supporting documentation

Veritext Legal Solutions
800-336-4000

```
1    they're going to schedule (Zoom failure) session for

2    a consultant to finish that -- let's say, that same

3    week.  A -- I've been asked, hey, will you have time,

4    when are you flying back, Thursday night, great,

5    like, do you have time on Friday morning to finish

6    this with them or --

7         Q.    Yeah.  My question's a little different,

8    though.

9              If you're on site by yourself as the

10   implementation consultant working with the customer

11   and you realize that you are not accomplishing the

12   goals for the week and you need additional time you

13   would not contact your project manager and say I

14   think we need additional time?

15        A.    I would contact my project manager and say

16   we need additional time or I'm not sure if we will

17   accomplish this agenda based on what you've provided

18   to me.

19        Q.    So -- so going back to the -- the

20   allotments of amount of time.  I'm trying to get a

21   sense of how the work is distributed across these

22   sections that we're going to walk through.  So I've

23   got two to four weeks for a fundamentals

24   presentation.  I've got four to six weeks for the

25   analysis phase.
```

Page 104

1    project managers and it's something, you know, other

2    Tyler project managers, including Scott Steven, told

3    me about his experience becoming PMP certified.

4         Q.    So if you had been promoted to project

5    manager as you requested you would have had no

6    ability to allocate billable hours across these

7    phases without additional training?

8         A.    I would have had to learn and have access

9    to all the separate project management documentation,

10   time lines, methodologies for running a project at

11   Tyler Technologies.  That is why these are two

12   different roles.  One is a project manager and then

13   one is an implementation consultant.

14        Q.    The first -- the -- the phase we're talking

15   about is called analysis, correct?

16        A.    Correct.

17        Q.    What did you analyze, if anything?

18        A.    Current state and future state.

19        Q.    But you told me that the clients filled out

20   a form and you answered their questions about

21   terminology and what other clients do; do I have that

22   correct?

23        A.    Correct.

24        Q.    So what were you analyzing?

25        A.    We were looking at how the client was going

Page 108

1    to be doing, you could say, business operations in

2    the new system.

3        Q.    What did that entail on your part?

4        A.    Essentially, translating what they were

5    currently doing or what they are looking to be doing

6    into the Munis terms.

7        Q.    So in the Munis software is there only one

8    way to accomplish each of the financial functions

9    that your clients were implementing Munis to

10   accomplish?

11       A.    No.  As discussed previously there are

12   hundreds and thousands of different options,

13   configurations and ways that this can be configured,

14   but each check box option, everything is configured

15   based on decisions made during analysis.

16       Q.    But is that just an entirely automated

17   process based on their answers to that spreadsheet or

18   is there -- what -- what else plays a role, if

19   anything?

20       A.    Analysis is there to adopt whatever their

21   processes are, whether they're going to stay the same

22   or whether they choose to make changes in this.

23   Sometimes there was questions asked to the clients

24   where that functionality or decision had not been

25   made before because their previous system did not

Page 109

1    have that feature or functionality, and that is where

2    we were asked to explain, give examples, give

3    definitions, give experiences because now the client

4    was tasked with making a decision on that.

5        Q.    Did you ever have a client ask you if Munis

6    could do something that to your knowledge it could

7    not do?

8        A.    Yes.

9        Q.    What did you do in response to that

10   scenario?

11       A.    If Munis did not have the functionality --

12   well, first, we had a, you could almost say, a forum

13   or board where we can post, essentially, questions,

14   and generally -- actually the -- the proper, you

15   could say, step in that scenario was to send an

16   e-mail to the implementation analyst, which is a

17   separate role at Tyler, and that implementation

18   analyst was going to tell you what the proper

19   solution, workaround, et cetera.  So I could ask

20   other consultants and say, what have you done before,

21   and oftentimes, at one point or another it's a --

22   it's a question or answer or a solution that came

23   from the project analyst, implementation analyst, and

24   they're -- it's a separate implementation analyst

25   team, and also a specific designated e-mail, I think

Page 110

1    it was like Munis IMPL at Tyler Tech dot com or

2    something specific where you send in your question or

3    your issue and then that creates, I think, like a

4    separate support ticket and that's where the

5    implementation analyst answers that question.

6         Q.    Do you dialogue with the implementation

7    analyst at all?

8         A.    It was, essentially, recommended that

9    everything was done in that, like, support case and

10   ticket, so it was then available for future reference

11   and documented if anyone -- so that Tyler -- again,

12   step one is like Tyler knowledge base was a good

13   place to search, and you can search specific key

14   words and it will give you and me -- if I needed help

15   with something or I -- I needed to learn about

16   something then I would go to the Tyler document

17   library and knowledge base and type in whatever key

18   words or questions and terms, and some of the search

19   results I would get would be documents that could be

20   related to it or previous, you know, for example,

21   implementation analyst cases or support cases to

22   instruct me or guide me of how to go forward.

23        Q.    To your knowledge, was there ever an effort

24   to create a new solution to meet that customer need?

25        A.    That's what the implementation analyst and

Page 111

1    Again, we have six phases here.

2         A.    Yes.

3         Q.    Was your personal work, things you did,

4    more focused on any one of those phases or was it

5    pretty evenly distributed all across in terms of the

6    types of projects you were doing?

7         A.    I don't have a way to answer that question.

8    You would have to look at my previous calendar to

9    see.  It was how I was scheduled or tasked.

10        Q.    So as you sit here today you don't have a

11   sense of it?  That's all I'm trying to ask you.

12        A.    I have a sense that I've done them all.

13        Q.    But you don't have a sense of whether

14   you've done some more than others?

15        A.    I would say training, testing and setup

16   configuration are the biggest bulk of that time

17   there.  Yeah.

18        Q.    Going back to Exhibit 1.  Take a moment

19   because it's taking a second to load.  There we go.

20   In the first bullet under Tyler Technologies there's

21   one slight difference here that I just want to have

22   you explain.  You say, provided client facing

23   professional and thorough training implementation and

24   consultation.  On the other exhibit that we just

25   looked at it only referenced training and

Page 143

1    consultation.  What did you mean by adding the word

2    implementation here as distinct from the other two?

3         A.    You mean why did I add client facing?

4         Q.    No.  So in -- in the LinkedIn resume it

5    says training and consultation.

6         A.    Right.

7         Q.    In the resume here it says training

8    implementation and consultation.  I've asked you to

9    explain what training means and what consultation

10   means.

11        A.    Right.

12        Q.    What did you mean when you added the third

13   word implementation as -- as distinct from these

14   other two?  I'm trying to figure out what each of

15   these skills are that are on your resume.

16        A.    Right.  Implementation is really getting

17   your system up and running, or your client up and

18   running on the system, really putting -- kind of

19   inter-webbing the two between them and view, so doing

20   everything that's needed.  So you could say that

21   training and testing and everything that we talked

22   about, it goes within implementation, but it's to

23   show that I've worked on the different phases overall

24   in implementation while some organizations have

25   specific positions or tasks that focus on just

Page 144

1    testing or just training versus at Tyler we were

2    tasked on the various parts of -- of implementation

3    and getting the software implemented and the client

4    up and running.

5        Q.    And -- and while we're here, there was a

6    bullet here that says, completed six life cycle ERP

7    implementations including SAAS.  What does that mean?

8        A.    SAAS, software as a service.  Some clients

9    had the system and the data sitting on their servers

10   versus some clients had the data in the system

11   sitting on the Tyler servers.

12       Q.    And -- and I'm sorry.  I wasn't clear.

13             What does completed six life cycle ERP

14   implementations mean?

15       A.    Really, like having gone through, you could

16   say, like the full -- like the -- life cycle being

17   you've gone through the whole implementation.

18       Q.    By that do you mean on a single

19   implementation you did the -- the full life cycle six

20   times?  So from -- you did all of these phases for

21   one customer's implementation or I --

22       A.    No.  Six --

23       Q.    -- I'm just trying to understand what you

24   mean by that.

25       A.    Six different ones.  Six different ones.

Page 145

1         A.      Yeah, go-live phase.

2         Q.      Once the system has gone live.

3         A.      So the system could be broken, a lack of

4     setup in the previous steps, so you could start

5     trying to process something and it's not working

6     because there's little pieces of the puzzle missing.

7         Q.      Whose job is it to figure out what piece is

8     missing?

9         A.      Oftentimes, the system will tell you

10    there's an error, and as an implementation consultant

11    I have better knowledge and access to that knowledge

12    base to help the client determine what it is that

13    needs to be changed.  But at that point, especially

14    if the client is live, it is their system for them to

15    use for them to configure, so as an implementation

16    consultant I'm there to say the reason why you're

17    having this error message is because we are missing

18    this code table.  You need to go in and create this

19    code table.  Or one of the bigger parts, I'd say, are

20    more common during go-live is users missing a role

21    in, like, permissions in the system to be able to do

22    certain things.  And, again, as an implementation

23    consultant with the knowledge of the system, if

24    they're trying to do something and they can't do it

25    and they say I am trying to, let's say, delete and I

                                          Page 152

1    don't have that ability, I'll tell them you need to

2    go in there, you know, role and give them the ability

3    to delete, or, you know, go to that user and change

4    their role that they are given.

5        Q.    When an implementation starts from the very

6    beginning is there a go-live date?

7        A.    Yes.

8        Q.    Who decides the go-live date at the very

9    outset of the implementation?

10       A.    The project manager.

11       Q.    Does that date ever change?

12       A.    Yes.

13       Q.    What kinds of things can cause the go-live

14   date to change?

15       A.    The -- I would say 90 percent of the time

16   it's factors from the client side.  Whether they

17   don't --

18       Q.    Such as?

19       A.    They might not feel ready.  They might have

20   had staffing changes where they are not in the

21   position to continue implementation.

22       Q.    Any others that just come to mind, any

23   other examples?

24       A.    The system either missing functionality or

25   issues where, again, there -- there -- it's not ready

Page 153

1     to go-live because it's still broken or not working

2     right.

3          Q.    How common was it for the go-live date to

4     change in your experience?

5          A.    It's happened.  But I wouldn't always,

6     let's say, know about it because I wasn't there for

7     the full part of the project with the exception of my

8     EAM projects where I would get to see that more

9     directly play out.  But if I was tasked on a specific

10    project, a project manager could mention to me, like,

11    you know, they've had to delay their go-live because

12    they feel that they're lacking training in the

13    certain area, I'm bringing you on site so you can

14    provide them this additional training so they can

15    move a step in the stage closer to go-live.

16         Q.    Were you aware of any time when a go-live

17    date was accelerated to be faster than it was

18    originally planned?

19         A.    I guess it could have happened.  I -- I

20    can't recall any direct examples.  But most of that

21    initiative is pushed from the client.

22         Q.    Did you ever reach out to a project manager

23    and recommend that the go-live date be changed?

24         A.    No.

25         Q.    Would it surprise you if other

                                          Page 154

1    implementation consultants did reach out to project

2    managers and make suggestions about the go-live date?

3         A.    It wouldn't surprise me.  But, really, the

4    decision and everything around the go-live date was

5    at the hand and tasked the hand and -- and really in

6    the control of the project manager.  The project

7    manager could reach out to the consultant and say,

8    you know, I need them to have -- to be fully trained

9    on this area in order to be live, do you think that

10   you accomplished your goals, that they are 100

11   percent trained and capable to perform that

12   certain -- you know, working in this certain program

13   in order to go-live, you know, if not we're going to

14   have to change the go-live date.

15        Q.    At any point while you were working as an

16   implementation consultant did you work on an

17   implementation and think to yourself I think the

18   go-live date needs to be postponed?

19        A.    I may have thought that, but the push is

20   always get the customer live, get the customer live.

21   And it's one of those, like, push them over the edge,

22   like, you know, even if I thought that, my goal was

23   to meet the agenda or task at hand provided by the

24   project manager, because that's what they wanted for

25   the project, that's what they had planned, that's

Page 155

1     time is approximately 4:34.

2         Q.    (BY MR. CORRELL)  Mr. Kudatsky, one last

3     point I want to address before moving on to some

4     other topics.

5                    Several times today you've made

6     reference to tracking and reporting that was

7     happening while you were on site as an implementation

8     consultant; did I understand that correctly?

9         A.    Correct.

10        Q.    And part of the purpose of that tracking

11    and reporting was to allow project managers to know

12    whether things were going well or going poorly,

13    correct?

14        A.    Correct.  Also --

15        Q.    How did you -- go ahead.

16        A.    It's more than just well or poorly.  One is

17    document everything that was happening on site for

18    any future reference.  If -- the client may have

19    asked for something to be done or had -- let's say,

20    we've gone through and they said, I'm happy with

21    this, we're ready to move forward but later they tell

22    the project manager I was not happy about that and

23    was not ready to move forward then this is a -- you

24    know, basically, like a CYA for me that I acted

25    accordingly, and a resource and a backup for the

                                          Page 157

1    client -- or for the project manager to say here's

2    what happened.  This also allows them to track the

3    progress.  So I would put them in, like, all agenda

4    items completed or not completed or need -- you know,

5    like need to finish last, you know, three bullet

6    points on next week's session, or whatever it is, and

7    that would then -- that's something that the -- any

8    consultant going into a, you know, new session the

9    following week he would review that to see what

10   happened last week and what's outstanding.

11       Q.    So walk me through a typical week as an

12   implementation consultant.  Your -- your -- your

13   standard schedule was Monday to Friday, correct?

14       A.    Correct.

15       Q.    What did you do on Monday?

16       A.    Monday I -- Mondays, generally, like was

17   known as travel day, but starting with answering any

18   e-mails that need to be addressed, any planning that

19   I need in terms of, like, I have to figure out where

20   I need to be on site, when -- you know, so that

21   information could be provided to me from the project

22   manager, or the project manager could say, hey, you

23   need to get in touch with so-and-so person and, you

24   know, they're your point of contact for the week,

25   finishing any tasks from the following week, doing

Page 158

1    any -- finishing expense reports, finishing any site

2    reports, studying and preparing for the upcoming

3    week, which, generally, I would have also started the

4    week prior, but wasn't always the option or case, and

5    then I would actually travel.  And travel,

6    oftentimes, consumed the majority of that day.

7         Q.    Did you study while you were traveling?

8         A.    If I had the abilities to.  But Tyler did

9    not compensate for in-flight WiFi or Internet, so if

10   I had some downloaded documents, resources, anything

11   I can work on offline I could do that on the plane,

12   but if it was something I needed, you know, to access

13   for then I did not have the ability to do that.

14        Q.    Would you say you mostly worked on the

15   plane or you mostly didn't?

16        A.    I mostly worked on the plane.

17        Q.    What did you work on?

18        A.    Site reports.  Which, again, those -- for

19   me those could have been seven, ten, 12 pages,

20   sometimes only a couple of pages, but site reports,

21   studying, reviewing documentation, which, again, if

22   I -- while I was home downloaded them from the

23   project library where I can review and study those

24   there.  I can put together parts of my expense

25   report.  Those are just some of the examples I can

Page 159

1    recall.

2        Q.   So what, generally, went into a site

3    report?

4        A.   Anything and everything that happened on

5    site that week, so every agenda item that we covered,

6    any question that was asked and any answer that I

7    gave.  Or, again, you know, I'd be expected to

8    document if someone in the room, like if functionally

9    one person asked another person a question about a

10   certain decision or a certain outcome, or is that

11   what we want to see, I would document all

12   basically -- almost like a -- not really a

13   transcript, but like sometimes it would be this

14   person asked this person, this is the decision that

15   they made, or sometimes they would literately -- like

16   our project managers would, again, encourage and

17   guide us to be as detailed as possible, so so-and-so

18   left the room at 3:30 p.m., meaning earlier than when

19   the session was to end.  So really just documenting

20   every -- anything and everything.  You know, if I was

21   to make -- run into an issue I could say at 11:30

22   a.m. the invoice entry program was not functioning

23   correctly, client asked to move on, I will be opening

24   a support ticket during lunch, for example.

25       Q.   Were you keeping these notes in realtime or

                                          Page 160

1    did you just do this from memory after you got back?

2         A.    That varied.  Some clients -- my goal was

3    to be doing part of the notes in realtime, but most

4    clients did not like when a consultant was on their

5    laptop working on something else.  It's site report,

6    and then, essentially, they would know what it is,

7    but many times clients, if you were on site, they

8    wanted that, you know, undivided attention face to

9    face and not you kind of typing away.  Some of them

10   considered it a distraction.

11        Q.    So Monday you're doing -- go ahead.

12        A.    And so, you know, lunchtime after work was

13   also times when I'd be continuing to update my site

14   report.

15        Q.    But all you're doing is reporting

16   information, correct?

17        A.    Correct.

18        Q.    You're not composing anything that

19   expresses opinions, analysis, anything of that

20   nature?

21        A.    Correct.  You were just documenting what's

22   happening.

23        Q.    So how long did it take you to write a site

24   report?

25        A.    It could take anywhere from, you know, one

Page 161

1      Q.    But I'm asking what was typical.  Not for

2    (unintelligible).  Just -- just an average.

3      A.    That -- that -- that is a large time

4    average.  We were traveling home on Thursday night.

5    I would say 85, even more like 90 percent, of my

6    travel was done Thursday night rather than Friday

7    morning.

8      Q.    And then how many hours would you say you

9    worked on a typical Friday?

10     A.    Eight to ten hours.

11     Q.    So your sworn testimony today is that on

12   the low end you worked 56 hours per week on the low

13   end?

14     A.    Yes.

15     Q.    And on the high end it could be well over

16   60?

17               MR. BROME:  Sorry.  Did you say 56 or

18   50 to 60?

19               MR. CORRELL:  Fifty-six.

20               MR. BROME:  Thanks.

21     Q.    (BY MR. CORRELL)  Did you work on Saturdays

22   and Sundays?

23     A.    When -- you could say when needed or

24   when -- when the situation arose.

25     Q.    How -- and on average, over the course of

Page 178

1    your tenure, how -- how many hours per week would you

2    say you worked on the weekend?

3         A.    Four -- maybe four to six.

4         Q.    Every weekend on average?

5         A.    Every weekend.  Again, a lot of, you could

6    say, prep work for the following week would often

7    start on a Sunday night.

8         Q.    So then your testimony actually is that you

9    averaged 60 to 62 hours per week on the low end?

10        A.    Yes.

11        Q.    And that was true every week, week after

12   week, from the time you started in July 2016 until

13   you quit in March of 2019?

14        A.    Correct.

15        Q.    And you believe this was typical of other

16   implementation consultants?

17        A.    I would say at least 50 hours per week like

18   at a -- you could almost say as a base.

19        Q.    What work did you do on Fridays?

20        A.    Fridays.  So if we were assigned with a

21   different client or a client we would do a half

22   billable day so that would be -- what is that -- 8:30

23   to 12:00 is usually how that would be.  And then

24   finishing with anything that was in that week, which

25   again, resolving [SIC] on open support cases, sending

Page 179

1    e-mails, doing expense reports, those also, again,

2    took up usually a couple of hours on average, expense

3    reports, time sheets, again, planning for that

4    following week, which oftentime [SIC] poured into the

5    weekend.  So, you know, usually, like I said, one to

6    two weekends a month for sure had that, you know,

7    couple of hours of work.

8         Q.    When you worked with the client or at a

9    client's site --

10        A.    Uh-huh.

11        Q.    -- where did you work from?

12        A.    Reno, Nevada as my primary residence, or if

13   I was staying anywhere for the weekend we had the

14   flexibility to -- let's say I was working in

15   California I could stay the weekend with my family; I

16   was working in Texas, I can stay the weekend there.

17        Q.    So did you work from homes and hotels or

18   did you go into a Tyler office on those days?

19        A.    Homes and hotels.

20        Q.    Did you ever go in to work at a Tyler

21   office on any kind of regular basis?

22        A.    No.

23        Q.    How were you supervised when you weren't

24   working at a client site?

25        A.    I would say communication with my project

Page 180

1            THE WITNESS:  So the majority of the

2    time I was traveling back to my residence in Reno,

3    Nevada.  And it was also reflected based on what was

4    entered per, what do you say, in our expense reports,

5    and that's what calculated whether you got that or

6    not.

7        Q.    (BY MR. CORRELL)  So there were occasions

8    where you put in your expense reports that you were

9    residing in California at the time of the work so

10   that Tyler would know not to pay you a travel

11   premium?

12       A.    If you billed -- it was based on putting

13   mileage in there, so if I put in travel miles and I'm

14   putting into Reno 220 miles [SIC].

15       Q.    Well, and that's what I'm asking.  When you

16   put in the mileage were you putting in the mileage,

17   wherever you were, as calculated from Reno or as

18   calculated from San Francisco?

19       A.    Wherever I was traveling to home that week

20   I would do honest reporting.

21       Q.    Other than salary, travel premium and

22   expertise premium did you receive any other form of

23   compensation from Tyler communication [SIC] -- or

24   Tyler Technologies?

25       A.    We received an annual bonus.

                                        Page 187

1          Q.     What was the criteria for the annual bonus,

2     to your knowledge?

3          A.     That you were not, you know, on the --

4     let's -- poor performance, and that you were there

5     for the full year, but it was some sort of percentage

6     calculated based on how, like, Tyler did overall that

7     year, based on your division or -- like, it wouldn't,

8     per se, as long as you were doing a satisfactory job

9     and you weren't on, like, a performance improvement

10    plan you were eligible for that bonus.

11         Q.     Did you receive that bonus every year you

12    were at Tyler?

13         A.     Yes, I did.

14         Q.     How much was that bonus, approximately,

15    each year?

16         A.     Say, in the $2,000 range.  One to $2,000.

17    Maybe 1,500 to two.

18         Q.     Are you aware of a position titled senior

19    implementation consultant?

20         A.     Yes.

21         Q.     What was the difference between an

22    implementation consultant and a senior implementation

23    consultant in your understanding?

24         A.     You were, essentially, given higher level

25    duties and also expected to, you could say, produce,

Page 188

1    create documentation.  I don't fully know.  That was

2    a position that was created or -- kind of later down

3    the road towards the end of my time at Tyler.  But

4    you were given higher level tasks and duties.

5         Q.    What do you mean by higher level tasks and

6    duties?

7         A.    Again, the work that you were expected in

8    terms of creating certain new documents.  I'm trying

9    to think.  You were kind of expected to lead certain

10   functions or areas.  You were kind of like the --

11   almost to a level of implementation analyst, but,

12   like, you know, the go-to, so there was -- there was

13   an additional level of work that was required.  I

14   don't know the -- I don't know what that is.  I was

15   not a senior IC and I didn't -- you know, I didn't do

16   that, so I don't fully know.

17        Q.    Perfectly fine.  And then just so you know,

18   my goal here today is just to get what you do know,

19   and if you don't know things that's perfectly okay.

20              What was the role of the

21   implementation analyst?  I know we touched on this a

22   little bit earlier, but I got the impression that

23   they're really kind of back at an office somewhere

24   available for you as a resource; is that fair?

25        A.    Correct.  Yes.

Page 189

```
 1                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2

 3   AARON KUDATSKY, Individually ) Case No.:  3:19-CV-07647-WHA
     and on behalf of all others  )
 4   similarly situated,          )
                                  ) DEFENDANT'S NOTICE OF TAKING
 5        Plaintiffs              ) DEPOSITION OF PLAINTIFF
                                  ) AARON KUDATSKY
 6   vs.                          )
                                  ) Judge William Alsup
 7   TYLER TECHNOLOGIES,          )
                                  ) Action Filed:  November 20,
 8        Defendant.              )                 2019
 9
10                REPORTER'S CERTIFICATION
11   THE STATE OF TEXAS:
     COUNTY OF TARRANT:
12
13        I, Christie L. Tawater, Shorthand Reporter in and for
14   the State of Texas, hereby certify to the following:
15        That the witness, AARON KUDATSKY, was duly sworn by the
16   officer and that the transcript of the oral deposition is a
17   true record of the testimony given by the witness;
18        That the deposition transcript was submitted on October
19   12, 2020, to the attorney for the witness, for examination,
20   signature, and to Veritext Legal Solutions, by November 11,
21   2020;
22        That the original deposition was delivered to Mr.
23   Michael A. Correll, Custodial Attorney;
24
25
                                                    Page 223
```

```
1           That the amount of time used by each party to the
2      deposition is as follows:
3           Mr. Michael A. Correll - 5 hours and 7 minutes
            Mr. Paulo McKeeby - 00:00
4           Mr. Daniel S. Brome - 6 minutes
            Ms. Abigail Diaz - 00:00
5
6           I further certify that I am neither counsel for,
7      related to, nor employed by any of the parties or
8      attorneys in the action in which this proceeding was
9      taken, and further that I am not financially or
10     otherwise interested in the outcome of the action.
11          GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this
12     the 12th day of October, 2020.
13
14
15
16
                          Christie L. Tawater, CSR, RPR
17                        Expiration Date:  12/31/2022
                          VERITEXT LEGAL SOLUTIONS
18                        Veritext Registration No. 571
                          300 Throckmorton Street
19                        Suite 1600
                          Fort Worth, Texas 76102
20                        (817) 336-3042
                          (800) 336-4000
21
22
23     Job No. 4253180
24
25

                                        Page  224
```

1    dbrome@nka.com

2                          October 13, 2020

3    RE: Kudatsky, Aaron v. Tyler Technologies

4    DEPOSITION OF: Aaron Kudatsky (# 4253180)

5         The above-referenced witness transcript is

6    available for read and sign.

7         Within the applicable timeframe, the witness

8    should read the testimony to verify its accuracy. If

9    there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                          Yours,

19                          Veritext Legal Solutions

20

21

22

23

24

25

                                        Page  225

# EXHIBIT 4

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4                        Case No.:  3:19-CV-07647-WHA

5                             Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9           Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12          Defendant.

13   _____

14

15

16

17       REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                   IAN M. ROTH

19           Taken Tuesday, October 20, 2020

20              Scheduled for 2:30 p.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297263

                                      Page 1

1        about how many different implementations would

2        you say you worked on, just ballpark figure?

3        A.   Start to finish I did two.  If you add up

4        all the rest of them, 40 to 50.

5        Q.   When you say "start to finish," what do

6        you mean?

7        A.   Start is when it's the kickoff.  When you

8        meet the client for the first time, you do the

9        analysis with them, and you take them through

10       go live of the financials.  So "go live"

11       meaning you stop entering in your old system

12       and you start entering in Munis.

13       Q.   And we're going to go through all of the

14       phases here in just a little bit, but I just

15       want to make sure I understand correctly.  So

16       there were two projects where you did every

17       phase of the implementations from beginning to

18       end, and then the rest of these would be a

19       portion or a single discrete phase?

20       A.   That's correct.

21       Q.   Would you say of the 40 to 50 that weren't

22       complete that you were typically only doing one

23       phase on a given project, or was it more of a

24       you did a piece of it with a couple of

25       different phases?

Page 23

1      Q.   So at a very high level, how would you
2      describe the job of an implementation
3      consultant?
4      A.   Boots on the ground.
5      Q.   To do what?
6      A.   To work one-on-one with the client to
7      ensure a successful go live for a product that
8      met their needs.
9      Q.   And during your tenure at Tyler, did Tyler
10     ever give you instruction on how you should
11     describe the role of an implementation
12     consultant to clients?
13     A.   Tyler described the role of an IC to us.
14     Q.   How did Tyler describe that role?
15     A.   I don't recall, except to say that what I
16     just told you is sort of engrained in my
17     psyche.
18     Q.   But do you recall any training on if
19     you're sitting on an airplane and the person
20     sitting next to you says:  Hey, what do you do,
21     here's what Tyler wants you to say?
22     A.   No.
23     Q.   And again, another high-level question:
24     In your own words, what is an implementation?
25     A.   What is an implementation consultant?

Page 27

1    Q.    No.   What is an implementation?

2    A.    With regard to Tyler?

3    Q.    Correct.

4    A.    An implementation is working with the

5    client to translate what they do into the Munis

6    software so that they can successfully transfer

7    their time on their old financial system onto

8    the Munis.   You're implementing the product.

9    You're getting them onto it.

10    Q.    And Mr. Roth, I want to run through what I

11    understand from other witnesses to be the

12    phases of an implementation.   If you disagree

13    with these phases, please say so.   I'm not

14    trying to tell you what to testify.   I'm just

15    trying to expedite the process here rather than

16    trying to solicit them from you individually.

17          So what I understand the phases of an

18    implementation to be within ERP are, number 1,

19    a fundamentals review; number 2, an analysis,

20    which is sometimes called current state or

21    future state; number 3, setup and

22    configuration; number 4, testing; number 5,

23    training, which can split for some people into

24    two categories, staff training and end-user

25    training; and number 6, go live.   Do those

Page 28

1    Q.   And you said a few moments ago that this

2    training became much more structured as the

3    organization got larger.  What changed about

4    the training based on your observations?

5    A.   I made a recommendation that they

6    introduce the shadow assignments during that

7    nine-week period.  So they added those.  I

8    believe they started providing outlines.  I

9    can't recall a whole lot, but I definitely

10   remember that the first nine weeks evolved

11   quite a bit since I had been there.

12   Q.   So this is going to sound like a dumb

13   question, but when you say "outlines," what do

14   you mean?

15   A.   I'll retract that.  I don't know.  It's

16   very vague, but I do remember talking to the

17   new onboards because as I shadowed someone, I

18   had a number of shadows as I was moving along.

19   So I remember vague conversations about that.

20   Q.   When you recommended that shadowing be

21   added to the earlier period of training, was

22   that recommendation adopted?

23   A.   Yes.

24   Q.   Who did you make that recommendation to?

25   A.   My PM, Scott Parks.

1    what you say.  Rather it was more like a
2    checklist of items that will be demonstrated,
3    and then you can check off on them and see if
4    they're satisfied.  And if they didn't, then
5    they would go back and talk to the project
6    manager.
7    Q.   So if you were working in your hotel room
8    to prepare for a fundamentals review and going
9    through this checklist and you encountered
10    something that didn't work or was wrong, what
11    did you do?
12    A.   Depends on the nature.  If it's data, you
13    can go into the back end and you can fix that
14    data.  If it's trying to convert -- what did we
15    do?  Convert a received item to something that
16    could be paid and that didn't work, you call
17    support.
18    Q.   Who attended the fundamentals review
19    presentations that you provided for the client?
20    A.   Typically the project manager is there on
21    Tyler's side, myself.  And then it would depend
22    on what module of functionality we would be
23    demonstrating.  So we would have -- how many
24    did we do?  Maybe three or four modules in the
25    morning and three or four in the afternoon.  So

Page 35

1    Q.    Did you ever do that, add your own?

2    A.    Yes.

3    Q.    Why?

4    A.    Because the way I wanted to demonstrate

5    something, that data was not in the system.

6    Q.    Did you have to go to the PM to get

7    permission to make those deviations?

8    A.    I wouldn't call them deviations.

9    Q.    Did you have to go to your project manager

10   to get permission to add your own data as

11   you've described?

12   A.    No.

13   Q.    Did you tell your project manager prior to

14   giving the presentation that you had made those

15   changes?

16   A.    They're not changes inasmuch as you're

17   adding data points.  I would always keep my PM

18   abreast of what was going on and how it was

19   going.

20   Q.    Once you completed the fundamentals

21   review, the next phase would be analysis, which

22   is sometimes called current state/future state,

23   correct?

24   A.    Yes.

25   Q.    What does that phase entail?

Page 43

1     A.   It's going through with the client doing

2     analysis of how they do their work currently,

3     the steps involved and how that would be done

4     in Munis going forward.

5     Q.   Practically speaking, your task to go do

6     an analysis for an implementation, you're

7     helping the client do this review of how they

8     do their work and the steps involved, to use

9     your testimony, what does that actually look

10    like?  What are you actually doing during the

11    three days that you're on site in a given week?

12    A.   It's more than three days, but it's just

13    multiple weeks.  We had spreadsheets where we

14    would go through.  I'm trying to visualize it

15    right now.  Ask them how procedurally they went

16    through each of the functionalities.  And we

17    mark it on the spreadsheet, which was then used

18    for future use.  And then we -- through

19    discussion we would then put down the answers

20    to what they will be doing going forward with

21    Munis.

22    Q.   So on that first part, the current state,

23    where you're asking them questions and then

24    inputting data onto the spreadsheet, are you

25    just putting in word for word what they tell

Veritext Legal Solutions
800-336-4000

```
1          you, or how -- what's actually being written
2          down in that exchange?
3          A.   Information pertinent to be used during
4          setup.  God, I'm relearning my entire job
5          there.  I hadn't thought about it for two
6          years.  Inn-keeping is a little different.
7          Q.   I can imagine.  Hopefully fewer
8          spreadsheets.
9          A.   Yeah.
10         Q.   The spreadsheet you described, and I've
11         heard some testimony on this already, could the
12         client just fill out the current stateside by
13         themselves with no input from you?
14         A.   No.
15         Q.   Why not?
16         A.   As I said, this is a basis for the setup
17         process.  So as an implementer, I understand
18         the question and what it translates to with
19         regard to the software.  That being said, at
20         times we would give the spreadsheet to the
21         client after going through if we ran out of
22         time, and then we would together review their
23         answers and correct them as needed.
24         Q.   Once you got to the future stateside of
25         the analysis phase, what were you doing with
```

Page 45

1      the information from the current stateside of

2      the analysis phase?

3      A.    So that goes to:  You're doing it this way

4      now.  Do you want to keep doing it that way, or

5      do you want to do it differently?  A lot of

6      times their current software constrained them

7      to do things a certain way and the

8      functionality of Munis would allow them

9      multiple options beyond what they were allowed

10     to do.  So then they got to consider:  Is this

11     an efficiency?  Is this something we want to

12     embrace?  Do we want to change what we've been

13     doing before?  Do we want to stay the same?

14     Q.    Did you play any role helping them make a

15     decision between the options available in

16     Munis?

17     A.    Yes.

18     Q.    What role did you play?

19     A.    They would ask questions, I would give

20     them answers.  They would --

21     Q.    What do you mean by that?

22     A.    They would say:  Well, if we did it this

23     way, what does that mean?  How would that

24     change things?  And if I saw efficiencies, I

25     would recommend them.  If the client decided

Page 46

1        not to adopt them, that's the client's choice.

2        It was not my place to tell them they had to do

3        it a certain way unless it was a functionality

4        limitation by Munis software.

5        Q.   Were you ever told by Tyler that you were

6        prohibited from making recommendations to a

7        client about one modality versus another for

8        accomplishing tasks in Munis?

9        A.   No.

10       Q.   Would you say making recommendations was a

11       pretty common occurrence to bring your work on

12       the future stateside of analysis?

13       A.   Yes.

14       Q.   Did Tyler encourage you to make any

15       specific types of recommendations between given

16       choices that might be available for a

17       particular task that needs to be performed?

18       A.   No.  Tyler as a business, no.  We did have

19       back and forth between ICs.  We had sessions

20       where we came together and worked through

21       issues.  We shared knowledge, but that's --

22       nothing that the company said:  This is what

23       you need to do.

24       Q.   And when you talk about this

25       knowledge-sharing among ICs, was that through

Page 47

1       message boards and things of that nature

2       provided through Tyler?

3       A.   No.  That was me picking up my cell phone

4       and texting someone or putting an email out to

5       the whole team:  How does this work?  Or

6       reaching out saying:  I need some tutoring on

7       this.  Who can help me?

8       Q.   During this process of helping the client

9       migrate to the future state, did the client

10      ever ask you if Munis could do something that

11      you knew it could not do?

12      A.   Yes.

13      Q.   What did you do in response to those kind

14      of inquiries?

15      A.   I would tell them that Munis can't do

16      that.  But if I saw some way to get to where

17      they wanted to go, I would help explore that

18      and see if we can get a positive answer.

19      Q.   Was there an option for clients to

20      purchase customization to make Munis do things

21      that it didn't do in its normal form?

22      A.   Yes.

23      Q.   Did you play any role in facilitating

24      those kind of changes as part of your role as

25      an IC?

```
1         A.    Facilitating, yes.
2         Q.    And now I'm going to break that down.  So
3         what did you do when a client said:  Yes, I'm
4         willing to pay to make Munis perform this task
5         that it doesn't normally do?
6         A.    I'm going to go into El Paso, Texas again.
7         They had a -- I can't remember the specifics.
8         Some way of looking at funds Tyler couldn't do,
9         Munis couldn't do.  Through a series of back
10        and forths with myself and the other financial
11        IC, we brought it back to Kevin's attention,
12        Kevin came in, we had a number of meetings
13        between the division managers.  What's her
14        name?  She and I helped answer questions to our
15        technical ability.  Kevin and -- God, I can
16        picture her.  I can't remember her name.  Kevin
17        and her and I kind of pow wow'd.  They were
18        adamant about they wanted to have that
19        functionality, couldn't live without it.  So
20        the project was put on hold.  And there were
21        negotiations between El Paso and Tyler.  And
22        that functionality came in in a later version.
23        Q.    Once you completed the analysis phase, and
24        I mean the royal you, not you personally, the
25        next phase would be setup and configuration,
```

Page 49

1      correct?

2      A.    Yes.

3      Q.    What was your responsibility in the setup

4      and configuration phase?

5      A.    Just to go into the software and with the

6      client work through those spreadsheets to

7      toggle on and off switch, put in settings.

8      It's all the back end.  Who has access to these

9      accounts, how the accounts are set up.  It's

10     all the functionality of each of the modules.

11     There's a setup screen for each of them.

12     Q.    So if you already have the completed

13     spreadsheet from the analysis phase, why do you

14     need to be with the client to do the setup and

15     configuration?

16     A.    You want to be sitting with the client

17     who's going to be owning that part of the

18     functionality of the software when you leave.

19     You want to be -- what you're doing is you're

20     setting up the system, but you're also training

21     the person who's going to be modifying and

22     manipulating the settings after the IC leaves.

23     Q.    So in that case is the reason, in your

24     opinion, that you were on site to perform that

25     task is primarily to start the training

Page 50

1          client may have paid for, such as this type of

2          conversion, or they may not have paid for.  So

3          in that discovery phase, if they decided they

4          really want to migrate this, then we kick it

5          back to the PM.  The PM goes to conversion,

6          conversion makes a quote, and that gets brought

7          back to the client.

8                    MR. CORRELL:  Okay.  I think we're

9          at a good spot for a break.

10                   (Recess 3:40-3:50.)

11         BY MR. CORRELL:

12         Q.   So Mr. Roth, when we left off, we had just

13         finished talking about the setup and

14         configuration phase.  I believe the next phase

15         in the implementation would be testing, is that

16         correct?

17         A.   Yes.

18         Q.   What is the testing phase of an

19         implementation?

20         A.   Testing is meeting out whether or not the

21         setup was done as expected, and it's more

22         training.

23         Q.   First, what exactly are you checking

24         through your tests?

25         A.   So I'm digging back here.  The chart of

Page 56

1          accounts should have been built.  The testing
2          goes and it starts with the bare beginnings of
3          the combination of the different elements of
4          the charter of accounts to make sure that your
5          accounts are what are expected.  My brain is
6          thinking about all the different other pieces
7          of this that I remember doing now.  So you're
8          building things.  You're building accounts to
9          make sure that they're behaving as expected.
10         You are then pulling the accounts into -- it's
11         amazing how quickly you lose the big scheme of
12         things.  You're bringing the accounts into
13         things like invoices and purchase orders.
14         You're running through the different processes
15         so that you're training how to use them.
16         You're seeing if the setup gained what was
17         expected.  You're going to hit bumps all along
18         the way.  And it's just testing the setup and
19         configuration through the processes to see if
20         the outcome was the desired outcome and if the
21         setup was done properly with all the different
22         elements.
23    Q.    How did you know what tests to run on a
24         given client system?
25    A.    So we have scripts for each of the

Page 57

```
 1        A.    Okay.
 2        Q.    So the next phase that we listed at the
 3   beginning of the deposition today that would
 4   come after testing would be training, is that
 5   right?
 6        A.    Yes.
 7        Q.    And I know we've talked a little bit about
 8   training along the way.  Do you make a
 9   distinction between an informal training
10   earlier in the process and this phase that's
11   actually labeled as training?
12        A.    Yes.
13        Q.    What's the distinction?
14        A.    During the prior phases before training
15   you're working with the functional leaders, the
16   decision-makers to conform, build the system as
17   desired.  There's not -- if you have a larger
18   organization, City of Berkeley; El Paso, Texas,
19   you can't have all the players in the room
20   because you'll never get anything done.  And
21   it's just not feasible.  So the training is
22   rolling it out to the functional users at
23   different levels.
24        Q.    And when you say "functional users," what
25   do you mean?
```

Page 63

```
 1      who need to be there aren't showing up, the
 2      people who are showing up are doing their email
 3      all day long or they're being called out to
 4      meetings if they're not getting it.  That's why
 5      the go-live date is so tricky.  But always if
 6      you -- if it's not working, I always go to my
 7      PM and I lean on them because that's their
 8      responsibility in terms of meeting it.
 9      Q.   When you encounter those problems and you
10      go to your PM, did you make recommendations
11      about what should be done to solve the problem?
12      A.   We would talk about it.  If it was -- I
13      mean, I wouldn't make any recommendations that
14      the PM already wouldn't know.  So it's, you
15      know, do we need to add training?  Do we need
16      to swap this out?  Is this group really on it
17      and this group isn't?  So we -- I mean, like I
18      said, I'm the boots on the ground.  I see
19      everything firsthand.  The PM comes out as
20      often as they feel necessary, maybe one week a
21      month, maybe one week every five, six weeks,
22      whatever it is.  But my responsibility is to
23      communicate to the PM what I see and have them
24      make the decisions about how they want to
25      proceed.
```

Veritext Legal Solutions
800-336-4000

1      assigned to the go-live phase?

2      A.    Those were always the most fun because you

3      see the fruition of all your work coming

4      together.  On a good go live, everyone's been

5      trained, everyone's done their practicing.  The

6      agenda is:  Go help whoever needs help.  So

7      everyone starts -- you flip the switch,

8      everyone starts processing in Munis.  And

9      depending on the size and whether it's a

10     smaller client that's in one building or a

11     larger client that's in multiple buildings,

12     you're working with the project manager on

13     their side.  And you're saying, you know:

14     Contact me if you hear something that's going

15     on.  And you're basically putting out fires and

16     answering questions.

17     Q.    Is the project manager on site with you

18     for the go live in most instances?

19     A.    It depends.

20     Q.    How often as a percentage of your

21     implementations was the project manager with

22     you for go live?

23     A.    At least 75 percent of the time.  They

24     make a great effort to be there because it's

25     a -- hopefully it's a celebration.

Veritext Legal Solutions
800-336-4000

1    Q.   What are they doing during go live?

2    A.   Moral support.  It depends on the project

3    manager.  Some are more hands-on than others.

4    If they're hands-on, then they will be putting

5    out fires the same way I am.

6    Q.   And just to clarify one thing from the

7    beginning of the day, we got your list of

8    supervisors when we first started, correct?

9    A.   Yes.

10    Q.   The project manager would change for every

11    project, correct?

12    A.   Okay.  So let me explain this a little

13    better.  Well, you probably know this, but I am

14    assigned to a project manager who's my

15    supervisor.  Each project has its own project

16    manager.  They sometimes are the same.

17    Oftentimes they aren't.

18    Q.   And I just wanted to clarify that so that

19    when we look at the transcript later when

20    you're talking about project manager in these

21    phases, it may or may not be your supervisor,

22    correct?

23    A.   That's correct.  Actually, it will be my

24    supervisor if they are the project manager of

25    that project.

Page 79

```
 1        steps more than others, or were there certain
 2        areas where you had more work than others?
 3        A.    So on the clients that I did -- I'll call
 4        it soup to nuts, the whole start to finish, you
 5        spent the time that was allotted that was
 6        determined by the contract and the two PMs.
 7        For the one-offs or the -- I'm doing three or
 8        five weeks here and I'm going to do another six
 9        weeks here over there and then I'm going to
10        have one week over here, it's hit or miss.  So
11        I can't say that I spent any more time doing
12        one phase or another because it's just all over
13        the place.
14        Q.    And then looking at implementations
15        generally, not specifically what you were
16        doing, are all of these phases pretty much
17        equal parts of the implementation process, or
18        do some take more work than others?
19        A.    By "more work," do you mean more weeks?
20        Q.    Correct.  More time.
21        A.    Yeah.  It's not five weeks to each of
22        them.  It all depends on what modules they
23        purchased.  It depends on what was negotiated.
24        It depends on the structure of the client.  It
25        varied.
```

Page 83

1       of the implementation in the site report?
2       A.    It's more observations and decision
3       points.
4       Q.    What do you mean by "decision points"?
5       A.    If the client saw some sort of
6       functionality and they changed their mind or
7       they had to make a decision to be able to
8       figure out whether they want to go to the right
9       or to the left, document it.
10      Q.    Did you make any recommendations for the
11      project manager to consider in your site
12      reports?
13      A.    No.
14      Q.    You've talked about agendas a couple of
15      times.  When would you receive the agenda for a
16      given week?
17      A.    Depends on the project manager.
18      Q.    What were the different possibilities?
19      A.    You never receive it.  In which case you
20      know what you're supposed to be working on that
21      week and you go into the library and you grab
22      the generic one and you just do it.
23      Q.    How often did that happen?
24      A.    Too often.  Once is too often.  Some PMs
25      were known to exhibit -- the behaviors of the

1      reports instead of learning the client from the
2      client.
3      Q.   I want to walk through quickly a typical
4      week.  And again, this will just be a
5      generalization.  I understand that it's an
6      estimate and that it's not going to correlate
7      to a specific week during your time with Tyler.
8      And we'll do Monday through Sunday just so you
9      know where we're going.  So on Mondays, what
10     was your typical job responsibility?
11     A.   My typical job responsibility on Monday is
12     to get to the client site safely, to get myself
13     from wherever I am to the hotel that's been
14     chosen for the client.
15     Q.   Any other job responsibilities on Mondays
16     besides travel?
17     A.   Oh, yeah.  Continually prepping for the
18     client.  If this is a week that's -- if this is
19     your first week with the client, any research
20     you haven't done, continue to do.  If it's a --
21     if you've been there the week before, make sure
22     that everything that you promised you have
23     answered.  On clients where I only had to
24     drive, I would typically use my home office for
25     a lot of that stuff.  On those clients where I

Page 93

```
 1        usually you're off site by 4:30.  Now, it's
 2        nice the client gets those breaks, but rarely
 3        does the IC because they're always trying to
 4        answer questions or deal with a support issue
 5        or the PM wants to talk to you about this or
 6        that.  So it's really -- the breaks aren't even
 7        discretionary.
 8        Q.   And the break that I am actually
 9        interested in is going to be the lunch break.
10        How often would you say that you had a lunch
11        break where you didn't work?
12        A.   Thirty-five percent.
13        Q.   And would that be an hour or less than an
14        hour?
15        A.   Oh, that I actually got the full break or
16        the break -- about 35 percent of the time I
17        would get a full break, the full hour.
18        Q.   The rest of the time, did you get partial
19        breaks, or were you working straight through
20        that hour-long lunch?
21        A.   Oh, working straight on through.  If I
22        could get out, I could get out.  If I couldn't,
23        it was done.
24        Q.   Did you --
25        A.   And then --
```

Page 96

1       13.5 hours a day would be the typical range you

2       experienced on a Tuesday?

3       A.    Yes.  And you can copy that for Wednesday.

4       Q.    Did that change over your tenure as an IC

5       as you became more experienced?

6       A.    No, because you're -- like I said, the

7       software is constantly changing and developing,

8       so you have to stay an expert on that.  And the

9       client demand doesn't really change.  So you

10      just always need to be prepping.  When you

11      become more familiar and you're getting used to

12      the tasks, then you take the time to learn the

13      next thing that's coming up.  So yeah, I might

14      be better with accounts payable.  And as I get

15      more adept at it, I don't need to learn it.

16      Instead I'm prepping other aspects.  I'm

17      learning other modules.  I'm corresponding with

18      other Tyler people.

19      Q.    What was your schedule on Thursdays in

20      terms of time you spent doing things as an

21      implementation consultant?

22      A.    So it would be the same for the morning

23      and afternoon.  In Summit County and Pleasanton

24      and a couple other places, I sometimes did a

25      half day on Friday.  So if I do a half day on

Page 100

1        Friday, my Thursday is like my Wednesday and

2        Tuesday.

3        Q.   What about when you didn't?

4        A.   Okay.  So that becomes I've got to go home

5        now.  So typically at 4:30 I'm shot from the

6        week.  So at that point I probably set up my

7        flight at a time where I would go straight from

8        the site to return -- to go and fill up -- get

9        towards the airport, fill up the gas in the

10        car, rental car, return the rental car, take

11        the shuttle back to the airport, do your TSA

12        dance waiting in line to get to your gate.  And

13        then if it's a flight, typically it's two legs.

14        And then you -- at that point you make it out

15        to your car, whether that's -- typically that's

16        a walk, not a shuttle for me.  And then you

17        drive home.  Now you're going to ask me:  Well,

18        how long is that?  I can say:  Well, it

19        depends.

20        Q.   And again, I'm just trying to get a range

21        here.  So on a Thursday when you're staying to

22        do a Friday training, you typically bill 10.5

23        to 13.5 -- or work 10.5 to 13.5 --

24        A.   Work, yeah.

25        Q.   Apologies.  I misspoke.  It's work.  On a

Page 101

1        implementations where you did every phase,

2        correct?

3        A.   I did two of those.  I did Pleasanton and

4        Summit County, Colorado.  Everything else I

5        think I've hit -- I spent a lot of time in

6        Texas.  And I got to go to the far eastern side

7        of Texas, which is exciting.  So I got to skip

8        a couple time zones.  I thought it was central.

9        I've been to Washington, Oregon, Nevada, Utah,

10       California.  Who am I missing?  Pretty much it.

11       Q.   What does your schedule look like on a

12       Friday?

13       A.   There are two types of Fridays.  There's

14       the I'm working on site for a half day, which

15       is -- and that was Summit County.  And there

16       are a couple others.  I think Bend, Oregon.  I

17       did a couple of those.  And that would be

18       working until noon and then doing that whole

19       fly thing back home.  So that would be -- I'm

20       tracking time zones.  I'm trying to remember.

21       Six to eight hours.

22       Q.   So that would put us again at 12 to 14 on

23       a Friday when you were on site?

24       A.   Yeah.

25       Q.   What about the Fridays where you were not

                                          Page 103

1    five-minute break for me to collect my notes,

2    and then I may just be ready to pass the

3    witness.

4              THE WITNESS:  Okay.

5              (Recess 5:12-5:17.)

6              MR. CORRELL:  I'm just going to pass

7    the witness.  I don't know if Mr. Brome has

8    anything or not.

9              MR. BROME:  Yeah, I just have a

10    couple quick things to follow up on.

11                   EXAMINATION

12    BY MR. BROME:

13    Q.   Mr. Roth, earlier today you said that

14    there are a million decisions in putting

15    together Munis.  Do you recall that?

16    A.   Yes, I do.

17    Q.   How many of those decisions are you

18    making?

19    A.   Zero.  These are all the client decisions

20    on how they want the software to work.

21              MR. BROME:  I have no further

22    questions.

23                FURTHER EXAMINATION

24    BY MR. CORRELL:

25    Q.   How does the client go about making those

                                      Page 112

1        decisions?

2        A.    Clarify?

3        Q.    What is the process provided by Tyler to

4        facilitate the client making those, quote,

5        million decisions?

6        A.    Asking questions.

7        Q.    Of whom?

8        A.    Of the IC.

9        Q.    And what do you do in response to those

10       questions as an IC?

11       A.    Answer them truthfully.  So if they've --

12       what happens if we put -- if we include this

13       option or not include, what happens if we want

14       to track this data or that data.  I understand

15       the functionality of the software, they don't.

16       So they tell me what they want and I assist

17       them in that type of configuration.

18                     MR. CORRELL:  I have no additional

19       questions.

20                     THE COURT REPORTER:  Danny?

21                     MR. BROME:  Nope.

22                     THE WITNESS:  Quick question.  Is

23       there going to be a transcript that's going to

24       be coming out that I get to review?

25                     MR. BROME:  Yep.  I'll give you a

Page 113

```
1                    REPORTER'S CERTIFICATE
2
     STATE OF MINNESOTA    )
3                          ) ss.
     COUNTY OF HENNEPIN    )
4
5           I hereby certify that I reported the
     deposition of Ian M. Roth on October 20, 2020, in
6    Maple Grove, Minnesota, and that the witness was
     by me first duly sworn to tell the whole truth;
7
            That the testimony was transcribed by me
8    and is a true record of the testimony of the
     witness;
9
            That the cost of the original has been
10   charged to the party who noticed the deposition,
     and that all parties who ordered copies have been
11   charged at the same rate for such copies;
12          That I am not a relative or employee or
     attorney or counsel of any of the parties, or a
13   relative or employee of such attorney or counsel;
14          That I am not financially interested in the
     action and have no contract with the parties,
15   attorneys, or persons with an interest in the
     action that affects or has a substantial tendency
16   to affect my impartiality;
17          That the right to read and sign the
     deposition transcript by the witness was reserved.
18
19          WITNESS MY HAND AND SEAL THIS 1st day of
     November, 2020.
20
21
22
23
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025


                                            Page 115
```

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 5

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4                      Case No.:  3:19-CV-07647-WHA

5                          Judge William Alsup

6    _____

7    AARON KUDATSKY, Individually and on

8    behalf of all others similarly situated,

9          Plaintiffs,

10   vs.

11   TYLER TECHNOLOGIES,

12          Defendant.

13   _____

14

15

16

17     REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                 TRAVIS E. VOID

19          Taken Friday, October 23, 2020

20            Scheduled for 10:00 a.m.

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  TX 4297303

                                    Page 1

1      Q.    Second, the court reporter is going to be

2      taking down everything we say today in a

3      written format.  As a result, there's a couple

4      of things we need to do to make her job easier.

5      The first is if you let me finish my question,

6      I'll let you finish your answer.  That way we

7      have a clear back and forth on the paper.

8      Okay?

9      A.    Understood.

10      Q.    The second thing is when you answer a

11      question, it's important that you answer

12      verbally and as clearly as possible.  So the

13      example I typically give is if the answer is

14      yes or no, you should say yes or no as opposed

15      to uh-huh, uh-uh, nodding your head or shaking

16      your head because it's very difficult for the

17      court reporter to write those things down.

18      Okay?

19      A.    Understood.

20      Q.    The third thing that's a little bit --

21      additionally if I ask a question that you don't

22      understand, whether it's a word or the entire

23      question or anything of that nature, and you've

24      already done this once or twice today, which

25      has been good, please let me know and I am

Page 9

1     happy to clarify the question.  If you don't,
2     later on when we get the transcript and it has
3     your answers, we have to assume you understood
4     the question when you answered.  Okay?
5     A.   Yes.
6     Q.   Today is a little bit different probably
7     than your last deposition because this one is a
8     remote deposition, which we're doing because of
9     the COVID-19 issues going on.  And so there's
10    two additional important things to be aware of.
11    First, unlike a normal deposition where we
12    would all be sitting in a room together and we
13    can all see each other, I don't know who is in
14    the room with you or not in the room with you.
15    So if anyone joins you today, it's important
16    that you let us know so we can add to the
17    record that they were present.  Okay?
18    A.   Understood.
19    Q.   Is anyone there with you now?
20    A.   Not in this room.
21    Q.   And if someone just passes through and
22    grabs something, that's fine.  It's really more
23    if they come in and stay for any extended
24    period of time, we need to record that.
25    A.   Understood.

Veritext Legal Solutions
800-336-4000

1    Q.   The second thing is, again, since I can't

2    observe you, you're not permitted to consult

3    documents, text messages, having things

4    delivered, having information provided to you

5    while you're testifying without me knowing

6    about it.  So if you do receive any messages

7    that you're consulting while you're testifying

8    or if you're looking at any documents while

9    you're testifying, it's important that you let

10   us know.  Okay?

11   A.   Understood.

12   Q.   Today is not intended to be a marathon

13   test.  If you need a break at any time, just

14   let me know.  I'm going to try to stop about

15   every hour to give everyone a chance to stretch

16   and go to the restroom.  The only thing I would

17   ask is if you do need to take a break and I've

18   asked a question, please finish answering the

19   question before we take the break.  Okay?

20   A.   Understood.

21   Q.   Are you under the influence of any

22   substance or do you have any illness or injury

23   that would prevent you from testifying

24   truthfully and completely today?

25   A.   No.

```
 1      Q.   Is there any other reason that you believe
 2      you would not be able to testify truthfully and
 3      completely today?
 4      A.   No.
 5      Q.   Other than specific conversations with
 6      your counsel, what, if anything, did you do to
 7      prepare for your deposition today?
 8      A.   Put it on my calendar.
 9      Q.   Fair enough.  Did you review any documents
10      to prepare for your deposition?
11      A.   I looked at the last deposition just to
12      review.
13      Q.   Okay.  Anything else?
14      A.   No.
15      Q.   Did you speak to anyone other than counsel
16      to prepare for your deposition?
17      A.   No.
18      Q.   You've been with Tyler since 2007, is that
19      correct?
20      A.   Correct.
21      Q.   Have you been employed by anyone else
22      simultaneously while working for Tyler in the
23      last 13 years?
24      A.   No.
25      Q.   What is your current job title at Tyler?
```

Page 12

```
 1       A.    Implementation consultant.
 2       Q.    Have you had any other titles during your
 3       tenure with Tyler?
 4       A.    Yes.
 5       Q.    What other titles have you had?
 6       A.    Project manager.
 7       Q.    Have you ever had the title senior
 8       implementation consultant at Tyler?
 9       A.    Yes.
10       Q.    And I understand from other witnesses that
11       senior implementation consultants don't
12       outwardly give that title to clients, is that
13       correct?
14       A.    Correct.
15       Q.    Is it your understanding, though, that it
16       is a distinct job title from implementation
17       consultant?
18       A.    Not really.
19       Q.    Is it a promotion?
20       A.    Yes.
21       Q.    And there are at least some -- and we can
22       get into these later -- differences in the job
23       tasks that senior implementation consultants do
24       versus implementation consultants, right?
25       A.    Not really.
```

Page 13

1   Q.   Okay.  In that case, let's go ahead and
2   address that now.  What's the difference in
3   your understanding between a senior
4   implementation consultant and a non-senior
5   implementation consultant?
6   A.   A non-senior would probably help a client
7   key in lots of data, whereas a senior would
8   assist in how to set it up.
9   Q.   In your role as a senior implementation
10   consultant, do you have mentoring
11   responsibilities with respect to more junior
12   implementation consultants?
13   A.   Yes.
14   Q.   Did you have those responsibilities before
15   you were a senior implementation consultant?
16   A.   Not officially.
17   Q.   What do you mean by -- first of all, do
18   you officially have those responsibilities as a
19   senior implementation consultant?
20   A.   I believe so.
21   Q.   What's the distinction you make between
22   officially having those responsibilities and
23   not officially having them?
24   A.   Actually having a document that says:
25   This is your buddy who you need to train versus

Page 14

1        having someone shadow you on a job.

2        Q.   And then one thing I have heard from other

3        senior implementation consultants is that there

4        is a task involving creating guides and other

5        documents and information that supports the

6        implementation process.  Is that something

7        that's part of your role as a senior

8        implementation consultant?

9        A.   Yes.

10       Q.   Did you have that responsibility before

11       you were a senior implementation consultant?

12       A.   Every now and then.

13       Q.   Is it more frequent now?

14       A.   Yes.

15       Q.   Can you give me a sense of how much more

16       frequent it is?

17       A.   At least monthly.

18       Q.   How much was it before?

19       A.   Probably quarterly.

20       Q.   When did you become a senior

21       implementation consultant at Tyler?

22       A.   A senior implementation consultant?

23       Q.   Yes.

24       A.   Give me a minute to think of the dates

25       from project management to senior implementer.

Veritext Legal Solutions
800-336-4000

```
 1          That was -- I've got to think in terms of my
 2          children being born.
 3       Q.    Sure.  Take your time.
 4       A.    Seven years.
 5       Q.    Okay.  So that would be around 2013 you
 6          would say you became a senior implementation
 7          consultant?
 8       A.    Yes.  2013, 2014, somewhere around there.
 9       Q.    When were you a project manager?
10       A.    2012.
11       Q.    So just in that one-year block?
12       A.    Yes.  2012-2013.
13       Q.    And just so I make sure I have the full
14          timeline correct, so you joined in 2007 as an
15          implementation consultant, 2012 into 2013 you
16          were a project manager, 2013 onward you've been
17          a senior implementation consultant through the
18          present?
19       A.     It would probably be 2014-'15 because
20          there was a lag time between project management
21          to senior.  So it was implementation, project
22          manager, implementation consultant, then
23          senior.  So that's why the timeline is kind of
24          hazy from project management to senior.
25       Q.    Why did you go from project management
```

Page 16

1        back to implementation consultant?

2        A.    I like training.

3        Q.    So you just wanted that job function more

4        than the project manager after you had some

5        experience with it?

6        A.    Right.

7        Q.    So with each witness, I'm trying to make

8        sure I'm using the terms that you use to

9        describe Tyler's organization structure.  So

10       the way I understand it is at the top level we

11       have divisions.  That's things like ERP, Local

12       Government, Appraisal and Tax.  Below that we

13       have within ERP two big subdivisions,

14       Financials and Human Capital Management.  And

15       then below that we have modules.  Is that the

16       correct structure based on your experience at

17       Tyler?

18       A.    Yes.

19       Q.    What divisions have you been assigned to

20       work in during your time at Tyler?

21       A.    Just ERP.

22       Q.    And within ERP, have you worked in both

23       Financials and Human Capital Management or just

24       one of them?

25       A.    Just Financials.

Veritext Legal Solutions
800-336-4000

1      Q.   And I have a copy of your résumé.  We'll

2      probably use it as an exhibit later.  But I

3      know it lists a whole bunch of modules, so I'm

4      not going to make you list them all.  Are there

5      modules within ERP Financials that you have not

6      done?

7      A.   Yes.

8      Q.   Do you have a sense of how many there are

9      that you have not worked on?

10     A.   At least three.

11     Q.   Can you tell me which three you haven't

12     done work on?

13     A.   Performance [unintelligible] budgeting,

14     work orders, if that really falls under

15     Financials, and any of the general revenue that

16     would fall under Financials outside of accounts

17     receivable.

18     Q.   Over the last four years, who have been

19     your supervising project managers?  And I don't

20     mean the project managers for the projects

21     you've worked on, I mean your actual designated

22     supervisors.

23     A.   Amy Butts, Kathy Pelletier.  I've had a

24     lot.  Lee Kaylor.

25     Q.   And we'll come back at our first break and

1      help the court reporter with the spellings on

2      some of those names because I know it's a

3      little bit hard to get that over the remote

4      setup right now.

5          In terms of rough breakdown, can you give

6      me a sense of when each of those people were

7      your supervisor over the last four years just

8      by year?  Doesn't have to be month.

9      A.   Okay.  Lee Kaylor from -- oh, gosh.  No,

10     not Lee.  Amy Butts first for about a year and

11     a half, then Lee Kaylor, I believe, because I

12     had my accident, then I've been with Kathy

13     since 2019.

14     Q.   That is close enough for our purposes

15     today.

16         You mentioned when you were going through

17     the list there that you had a lot of different

18     supervisors.  Is there any particular reason

19     you've moved between supervisors?

20     A.   They -- either they get promoted and do

21     other sites where I was mostly at the other

22     places -- that's pretty much been the gist of

23     it.  Never had internal conflicts.

24     Q.   And you mentioned as well that there was a

25     period where you had an accident of some sort.

Page 19

1      on leave?

2      A.   I was on leave.

3      Q.   Over the last four years -- again, I'm

4      really just asking for an estimate here, I know

5      this is not going to be something you can

6      precisely identify -- how many different

7      implementations would you say that you have

8      worked on?  So between 2016 and the present.

9      A.   At least four or five.

10     Q.   So when you're working on an

11     implementation then, are you typically only

12     doing one phase of the implementation, multiple

13     phases, or are you doing the implementation

14     from start to finish?

15     A.   I'm not sure I understand your question.

16     Q.   Sure.  Let me ask it a little bit

17     differently.  How many weeks of your time is

18     being spent on a given implementation?  What

19     I'm getting at is:  Are you working on them

20     consecutively for months, are you bouncing

21     between them, that kind of -- I'm just trying

22     to get a sense of the structure of your work.

23     A.   I bounced between projects up until I got

24     in the school site.  Before that, I bounced

25     between at least two or three projects at a

Page 21

1          consultant to people outside of the company?

2          A.   Not that I can recall.

3          Q.   Have you ever had occasion to describe

4          your job to strangers, so someone on an

5          airplane that asks you what you do or something

6          of that nature?

7          A.   Yes.

8          Q.   In those circumstances, how do you

9          typically describe your job?

10         A.   I'm a software trainer.

11         Q.   Within the Tyler framework, what is an

12         implementation?

13         A.   Within the Tyler framework, what is an

14         implementation?   Client buys software, needs

15         to use it before a certain date, so we showed

16         them options that they [unintelligible] and

17         help them work through processes.

18         Q.   Because we have some prior depositions, we

19         have some information here that I can use as a

20         framework rather than trying to elicit it all

21         from you.  So I want to run through what I

22         understand the phases of implementation to be

23         based on what I've heard from other witnesses.

24         If you disagree, please say so.  I'm not trying

25         to make this your testimony.  I just want us to

Page 24

```
1       A.   Currently, Kathy does.
2       Q.   In your experience, has there always been
3       a fundamentals review script available for you
4       to use for this process going back to the
5       beginning of your employment with Tyler?
6       A.   No.
7       Q.   When did that change?
8       A.   Fundamentals review may be five or six
9       years old maybe.
10      Q.   And when it was first begun five to six
11      years ago, did it still have the same materials
12      you've already testified to to inform your
13      ability to present?
14      A.   The materials have changed drastically
15      over the years.
16      Q.   How so?
17      A.   It's evolved.  It could have been Word
18      documents before.  Now they're more
19      spreadsheets.  And they keep evolving with the
20      software training.
21      Q.   So you've mentioned a review script.  Do
22      you know how that was created in the first
23      instance?
24      A.   How it was created in the first instance?
25      I know as senior implementers we tweaked some
```

```
 1        stuff that was existing.
 2        Q.   Mr. Void, did you personally participate
 3        in revising the script or tweaking it to use
 4        your term?
 5        A.   Yes.
 6        Q.   Can you tell us a little bit about your
 7        efforts in revising or tweaking the script?
 8        A.   We were put into groups to review what was
 9        existing and modify and update it with the
10        newest changes in the software.
11        Q.   When did that take place?
12        A.   Maybe five years ago.
13        Q.   In the last five years, have you done any
14        additional work to update, tweak or revise the
15        script that you've referenced?
16        A.   Yes.
17        Q.   When is the next time that you did that?
18        A.   I'm trying to think of the last thing an
19        IC did where we worked on scripts.  Without
20        looking through my emails, I can't give you an
21        exact --
22        Q.   Sure.
23        A.   -- [unintelligible] before this year.
24        Q.   Is it something that you do on a recurring
25        basis up to the present?
```

Veritext Legal Solutions
800-336-4000

1       A.    Yes.
2       Q.    How many times a year would you say you're
3       tasked with working on revisions to the
4       fundamentals review script?
5       A.    At least twice a year, maybe more
6       depending on how many modules we have to
7       complete.
8       Q.    When you performed that work, you said
9       that it was done in groups, correct?
10      A.    Yes.
11      Q.    Are there people other than senior
12      implementation consultants within those groups?
13      A.    Not that I'm aware of.
14      Q.    How do you go about deciding what to
15      change and what to update in the script?
16      A.    We don't decide.  We go off of the release
17      notes.
18      Q.    Can you explain that to me a little bit
19      more?
20      A.    So if the software is upgraded and there's
21      release notes, if the document doesn't have
22      what's in the upgrade, that's what we have to
23      add to the document.
24      Q.    Do you have a sense of why that task is
25      performed by senior implementation consultants

Page 30

1    Q.    Has a client ever asked you:   What should

2    I do with respect to one of these choices?

3    A.    They have, yes.

4    Q.    What do you say in response?

5    A.    "What do you feel is best?"

6    Q.    So your testimony is you have never made a

7    recommendation to a client on which option they

8    should select ultimately as part of future

9    state?

10   A.    I wouldn't say I've never made a

11   recommendation, but I have presented multiple

12   options and given them multiple outcomes for

13   them to make a better decision.

14   Q.    And I understand that piece.  I totally

15   understand the information you're presenting.

16   What I'm trying to determine is the extent to

17   which you play any role at all in their actual

18   decision-making process by providing a

19   recommendation.  So from your answer a moment

20   ago, it sounded like you have on some occasions

21   made a recommendation to a client in the past,

22   is that correct?

23   A.    I've offered multiple solutions for them

24   to make a choice.

25   Q.    Have you ever expressed to a client that

1      you believe one of those solutions was better

2      suited to them than others?

3      A.    Not that I can recall.

4      Q.    Are you prohibited from doing that?

5      A.    Am I prohibited from doing that?  I'm not

6      sure.

7      Q.    So if a client was working with you and

8      directly said:  Come on, Mr. Void, there's

9      three choices here, I don't know which one to

10     pick, really what's the best choice, your

11     answer would be to not give them a

12     recommendation on which of those three to

13     select?

14     A.    My answer would be to show them the

15     results of each three and let them decide which

16     result they want.

17     Q.    Would it surprise you if other

18     implementation consultants were to testify that

19     they did provide recommendations in this

20     process?

21     A.    It would not surprise me.

22     Q.    I'm sorry.  I don't think we got your

23     answer there.

24     A.    It would not surprise me.

25     Q.    Why do you say that?

Veritext Legal Solutions
800-336-4000

1    A.    Not all of us do it the same way, but I

2    have seen how others could have made

3    recommendations and it comes back to bite them,

4    so I steer clear of making recommendations.

5    Show them what's available.  Let them decide.

6    Q.    What's an example of what you've just

7    described of someone making recommendations and

8    it came back to bite them?

9    A.    If they made a recommendation on how to do

10   a process because of another setting that could

11   have made that option available and this client

12   can't do that because they don't have that

13   setting available.

14   Q.    When you're going through this process, do

15   customers ever ask you if Munis can do

16   something and you know that Munis doesn't have

17   the current capability to perform that task?

18   A.    What's your question?

19   Q.    Sure.  Have you ever had an instance where

20   a client said to you:  Can Munis do X, X being

21   any given task that they would want Munis to

22   do, and you know Munis cannot do that task?

23   A.    Is there a question with that?

24   Q.    Yes.  Has that ever happened to you?

25   A.    Yes.  I would say yes.

Veritext Legal Solutions
800-336-4000

1        is does your modality change, the way you

2        approach the client, the way you ask questions

3        or present the information?  Does that vary at

4        all from client to client?

5        A.    There would always be variances.

6        Q.    So what types of variations do you utilize

7        in training clients between different

8        implementations?

9        A.    Not sure I understand the question.  What

10       types of -- I'm not sure I understand the

11       question.

12       Q.    How do they vary?

13       A.    A lot of stuff can depend on the mood of

14       the client, how resistant they are to learning

15       or how receptive they are to the information.

16       So if the client is you want to say, like, a

17       quick study, then it's like you can kind of

18       move a little further along with the sessions,

19       get the questions answered timely.  But if the

20       client is resistant to the change and not

21       really wanting to answer questions, you can get

22       stuck on topics just almost repeating the same

23       thing.  And it's like:  Okay.  What's another

24       way I need to say it?  This is what it does.

25       Q.    Do you do anything different in your

Page 67

1        teaching?

2        A.    How do I know we've completed training?

3        Q.    Let me ask that differently.  How do you

4        decide it's time to move on to the next topic

5        in training, if you do?

6        A.    During my trainings I constantly ask:

7        Does that make sense?  Does that make sense?

8        And that kind of gives me the go-ahead for the

9        next topic.

10       Q.    The last phase of an implementation is go

11       live, correct?

12       A.    Correct.

13       Q.    What does go live entail?

14       A.    For financials, it's pretty much if they

15       can write a check to a vendor, they're live in

16       a nutshell.

17       Q.    So if you have been assigned a go-live

18       week of an implementation, what are you as an

19       implementation consultant doing?

20       A.    I am assisting in errors with roles,

21       errors with workflow, anything that pops up,

22       kind of facilitating or being a facilitator

23       between support and the client because they

24       have not been transitioned to support yet, so

25       there's a lot of support calls for different

Page 71

```
1        issues that pop up when users are entering
2        data.
3        Q.    How is the go-live date determined?
4        A.    Generally that's determined on the
5        contract initially when they're going to go
6        live.  And that's put in the project plan.
7        Q.    Does the go-live date ever change?
8        A.    Yes.
9        Q.    What kinds of things can cause changes in
10       the go-live date?
11       A.    COVID.  Could be changes in end users,
12       functional leads, people changing jobs, people
13       quitting, new hires coming on, things like
14       that.
15       Q.    Have you ever made -- actually, have you
16       ever contacted a project manager to tell them
17       you were concerned that the client wasn't going
18       to meet the go-live date?
19       A.    I have not.
20       Q.    Are you aware of other implementation
21       consultants doing that?
22       A.    I'm not aware of them doing it.  Project
23       managers usually tell us that during, like,
24       they've had calls with the client and the
25       client is pushing them to say:  We want to
```

Page 72

```
 1        configuration, go lives.
 2        Q.   So not a lot of end-user training, not a
 3        lot of testing and not a lot of --
 4        A.   I left out testing.  Lots of testing.  Not
 5        a lot of end-user training.  Lots of
 6        troubleshooting.
 7        Q.   What do you mean by "troubleshooting"?
 8        A.   A client -- I get calls for a client that
 9        was at a go live, couldn't print checks, so we
10        get scheduled a day or two days to help them
11        figure out what's going on with that.  So I had
12        that a lot over the last four years.
13        Q.   What about the current state/future state
14        analysis?  I didn't hear that in your list.
15        A.   Yes.  Current state/future state, I get
16        that a lot.
17        Q.   Are there any one of the phases that you
18        mentioned that you worked on that you have done
19        more than others?  I'm just trying to get a
20        sense of if there is any kind of specialization
21        or if there is any kind of concentration of
22        specific work types given to you.
23        A.   I wish there was, but I wouldn't say there
24        is a concentration of one given to me
25        specifically.
```

Page 76

1      Q.    You're on site with a client typically for

2      about three days in a given week, correct?

3      A.    Typically.

4      Q.    And we'll go into your schedule in more

5      detail later.  Over the course of a given

6      three-day on-site week, how many times are you

7      typically reaching out to your project manager

8      to ask questions?

9      A.    Depending on the client, could be once a

10     week, could be two or three times, could be

11     each day.  So it depends on the client.

12     Q.    What kinds of things are you reaching out

13     for to your project manager about while you are

14     on site with a client?

15     A.    Client attitudes, their morale for the

16     project, their drive for the project so they're

17     aware of how the client is absorbing the

18     information.

19     Q.    Is your project manager ever on site with

20     you?

21     A.    Yes.

22     Q.    How often is your project manager on site

23     with you?

24     A.    Not often.  Mainly at go lives.

25     Q.    What's the project manager typically doing

Page 77

1    Q.   Do you ever travel home on Thursday

2    nights?

3    A.   I have.

4    Q.   In the last three to four years?

5    A.   Not often in the last three to four years.

6    It's typically Friday mornings or Friday night

7    depending on if I got booked on Friday.

8    Q.   So for Thursday you would again say ten to

9    11 hours a day spent doing implementation

10   consulting tasks?

11   A.   Correct.

12   Q.   What about Friday?  What's your typical

13   schedule on Friday?

14   A.   Friday, if I am not traveling, that's

15   again filling out time sheets, completing site

16   reports, following up on any parking lot

17   issues, any support tickets that we put in.

18   Doing a lot of follow-up on Fridays.

19   Q.   And so you said if you're not traveling,

20   but my understanding from your testimony a

21   moment ago is most Fridays you're getting up

22   Friday morning and traveling and then doing

23   those tasks, is that right?

24   A.   Correct.

25   Q.   And then on other Fridays you would be

Page 90

1        booked with a client on Friday morning and then

2        you would travel home?

3        A.    Correct.

4        Q.    So on the ones where you travel on Friday

5        morning, about how many hours during that day

6        including the travel would you say that you're

7        engaged and doing implementation consulting

8        things?

9        A.    So you said including the travel?

10       Q.    Yes.

11       A.    That would be almost like my Mondays.

12       Probably, like, an eight to nine-hour day.

13       Q.    And how do you break that out between

14       travel and other work that you're doing?

15       A.    How do I break that out between travel --

16       Q.    The eight to nine that you just estimated,

17       how much of that is typically travel and how

18       much of that are the tasks that you described?

19       A.    So depending on the site, travel would be

20       anywhere from four to maybe five hours

21       traveling depending on the site.  And then

22       another four doing all the follow-up; four to

23       five maybe doing the follow-up.

24       Q.    What about on the days where you do a

25       session with the client on a Friday, what are

Page 91

1        just to finish it.

2        Q.    And so just to do the math here, with an

3        8:30 to 4:30 with the client, minus an hour for

4        lunch would be seven hours, and you've said

5        four to five hours to get home, so that would

6        be the 11 to 12-hour range on days when you're

7        working with a client on a Friday?

8        A.    Correct.

9                  MR. BROME:  Objection, misstates his

10       testimony.

11       BY MR. CORRELL:

12       Q.    What about weekends?  How often do you

13       work on weekends?

14       A.    I try to avoid it.  If I have time sheets

15       or anything that's pressing, if I had to put a

16       time to it, once or twice a quarter I might

17       have to do something on Saturdays or a Sunday.

18       Sundays could be preparing for the next week.

19       Saturday, just finishing up if I had a full day

20       on a Friday.

21       Q.    On the one or two weekends a quarter that

22       you're doing work on the weekend, about how

23       many hours would you say you're doing?

24       A.    I try to spend no more than two hours when

25       I have to.

Veritext Legal Solutions
800-336-4000

1                    REPORTER'S CERTIFICATE
2
     STATE OF MINNESOTA    )
3                          ) ss.
     COUNTY OF HENNEPIN    )
4
5           I hereby certify that I reported the
     deposition of Travis E. Void on October 23rd,
6    2020, in Maple Grove, Minnesota, and that the
     witness was by me first duly sworn to tell the
7    whole truth;
8           That the testimony was transcribed by me
     and is a true record of the testimony of the
9    witness;
10          That the cost of the original has been
     charged to the party who noticed the deposition,
11   and that all parties who ordered copies have been
     charged at the same rate for such copies;
12
            That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
            That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the
16   action that affects or has a substantial tendency
     to affect my impartiality;
17
            That the right to read and sign the
18   deposition transcript by the witness was reserved.
19
            WITNESS MY HAND AND SEAL THIS 6th day of
20   November, 2020.
21
22
23   *Dana Anderson* (signature)
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025

                                        Page 110

1     Mr. Daniel S. Brome, Esq.

2     dbrome@nka.com

3                         November 6, 2020

4     RE:    Kudatsky, Aaron Et Al. v. Tyler Technologies

5          10/23/2020, Travis Void (#4297303)

6          The above-referenced transcript is available for

7     review.

8          Within the applicable timeframe, the witness should

9     read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    errata-tx@veritext.com.

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                      Yours,

23                      Veritext Legal Solutions

24

25

                                        Page 111

1    Kudatsky, Aaron Et Al. v. Tyler Technologies

2    Travis Void (#4297303)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Travis Void                                    Date

25

                                         Page 112

1    Kudatsky, Aaron Et Al. v. Tyler Technologies

2    Travis Void (#4297303)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Travis Void, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Travis Void                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

                                        Page 113

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.


DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 6

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3

4    _____

                                    )

5    Aaron Kudatsky, individually and )

     on behalf of all others similarly)

6    situated,                       )

                                      )

7              Plaintiff,            )

                                      )

8    vs.                             ) No. 3:19-CV-07647-WHA

                                      )

9    Tyler Technologies,             )

                                      )

10             Defendant.            )

                                      )

11   _____)

12

13

14         30(b)(6) DEPOSITION OF CHRISTOPHER WEBSTER

15                  North Yarmouth, Maine

16              Thursday, September 10, 2020

17                       Volume I

18

19

20

21   Reported by:

     CATHERINE A. RYAN, RMR, CRR

22   CSR No. 8239

23   Job No. 4245365

24

25   PAGES 1 - 166

Page 15

1    the conversion and the forms, the checks and bills and

2    anything that would be output in that manner.

3        Q    Did you have any employment before working at

4    Tyler?

5        A    Yes.

6        Q    Can you summarize that for us?

7        A    I worked for Kiewit construction company as a

8    business manager, performed back-office payroll

9    purchasing-type activities.

10       Q    About how long were you with them?

11       A    One year.

12       Q    Anything else?

13       A    Prior to that, I worked in college.

14       Q    Okay.  You understand that we're here today in

15   the case of Kudatsky versus Tyler Technologies?

16       A    Yes.

17       Q    Do you have an understanding of what this case

18   is about?

19       A    Yes.

20       Q    And what's that understanding?

21       A    That there is a dispute around whether or not

22   the Implementation Consultant position is a salaried or

23   hourly position.

24       Q    So what is Tyler Technologies in the business

25   of doing?

Page 16

1       A    We provide software and services to

2    public-sector clients, public sectors being cities,

3    town, counties, schools.  We sell software that ranges

4    from accounting, payroll, utility billing, document

5    management, student information, pretty much anything

6    that a local government, city, town, county, school

7    government could need.

8       Q    About how many people work for Tyler

9    Technologies?

10      A    Approximately 5500.

11      Q    Are they all in the US?

12      A    No.

13      Q    Where are -- what other countries does Tyler

14   have employees in?

15      A    Philippines, Australia, South America.  I

16   believe that we have some in England.

17      Q    About how many employees are in the US?

18      A    I mean, it would be a guess.  I would say

19   probably 52-, 5300 of those.

20      Q    A substantial majority?

21      A    Yes.

22      Q    Okay.  The company is based in Texas?

23      A    The headquarters are in Texas, yes.

24      Q    Thank you.

25           What are the main groups within Tyler?

Page 19

1     A    Yes.

2     Q    Have you worked in both the Enterprise and the

3 Justice groups?

4     A    Yes.

5     Q    Have you worked as a manager in both groups?

6     A    Yes, although it was not considered the Courts

7 & Justice division at that point in time.

8     Q    So the structure that you just went through,

9 about how long has that structure been in place?

10    A    Approximately five to six years.

11    Q    Within the Enterprise group, what products do

12 Implementation Consultants work with?

13    A    Within the Enterprise group, that would

14 consist of the Munis product, Tyler content manager,

15 ExecuTime, Tyler Hub, Tyler ReadyForms, to name a few.

16    Q    And I -- I lost you a little bit.  I think

17 that you said ExecuTime?

18    A    Yes.

19    Q    Within the Justice group, what are some of the

20 products that Implementation Consultants work with?

21    A    The Odyssey products, which is case

22 management, jail, supervision, e-filing.

23    Q    I'm sorry.  When you said "jail, supervision"

24 and "e-filing," were those all functions of the Odyssey

25 products or were they separate products?

Page 20

1        A     Some would be modules within the Odyssey

2    product.   Some would be stand-alone.

3        Q     Are you familiar with the EnerGov product?

4        A     Yes.

5        Q     Do Implementation Consultants work with --

6    with that product?

7        A     Yes.

8        Q     And what division deals with the EnerGov

9    product?

10       A      That is dealt with two business organizations,

11   two business units:   The EnerGov business unit as well

12   as the Munis ERP business unit.

13       Q      Are there software products that Tyler sells

14   that don't entail Implementation Consultant work?

15       A      I believe there are some.

16       Q      Do you have any examples?

17       A      I -- I wouldn't have any specific examples.   I

18   don't have a deep understanding of some of those

19   modules.

20       Q      Just briefly, can you sort of summarize what

21   Implementation Consultants do?

22       A      They're responsible for the knowledge transfer

23   of the products that cust- -- our clients purchase.

24   They assist with the analysis and consulting of their

25   current state, the future state, also known as their

1   as-is, to-be states whereby they will understand the

2   current business flows, workflows and requirements, and

3   then help clients translate that into configuring, data

4   conversion and training of the to-be system, the system

5   that they purchased through Tyler to help achieve those

6   business flows and workflows in the business needs that

7   they have.

8       Q    And why is that role important at Tyler, or is

9   it?

10      A    It is an important role.  They -- that role

11  assists our clients in making decisions around best

12  practice decisions around configuring the software, the

13  options that they have in terms of configuring the

14  software, the pros and cons of the various options that

15  they have, helping clients understand the outcomes of

16  those -- those decisions and setup as well as ultimately

17  helping -- in some product lines, helping with the data

18  conversion mapping from their legacy system to the Tyler

19  product that they had purchased.  So those are pretty

20  key, important things to assist clients with in making

21  sure that they get the system up and running and that

22  they're able to pay employees correctly, bill citizens

23  correctly, you know, all the various job functions that

24  you can imagine that would occur at a city, town or

25  school or county.

Page 24

1    Consultant and senior Implementation Consultant?

2         A     If that structure were to exist and it made

3    sense, yes.

4         Q     At this point, is it your understanding that

5    everyone has been merged into that structure?

6         A     For the appropriate business units, yes.

7         Q     So for today, when we're talking about ERP, if

8    I use the term "Implementation Consultant," or "IC,"

9    I'll be referring to both Implementation Consultants and

10   senior Implementation Consultants unless I say

11   otherwise.

12             Is that -- is that all right with you?

13        A     Yes.

14        Q     And will you let me know if that becomes a

15   problem with any of my questions, and we can break it

16   out?

17        A     Yes.

18        Q     So how does Tyler make money?

19        A     There are a couple of key ways that we make

20   money, which are through software sales, through license

21   sales, through Software-as-a-Service subscriptions,

22   through our maintenance dollars for our on-premise

23   clients as well as revenue through training

24   Implementation project management professional

25   service-type services, as well as some other

Page 25

1    subscription-type business around payments and other

2    transactions.

3         Q    With the Munis product, is that treated as a

4    Software-as-a-Service subscription or a software sales

5    or license sales, or could it be some combination of

6    those three?

7         A    It could be a combination, yes.

8         Q    What's most common?

9              MR. McKEEBY:  Within Munis?

10             MR. BROME:  Yes.

11             THE WITNESS:  Today, the most common

12   deployment is SaaS deployment for -- for new clients.

13   Our existing clients would be on-premise, the majority

14   there.

15   BY MR. BROME:

16        Q    What do you mean by "on-premise"?

17        A    Where they host their own -- they host our

18   software on their own servers.  So it would be

19   on-premise revenue rather than a SaaS or subscription

20   fee.

21        Q    And when you say SaaS, that's S-a-a-S?

22        A    Correct, Software-as-a-Service.

23        Q    Is there a reason that Tyler is shifting to

24   the SaaS model for new clients as opposed to the

25   on-premise model?

Page 32

1    client that they should pay for additional

2    Implementation Consultant days?

3         A    Yes.

4         Q    In what circumstances?

5         A    If a consultant is working with a client and

6    they see that they're struggling in a particular area or

7    if they are understaffed in a particular area, they may

8    make recommendations to purchase additional days to help

9    augment that client in implementing the software.

10        Q    Does the Implementation Consultant have the

11   authority to approve those additional days for the

12   client, or do they just make that suggestion?

13        A    It's just a suggestion.

14             MR. McKEEBY:  Object to the form of the

15   question.

16             You can answer.

17   BY MR. BROME:

18        Q    Are Implementation Consultants able to

19   determine how many billable days they can work for a

20   given client?

21        A    Some would.

22        Q    What do you mean by that?

23        A    More senior resources will work with Project

24   Managers to help set and establish how many days that

25   they would need to work with on clients for particular

Page 33

1    modules in establishing the overall project and training

2    schedules.

3        Q    So apart from setting the overall schedule,

4    does a given -- does an Implementation Consultant decide

5    how many billable days they will work for a given

6    client, you know, in a given month?

7        A    No.

8        Q    That number of billable days is assigned to

9    the Implementation Consultant?

10       A    Yes.

11       Q    And Implementation Consultants are

12   compensated, in part, based on how many billable days

13   they work; is that correct?

14       A    Correct.

15           MR. BROME:   I'm marking Exhibit 2 in Exhibit

16   Share.

17           (Exhibit 0002 was marked for

18           identification.)

19           MR. BROME:   While you are loading that, I'll

20   represent that this is a document that was produced by

21   Tyler in discovery in this case, and it is 22 pages of

22   organizational charts.

23           So let me know when you have that.

24           THE WITNESS:   I have it open.

25   //

Page 66

1  circles -- are those telling us the number of direct

2  reports to a given individual?

3      A    I assume so, based -- I don't know what tool

4  produced this.

5      Q    So I'd like to just understand the hierarchy

6  between you, as the president of the ERP division, and

7  an Implementation Consultant.

8          So underneath you there are the vice

9  presidents?

10     A    Yes.

11     Q    And then underneath the vice president of

12 Implementation, we have the senior directors as well as

13 one director, it looks like?

14     A    And an administrative assistant, yes.

15     Q    And then under the senior directors there are

16 Implementation Directors?

17     A    Yes.

18     Q    And so then under the Implementation

19 Directors, it looks like there are Implementation

20 Consultants, senior Implementation Consultants, and

21 Project Managers; is that correct?

22     A    Yes, and Implementation Managers.

23     Q    Thank you.

24          Okay.  So who supervises Implementation

25 Consultants?

Page 67

1      A     Directly would be a Project Manager.

2      Q     Who supervises the Project Manager?

3      A     That could be an Implementation team lead, an

4  Implementation Manager, or an Implementation Director.

5      Q     What determines which of those options

6  applies?

7      A     Based on the size of the team, the type of

8  work that they're -- they're managing.

9      Q     And I'm sort of interpreting your expression

10  from that answer.

11            Is there any particular guiding principle, or

12  it's sort of somewhat ad hoc?

13      A     Somewhat ad hoc.  It primarily would be based

14  on the size of the team.

15      Q     Okay.  About how many of those Implementation

16  team leads do you think there are within Implementation?

17      A     I guess probably six to seven.

18      Q     And about how many Implementation Managers

19  would you say there are?

20      A     Probably five to six.

21      Q     Have those numbers been roughly consistent

22  over the last five years?

23      A     Those are newer roles in the last, probably,

24  two to three years.

25      Q     Is there a reason that those roles have been

Page 68

1   created?

2       A    Growth.

3       Q    Can you explain what you mean by that?

4       A    As we have sold more software, we've needed to

5   provide more services, and, therefore, we've needed to

6   have more staff to deliver those services.

7       Q    About how many Implementation Consultants are

8   there currently within ERP?

9       A    I'd estimate between 3- -- about 350 to 360.

10      Q    About how many Implementation Consultants are

11  currently serving in a temporary tech support role you

12  mentioned earlier?

13      A    Under 20.

14      Q    Were you including those 20 in the 350 to 360?

15      A    Yes.

16      Q    I think I'm going to shift gears away from the

17  organizational charts and move into sort of what

18  Implementation Consultants do.  Before we do that, can

19  you -- before we do that, I want to have you give us

20  sort of an overview of Munis, and then I think we'll

21  probably take a short lunch break.

22           So can you tell us what Munis is?

23      A    Munis is the Enterprise Resource Planning

24  software designed specifically for public-sector clients

25  to manage their finances, payroll, utility billing, tax

Page 69

 1   billing, community development departments within

 2   cities, towns, counties, local authorities, special

 3   districts.

 4       Q    And about how many clients are using Munis

 5   currently?

 6       A    Approximately 1800.

 7       Q    What is the sort of smallest chunk of Munis

 8   that a client could purchase?

 9       A    We have some clients that may have just some

10   of our financial procurement modules.

11       Q    Is it pretty uncommon to sort of just get the

12   financial module?

13       A    Yes.

14       Q    What's a more common sort of suite of modules?

15       A    The majority of our clients would own the

16   financials, the human capital management and a subset of

17   our revenue applications.

18       Q    And then are there additional add-ons beyond

19   those that some clients can elect?

20       A    Yes.

21       Q    What are some examples of those?

22       A    Content management would be one.  ExecuTime

23   could be one.  There might be subsets of modules that

24   they didn't originally purchase that are part of those

25   suites that they could purchase.

Page 75

1   they would be working with.  So, you know, if I had to

2   guess, each month a consultant -- or each year a

3   consultant may be involved with two to three over the

4   course of one to many days.

5   BY MR. BROME:

6       Q    Two to three instances of that presale work

7   per year?

8       A    Correct.

9       Q    Is it fair to say that that presale work is

10  within the scope of the Implementation Consultant's

11  duties that could be assigned by their supervisor just

12  as they could be assigned to any other client?

13      A    Yes.

14      Q    Are you familiar with the term "fundamental

15  review"?

16      A    Yes.

17      Q    What does that mean?

18      A    That's where we have -- for the Munis product,

19  we have the sandbox environment with prepopulated data

20  such that our Implementation Consultants are able to

21  take a client through a process so they are able to see

22  it with -- it may not be their data, but at least

23  workable data to understand the end-to-end process so

24  they can see the transaction going in, being processed,

25  going through various workflow approvals, making its way

1   through the various integrated components of the system,

2   as well as then making its way out through -- to an end

3   result being a report or a bill or a check.

4        Q    Is the fundamental review something that's

5   done by an Implementation Consultant?

6        A    Yes.

7        Q    Is that something that happens before there's

8   a contract or after or it could be either?

9        A    Generally after.

10       Q    And does Tyler provide specific examples of

11  the fundamental review for the Implementation Consultant

12  to conduct?

13       A    Yes.

14       Q    Does Tyler provide scripts to use as part of

15  those reviews?

16       A    Yes.

17       Q    And you said there's a sandbox environment.

18            Does that mean that there's sort of dummy data

19  that's not live data?

20       A    Correct, that it's -- it would be data that

21  would be a mock-up data set.

22       Q    And Tyler provides that mock-up data?

23       A    Yes.  There are instances where the

24  implementation itself will have to build data.

25       Q    What do you mean by that?

Page 82

1    resources, transfer resources and/or if there's been

2    attrition, not to backfill.  So it's ensuring that our

3    -- our resources are being utilized to the highest

4    degree that they are, to ensure that our -- you know,

5    our clients go -- our client project -- client projects

6    go live.

7         Q    Anything else?

8         A    That's the general highest level around it.

9         Q    I mean, I guess I'm -- we talked a little

10   earlier about how, you know, this is -- the IC role is

11   revenue-generating.  It seems like the more billable

12   days they have, the more potential revenue there is, and

13   so it would make sense to incentivize that for their

14   supervisors; is that fair?

15        A    Certainly that is a component, but the -- the

16   main driver is to make sure that the staffing levels are

17   -- are kept at the appropriate levels.

18        Q    What do Project Managers do?

19        A    Project Managers will work with the clients to

20   develop the project phasing, the project schedule,

21   determine the scope, the -- develop the various

22   management plans, being the project plan, the

23   implementation management plan, the change management

24   plan, all those various implementation project-related

25   documents that will control and guide the overall

Page 83

1   implementation.

2           They -- for Munis, they also have a number of

3   Implementation Consultants that report to them that they

4   will manage through their projects, through their

5   day-to-day activities, perform their performance

6   reviews, provide them with their regular feedback from

7   clients and other interaction that they've had with

8   other Tyler employees.

9       Q    Do the Project Managers -- I think you said

10  this.  Do they come up with a timeline for an

11  implementation project?

12      A    They will generally come up with a timeline of

13  the overall implementation schedule.  They'll do that in

14  conjunction -- in collaboration with the client, as well

15  as they will often rely on the Implementation

16  Consultants to help provide feedback in particular areas

17  if clients need to have more time in particular areas of

18  the application than others.

19      Q    And do the Project Managers come up with the

20  budget for a project?

21      A    No.  That is set at the contract signing.

22      Q    Are the Implementation Consultants expected to

23  keep to the budget and a timeline that's set for a

24  project?

25      A    They're expected to assist the Project Manager

Page 101

1    implemented previously, and so they would then get

2    assigned based on their product knowledge, their

3    availability.

4        Q    And I think, at the beginning of that -- that

5    answer, you said that it's the Project Manager who is

6    assigning the Implementation Consultant to a client?

7        A    Correct.

8        Q    How does the Implementation Consultant know

9    what modules a client is getting?

10       A    So through the contract document, there's an

11   investment summary that itemizes the various products

12   that they have purchased, and then, also, they will work

13   with the Project Manager through that planning phase in

14   terms of the scope of work and the scope of the phasing

15   in products that will be implemented in what order.

16       Q    So when you were describing the Implementation

17   Consultant duties, there's sort of some phases in the

18   implementation process.  We talked earlier about the

19   fundamental review, but I want to talk about some of the

20   other -- other parts of that process.

21            In the assessment or analysis phase, what does

22   that mean?

23       A    So during that stage, the -- where we're

24   working with that client to do that current state,

25   future state analysis where that's where we're

1   understanding their current business processes and

2   flows, understanding why they're going out to purchase

3   new software because they certainly didn't go out to

4   purchase software just to do the same thing that they're

5   doing today, so understanding what they're looking for

6   for efficiencies, understanding the requirements that

7   were documented in the -- most -- most of the time

8   documented in the RFP checklist in terms of the

9   functional requirements that the client is looking for,

10  helping them ultimately marry all of that up to the --

11  to the -- in the to-be state or future state, and then

12  walking the client through that and helping them

13  validate that -- the options and decisions that they

14  made on the desired workflow and business flows.

15       Q    And so in this stage, the Implementation

16  Consultant is gathering this information from the

17  client, correct?

18       A    Correct.

19       Q    And Tyler provides forms for Implementation

20  Consultants to fill in that required information?

21       A    For most products, that would be true.

22       Q    For which products is that not the case?

23       A    There may be some ancillary products, like a

24  -- like a Tyler business form -- excuse me -- Tyler

25  ReadyForms or MyCivic or something like that that may

Page 105

1    sort of the next big-picture stage?

2        A    Yes, configuration and conversion.

3        Q    And is that the stage where the Tyler product

4    is configured based on the information provided by the

5    client?

6        A    Yes, that's where the information from those

7    analysis processes that they've walked the client

8    through, that the system will then be configured based

9    on that, and the client would then run through and

10   validate that with the -- you know, the data as it's

11   converted and mapped to meet those business processes.

12   Oftentimes, clients will then decide that that was not

13   the desired result, and then, therefore, they will work

14   with the consultant to then figure out the other two

15   options that maybe -- that they described, or whatever

16   the case may be, to then make changes to achieve the

17   desired business results.

18       Q    During this configuration conversion, the

19   Implementation Consultants aren't coding or programming

20   Munis, correct?

21       A    Correct.  They are utilizing parameters to

22   guide the client in the various setting options that

23   they may have to achieve those desired business results

24   or educating them and training them in a new way to take

25   various steps to achieve the desired business results.

Page 106

1    Q    Is it fair to say that Munis is customizable

2   but not programmable by the Implementation Consultant?

3    A    Correct.  By the Implementation Consultant,

4   yes.

5    Q    If there were ever a situation where, in this

6   configuration and conversion stage or in testing, it

7   became apparent that there was a programming change

8   needed, could the Implementation Consultant go to

9   Tyler's software engineering team for a change?

10    A    Through a formal change request process, yes,

11   they would then work with both the client and the

12   developer, development team or teams that are involved

13   to document the desired feature or functionality results

14   and then helping the client guide them through to make

15   sure that they have considered all the various, you

16   know, options and processing points and whether or not

17   it's going to have an impact on their checks or whatever

18   it may be.

19    Q    Is that scenario in which an Implementation

20   Consultant and/or a Project Manager requests a change

21   request -- is that something that happens somewhat

22   regularly? rarely?

23    A    I'd say pretty frequently.

24    Q    Is that something that the Implementation

25   Consultant would need to involve the Project Manager in?

Page 109

1        A     Correct.

2        Q     Thanks.

3              Along with -- the data conversion

4    implementation involves some testing, right?

5        A     Of course.

6        Q     And why is that important?

7        A     To make sure that the system is set up

8    properly, making sure that the system is meeting the

9    client's desired business needs and processes, ensuring

10   that the data conversion is complete, making sure the

11   system is ready for end-user training.

12       Q     And, then, in that training, there is end-user

13   training, subject-matter-expert training as well?

14   Excuse me.

15       A     Yeah, subject-matter-expert training would

16   really be more, say, a departmental lead, somebody that

17   was, you know, higher up and responsible for the overall

18   decisions in the configuration of the modules.  And then

19   the end users, in this case, would be the -- the daily

20   heads-down data entry folks that are putting the -- you

21   know, how do I achieve my -- my job that I need -- need

22   to do every day.

23       Q     Implementation Consultants are doing that

24   training for those end users, right?

25       A     They all do the subject-matter-expert training

Page 110

1     as well as the end-user training, yes.

2          Q     The Implementation Consultant doesn't make the

3     determination of what trainings the client needs, right?

4          A     They will heavily work with the Project

5     Manager in determining those end-user training needs,

6     again, making sure that the areas that they're going to

7     need more help with, areas that they have, you know, a

8     larger staff involvement, more client staff that are

9     involved and ultimately designing the training

10    curriculum around the -- you know, what they have

11    learned through the implementation process.

12         Q     Does the contract specify how much training

13    the client gets?

14         A     No.

15         Q     Does the contract ever specify how many people

16    can attend the training?

17         A     There are some -- many contracts will have a

18    provision in there to limit the size or number of client

19    attendees in a particular -- be it a consultant session

20    or -- and/or a training session.

21         Q     Does Tyler have lesson plans available for

22    Implementation Consultants?

23         A     Yes, we have generalized training guides,

24    training plans, lesson plans.

25         Q     Are they stored in SharePoint?

Page 111

1      A    More than likely.

2      Q    Who would know if they're in SharePoint or

3    somewhere else?

4      A    I hope my vice president of Implementation

5    would or that content and document management team.

6      Q    What's -- what is the go-live stage?

7      A    So once a client system has been configured,

8    the data has been converted, the client has tested and

9    validated with our staff as well as themselves that the

10   various processes that they were looking to achieve, the

11   parallels for the pay- -- for the payroll, parallel

12   billings for utility billing, the various -- all the

13   various job functions and processes that maybe may go

14   on -- once they have validated that, they then are ready

15   to -- set for go-live, whereby the data would then be

16   converted into the production environment.

17            And then the Implementation Consultants will

18   then work with the client for any sort of final training

19   that may need to be -- occur, any refresher training;

20   ultimately, once live, any troubleshooting, any sort of

21   tweaks to -- even though -- that they've had multiple

22   points in time that they've seen certain processes, it's

23   not unlikely that they'll have changed their mind again

24   and help them reconfigure the system; educate them on

25   that; troubleshoot security and permissions that have

Page 112

1    been assigned to users; help them with reconciliation

2    activities, so their daily collections and making sure

3    that these tie out to the general ledger; doing

4    month-end processing; making sure that the generals are

5    in balance; and so a lot of reconciliation and follow-up

6    kind of final training.

7        Q    During the go-live process, the Implementation

8    Consultant should be in pretty close contact with the

9    Project Manager?

10        A    Generally, yeah.

11        Q    And also in close contact with technical

12    support?

13        A    Could be.

14        Q    Okay.  An Implementation Consultant doesn't

15    set the go-live date, right?

16        A    They wouldn't set the date, but they would

17    certainly collaborate with the Project Manager and the

18    -- and the client.  They're involved -- typically

19    involved in the go-live readiness assessment in terms of

20    either feeding the Project Manager information or, in

21    that meeting, to assess whether or not that client is

22    ready for go-live.

23        Q    We talked about the site report a bit.

24            What information should the Implementation

25    Consultant put into the site report?

Page 123

1    troubleshooting defect remediation, those types of

2    things as well.

3        Q    Implementation Consultants don't have any

4    responsibility for managing the client's business

5    affairs, do they?

6        A    Generally, no.

7        Q    Implementation Consultants aren't reviewing

8    data from Munis and making recommendations about changes

9    to a payroll process, for example?

10       A    Absolutely, they would.  If -- we often

11   have -- in particular for the Munis products, once a

12   client has been live, we'll do something called an

13   investment analysis or investment assessment whereby we

14   will come in, review their current use of the system,

15   their -- maybe they've changed their mind about things,

16   you know, two, three years later.  So they'll certainly

17   review data reporting.  You know, if they want to change

18   -- if a client is looking to change their reporting

19   structure or they're looking to change their chart of

20   accounts or something along those lines, they will

21   certainly actively work with clients to then come up

22   with a plan on how to make those changes, whether or not

23   they're going to need to convert data, whether or not

24   that they're -- what type of training that they're going

25   to need to achieve that desired result.

1    expected to then do that configuration work.

2        Q    So those Implementation Consultants do a

3    little bit less than the Munis folks?  The scope of

4    their duties is a little bit less because their clients

5    are doing more?

6        A    In the Munis model, the clients are doing more

7    of the configuration -- generally, more of the

8    configuration unless they paid for additional services

9    for the consultants to assist with more of that

10   configuration.

11       Q    Has that Tuesday-Wednesday-Thursday-maybe-

12   Friday model been sort of a consistent model over the

13   past five years?

14       A    For the Munis Implementation team, yes.

15       Q    Can you estimate how often the Implementation

16   Consultants within Munis are working that schedule?

17       A    I would say that, in general, they would be

18   three to four weeks a month.

19       Q    And so if somebody is working that schedule,

20   you know, Tuesday, Wednesday, Thursday, four weeks a

21   month, they're going to have 12 billable days in that

22   month; is that -- am I understanding that right?

23       A    They would generally have 12 days, perhaps 13,

24   depending on if they, you know, had a half-day -- couple

25   half-day on a Monday or Friday.  Those might be remote.

Page 135

1      Q    Is the comp plan for Munis effectively

2    incentivizing that schedule?

3      A    Yes.

4      Q    Do Implementation Consultants have a scheduled

5    shift?

6      A    No.

7      Q    Why not?

8      A    They're generally expected to work with

9    clients based on their hours of operation within --

10   within reason, and so in addition to that, they are

11   required to travel on, typically, a Sunday or Monday or

12   Friday or whatnot.  So they're -- they're responsible

13   for the scheduling of that and the management of their,

14   you know, appropriate travel requirements and needs.

15     Q    What is Changepoint PSA?

16     A    That is our time and expense management

17   system.

18     Q    And how do Implementation Consultants use it?

19     A    They will, on a -- likely, a weekly basis,

20   they will be going in to record their billable expenses,

21   be entering in their billable or nonbillable time

22   working with clients.

23     Q    Implementation Consultants are expected to

24   fill out 40 hours per week in there, correct?

25     A    Not all groups require that.  Some business

Page 166

1      I, the undersigned, a Certified Shorthand Reporter

2  of the State of California, do hereby certify:

3      That the foregoing proceedings were taken before

4  me at the time and place herein set forth; that any

5  witnesses in the foregoing proceedings, prior to

6  testifying, were administered an oath; that a record of

7  the proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing is a true record of the testimony

10 given.

11     Further, that if the foregoing pertains to the

12 original transcript of a deposition in a Federal Case,

13 before completion of the proceedings, review of the

14 transcript [  ] was [ X ] was not requested.

15         I further certify that I am neither

16 financially interested in the action nor a relative or

17 employee of any attorney or any party to this action.

18     IN WITNESS WHEREOF, I have this date subscribed my

19 name.

20 Dated:    09/28/2020

21

                 Catherine A. Ryan, RMR, CRR

22               CSR No. 8239

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT B

  Search          | **Try Premium Free for 1 Month**

**Automate the Real World** - Create end-to-end automated workflows, integrating people and systems



Message   More...

2K Property Management

 University of Nevada-Reno

## Aaron Kudatsky · 3rd 

Implementation Manager; Actively seeking employment in ERP Software, Professional Services space

San Francisco, California, United States · 405 connections ·

Contact info

## Highlights

**Reach out to Aaron for...**
Joining a nonprofit board.

**Message Aaron**

## Activity

403 followers

Posts Aaron created, shared, or commented on in the last 90 days are displayed here.

**See all activity**

## Experience

**Owner**
2K Property Management
May 2015 – Present · 5 yrs 8 mos
Reno, NV

Own and manage multi-unit residential and vacation rental properties.

 **Implementation Manager**
Tipalti · Full-time
Mar 2019 – Mar 2020 · 1 yr 1 mo
San Francisco Bay Area

People



People



 Messaging 



Search        

• Completed 15 life-cycle implementations, working directly with c-suite executives and manufacturing sectors .
• Work with internal/external customer teams to assess business and implementat project plan & timeline, guide the technical integration process, assist with technic solving, and manage internal resources to assist with project execution and resolv customer issues.

see less



**Rowing Coach**
George Pocock Rowing Foundation (GPRF)
Jan 2018 – Mar 2019 · 1 yr 3 mos
Seattle, WA



**Financial Implementation Consultant**
Tyler Technologies
Jul 2016 – Mar 2019 · 2 yrs 9 mos
Western Region

• Provide professional and thorough training and consultation to public sector/loc clients on Tyler software products.
• Perform consultation/analysis sessions on applicable Tyler products to determine business model and create a new model to use in the deployment of the project.
• Consult with users to identify the proper data mapping process for data convers
• Provide instruction on proofing and analyzing data conversions from existing so applications.
• Assist project managers on project planning.
• Play an active role in troubleshooting client issues, or working with the support a departments to resolve issues and propose enhancements to product stakeholder

see less

**Independent Contractor**
CSUS Aquatic Center
Apr 2012 – May 2018 · 6 yrs 2 mos
Gold River, CA

Championship regatta operations at a world class venue hosting over 30 teams and 5,000 attendees.

**Show 5 more experiences** ⌄

## Education



**University of Nevada-Reno**
Bachelor's Degree, Management Information Systems and Services
2011 – 2015
Activities and Societies: Division I Cycling Team

## Licenses & certifications



**Licensed Referee**
USRowing
Issued Feb 2015 · No Expiration Date

Promoted




Messaging



## Skills

**Database Design**

**Business Analysis**

**Project Management**

Show more ⌄

## Accomplishments

**10**  **Courses**

Accounting • Android Systems Development • Business Law • Database Design and • Finance • Marketing • Organizational Behavior • Project Management • Sports Management and Policy

**4**  **Languages**

American Sign Language • English • Hebrew • Russian

**3**  **Organizations**

Pacific Rowing Club • George Pocock Rowing Foundation • Penn A.C. Rowing Association



## Interests

**Fast Enterprises, LLC**
24,202 followers

**Logi Analytics**
17,239 followers

**The Reynolds and Reynolds Company**
116,021 followers

**Albertsons Companies**
72,235 followers

**Baker McKenzie**
273,472 followers

**Awards Professionals**
97 members

See all



# EXHIBIT J