UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON KUDATSKY, on behalf of himself, and on behalf of those similarly-situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>TYLER TECHNOLOGIES,<br><br>    Defendant. | No. C 19-07647 WHA<br><br>**ORDER RE MOTION TO CERTIFY CLASS** |

**INTRODUCTION**

In this wage-and-hour action, plaintiff seeks class certification. The motion is **GRANTED IN PART** and **HELD IN ABEYANCE IN PART.**

**STATEMENT**

Defendant Tyler Technologies sells sophisticated software to facilitate business and public sector operations. It offers various product "suites," but its Public Administration and K-12 Education suites feature here. Tyler utilizes Enterprise Resource Planning (ERP) Implementation Consultants (ICs) to customize software and train clients to use each of the suites. The ERP division's "flagship" product, Munis, offers finance, payroll, utility billing, tax billing, and community development services. The division also sells other products, each with their own modules. Tyler employs a team, including ICs, "senior ICs," and "project managers"

to customize the software and train clients to use it.  ICs and senior ICs in this putative class largely implemented Munis, not other Tyler products (Webster Dep. at 68–69).

Plaintiff Aaron Kudatsky worked for Tyler as an IC from July 2016 to March 2019.  He earned $50,000–54,000 per year, plus incentive pay of between $30 and $120 per day.  During his employment, he worked remotely from his primary residence in Reno and from his secondary residence in San Francisco, as well as on-site at other locations in California.  He asserts that Tyler structured and standardized his duties as an IC and paid him an annual salary.  He additionally claims that he worked overtime, did not receive itemized wage statements, and suffered waiting time penalties.  Kudatsky filed this putative class action in November 2019, alleging

1. Failure to Pay Overtime Compensation in Violation of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq.*);
2. Failure to Pay Overtime Compensation in Violation of California Law (Cal. Lab. Code §§ 510, 1194, and 1198, and IWC Wage Order(s));
3. Waiting Time Penalties (Cal. Lab. Code §§ 201–203);
4. Failure to Provide Itemized Wage Statements (Cal. Lab. Code § 226); and
5. Violation of California Business and Professions Code §§ 17200, *et seq.*

In May 2020, an order herein conditionally certified an FLSA class of "All implementation coordinators, implementation consultants, or other positions with similar job titles and/or duties . . . who work or have worked for Tyler Technologies . . . since May 15, 2017, in the ERP divisions" (Compl. ¶¶ 19–22, 26, 28, 31, Dkt. Nos. 1, 40).

Since the conditional FLSA certification, four out of forty employees residing in California have opted into the action.  Opt-ins for non-California residents stand at 18 out of 252 (Correll Decl. ¶¶ 6–8).

2

Plaintiff now seeks to certify the following class:

> All persons who worked for Defendant as ERP Implementation Consultants, or other positions with similar job duties and/or job titles within the State of California at any time during the four (4) years prior to the filing of this case.

Tyler opposes. This order follows full briefing and oral argument (telephonic due to COVID-19).

## ANALYSIS

For the following reasons, a class of ICs (but not senior ICs) who worked in California during the class period will be **CERTIFIED**. The request to certify senior ICs in the class is **DENIED**. For now, certification applies solely to this issue: whether Tyler properly classified ERP ICs as administratively exempt from overtime and other California labor laws (or not). We will revisit possible certification of the other claims after we hold a trial on the certified issue. At that point, the Court will be better-informed to process the multitudinous and bone-crushing details of how plaintiff might establish class-wide overtime liability. Accordingly, the motion to certify a class as to the overtime, wage statement, waiting period, and UCL claims shall be **HELD IN ABEYANCE**.

1. **COMMONALITY AND PREDOMINANCE.**

This order finds that plaintiff has narrowly met his burden to show that common proof will resolve the administrative exception issue for a class of ICs. Federal and California law define the administrative exemption nearly identically. California's Wage Order 4–2001 provides that for the administrative exemption to apply,

> The employee must (1) perform "office or non-manual work directly related to management policies or general business operations" of the employer or its customers, (2) "customarily and regularly exercise[ ] discretion and independent judgment," (3) "perform[ ] under only general supervision work along specialized or technical lines requiring special training" or "execute [ ] under only general supervision special assignments and tasks," (4) be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage.

3

*Eicher v. Advanced Business Integrators, Inc.,* 151 Cal.App.4th 1363, 1371–72 (2007), *citing* 8 Cal. Admin Code § 11040(A)(2)(a)(I), (b), (d), (f). California's exemption incorporates the FLSA regulations and has been construed in the same manner as the federal exemption. *See Heffelfinger v. Elec. Data Sys. Corp.*, 580 F. Supp. 2d 933, 949–51 (C.D. Cal. 2008), *aff'd in part, rev'd in in part on other grounds,* 492 F. App'x 710 (9th Cir. 2012). California's requirement differs only in that employees must show they spent *more than 50%* of their time on exempt tasks; the federal definition contains no 50% requirement. *See* Cal. Code Regs. Tit. 8, § 11040; *see also* 29 C.F.R. §§ 541.201–205, 541.207–208, 541.210, and 541.215.

A fact finder will be able to determine elements (3) and (5) for all ICs based on Tyler records in one fell swoop by reviewing Tyler records. This order considers (1) and (4), in two parts: *first* it looks at the ICs' primary duties and, *second,* turns to whether their work is "directly related" to "management policies or general business operations." Finally, it turns to (2), the exercise of discretion.

***Primary duties*:** The question is whether plaintiff has demonstrated a common method of proof, which will cover all ICs, to show that Tyler misclassified all ICs (or not). Implementing software, Tyler concedes, made up 80–90% of ICs' work during the class period. Therefore, if class-wide resolution applies to the primary IC duties, answering whether (or not) 50% of the work qualifies as exempt will follow. Parties appear to agree that all ICs shared similar reporting and pay structures. Tyler assigned each one or more geographic regions. Project managers supervised all ICs. All received a base salary plus incentives and shared standard annual pay (Opp. at 18, Webster Dep. 34–36, 124–152).

ICs worked on one or more of the six "phases" of implementation. The first phase, called "fundamentals," involved review of existing customer operations using structured tools (Tyler's scripts, a prefilled "sandbox" data set, and Tyler-issued examples, among others). The scripts, for instance, provided detailed "talking points" and a list of all topics, the order in which to discuss them, and a step-by-step guide for ICs to use in educating the client about the software. Next, ICs used Tyler stock forms to analyze clients' old computer systems. After that, the "configuration" stage required customizing the program by selecting settings and choosing

4

options within the Tyler software. This process involved making recommendations tailored to the client and selecting different options within Munis for each client (Webster Dep. at 72, 101–102, 108, Choquette Dep. at 36, Franzen Decl. ¶ 5, Miles Decl. ¶ 2, Void Dep. at 38, 43, Kudatsky Dep. at 88, 108–109, 123, Costner Dep. 46–47, Roth Dep. at 43–44, Costner Dep. at 25–26, 51, Brome Decl. Exh. 1).

After configuration, ICs moved on to testing. Testing required "informal [client] training," variously scripted and unscripted, which lasted months to years. One of Tyler's declarants described this phase as "test[ing] those" configured software "processes to make sure [they] did what" the client "had wanted." The declarant had also received daily "scripted" agendas for this phase. Asked to explain what "scripted" meant, she testified:

> Well, if we were training on, say, entering — setting up projects, we would go on the Tyler website and the agendas were . . . already in the client folder. The project manager put[] them there for us to go and download.

She also testified that she did not generally deviate from the script:

> Q. . . . [E]verything always just progressed just as the agenda had set forth?
>
> A. Well, on our side, yes.

She clarified that clients asked follow-up questions and she responded to those as needed. Formal training followed in the next phase, using materials and lessons that the project managers assigned. Exceptions to this arrangement included occasions in which more experienced ICs scheduled the training themselves. In addition, the "senior ICs" created training documents and resource materials themselves, while standard ICs did not. One declarant IC described assigning "training classes" to other ICs as part of site-based training with clients, creating agendas, and drafting schedules. Tyler's ERP division president, however, testified that project managers (not ICs) created the schedules in collaboration with the clients. Tyler provided lesson plans (Choquette Dep. at 43, 69–71, Webster Dep. at 82,

5

109, 110, Webster Decl. ¶ 8; Franzen Decl. ¶ 7, Giesy Decl. ¶ 5, Miles Decl. ¶ 3, Roth Dep. at 49, 72, 31, Kudatsky Dep. at 154, 161, Costner Dep. at 75).

Next, the "present state/future state" phase required "making recommendations to clients about how to improve" processes in Munis' "software module[s] and guiding" the client's use of Tyler software. This phase had ICs use prefabricated, "simulated" data sets based on real-life examples to train clients on software functions such as running payroll. In that process, an IC deponent testified, he would give clients all the options for using the Tyler software that he knew, and the clients chose their preferred methods of performing a task. The IC did not dictate what option to select. Some more experienced ICs also met with customer representatives and may have recommended other alterations to Munis' features (Costner Dep. at 50, 73, Giesy Decl. ¶ 7).

Class certification on the issue of exemption may fail when "class members who shared the same job code had different duties." *Heffelfinger v. Elec. Data Sys. Corp.*, 492 F. App'x 710, 714 (9th Cir. 2012). As *Vinole* noted, district courts have not reached a "consensus" about these types of certifications. 571 F.3d at n. 11. Prior to our court of appeals' decisions in *Vinole* and *In re Wells Fargo*, some plaintiffs seeking class certification had contended that employers' blanket policies, which classified employees as exempt, meant that employers implicitly sanctioned class certification. Indeed, some courts relied solely on the blanket classification in certifying classes. *Vinole* and *In re Wells Fargo* flatly rejected that approach.

*Heffelfinger v. Elec. Data Sys. Corp.*, No. CV 07-00101 MMM (EX), 2013 WL 12201050, at *13 (C.D. Cal. Feb. 26, 2013) (Judge Margaret M. Morrow), guides our analysis of certification and primary duties. In that decision, the district court decertified a class after our court of appeals overturned a grant of summary judgment for the previously-certified class of information technology workers. Our court of appeals had held that the district court had not abused its discretion in certifying the class but also issued a caution, which the district court summarized in its decertification order:

> Based on the Ninth Circuit's decision, it is now clear that some of the tasks . . . were administratively exempt — tasks such as "assigning

and coordinating work, determining schedules, reviewing assignments, and running team meetings.

In contrast, designing computer systems fell outside the exemption. *Ibid.*

Further guidance comes from district court cases identified in *Vinole*. The *Vinole* decision pointed to some prior cases that had "properly" analyzed the balance of common versus individual issues. 571 F.3d at 946. In one, *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 159 (S.D.N.Y. 2008) (Judge Gerard E. Lynch), an order certified a class of assistant managers who alleged New York wage laws entitled them to overtime pay. The employer, Duane Reade, claimed that "duties depend[ed] on . . . the store manager they work under, the amount of experience they have, and specific differences in the stores, such as their size, hours of operation, sales volume, and location." *Id.* at 160. Duane Reade did not convince the district court, which ruled: "[E]vidence that the duties of the job are largely defined by comprehensive corporate procedures and policies" justified certification "despite arguments about 'individualized' differences in job responsibilities." *Ibid.*

In another persuasive example, the California Supreme Court's decision in *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 330 (2004), upheld class certification for managers whose jobs involved varied responsibilities. It found that manuals and policies presented common proof of employees' duties. There appeared "substantial evidence suggesting that the predominant issue in dispute [was] how the various tasks in which" all managers "actually engaged should be classified — as exempt or nonexempt." *Ibid.* In short, where employees reliably perform the same general duties, only job variations "meaningful" to the exemption defeat predominance with respect to the primary duty factor. *Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 608 (S.D. Cal. 2010) (Judge Larry Alan Burns).

Tyler argues that some phases entailed work falling under the exemption, and some did not. And, it argues, ICs did not work each phase in standard proportion. In its estimation, these points render class-wide resolution of the issue impossible. In the record, the phases in which ICs provided tailored guidance to clients appear the most qualitatively different from the other phases. Tyler records indicate that ICs still onboarded the software following well-

7

1  documented Tyler processes, however.  Even if some ICs only ever worked in the
2  configuration stage, while others worked in analysis or present state/future state, the primary
3  duty of molding the Tyler product to the client, based on the professed needs, remained the
4  same.  The substance of ICs' work appears well-documented in Tyler's "library" of documents
5  and in the daily agendas that ICs received to guide their work with clients.

6  Regardless of phase, however, variation in the length of time spent with one client,
7  clients' needs, and even Tyler software could have represented meaningful job differences
8  among ICs.  ICs handled the "thousands of variations" created by each client and guided
9  clients through "how their organization [would] operate within the new software."  ICs used
10 soft skills, including offering moral support, depending on client need.  Ultimately, these
11 variations do not suggest ICs' "primary dut[ies]" to customize a Tyler product to clients'
12 "workflow" fundamentally changed from one IC to another.  The need to adjust to software
13 quirks or customer needs using knowledge and skill does not necessarily mean independent
14 variations in the main types of tasks:  assessing client needs, customizing software, and
15 training the client to use it.  Moreover, each of Tyler's declarants (ICs, senior ICs, and
16 managers) described implementing Munis and no other software systems.  Thus significant
17 differences across the software products do not defeat predominance as to primary duties (*see,*
18 *e.g., *Giesley Decl. ¶¶ 7–9, Webster Decl. ¶ 3).

19 In contrast, both *Vinole* and *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268
20 F.R.D. 604, (N.D. Cal. 2010) (Judge Marilyn Hall Patel), found class certification
21 inappropriate for home mortgage consultants because resolving the legal question required
22 individual review of day-to-day work.  The home mortgage consultants' employer had
23 "claimed that it 'had no control over what [consultants] actually d[id] during the day and [did]
24 not monitor how [they] perform[ed] their work activities." *In re Wells Fargo* at 610; *see also*
25 *Casida v. Sears Holdings Corp.*, No. 1:11-CV-01052 AWI, 2012 WL 3260423, at *22 (E.D.
26 Cal. Aug. 8, 2012), *report and recommendation adopted*, No. 1:11-CV-01052-AWI, 2012 WL
27 3763621 (E.D. Cal. Aug. 29, 2012) (Magistrate Judge Jennifer L. Thurston) (no predominance
28 when no common policies established the "tasks that managers had to perform in their

8

overtime hours" or how they had to allocate that time). Our case differs. Tyler closely guided the ICs' work and time, as agendas and training materials reveal.

Tyler also urges that this order follow *Alakozai v. Chase Inv. Servs. Corp.*, No. CV 11-09178 SJO JCX, 2014 WL 5660697, at *8 (C.D. Cal. Oct. 6, 2014), which found commonality lacking in a classification action due to "[s]ignificant variation" in tasks such as selling products, researching products, "assessing clients' financial goals," and "developing client relationships." But the variations in types of duties in *Alakozai* differed in nature from our variations in Tyler's phases (assessment, customization, training, and adjustments by client). The structured nature of ICs' work will afford common proof.

Based on the above, the differences afforded to ICs based on seniority represents Tyler's strongest argument against predominance. *First,* "senior" ICs' additional duties included mentoring new ICs. They also autonomously developed and distributed training materials for other ICs and clients to use. One deposed senior IC testified that he spent an extra three hours per week fielding questions from a mentee at the beginning of a six-month period, and that the time thereafter decreased over the six months. When asked what it meant to serve as a senior IC, another stated:

> It means that previously one Friday a month we would attend a meeting, a conference call web meeting, and we would be assigned additional documents to either update, review or create that would help the client better understand the Munis system with the implementation process.

Although the time spent on these different tasks did not dominate their work, the substantial variation in role matters to this analysis. These tasks resemble the leadership duties which our court of appeals found meaningfully different under the administrative exemption, so much so that those differences spoiled predominance. *See Heffelfinger*, 2013 WL 12201050, at *13. So too here. Significant portions of senior ICs' primary duties required greater autonomy, leadership, and discretion. Senior ICs may not be certified in the same class as ICs (Giesy Decl. ¶ 9, Costner Dep. 26, Brome Decl. Exh. 5 at 64, Void Dep. at 140).

*Second*, Tyler maintains that seniority among rank-and-file ICs also caused their implementation work to materially vary, as more experienced ICs met "with customer representatives to understand their software needs in more depth and nuance, to evaluate their legacy systems . . . and to make recommendations" about Tyler software while others did not. Similarly, those with more seniority spent more time performing the "present state/future state" analysis. These differences do not involve supervising others or creating original materials for Tyler. The primary duty element remains determinable with common proof such as scripts and training materials for ICs as a class (Miles Decl. ¶ 3, Roth Dep. at 49, 72, 31, Kudatsky Dep. at 154, 161, at 188–189, Costner Dep. at 75, 98–99, 101–102, 103, Void Dep. at 14, 15, 28–29, 30).

*Third*, Tyler argues that variations emerge in the "feedback" that ICs received from supervisors, regularity of supervision, and input ICs gave in scheduling. One declarant stated that as a more experienced IC, he worked at one client site only, rarely met with supervisors, and that project managers asked *him* for guidance. Variations in supervision exist in all positions. Even though more experienced ICs received different tasks within a range of IC duties, those tasks did not plainly fall into non-exempt or exempt types of work: the primary questions remain common to the putative class of ICs and Tyler policies, practices, scripts, etc., will provide the needed common proof under this prong of the exemption analysis (Franzen Decl. ¶ 7, Giesy Decl. ¶ 5, Miles Decl. ¶ 3, Roth Dep. at 49, 72, 31, Kudatsky Dep. at 154, 161, Costner Dep. at 75).

***Directly related*:** Tyler emphasizes that it will prove the merits of the exemption by showing the ICs' relation to the administration or general business operation of "their employer's clients or customers . . . ." *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066, 1069 (9th Cir. 1990), *quoting* 29 C.F.R. § 541.205 (1987) (internal quotations omitted) (finding probation officers non-exempt). The "essence of this requirement" goes to whether a class of employees affects "the running of a business, and not merely . . . the day-to-day carrying out of its affairs." *Ibid*. Common evidence, too, will answer this question.

10

More recently, our court of appeals considered an FLSA dispute about an employee who worked "installing, troubleshooting, and maintaining" a robotics company's products. *Bothell v. Phase Metrics,* Inc., 299 F.3d 1120, 1122 (9th Cir. 2002). *Bothell* focused on whether the plaintiffs' purpose *vis-a-vis* its clients represented a good in and of itself, or administration. Overturning summary judgment for the employee, our court of appeals observed:

> If Bothell's primary duty was to manage the [employer's client's] account, creating policy for Phase Metrics or assisting [the client] in running its general business operations (rather than its production capabilities), his employment would satisfy the primary duty requirement . . . . If, however, the fact-finder concludes that Bothell was a highly skilled repairman whose primary duty was to install, troubleshoot, and maintain production equipment, he would not qualify as exempt and would be entitled to overtime compensation.

*Id*. at 1128–29. Tyler's technologically sophisticated product required training and customization for clients. In Tyler's words, its implementation services "help clients' managers and support personnel perform core administrative functions through Tyler software." Based on common evidence, a jury may decide that ICs "create[ed] policy" for Tyler and "assist[ed]" in "running" clients' operations (exempt). Or, the jury may conclude that ICs primarily ran "production capabilities" or "installed, troublesh[ot], and maintained" Tyler products (non-exempt). *Bothell v. Phase Metrics, Inc.*, 299 F.3d at 1122 (Opp. at 3).

***Discretion and independent judgment*:** The administrative exemption requires that the employee "customarily and regularly exercise[d] discretion and independent judgment" and compared, evaluated, and chose from possible courses of conduct. *Id*. at 1129, *quoting* 29 C.F.R. § 541.207(a) (internal quotations omitted). The requirement "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." *Ibid*. The record shows that discretion and independent judgment may be analyzed for ICs as a group (but not for senior ICs).

Tyler disagrees, citing *Rosenberg v. Renal Advantage, Inc.*, No. 11-CV-2152-GPC-KSC, 2013 WL 3205426, at *8 (S.D. Cal. June 24, 2013), *aff'd*, 649 F. App'x 580 (9th Cir. 2016).

11

1   Registered dieticians (RDs) working at dialysis clinics contested their exempt status. That
2   decision found that the plaintiffs' job description offered essentially the only document to
3   demonstrate job duties. It referred to "several functions that appear[ed] to require some use of
4   judgment and skills," but others that did not. *Ibid*. As a result, the document alone could not
5   prove up the judgment and skills element of the exemption test for all employees. Similarly,
6   the certification decision in *Alakozai v. Chase Inv. Servs. Corp.*, 2014 WL 5660697, at 8, found
7   commonality lacking with respect to judgment and discretion, due to variations in how often
8   financial advisors "met with" supervisors, "needed their supervisors' approval" to recommend
9   products, and whether they "serviced businesses or individuals."

Not so here. Our record contains training documents, scripts, sample questions, sample forms, and stock lesson plans that indicate uniformity in rank-and-file ICs' discretion and exercise of judgment. For example, the Tyler document "Life as an IC" provides, "Each Munis client will have a client SharePoint site for their implementation. The Project Manager manages this site. ICs will be asked to upload site reports and other documents, as required." Finally, to repeat somewhat, Tyler objects that "[d]ifferent [software] modules within Munis" required "different skills, and different job functionalities, in connection with the implementation process," and thus different levels of judgment and discretion. As discussed, these job functionalities did not represent qualitatively different work. Regulations, moreover, "warn against confusing 'the exercise of discretion and independent judgment'" with "the use of skill in applying techniques, procedures, or specific standards." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1129 (9th Cir. 2002), *quoting* 29 C.F.R. §§ 541.207(b)(1) and (c). Our common proof will resolve questions of discretion and independent judgment (Giesy Decl. ¶ 9, Costner Dep. 26, Brome Decl. Exh. 5 at 64 (emphasis added), Void Dep. at 140).

Despite variation in phase, client, or supervision, Tyler's written policies, agendas, training materials, sample data sets, and testimony of leadership, will speak uniformly to the administrative exemption analysis for Tyler ICs. Common questions and proof predominate on this issue.

### 2. TYPICALITY.

The claims or defenses of the representative parties must typify those of the class. Tyler does not contest this point. Plaintiff worked in California as an ERP IC during the class period. He shared common alleged injuries from a common source as other class members. Plaintiff thus satisfies typicality. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

### 3. ADEQUACY.

An adequate class representative will fairly and adequately protect the interests of the class. Our court of appeals has explained that a class representative meets this standard if they (1) have no conflicts of interest with other class members, and (2) will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Nothing in the record suggests plaintiff's interests deviated from the interests of the other putative class members. Nor does the record reveal any risk that plaintiff or his counsel will fail to prosecute the action vigorously.

### 4. SUPERIORITY.

Even if common questions predominate, a Rule 23(b) class must offer the superior method of adjudication, considering (among others):

> (A) The class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) The extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) The likely difficulties in managing a class action.

FRCP 23(b)(3). Two other Tyler employees have sued for employee misclassification, but none allege California claims, thus indicating that few, if any, other individual suits will emerge in California. Given the range of potential damages separate actions appear. At this

stage, with the classification of a class to determine an issue of exempt status, the benefits of class-wide resolution resound.

### 5. NUMEROSITY.

Plaintiff alleges a class of 200 ICs who worked in California, but lived elsewhere, and 27 more who lived and worked at least some of the time in California during the class period, all determinable with Tyler's records. For the issue of the administrative exemption, individual litigation would prove inefficient and resource-intensive; the proposed class satisfies numerosity (Webster Dep. at 141:12–14).

### 6. ASCERTAINABILITY.

As discussed above, the proposed class may be ascertained through Tyler records (Webster Dec. ¶ 10, Exh. D).

## CONCLUSION

On the issue of whether Tyler ICs are properly classified as exempt, the class of ICs (without senior ICs) is **CERTIFIED**. The request to certify senior ICs with that class is **DENIED**. The motion to certify a class as to the other claims is **HELD IN ABEYANCE**. Class notice appearing adequate, request for its approval is **GRANTED.**

Nichols Kaster, LLP, is **APPOINTED** counsel for the class.

**IT IS SO ORDERED.**

Dated: February 25, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE