Matthew C. Helland, CA State Bar No. 250451
helland@nka.com
Daniel S. Brome, CA State Bar No. 278915
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Rachhana T. Srey, MN State Bar No. 340133*
srey@nka.com
NICHOLS KASTER, PLLP
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
*Admitted pro hac vice

Benjamin L. Davis, MD Bar No. 29774*
bdavis@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 Charles Street, Suite 1700
Baltimore, MD 21201
*Pro hac vice application forthcoming

Attorneys for Plaintiff and those similarly situated

# IN THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aaron Kudatsky, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> Tyler Technologies, <br><br> Defendant. | Case No.    3:19-CV-07647-WHA <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> **Date: May 26, 2021, 12:00 p.m.** <br> **Courtroom: 12 – 19th Floor** <br><br> **Judge: Hon. William Alsup** |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

   I.       INTRODUCTION ...................................................................................... 1

   II.      PROCEDURAL HISTORY ......................................................................... 2

   III.     STATEMENT OF FACTS .......................................................................... 3

     A.     Implementation generates Tyler revenue. .................................................... 4

     B.     ICs implement Tyler's software products for Tyler's clients. ......................... 5

       i.    ICs' supervisors are responsible for high-level implementation planning .................. 5

       ii.   ICs perform standardized steps in an implementation ................................... 6

       iv.  Tyler's ICs have limited discretion ........................................................ 10

   IV.     ARGUMENT ........................................................................................... 11

     A.     Tyler cannot satisfy its burden to prove the administrative exemption applies under state or federal law ....................................................................................... 12

       i.    Implementing software products is not directly related to Tyler's or Tyler's clients' "management or general business operations." ........................................... 14

       ii.   ICs do not exercise discretion and independent judgment with respect to matters of significance. .................................................................................... 20

       iii.  None of the phases of Tyler's implementations constitute exempt work. .................. 23

   V.     CONCLUSION ........................................................................................ 25

# **TABLE OF AUTHORITIES**

**Cases**

*Ambrosia v. Cogent Commc'ns, Inc.*, 312 F.R.D. 544 (N.D. Cal. 2016) ........................................ 14

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960)................................................................. 12

*Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901 (9th Cir. 2004) ............................................. 12

*Beall et al. v. Tyler Technologies, Inc.*, 2:08-cv-422 TJW (E.D. Tex. 2008)................................. 1

*Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002).......................................... 12, 15, 20

*Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273 (C.D. Cal. 2015) .......................... 18, 20, 24, 25

*Carbaugh v. Unisoft Int'l, Inc.*, 2011 WL 5553724 (S.D. Tex. Nov. 15, 2011) ........................... 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................................... 12

*Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050 (D. Minn. 2011) ...................................... 19

*Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009) .............................................. 20

*Deluca v. Farmers*, 386 F. Supp. 3d 1235 (N.D. Cal. 2019)................................................. 13, 24

*Eicher v. Advanced Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363 (2007)........................... *passim*

*Encino Motorcars, LLC v. Navarro*, — U.S. —, 138 S. Ct. 1134, 1142 (2018)........................... 13

*Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132
     (9th Cir. 2001)............................................................................................................... 12

*Gordon v. Model N, Inc.*, 2016 WL 3164240 (N.D. Cal. June 9, 2016), *aff'd*, 705 F. App'x 647
     (9th Cir. 2017)......................................................................................................... 17, 24

*Greene v. Tyler Technologies*, --- F. Supp. 3d ---, 2021 WL 1012164
     (N.D. Ga. Mar. 16, 2021) ....................................................................................... *passim*

*Klem v. County of Santa Clara*, 208 F.3d 1085 (9th Cir. 2000)................................................. 12

*McKeen-Chaplin v. Provident Savings Bank, FSB*, 862 F.3d 847 (9th Cir. 2017) ................. *passim*

*Ortiz v. Amazon.com LLC*, 389 F. Supp. 3d 728 (N.D. Cal. 2019) ............................................ 14

*Verkuilen v. MediaBank, LLC*, 646 F.3d 979 (7th Cir. 2011) .................................................... 19

*Wright v. Tyler Technologies, Inc.*, No. 4:20-cv-00454-KGB ..................................................... 1

**Other Authorities**

U.S. DOL, Wage & Hour Div., Opinion Letter, 2006-42 (Oc. 26, 2006)...................................... 25

---

U.S. DOL, Wage & Hour Div., Opinion Letter, FLSA 2020-9 (June 25, 2020) ........................... 24

**Regulations**

29 C.F.R. § 541.200.......................................................................................................... 1, 13, 22

29 C.F.R. § 541.201.............................................................................................................. 14, 15

29 C.F.R. § 541.202........................................................................................................ 20, 21, 22

8 C.C.R. § 11040 .................................................................................................................... 1, 13

## NOTICE OF MOTION AND MOTION

Please take notice that on May 26, 2021, at 12:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 12 of the above-captioned Court, Plaintiff Aaron Kudatsky, individually and on behalf of the Opt-in Plaintiffs and the Class (collectively, "Plaintiffs") will, and hereby does, move this Court for an order of partial summary judgment. Plaintiffs ask the Court to rule that, as a matter of law, Tyler cannot meet its burden to establish the administrative exemption defense. Accordingly, Tyler will be liable on all claims.

Plaintiffs make this motion on the grounds that there is no material factual dispute and Plaintiffs are entitled to judgment as a matter of law, as set forth in the accompanying brief. This Motion is based on this Notice, the Memorandum of Points and Authorities, supporting evidence filed herewith, the Court's file in this matter, and such other arguments or evidence as may be presented at the hearing on the Motion.

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         This is the third case in which implementation consultants have sued Tyler Technologies

4    ("Tyler") seeking unpaid overtime. Tyler settled the first case in 2011 when summary judgment

5    motions were fully briefed, but not decided, for a collective.[1] Following that case, Tyler never

6    reclassified its implementation consultants ("ICs"), or considered paying them overtime. Nor did

7    Tyler alter the IC position to satisfy the administrative exemption; the job duties have been

8    consistent for the past ten years. (Webster[2] *Dep.* at 71:22–72:1.) Tyler recently settled an

9    individual case, *Wright v. Tyler Technologies*.[3] Most recently, the district court in *Greene v. Tyler*

10   *Technologies* ruled on summary judgment that the plaintiff—an IC working on Tyler's ExecuTime

11   product—was misclassified. --- F. Supp. 3d ---, 2021 WL 1012164 (N.D. Ga. Mar. 16, 2021).[4]

12   Plaintiffs and the class here hold the same position, perform the same primary duties, assert the

13   same unpaid overtime claims, and work for the same defendant as in *Beall*, *Wright*, and *Greene*.

14   Tyler even asserts the same affirmative defense as in those cases—the administrative exemption.

15        To satisfy the administrative exemption, Tyler must prove that ICs' primary duty was

16   "directly related to the management or general business operations" of Tyler or its customers, *and*

17   involved the use of discretion and independent judgment. 29 C.F.R. § 541.200(a); 8 C.C.R. §

18   11040(1)(A)(2). Here, there is no real dispute about what ICs do: when a client purchases Tyler's

19   software products, ICs get [Tyler's clients] up and running" with Tyler's software products, but

20   are ***not*** "using the product for managing the client's general business." (Webster Dep. at 124:10–

21   13.) In other words, they provide "implementation and training on [Tyler's] software." *Greene*,

22   2021 WL 1012164 at *9. These duties, and ICs' role within Tyler's business, do not make ICs

23   administrative workers. *Eicher v. Advanced Business Integrators, Inc.*, 151 Cal. App. 4th 1363,

24   1373 (2007) (plaintiff, who was responsible for "implementing the ABI MasterMind product at

---

[1] *See Beall et al. v. Tyler Technologies, Inc.*, 2:08-cv-422 TJW (E.D. Tex. 2008).

[2] Deposition transcripts are submitted as exhibits 23–31 of the accompanying declaration of Daniel Brome ("Brome Dec."). Chris Webster is the president of the ERP division; he was deposed as a Fed. R. Civ. P. 30(b)(6) corporate representative.

[3] *See Wright v. Tyler Technologies, Inc.*, No. 4:20-cv-00454-KGB (E.D. Ark. 2020).

[4] *Greene* has since settled.

customer venues and supporting the customers, whether at the customer venues or in the ABI office," was not administratively exempt because he "engaged in the core day-to-day business of ABI"). These facts were central to the *Greene* court's analysis, and compel the same conclusion here. 2021 WL 1012164 at **10–12 ("a reasonable jury could not find that [plaintiff's] primary duties involved *advising* those government customers on matters involving running a component of the government or determining the overall course and policies of the government") (citing *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)). Through this motion, Plaintiffs ask the Court to confirm on a class-wide basis what the *Greene* court held on an individual basis: Tyler's ICs are not responsible for Tyler's management and general business operations, nor do they advise Tyler's clients on how their businesses "should be run or run more efficiently." *Bratt*, 912 F.2d at 1070. Nor do ICs exercise meaningful discretion in conducting their implementations. *Greene* at **14–17. This Court should hold that ICs are not administratively exempt.

Tyler will likely try to meet its heavy burden to prove that administrative exemption applies by narrowly focusing on just one phase of implementation—the present state/ future state phase—but these arguments cannot defeat summary judgment for Plaintiffs. First, ICs' primary duty of implementing Tyler's software products was broader than that one phase; ICs could be assigned to different implementation phases during different weeks. (Roth Dep. at 82:23–83:13 ("I can't say that I spent any more time doing one phase or another because it's just all over the place."); Kudatsky Dep. at 55:24 – 56:10 (IC work "varied every single week, and we were provided agendas by our project managers on what they expected us to accomplish that week.").) Accordingly, there are class members in this case (including Ms. Greene) who never performed that step.[5] Second, even if the Court were to isolate just that stage of implementation, that would not change the outcome of the analysis: ICs' role concerns the day-to-day operations, not management or general business operations.

## II. PROCEDURAL HISTORY

On November 20, 2019, Plaintiff Aaron Kudatsky filed this lawsuit seeking unpaid

---

[5] According to Tyler's records, Ms. Greene traveled to California as an ERP IC during the statutory period, and so is a member of the certified California class here. (Brome Dec. ¶ 6.)

overtime alleging that Tyler misclassified implementation consultants as overtime exempt in violation of the FLSA and California law. (ECF No. 1, Compl.) Plaintiff Kudatsky was employed as an IC from approximately July 2016 to March 2019 in a variety of locations, including Pleasanton and San Ramon, California, as well as remotely from his residences. (ECF No. 1, Compl. at ¶¶ 9, 10; ECF No. 17, Answer at ¶¶ 9, 10.) Tyler always classified Plaintiff (like other ICs) as administratively exempt, and never paid him overtime premiums. (ECF No. 1, Compl. at ¶ 27; ECF No. 17, Answer at ¶ 27.) Defendant denies that it misclassified Plaintiffs and other ICs as exempt, and denies that that it owes these employees unpaid overtime compensation or penalties. (ECF No. 17, Answer at ¶¶ 39–46.)

The Parties stipulated to conditional certification under the FLSA on May 13, 2020. (ECF No. 39.) Notice was distributed accordingly, and the case currently consists of 59 opt-in Plaintiffs and one Named Plaintiff.[6] (Brome Dec. ¶ 2.) On November 16, 2020, Plaintiff filed a motion for class certification. (ECF No. 78.) On February 25, 2021, the Court granted certification as to the issue of whether ICs are misclassified as administratively exempt. (ECF No. 98.)

The parties participated in a settlement conference with Judge Ryu on March 23, 2021, which did not result in a settlement, but the parties are returning to Judge Ryu on April 19th for continued negotiations. (ECF Nos. 103, 106.)

On March 26, 2021, Plaintiff filed a motion to modify the scheduling order and for leave to amend the complaint to add three individual named Plaintiffs. (ECF No. 104.) Those individuals, who previously opted-in to assert federal claims but who were not part of the certified class, sought to add related claims under state law. The Court denied that motion on April 9, 2021. (ECF No. 111.)

### III.   STATEMENT OF FACTS

Tyler provides software solutions primarily to public sector clients. When clients purchase

---

[6] Following the Court's rulings on class certification and Plaintiff's Motion to Amend, the Parties have discussed stipulating to partially decertify the collective, to dismiss individuals who worked only as Senior ICs or outside of the ERP division (while tolling those individuals' statute of limitations for 30 days to allow them to refile their claims), and to exclude time worked as a Senior IC for individuals who worked as regular and Senior ICs. Plaintiff anticipates filing a stipulation to that effect within the week.

these products, they also pay Tyler for implementation work. Most of Tyler's products are large systems, that would not be usable without implementation work. For example, Munis "is the Enterprise Resource Planning software designed specifically for public-sector clients to manage their finances, payroll, utility billing, tax billing, community development departments cities, towns, counties, local authorities, special districts." (Webster Dep. at 68:23–69:3.)

### A. Implementation generates Tyler revenue.

ICs are revenue generating employees at Tyler. (Webster Dep. at 29:12–14.) According to Tyler's most recent 10-K Annual Report, Tyler generated over $186,000,000 in revenue from its software services in 2020, down (due to the COVID-19 pandemic) from over $213,000,000 in 2019. (Brome Dec. Ex. 1 (Tyler's 2021 10-K Form) at 29.) Tyler explains that "[s]oftware services revenue primarily consists of professional services billed in connection with implementing our software, converting client data, training client personnel, custom development activities and consulting. New clients who purchase our proprietary software licenses or subscriptions generally also contract with us to provide for the related software services. Existing clients also periodically purchase additional training, consulting and minor programming services." *Id.* at 30. This report explains that "[v]irtually all of our clients contract with us for installation, training, and data conversion services in connection with their implementation of Tyler's software solutions." *Id.* at 7. Implementation revenue is one of "a couple of key ways that [Tyler] make[s] money," along with software sales, license sales, Software-as-a-Service subscriptions, maintenance for on-premise clients. (Webster Dep. at 24:18–25:2.) Even Tyler's internal position description states "The Implementation Consultant position is a revenue-generating position." (Brome Dec. Ex. 2.)

When a client agrees to purchase Tyler's software, the contract provides the rates (Webster Dep. at 29:22–25) and amounts (*id.* at 30:24–31:2) of IC work. Tyler then charges its clients for the ICs' time on the client's project. (*Id.* at 29:16–21.) In other words, the more hours of IC work on a given project, the more Tyler can charge that client. ICs do not set how much of their time a client can receive (*id.* at 31:3–5), or what rate the client pays for their services (*id.* at 31:1–5); they provide the services they are instructed to provide under the terms of the contract between Tyler and its client. Tyler tracks ICs' billable days, and its compensation plans include added incentives

based on how many billable days the individual works per month. (Webster Dep. at 135:1–3; Brome Dec. Ex. 3.)

Tyler's sales department works with new clients through the point of signing a contract with Tyler. (Webster Dep. at 43:15–44:4.) There are no ICs in the sales department. (*Id.*) Once a contract is signed, the client moves to implementation. (*Id.* at 44:5–7.) The contract will specify how many days of ICs' work are included, and how much the client pays for those days. (*Id.* at 31:15–24.) Those terms are based on a price book set by sales and executive management. (*Id.*) After the contract is signed, ICs are assigned to a client by their project manager. (*Id.* at 101:4–7.)

On an implementation project, the project manager—not the IC—is responsible for working with the client to set the "project phasing, the project schedule, […] the scope, . . . all those various implementation project-related documents that will control and guide the overall implementation." (*Id.* at 82:18–83:1.)

**B. ICs implement Tyler's software products for Tyler's clients.**

Tyler's corporate representative testified that ICs spend "80 to 90 percent" of their time "doing the initial work to get the client up and running;" their "primary duty is to get the client up and running" with Tyler's products. (Webster Dep. at 124:25–125:13; 147:25–148:3 (same for different business units).) Tyler's job description confirms the IC "ensures that the transition to Tyler software is completed according to predetermined timelines." (Brome Dec. Ex. 2.) ICs' duties are consistent throughout the country, and have been consistent for the past ten years. (Webster Dep. at 72:15–18; 71:22–72:1.)

*i.      ICs' supervisors are responsible for high-level implementation planning*

All ERP ICs are assigned to geographic territories. (Webster Dep. at 64:1–11.) They are supervised directly by project managers who are supervised by an implementation team lead, an implementation manager, or an implementation director, depending on the specific team. (*Id.* at 66:24–67:14.)

ICs' training focuses on learning about Tyler's products, and accurately conveying that information—not on advising Tyler's clients. First, Tyler requires new ICs to present sample lessons and facilitations, providing extremely detailed feedback. (Brome Dec. 4, facilitation

feedback.) Next, new ICs then spend time shadowing a tenured IC. (Webster Dep. at 97:1–13.) During this time period, Tyler expects them to "observe only," to "listen and absorb as much information as possible," to prepare a "job shadow site report," and then to debrief with the tenured IC. (Brome Dec. Ex. 5, "Life as an IC" at Tyler 007421.)

Once ICs complete training, they report to project managers ("PMs"). PMs "work with the clients to develop the project phasing, the project schedule, determine the scope," as well as to develop "the project plan, the implementation management plan, the change management plan, all those various implementation project-related documents. . . ." (Webster Dep. at 81:18–25.) PMs are responsible for assigning clients to ICs and scheduling ICs for their implementation days. (*Id.* at 100:4–7; Brome Dec. Ex. 5, at Tyler 007427.) Compared to ICs, the PMs "have ultimately more responsibility for decision-making around keeping clients on track and trying to ensure that things happen to get them to be successful and to go live." (Geisy Dep. at 50:1–4.) The PM is "ultimately responsible" for "maintaining the project plan and having to report out to the client on the status of tasks and what has been completed" or not. (*Id.* at 51:14–25.) The ICs, in contrast, are given a specific assignment to carry out within that implementation. (*E.g.*, Roth Dep. at 82:23–83:13 ("you spent the time that was allotted that was determined by the contract and the . . . PMs").) Tyler's instruction to ICs is clear: "ANY changes to the schedule must go through the PM as there may be circumstances of which you are not aware." (Brome Dec. Ex. 5, at Tyler 007427.) Even if a client asks the IC to stay late, Tyler instructs the ICs to not "stay or make any agreements for additional time without consulting [their] PM." (*Id.*) ICs are not managing the overall course of their implementations, the PMs are.

### ii.    *ICs perform standardized steps in an implementation*

Implementations generally involve six components: (1) a fundamentals review, (2) analysis (aka current state/future state), (3) setup and configuration, (4) testing, (5) training, and (6) go-live. All ICs could work on some or all of those phases of their implementations. (Webster Dep. at 92:1–93:20.) Tyler can and does "interchange" ICs on an implementation project. (*Id.* at 148:10–18; Kudatsky Dep. at 55:24–56:10 (could work on one phase one week and different phase the next week).) Tyler provides ICs with detailed sample agendas, █████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ (Brome Dec. Ex. 6–9 (agendas).)

Ex. 10–12.) The templates are specific to different phases and for different products or modules

within products. (*Compare id.* Ex. 6, 9 (training agendas ████████████████████████

████████████████ ); Ex. 11, 12 (template agendas ██████████████████████████ ).

Throughout the phases, ICs report their activities to Tyler through site reports that "document the

daily activities, any issues, any things that need to be followed up on." (Webster Dep. 84:4–12;

Brome Dec. Ex. 15 (sample site report).)

The fundamentals review step is "so the client can have an understanding of what the

[Tyler] system looks like," since it was often "their first time seeing the Munis software."

(Kudatsky Dep.at 77:22–78:9.) Tyler provides examples of standard tasks within Munis for the IC

to demonstrate, including detailed scripts to follow. (Webster Dep. at 76:4–16.) The scripts

provide a backstory[7] and specifically instruct ICs on what buttons to click and in what order.

(Brome Dec. Ex. 16, 17 (sample scripts); Kudatsky Dep. at 72:1–19 ("those scripts were very

detailed. . . the script would specify what account number to use, what vendor to use, so it was

very specific."); Roth Dep. at 34:2–10; Void Dep. at 31:3–20.)

After the fundamentals review, the next phase is referred to as "analysis," or "current state/

future state." This phase is focused on gathering information from the client, using Tyler's

standardized forms. (Webster Dep. at 102:15–21.) The standardized Tyler forms are specific to

what product or module a client is implementing, provide pre-filled guidance for the client in

answering, and are very detailed. (Brome Dec. Ex. 18 (analysis document ███████████ ), 19

(analysis document for accounts payable), 20 (analysis document ██████████████ )[8].) For

example, ██████████████████████████████████████████████████████████

_____

[7] *E.g.,* ██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████ (Brome Dec. Ex. 17 at Tyler 044301.)
[8] In addition to these examples, Tyler produced separate analysis documents for, among others,
Bid Management, Student Activity Accounting, Capital Assets, Purchasing, Recruiting, Salary
Benefit Projections, Project and Grant Accounting, and Work Orders. (Brome Dec. ¶ 5.)

███████████████████████████████████████████████████████████
█████████████████████████████████████████████████████ (*Id.* Ex.
19.) Tyler's PM loads the questionnaires onto a client-facing SharePoint site for clients to complete describing their current procedures (the "present state"). (Giesy Dep. 70:12–71:12.) To the extent the client does not complete the questionnaire, the IC helps them complete it. (Kudatsky Dep. at 97:17–25.) The ICs must ensure the required information is collected, because it "could be pretty detrimental to the overall project [if the implementation consults] fail to collect certain required information[.]" (Webster Dep. at 104:14–24.)

After getting the client's answers describing their present state, ICs use another Tyler form for the future state. Again, Tyler's forms provide detailed questions for clients to answer – ███████████████████████████████████████████ – some of which include considerations or pre-filled recommendations about how the system will work, or work best. For example, ████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████████████████████████ (Brome Dec. Ex. 20.) Similarly, ████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████ (*Id.* Ex. 19.)

For each question, the forms call for ████████████████ (*Id.* Ex. 18–20.) During this phase, ICs may provide factual information about how the Tyler product works, but they are not deciding what the client should do. (Kudatsky Dep. at 90:7–91:14; Void Dep. at 43:3–44:24.) Some ICs describe their role as making recommendations (e.g., Costner Dep. at 48:5 – 52:3), while others testified that they did not make recommendations (e.g., Void Dep. at 43:19 – 46:13). Even those ICs who make suggestions to the clients are clear that their recommendations are based on their familiarity with the system's functionality, and their role is to demonstrate options so that the <u>client</u> can make an informed choice. (Costner Dep. at 48:5–52:3.)

The information collected in the analysis phase is then used in the configuration stage to set up the Tyler product for the individual client, where the IC works through the setup screens and

check the appropriate boxes and toggle switches. (Kudatsky Dep. at 123:2–13; *see also* Brome Dec. Ex. 18 at 3 (████████████████████████████████).) In some cases, ██████████████████████████████████████████████████████████████████ ███████. (*See* Brome Dec. Ex. 19 at 2.) During configuration, ICs are not coding the Tyler software product. (Webster Dep. at 105:18–106:4.) Tyler employs conversion engineers for the actual data conversion, who "write a conversion program to take the raw data from the legacy system to then map that into the tables that would be needed to be populated for the [Tyler product]." (Webster Dep. at 108:16–23.) Here again, the IC can answer questions about the Tyler product, but the client always makes the decisions about how to configure the product. (Kudatsky Dep. at 53:9–14; Choquette Dep. at 75:1–4; 78:10–13; Void Dep. at 43:3–25.)

After configuration comes testing, to make sure that everything works. As Mr. Kudatsky explained, the ICs are "making sure that every single program opens, that all of the buttons work right[.]" (Kudatsky Dep. at 129:6–22.) Here again, Tyler provides specific checklists of functions to be tested (Brome Dec. Ex. 21 (testing checklist ████████████████); 11 (█████████ ████ agenda)) and instructs ICs on the components they need to test. (Kudatsky Dep. at 129:23– 130:18; Choquette Dep. at 43:8–19 (went through "each of the processes that we configured the business rules for. So one day we would go through the purchase orders, setting – entering a purchase order and releasing it and posting it and did it go to the proper approvals, the people it was supposed to.").) Testing is part of the training that ICs provide to Tyler's clients. (Geisy Dep. at 78:13 – 22.)

One of the ICs' main roles is to conduct training for Tyler's clients. During the training phase, the project managers provided an agenda to the ICs. (Choquette Dep. at 69:19–70:9; Roth Dep. at 65:2–16; Costner Dep. at 73:23–74:23; Void Dep. at 61:3–18.) Tyler also provides lesson plans that are available for ICs. (Webster Dep. at 110:21–24.) ICs are expected to check whether the client is grasping the material; if they are not, the IC may propose additional training to the client or the project manager. Ultimately, however, the client makes the call whether to proceed to go-live. (Costner Dep. at 75:18–77:13.)

The last phase of the implementation is referred to as "go-live," when "everything is

complete and the client flips the light switch and says we are no longer using our old system, we're using our new system." (Kudatsky Dep. at 150:6–10.) During this final phase, the IC's role is essentially helping to handle any problems that crop up, since the client has not yet been transitioned to Tyler's support team. (Void Dep. at 71:17–72:2.) Typical issues found during go-live are connected to roles (meaning users' permissions) or workflows (meaning required approvals) within the system. (*Id.* at 71:17–72:2 and 74:4–11.) Again, during this step, Tyler provides detailed checklists for ICs. (*See, e.g.*, Brome Dec. Ex. 22 (███████████████████████████████████████████████████████████████████████████████████████████████████████████).) Go-live is the end of the IC's work on a project; after that point, the IC generally has no further involvement. (*E.g.*, Wright Dep. at 36:6–13.) After go-live, the "client is handed off to the support organization." (Webster Dep. at 90:4–9.)

Importantly, throughout an implementation, the ICs are providing information to the client so that the <u>client</u> can make the decisions about how the product will be set up. (Kudatsky Dep. at 53:9–14; 90:7–91:14; Void Dep. at 43:3–44:24; Costner Dep. at 48:5–52:3; Choquette Dep. at 75:1–4; 78:10–13; Roth Dep. at 46:18–47:4; Brome Dec. Ex. 18–20 (Analysis spreadsheets); 15 (site report ██████████████████████).)

### iv. *Tyler's ICs have limited discretion*

ICs do not determine what software clients will buy, how much implementation work clients will purchase, how long an implementation will last, or how clients will use Tyler's software in the future. ICs are expected to follow the plan laid out for them in an implementation. The "project plan pretty much has everything listed out in the order it should go. And there are agendas for each day that we should follow." (Void Dep. at 51:21–52:8.) Tyler's "Life as an IC" document is clear that "[a]ny changes to what is provided for services (billable days, conversions, Tyler Forms) must go through your PM. . . . This is beyond your purview and should be handled by the PM." (Brome Dec. Ex. 5 at Tyler 007427.) This document is clear that even when a request from the client "seems like a simple request on the surface," the IC must engage the PM in any change because "there may be implications that [the IC is] not aware of that need to be

considered." (*Id.*; Void Dep. at 37:10–22; 62:11–63:14) (confirming that even small changes need approval from a PM).)

In the actual implementation, ICs do not have discretion to set up the Tyler product however they want. Instead, any choice about different configuration options ultimately lies with the client. (Roth Dep. at 46:18–47:4; Void Dep. at 44:1–45:3; Costner Dep. at 49:25–50:14; Kudatsky Dep. at 53:9–14.) Throughout the phases of implementation, Tyler provides forms and questionnaires, scripts, and lesson plans, which standardize the process and avoid inconsistent results. For example, in a fundamental review script, Tyler instructs ICs ███████████ ████████████████████████████████████████████. (Brome Dec. Ex. 16, 17.) With the fundamentals review, Tyler expects ICs to be follow the order of steps provided based on their skill and experience, so they are reading mechanically from a script while on-site with a client, but still controls those presentations. (Giesy Dep. at 65:4–66:12.)

Tyler also provides specific instructions about the manner and format of IC presentations (e.g., "ALWAYS dress professional: Should be '1 level up' from client," "Don't make recommendations for modules that you will not be implementing with the client," "Don't check your email during session (use breaks)," and client communications. (Brome Dec. Ex. 5. at Tyler 007425–26, Tyler 007429.) While ICs generally do not have a Tyler supervisor with them at the client site, ICs have to provide thorough, factual information about the progress to the project manager. (Webster Dep. at 85:4–12; Roth Dep. at 86:12–87:13.) ICs are responsible for informing the project manager about the progress, but do not have authority to adjust the schedule. (Roth Dep. at 82:6–17.)

If the implementation is not meeting the target deadlines, or if a client wants to adjust the schedule, such changes must go through the PM. (Brome Dec. Ex. 5 at Tyler 007427.) If a client is not happy with Tyler's service, Tyler can provide free additional days of IC work, but the ICs do not have authority to do that—only project managers or implementation directors can. (Webster Dep. at 107:16–108:15.)

## IV. ARGUMENT

The application of an FLSA exemption is a mixed question of law and fact. "The nature of

the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law." *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004); *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124 (9th Cir. 2002). The administrative exemption is an affirmative defense, so Tyler bears the burden of proof. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000).

On cross-motions for summary judgment, the Court must consider each motion "on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). On Plaintiffs' motion, Tyler is the non-moving party bearing the burden of proof. Plaintiffs are therefore "entitled to a judgment as a matter of law" if Tyler "fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no "express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Therefore, Plaintiffs will be entitled to judgment as a matter of law unless Tyler can show that ICs' work is directly related to Tyler's (or its clients') general business operations *and* that ICs' primary duty requires the exercise of discretion and independent judgment as to matters of significance.

The parties do not dispute what ICs do. Therefore, whether those duties meet the test for exempt status is a question of law that must be decided by the Court. *Ballaris*, 370 F.3d at 910. If the facts do not support finding that ICs were exempt as a matter of law, the Court should grant Plaintiffs' motion. *Celotex*, 477 U.S. at 323.

## A. Tyler cannot satisfy its burden to prove the administrative exemption applies under state or federal law

As Judge Totenberg recently concluded in *Greene*, "a reasonable jury could not find that Ms. Greene['s] primary duties involved *advising* those government customers on matters involving running a component of the government or determining the overall course and policies of the government." *Greene*, 2021 WL 1012164, at *11. Her role "was entirely distinct from that of a tax adviser or financial consultant who may direct a customer on matters of policy determination about how to better or more efficiently run their business operation or how to

3:19-cv-07647-WHA

comply with particular regulations." *Id.* The same is true for the ERP ICs in this case: their role is to carry out the tasks assigned to them, to get Tyler's clients "up and running," it is not to advise them on matters of policy about how to run their business.

To establish its administrative exemption defense, Tyler must prove that ICs' primary duty was (1) "directly related to the management or general business operations" of Tyler or its customers, *and* (2) involved the use of discretion and independent judgment.[9] 29 C.F.R. § 541.200(a); 8 C.C.R. § 11040(1)(A)(2). Tyler cannot meet its burden on either prong. *Greene*, 2021 WL 1012164, at **8–17 (finding that Tyler could not satisfy either duty prong of the administrative exemption under the FLSA for an ERP[10] IC). Plaintiffs are entitled to summary judgment unless Tyler satisfies *both* prongs; a ruling for Plaintiffs on either prong would defeat the exemption entirely. *McKeen-Chaplin v. Provident Savings Bank, FSB*, 862 F.3d 847, 849 n.1 (9th Cir. 2017) (administrative exemption is conjunctive).

The exemption analysis under the FLSA focuses on ICs' primary duty. 29 C.F.R. § 541.200(a); *see Deluca v. Farmers*, 386 F. Supp. 3d 1235, 1251–53 (N.D. Cal. 2019) (exemption begins with examining the workers' primary duty). Similarly, under California law, the employer must show that employees are "primarily engaged" in exempt work, meaning the workers are "engaged in the activities meeting the test for the exemption at least 50 percent of the time." *Eicher*, 151 Cal. App. 4th at 1371–72 (citing Wage Order No. 4–2001)).[11] Tyler bears the burden of proof, and must prove that employees' "duties and responsibilities involve . . . the performance of office or non-manual work directly related to the management or general business operations of his/her employer or his employer's customers." 8 C.C.R. § 11040(1)(A)(2)(a)(I).[12] Additionally,

---

[9] Plaintiffs do not dispute that the salary basis test of the exemption was satisfied.

[10] Ms. Greene worked on a product called ExecuTime, which Tyler acquired in June 2016. At the time of the acquisition, the roles and titles of individuals involved in implementation were slightly different, but have now been merged into Tyler's ERP structure. *See Greene*, 2021 WL 1012164, at *2; Webster Dep. at 98:17 – 99:13 ("given the highly integrated nature [of ExecuTime] with Munis, the Implementation Consultants that would implement Munis – they're also responsible for implementing ExecuTime.").

[11] The duties prongs are essentially the same under state and federal law. However, the California exemption is tied to the pre-2004 version of the regulations, and includes an objective requirement that 50 percent of work time be spent on exempt duties. *Eicher*, 151 Cal. App. 4th at 1371–72.

[12] While federal law has moved away from narrowly construing exemptions, *see Encino Motorcars, LLC v. Navarro*, — U.S. —, 138 S. Ct. 1134, 1142 (2018), California law has

the employees must "customarily and regularly exercise discretion and independent judgment, and "perform[ ] under only general supervision work along specialized or technical lines requiring special training" or "execute [ ] under only general supervision special assignments and tasks." *Ambrosia v. Cogent Commc'ns, Inc.*, 312 F.R.D. 544, 553 (N.D. Cal. 2016).

Tyler cannot satisfy either the "management or general business operations" prong or the "discretion and independent judgment" prong. ICs' main duty is to implement Tyler's products.[13] While Tyler's implementations consist of different phases, all of those phases fall under ICs' potential duties. (Webster Dep. at 92:1–93:20; *see* Geisy Dep. 38:24–39:5 (fundamentals review and current-state/ future-state are both IC duties).) In other words, it is not the case that some ICs are only responsible for (for example) training, and others only for testing, and there is no evidence that Tyler ever employed ICs to only handle certain phases. PMs generally consider ICs' experience when assigning projects, so some ICs are more likely to handle certain jobs, and may wind up working more on certain phases, but that fact does not change ICs' primary duty.

### i. Implementing software products is not directly related to Tyler's or Tyler's clients' "management or general business operations."

ICs are not formulating policy or setting Tyler's strategic course. Instead, ICs' work one of Tyler's core marketplace offerings, and had nothing to do with administering Tyler's general business operations. *Greene*, 2021 WL 1013164, at *9 ("Ms. Greene's work was clearly production rather than administrative. There is no evidence in the record that Ms. Greene's duties involved any aspect of running Tyler's business, formulating policy, negotiation contracts, or the like.") (citations omitted).

The essence of the "directly related" prong of the administrative exemption is "not whether an employee is essential to the business, but rather whether her primary duty goes to the heart of internal administration—rather than marketplace offerings." *McKeen-Chaplin*, 862 F.3d at 855.[14]

---

not. *See Ortiz v. Amazon.com LLC*, 389 F. Supp. 3d 728, 734 (N.D. Cal. 2019).

[13] ICs' secondary duties cannot drive the exemption analysis. Implementing Tyler's software is the main duty. Other duties are secondary, and represent minimal amounts of work time. (*See, e.g.*, Webster Dep. at 74:8-75:8 (two or three instances of presale work per year); 45:4–6 (consulting with software engineers is not a main duty for ICs).)

[14] 29 C.F.R. § 541.201 provides guidance on this prong. Section 201(a) describes the

The Ninth Circuit has explained that workers who are carrying out the day-to-day operations of their employer, but not running the business itself, do not qualify for the administrative exemption. *Id.* at 852 (mortgage underwriters not exempt in part because they "do not decide if Provident *should* take on risk, but instead assess whether . . . the particular loan at issue falls within the range of risk Provident has determined it is willing to take. Assessing the loan's riskiness according to relevant guidelines is quite distinct from assessing or determining Provident's business interests."); *Bothell*, 299 F.3d at 1128 (reversing summary judgment for an employer and recognizing that a worker who "meets and confers with customers to identify the problem, diagnoses the malfunction, formulates a work plan, repairs the equipment based on procedures established by the manufacturer, and fills out a field service report to enable his employer to bill for the work" would not be exempt); *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066, 1067–70 (9th Cir. 1990) (probation officers not exempt who investigated "adult offenders or juvenile detainees and advise the court on their proper sentence or disposition within the system" and whose recommendations were used "either to aid in sentencing an adult offender or to determine whether and how to detain a minor who has been arrested").

Through these cases, the Ninth Circuit has explained that this prong is satisfied "if the employee engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs. *McKeen-Chaplin*, 862 F.3d at 851 (citations and quotations omitted). The test under California law is similar, drawing "a distinction between administrative employees, who are usually described as employees performing work directly related to management policies or general business operations of his employer or his

---

administrative-production dichotomy, which courts often find useful. *See Greene*, 2021 WL 1012164, at *9 (with respect to Tyler's general business operations, "under the production-administrative dichotomy described above, Ms. Greene's work was clearly production rather than administrative."); *McKeen-Chaplin*, 862 F.3d at 852–53. Section 201(c) explains that employees who act as advisers to their employer's clients, such as "tax experts or financial consultants" can satisfy this prong. *See Greene*, 2021 WL 1012164, at *11 (finding that the "role was entirely distinct from that of a tax adviser or financial consultant who may direct a customer on matters of policy determination"). Section 201(b) describes work in certain functional areas that generally satisfies this prong. However, Tyler's corporate representative was clear that ICs do not perform the administrative duties listed in 29 C.F.R. § 541.201(b) (such as tax, finance, accounting, etc.). (Webster Dep. 34:17–36:14.)

employer's customers, and production employees, who have been described as those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce." *Eicher*, 151 Cal. App. 4th at 1372 (citations and quotations omitted).

Here, the evidence is clear that the IC role is a "revenue-generating position." (Webster Dep. at 29:12–14.) Tyler charges its clients for the ICs' time connected to the client's project, and the contract provides the rates and amounts of IC work. (*Id.* at 29:16–25; 30:24–31:2.) By Tyler's own admission, therefore, implementation work is one of its marketplace offerings (Webster Dep. at 24:18–25:2; 29:7–21) and therefore not administrative. *McKeen-Chaplin*, 862 F.3d at 855.

The application of these principles in *Eicher* is particularly useful, since that case involved very similar facts. There, the employer sold a software, MasterMind, which was "used in sports and entertainment venues to schedule staff, manage payroll, credentialing, and security, and keep track of costs." 151 Cal. App. 4th at 1370. The employer's "primary business is to sell the software to these venues, implement the software for the customer, train the customer, and provide additional support. During the implementation phase, ABI typically sends its employees to the customer's site to install and train the customer, based on the specific needs of that customer." *Id.* The plaintiff's duties were very similar to the ICs' duties here. The plaintiff spent most of his time:

> training customer employees on MasterMind and trouble shooting the software when he was engaged in implementation on the customer's site. [Eicher] also spent time gathering information about the customers' employment practices and entering data into the appropriate fields of the MasterMind program. [Eicher] testified that he spent the majority of his time, when in [ABI's] office, performing customer service work. The remainder of his time was spent on individual training and administrative duties.

*Id.* The court determined that the plaintiff was "engaged in the core day-to-day business of ABI—that is, implementing the ABI MasterMind product at customer venues and supporting the customers, whether at the customer venues or in the ABI office." *Id.* at 1373. Tyler's ICs perform the same role for Tyler and Tyler's clients. Because the clients used the MasterMind software "to schedule staff, manage payroll, credentialing, and security, and keep track of costs," the plaintiff necessarily had to learn about aspects of his clients' business operations. *Id.* at 1370, 1373. The court explained that, although the plaintiff was interacting with administrative matters, he did so as part of the company's day-to-day operations: plaintiff had "to learn of the customers' management

policies and business operations in the course of his work, **in order to ensure that the product met the needs of the customers**." *Id.* at 1373 (emphasis added). Thus, the administrative exemption is not satisfied just because a worker is involved with management policies; it depends on the <u>purpose</u> of that involvement as the *Eicher* court acknowledged. The *Eicher* plaintiff was not exempt because his role was "to implement the software in the most beneficial way for the customers and not to participate in policy-making or alter the general operation of the business." *Id*. This description matches the undisputed facts in this case, and compels the same result. There is no evidence that ICs' role is to participate in policy-making; their role is to "implement the software in the most beneficial way" for Tyler's clients.

This Court reached the same conclusion applying California law to very similar facts in *Gordon v. Model N, Inc.*, 2016 WL 3164240, at *3 (N.D. Cal. June 9, 2016), *aff'd*, 705 F. App'x 647 (9th Cir. 2017)[15]. There, this Court held that the principal technical education consultant for Model N was non-exempt under state law, and explained that while Gordon "never worked in the production of Model N's software, he *did* work in the production of an ancillary product – the training materials. To the extent he modified the training materials at his own discretion, he did so based on the already-established needs of the customers, **not based on any responsibility in crafting Model N's or its client's business strategy**." *Id.* (italics in original, bold added). The same is true of Tyler's ICs: they do not produce Tyler's software, but they produce revenue for Tyler under its model of billing clients for implementations. Similarly, and significantly, Tyler's ICs do not have "any responsibility for crafting [Tyler's] or its client's business strategy." *Id*. Instead, as Tyler's corporate representative admitted, ICs are responsible for getting the clients "up and running," ***not*** "using the product for managing the client's general business". (Webster Dep. at 124:10–13.) What is more, Tyler has a separate group of employees who <u>do</u> provide that general business consulting. Tyler's "Life as an IC" guide explains, in the context of documentation for

---

[15] In a short affirmance, the Ninth Circuit explained that: "The district court held, and the record shows, that '[a]lthough Gordon's work related to the heard of Model N's business, and the service he provided was essential to its success, his role in that work did not relate to the general operations of the business.' Gordon's work did not relate to Model N's or its customers' management policies or general business operations. [Citation] That is enough to make the exemption inapplicable." 705 F. App'x at 648.

clients: "If you create a document for a client, it should be one that is general enough that it can be . . . shared with all clients. We do have a paid service, Business Process Consulting, that clients can purchase if they would like customized documents." (Brome Dec. Ex. 5 at Tyler 007430; *see also* Webster Dep. at 123:1–124:9 (for ICs who are not on "installed accounts" team, 80–90 percent of work is getting the client up and running).)

Finally, *Greene* reached the same conclusion with respect to a Tyler IC. The court explained the distinction between service provided by the IC—teaching clients "how to [use] their new time and pay software and how to configure its functionalities"—with exempt adviser work which "is directed at advice on matters that involve policy determinations, *i.e.*, how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation." *Greene*, 2021 WL 1012164, at *10 (quoting *Bratt*, 912 F.2d at 1070). Applying that distinction, the court found that the plaintiff's primary duties did not involve advising government customers "how to run their personnel department, what benefits to offer (comp time, overtime, vacation time), or even what software to use to administer their time and attendance policies." *Id.* at *11. The same is true here, and the Court must reach the same conclusion: ICs' "role was entirely distinct from that of a tax adviser or financial consultant who may direct a customer on matters of policy determination about how to better or more efficiently run their business operation or how to comply with particular regulations." *Id.; see also Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1287–88 (C.D. Cal. 2015) (recognizing that "[t]ax and financial consulting is a form of specialized expertise meant to guide the policies of a business," and distinct from the work of real estate appraisers, whose "work is integrated into the day-to-day core product" of their employer).

The reasoning of *Greene*, *Eicher*, and *Gordon* is fatal to Tyler's administrative exemption defense. Accordingly, Tyler will likely focus on the few factually distinguishable cases where workers involved in software implementation were found to satisfy the administrative exemption. But, unlike Plaintiffs' cases, those cases are readily distinguishable. *See Greene*, 2021 WL 1012164, at **13–14 (distinguishing cases cited by Tyler). For example, in *Cruz v. Lawson Software, Inc.*, the court found that the plaintiffs' testimony showed their role was to "advise

Lawson clients on **how to run their businesses** using Lawson software." 764 F. Supp. 2d 1050, 1066 (D. Minn. 2011) (emphasis added). Unlike the Plaintiffs here, the plaintiffs in *Lawson* performed work "aimed at the overall efficiency or mode of operation of the Lawson customers—they are assisting in implementing and configuring Lawson software to run the client's business in a more efficient way." *Id.* Similarly, in *Carbaugh v. Unisoft Int'l, Inc.*, the court held that the plaintiff was "responsible for worldwide pre-and post-sales, installation, project management, and second-level support of OpCon/xps. Carbaugh was involved with infrastructure management, third party software and hardware management, recommendations and maintenance, and he developed and implemented cost savings to increase profit and revenue." 2011 WL 5553724, at *22 (S.D. Tex. Nov. 15, 2011). The plaintiff there also "either installed and adopted the OpCon/xps program onto the client's software or oversaw and instructed the client on how to do it. Carbaugh also suggested who at the client site should receive training, and developed and tailored the training modules." *Id.* Finally, in *Verkuilen*, the plaintiff, an account manager, had to "learn about the customer's business and help MediaBank's software engineers determine how its software can be adapted to the customer's needs." *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 982 (7th Cir. 2011). Account managers there had to "build functional and technical specifications and turn it over to . . . developers who will then build the software, . . . checking in with the account manager, making sure what they are building is ultimately what the customer wanted." *Id*.

These cases involve roles that serve a different purpose for the employer or the employer's clients than the IC role at issue here. ICs are not advising Tyler's clients about "how to run their businesses" using Tyler software. *Cruz*, 764 F. Supp. 2d at 1066. Nor are ICs responsible for "pre-and post-sales, installation, project management . . . infrastructure management, third party software and hardware management, recommendations and maintenance," or "cost savings to increase profit and revenue." *Carbaugh*, 2011 WL 5553724, at *22. And unlike the account manager in *Verkuilen*, Tyler's ICs are not "build[ing] functional specifications" for "developers who will then build the software." 646 F.3d 982.

The facts here show that ICs' primary duty was not directly related to the management or general business operations of Tyler or its clients, so the exemption does not apply.

1

2

   **ii.**  ***ICs do not exercise discretion and independent judgment with respect to matters of significance.***

3    ICs' primary duty does not include the exercise of meaningful discretion.[16] Exercising

4 discretion "involves the comparison and the evaluation of possible courses of conduct, and acting

5 or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).

6 Even if ICs exercise some discretion, that "must be 'free from immediate direction' and relate to

7 work that is of 'substantial importance' or with regards to 'matters of significance.'" *Boyd*, 109 F.

8 Supp. 3d at 1292 (citing *Bothell*, 299 F.3d at 1129 and 29 C.F.R. § 541.202(a), (c)). Exercising

9 discretion entails "more than the use of skill in applying well-established techniques, procedures or

10 specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

11    Here, the undisputed facts show that ICs' primary duty does not consist of exercising

12 discretion and independent judgment with respect to matters of significance. Instead, ICs are

13 presenting information during the fundamentals review and training phases, collecting data from

14 the client during the current state and future state analysis, following established procedures during

15 configuration, and performing routine troubleshooting according to detailed checklists during the

16 testing and go-live phases. None of these steps is sufficient to satisfy the exemption.

17    The *Greene* decision effectively explains why several allegedly discretionary tasks that ICs

18 perform do not rise to the level required. *Greene*, 2021 WL 1012164, at **15–17 (rejecting Tyler's

19 arguments as to the plaintiff's: 1) troubleshooting; 2) determining whether to escalate a

20 troubleshooting question; 3) coordinating and prioritizing her own schedule; 4) assessment of

21 client protocols to create "custom training agendas"; 5) providing input on the "go-live" date; and

22 6) discretion to make recommendations). The *Greene* court's analysis on these points is correct—

23 ICs' roles when troubleshooting, setting their schedule, or deciding to make a recommendation do

24 not deal with matters of significance, and the crucial decision-making as to the course of an

25 implementation or project deadlines was reserved for the client and the supervisor. *Id.* Ms. Greene

26

27

28

---

[16] Because Tyler cannot show the primary duty is directly related to management or general business operations, the exemption can be defeated without analyzing the discretion prong of the administrative exemption because. *See Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535–37 (2d Cir. 2009) (declining to address discretion prong because exemption is conjunctive).

performed the same type of work as the ICs here, so this Court should follow *Greene* and hold that ICs do not exercise legally significant discretion and independent judgment.

Plaintiffs anticipate that Tyler will likely focus on the analysis phase because Ms. Greene did not handle that aspect of implementations.[17] *See id.* at *2 (clients completed their questionnaires before Ms. Greene was involved). But this fact does not change the ultimate conclusion, because even for ICs who did perform this work, their role in is to answer client questions so *the client* can make the best decisions—not to push for a specific approach. (Kudatsky Dep. at 97:1–16; Void Dep. at 43:19–45:16; Costner Dep. at 53:15–20; Roth Dep. at 111:13–112:17.) And while some ICs make recommendations about software configurations during this phase, they do so in the context of explaining how they have seen Tyler's products work effectively, and always leave the decisions up to the client. (Costner Dep. at 51:5–53:20; Roth Dep. 46:18–47:4.) As Mr. Webster testified, ICs "assist[] our clients in making decisions around . . . configuring the software, the options that they have in terms of configuring the software, the pros and cons of the various options that they have. . . ." (Webster Dep. at 21:8–17.) None of the evidence shows that ICs have "authority to make an independent choice, free from immediate direction or supervision" when conducting the analysis phase. 29 C.F.R. § 541.202(c). Instead, ICs present information to clients about how the software works best. But "the use of skill in applying well-established techniques, procedures or specific standards" does not amount to legally significant discretion. 29 C.F.R. § 541.202(e).

ICs do not to advise clients about how to run their governments. Tyler's policies clearly limit how ICs did their work, and that all decisions in configuring the product ultimately sat with the client. (Roth Dep. at 46:18–47:4; Void Dep. at 44:1–45:3; Costner Dep. at 49:25–50:14; Kudatsky Dep. at 53:9–14.) And where ICs were making decisions, those were not on matters of significance. (*E.g.*, Sinclair Dep. 62:22–63:5 (examples of judgment include "I had the discretion to pick which screenshot or put a page break where something belonged" in a training manual).)

Even if ICs make suggestions about configuration options, that was not part of their

---

[17] Ms. Greene is not unique among ICs in this regard: Tyler does not assign new ICs to this phase, so there are likely other class members who have not handled the current state/ future state analysis. (*See* Geisy Dep. at 67:12–24.)

primary duty, so should not impact the Court's analysis. *See* 29 C.F.R. § 541.200(a)(3). ICs were not evaluated based on whether they were providing recommendations (*see* Brome Dec. Ex. 4 (facilitation evaluation), nor were they encouraged to provide recommendations (Roth Dep. at 47:14–23). Tyler's written site reports ███████████████████████, and the written analysis materials ████████████. (Brome Dec. Ex. 18–20 (analysis documents), 15 (site report). The record is clear that all configuration decisions stay with the client, and the IC is there to provide relevant information. (Webster Dep. at 21:8–25 (IC role "assists our clients in making decisions"); 100:21–101:18 (analysis phase helps client understand "the options and decisions that they [the client] made on the desired workflows and business flows"); 103:2–12 (ICs must collect required information to prepare for "a policy decision, a change decision for that client to make."); 104:2–17 (during configuration, clients may decide to take a different approach to achieve their desired business results); 108:12–22 (client's subject matter experts are the ones "responsible for the overall decisions in the configuration of the modules.").)

Nor do ICs exercise discretion about the course of an implementation. For example, while the IC may think a client is not ready to proceed, they cannot prevent them from going forward. (Costner Dep. at 76:2–24 ("if they [say they are ready], I can't push the issue. They are the ones making the call."); Roth Dep. 81:3–82:17 (any changes to the go-live date would be up to project manager, not IC).) Tyler's written documents are clear that "[a]ny changes to what is provided for services (billable days, conversions, Tyler Forms) must go through your PM. . . . This is beyond your purview and should be handled by the PM." (Brome Dec. Ex. 5 at Tyler 007427.)

Tyler may contend that ICs perform one of the functions listed in 29 C.F.R. § 541.202(b) such as "provid[ing] consultation or expert advice to management", but the evidence shows that ICs do not provide "expert advice to management."[18] Their role is to follow Tyler's overall implementation plans and weekly and daily agendas. During most phases, their role is focused on training and troubleshooting. And even during the current state/ future state analysis phase, their

---

[18] 29 C.F.R. § 541.202(b) lists numerous "factors to consider" that may demonstrate a worker exercises discretion and independent judgment with respect to matters of significance. The others plainly do not apply to ICs (e.g., ICs do not "formulate, affect, interpret, or implement management policies or operating practices" or have "authority to negotiate and bind the company on significant matters.").

job is to present all the relevant facts so that the client can make a decision about configuring the software, not to advise the client how to run their business. Moreover, even if they did make a recommendation about software configuration, that is distinct from advising "management." Tyler's analysis spreadsheet contained dozens of line items to be completed by the IC and the client, which relate to setting up the software, not to a broader management level. For example, one IC who made recommendations explained the nature of those suggestions as:

> "we recommend the order that you put your items called pay codes or deduction codes so it will make it easier for them as they grow those items within their system. We help recommend when they build tables maybe not to use alpha because then if something comes up later, they can't alphabetically fit things in the right order, so we have them do things numerically because they want to look at, you know, absence and, you know, out of office, and then they can't put something in between that they wanted to, so numerically they can easily do that. So it's small little things like that since, again, they don't know the system and we can help them, you know, build the system that's going to meet their needs today and down the road."

(Costner Dep. at 51:11–52:3.) These "small little things" do not constitute advising management; they are part of Tyler's day-to-day affairs. *Bratt*, 912 F.2d at 1070 (concept of advising the management as administrative duty "is directed at advice on matters that involve policy determinations, *i.e.,* how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation. The services the Employees provide the courts do not relate to court policy or overall operational management but to the courts' day-to-day production process."). The Court should hold that ICs do not exercise discretion and independent judgment with respect to matters of significance as part of their primary duty.

### iii. *None of the phases of Tyler's implementations constitute exempt work.*

Because the duties test of the administrative exemption are focused on an employee's primary duty, and all ICs' share a primary duty of implementing Tyler's software products, the Court should conclude that ICs are non-exempt. All ICs' work goes to Tyler's "marketplace offerings," and ICs are not formulating policy, setting Tyler's strategic course, or advising clients about how to run their businesses. *See McKeen-Chaplin*, 862 F.3d at 855. Therefore, the Court need not break down its analysis based on the phases of an implementation. However, to the extent Tyler attempts to argue that ICs' weekly assignments change the analysis, or attempts to

distinguish the facts of *Greene* based on which phases Ms. Greene handled, none of the phases standing alone constitutes exempt work.

The fundamentals review and training phases do not constitute exempt work. As *Greene* recognized, "providing routine education by way of 'delivering educational lectures, materials, and presentations would be day-to-day work and would be nonexempt.'" *Greene*, 2021 WL 1012164, at *12 (quoting U.S. DOL, Wage & Hour Div., Opinion Letter, FLSA 2020-9 at 4 (June 25, 2020)). Moreover, even if an IC "modified the training materials at his own discretion, he did so based on the already-established needs of the customers, not based on any responsibility in crafting [Tyler's] or its client's business strategy." *Gordon*, 2016 WL 3194240, at *3.

As discussed above, the current-state/ future-state analysis portion is the closest to exempt work of all the phases, but even this step falls short. The Ninth Circuit has confirmed that ICs' work in this phase is not exempt.[19] Indeed, during the current-state analysis phase, ICs gather facts in response to specific questions, which are then used to help the client make decisions about their desired business processes going forward. This is not exempt work. *See Bratt*, 912 F.2d at 1067–70 (investigators who "conduct factual investigations" are not administrative, because they are carrying out the day-to-day operations, not running the business); *see also Boyd*, 109 F. Supp. 3d at 1287-89 (real estate appraisers' fact gathering not "directly related"); *Deluca*, 386 F. Supp. 3d at 1256–57 (special investigators fact gathering not "directly related"). Likewise, during the future-state phase, ICs are expected "to implement the software in the most beneficial way for the customers and not to participate in policy-making or alter the general operation of the business." *Eicher*, 151 Cal. App. 4th at 1373.

Even if ICs make recommendations about best practices for setting up Munis, that does not make them exempt. In *Bratt*, the probation officers' primary duty was to "conduct factual investigations of adult offenders or juvenile detainees **and advise the court** on their proper

---

[19] Tyler will likely argue that because Ms. Greene did not handle the analysis phase, she is factually distinct from the ERP ICs here. But, Tyler nonetheless argued that Ms. Greene's "time spent reviewing client information, such as the questionnaire, and familiarizing herself with their policies" demonstrated that she was performing exempt work even though she was not responsible for completing the analysis questionnaire. *Greene*, 2021 WL 1012164, at *12.

sentence or disposition within the system." *Bratt*, 912 F.2d at 1069 (emphasis added). The officers made recommendations that were used "either to aid in sentencing an adult offender or to determine whether and how to detain a minor who has been arrested." *Id.* at 1069. Even so, their role was not administrative because they are carrying out the day-to-day operations, not running the business. *Id.* at 1070. Additionally, the ICs' work here does not satisfy the discretion and independent judgment prong, because they are applying well-established techniques to gather facts about the client's current state and the client's preferences for the future state. *See Boyd*, 109 F. Supp. 3d at 1294–97 (finding this prong not satisfied even though appraisers are engaged in "much more complex and opinion-based work" and must "fill out substantial, subjective narratives . . . select appropriate comparables to estimate a home's values" and must "weigh different factors in assessing a home's value").

Finally, during the configuration, testing, and go-live phases, ICs are working through checklists to make sure all components of Tyler's products are functioning correctly; when they find problems, they fix what they can and escalate what they cannot. On this type of troubleshooting work, "the law is abundantly clear . . . that IT support work, including troubleshooting computer applications . . . and ensuring that computer equipment or a computer application is 'working properly according to the specifications designed by others' are examples of work that 'lacks the requisite exercise of discretion and independent judgment within the meaning of the administrative exemption.'" *Greene*, 2021 WL 1012164, at *15 (quoting U.S. DOL, Wage & Hour Div., Opinion Letter, 2006-42 (Oc. 26, 2006)).

## V.    CONCLUSION

Whether the job of an IC is considered on the whole, or in component parts, Tyler cannot show that ICs' primary job duty satisfies the administrative exemption. The Court should hold that ICs are non-exempt, and that Tyler cannot meet its burden to show the administrative exemption applies under state or federal law.

Dated: April 19, 2021          **NICHOLS KASTER, LLP**

By:     s/Daniel S. Brome
Matthew C. Helland
Daniel S. Brome
Rachhana T. Srey