EXHIBIT 25

```
 1            UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA

 3

 4                    Case No.:  3:19-CV-07647-WHA

 5                         Judge William Alsup

 6    _____

 7    AARON KUDATSKY, Individually and on

 8    behalf of all others similarly situated,

 9          Plaintiffs,

10    vs.

11    TYLER TECHNOLOGIES,

12          Defendant.

13    _____

14

15

16

17       REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF

18                  CINDY CHOQUETTE

19          Taken Wednesday, October 21, 2020

20             Scheduled for 11:00 a.m.

21

22

23

24    REPORTED BY:  DANA S. ANDERSON-LINNELL

25    Job No.:  TX 4297272
```

Page 1

1    Q.   And how did you know what questions to ask

2    the client?

3    A.   Those were scripted.

4    Q.   All of the questions?

5    A.   Not all of them.  You would, of course,

6    get more information.  But, you know, what

7    business rules we needed to set up, the various

8    processes that they had, what approval levels

9    that they had, the thresholds for those

10   approvals, those were scripted questions --

11   Q.   Okay.

12   A.   -- that Tyler provided us.

13   Q.   Was it your follow-up questions that

14   weren't scripted?

15   A.   Correct.

16   Q.   Okay.  And how did you know what follow-up

17   questions to ask?

18   A.   Because sometimes they wouldn't give

19   complete answers or I didn't understand them.

20   Q.   But did you know to ask the follow-up

21   questions because of your knowledge of the

22   Tyler products or your experience with the

23   Munis software?

24   A.   Yes.  And how the system worked.  I had

25   knowledge of that.

Page 40

1     and configuration you just explained?

2     A.   That and we were doing the next phase, the

3     testing.

4     Q.   Okay.

5     A.   Because once we configured it, we needed

6     to test them and then test those processes to

7     make sure it did what they had wanted.

8     Q.   Okay.  And so can you explain to me what

9     you did in your role as an implementation

10    consultant testing?

11    A.   Yes.  Let's say it was -- we would have to

12    go through each of the processes that we

13    configured the business rules for.  So one day

14    we would go through the purchase orders,

15    setting -- entering a purchase order and

16    releasing it and posting it and did it go to

17    the proper approvals, the people that it was

18    supposed to.  If not, we had to revisit the

19    setup and determine why it didn't.

20    Q.   And for this testing you said it was on

21    site?

22    A.   That's correct.

23    Q.   Is there any reason that the clients

24    couldn't have done this testing?

25    A.   Well, you would have had -- a couple of

Page 43

1    Q.   Okay.  So you only recall calling your

2    project manager with an issue one time?

3    A.   Correct.

4    Q.   Okay.  Now, you just mentioned that your

5    project manager would come on site at times.

6    Would that be just to supervise you, or would

7    that be to meet with the client?  Can you

8    explain why the project manager was there?

9    A.   Meet with the client to make sure the

10    project was going according to, you know, the

11    schedule, were there any questions that, you

12    know, they could help with, anything not being

13    done by the implementation consultant.  And

14    then they would come and check on us as well.

15    Q.   Okay.  But your project manager wasn't

16    supervising you the whole day while you were

17    working?

18    A.   No.

19    Q.   Okay.  Going back to the training, was

20    there an agenda set for the training?

21    A.   Yes.

22    Q.   And who created that agenda?

23    A.   Those were scripted ones.

24    Q.   Okay.  And what do you mean by the agenda

25    being scripted?

Veritext Legal Solutions
800-336-4000

1      A.   Well, if we were training on, say,

2      entering -- setting up projects, we would go on

3      the Tyler website and the agendas were out

4      there already.  Actually, I'm going to back up

5      and say they were already in the client folder.

6      The project manager puts them there for us to

7      go and download --

8      Q.   Okay.

9      A.   -- to go out to client.

10     Q.   Okay.  And did you review those agendas

11     prior to conducting the training?

12     A.   Yes.

13     Q.   Did you ever give feedback to your project

14     manager saying:  I don't think a certain part

15     of the agenda would be necessary?

16     A.   No.

17     Q.   During a training, did you ever have to

18     change the agenda?

19     A.   No.

20     Q.   So everything always just progressed just

21     as the agenda had set forth?

22     A.   Well, on our side, yes.  I mean, the

23     client side they might have additional

24     questions during the training that we would

25     have to go and revisit or, you know, do because

1    Q.   And during this setup and configuration,

2    did you make any recommendations to the client

3    on best practices?

4    A.   They asked me how the system -- no.  No.

5    Q.   Okay.  And during the end-user training,

6    what did that consist of for the City of

7    Corvallis?

8    A.   I believe we trained on setting up

9    accounts payable and accounts receivable and

10   purchase orders if I'm not mistaken.

11   Q.   Okay.  And can you go into a little more

12   detail on what those trainings entailed?

13   A.   For accounts payable, the business

14   processes, how to enter an invoice, how to do a

15   check run, and then how to run reports, look at

16   your AP aging, and then how to tie it back to

17   the general ledger.

18   Q.   Okay.  And when those trainings were over,

19   did you again report to your project manager on

20   how you thought the client was progressing?

21   A.   Yes.

22   Q.   Okay.  And do you recall how you thought

23   they were progressing during those trainings?

24   A.   They were great.

25   Q.   Okay.

Veritext Legal Solutions
800-336-4000

```
 1        specific configuration of a workflow?
 2        A.    Meeting with the various people in the
 3        department and asking them questions, what the
 4        approvals were, who signed off on what, what
 5        the thresholds were, the approval levels, how
 6        many people had to approve until it got to the
 7        very end of the process.
 8        Q.    So it wasn't just simple data migration?
 9        A.    No.
10        Q.    Once you had the information from the
11        client, did you make any recommendations to
12        them on the best way to set up the system?
13        A.    No.
14        Q.    No?
15        A.    No.
16        Q.    And did you do anything else then for the
17        City of Glendale?
18        A.    Not that I can recall, no.
19        Q.    Okay.  So then after covering those three
20        clients, have we then discussed all of the
21        implementation work you did for clients while
22        at Tyler?
23        A.    Yeah.  I wasn't there that long.
24        Q.    Okay.  We did talk about your schedule
25        during the job shadowing.  What was your
```

Page 78

```
1              REPORTER'S CERTIFICATE
2
   STATE OF MINNESOTA    )
3                        ) ss.
   COUNTY OF HENNEPIN    )
4
5         I hereby certify that I reported the
   deposition of Cindy Choquette on October 21st,
6  2020, in Maple Grove, Minnesota, and that the
   witness was by me first duly sworn to tell the
7  whole truth;
8         That the testimony was transcribed by me
   and is a true record of the testimony of the
9  witness;
10        That the cost of the original has been
   charged to the party who noticed the deposition,
11 and that all parties who ordered copies have been
   charged at the same rate for such copies;
12
          That I am not a relative or employee or
13 attorney or counsel of any of the parties, or a
   relative or employee of such attorney or counsel;
14
          That I am not financially interested in the
15 action and have no contract with the parties,
   attorneys, or persons with an interest in the
16 action that affects or has a substantial tendency
   to affect my impartiality;
17
          That the right to read and sign the
18 deposition transcript by the witness was reserved.
19
          WITNESS MY HAND AND SEAL THIS 4th day of
20 November, 2020.
21
22
23
   Dana Anderson
24 Dana S. Anderson-Linnell
   Notary Public, Hennepin County, MN
25 My commission expires 1/31/2025
```

Page 98