# EXHIBIT 26

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4                          Case No.:  3:19-CV-07647-WHA
 5                              Judge William Alsup
 6  _____
 7  AARON KUDATSKY, Individually and on
 8  behalf of all others similarly situated,
 9        Plaintiffs,
10  vs.
11  TYLER TECHNOLOGIES,
12        Defendant.
13  _____
14
15
16
17     REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF
18                  PAMELA M. COSTNER
19            Taken Monday, October 19, 2020
20              Scheduled for 2:30 p.m.
21
22
23
24  REPORTED BY:  DANA S. ANDERSON-LINNELL
25  Job No.:  TX 4297248
```

Page 1

1   advance -- well, first of all, how often does
2   that happen where you show up and the entire
3   spreadsheet has been completed?
4   A.   Zero percent.
5   Q.   When you do show up, what is involved in
6   the process of interacting with the client on
7   this current state phase of identifying the
8   answers to these questions?  What does it
9   actually look like when you are sitting down
10  with the client?
11  A.   I usually have the spreadsheet up on the
12  overhead and we talk about it.  And if they
13  have a question of how that might look going
14  forward, then we would also have the Munis
15  system open to that implementation database
16  that's completed with the dummy material that
17  they saw in the fundamental review.  And we can
18  walk through a scenario or discuss a screen
19  because they are not going to know the screen
20  like us as implementers are going to know the
21  screen so they can get a feel for what it will
22  look like.
23  Q.   Now, within Munis on the Human Capital
24  Management side, is there only one way to
25  perform each of the functions that a client

1  might need, so only one way to process payroll,
2  only one way to process benefits, et cetera?
3  A.   In some areas, yes; but in other areas,
4  no, that there are multiple ways to do -- to
5  get the same end result.  And a lot of times we
6  might present them with both options, and then
7  the client makes the choice as to which option
8  they want, and then that's how we move forward.
9  Q.   Is that presentation of the different
10 options something you would be doing as part of
11 this between current state and future state
12 phase?
13 A.   It is.  If it's something where they could
14 have multiple choices, then yes.
15 Q.   Do you always show the client every
16 possible way of doing something in Munis if
17 there's multiple ways to do it?
18 A.   Not always, no.
19 Q.   Why wouldn't you show them every possible
20 way?
21 A.   Sometimes we as implementers don't even
22 know every single possible way.  We only know
23 the ways that we've come across in our
24 implementations.
25 Q.   Let me ask a better question then.  Do you

Page 49

1   show the client every way you know how to do a
2   given task if you're doing this demo, or are
3   there times when you only present some of the
4   ways Munis can perform a given task?
5   A.   If I know multiple ways, I -- whether I
6   show it or at least describe it to them because
7   then that way they can make a better informed
8   decision and I can note that on the spreadsheet
9   so that way the next implementer coming in,
10  whether it's myself or someone else, that they
11  will be able to pick up the ball and go help
12  the client configure the system the way that
13  they have decided to do, the choice that they
14  have picked.
15  Q.   How do you decide whether to show
16  different methods versus describing different
17  methods to a given client?
18  A.   If -- a lot of times clients want to
19  configure Munis exactly like their current
20  system without using the advanced functionality
21  that Munis offers.  And so sometimes we have to
22  show them something different versus just
23  trying to configure Munis to mirror what their
24  current legacy system is.  And sometimes they
25  are very firm on the way they want to do it.

1  And so I will verbally tell them how it could
2  also be done.  But if they are really stuck on
3  that's the way they want to do it, then that's
4  what we go with.
5  Q.   A moment ago in your testimony you
6  mentioned that after you've completed this
7  question-and-answer period, it moves to a phase
8  of recommendations.  Did I understand that
9  correctly?
10 A.   Correct.
11 Q.   Tell me about those recommendations.
12 A.   So we recommend the order that you put
13 your items called pay codes or deduction codes
14 so it will make it easier for them as they grow
15 those items within their system.  We help
16 recommend when they build tables maybe not to
17 use alpha because then if something comes up
18 later, they can't alphabetically fit things in
19 the right order, so we have them do things
20 numerically because they want to look at, you
21 know, absence and, you know, out of office, and
22 then they can't put something in between that
23 they wanted to, so numerically they can easily
24 do that.  So it's small little things like that
25 since, again, they don't know the system and we

```
 1        can help them, you know, build the system
 2        that's going to meet their needs today and down
 3        the road.
 4        Q.   And you said "we."  Is "we" implementation
 5        consultants?
 6        A.   "We" as in Tyler, yes, implementation
 7        consultants, that we want to have them be
 8        satisfied when they get the product.
 9        Q.   So you're sitting there, you're working
10        with a client on current state/future state,
11        you get to this recommendation phase, are you
12        utilizing any information that you've learned
13        about the client in this process to make these
14        recommendations?
15        A.   Absolutely, because they are telling you
16        their current process and you are asking them
17        how they want -- what do they want to see in
18        the future.  And so once they tell me what they
19        want to see in the future, then I can make a
20        recommendation of how we can best set up Munis
21        to meet the need of how they want to see their
22        system in the future.
23        Q.   At any point have you been told by a
24        project manager or other Tyler leadership that
25        you're prohibited from making recommendations
```

1     to clients about how to configure the system?
2     A.    No.
3     Q.    When you were doing this current
4     state/future state analysis, have you ever had
5     a customer ask if Munis can do something and
6     the answer is that it can't?
7     A.    Absolutely.
8     Q.    What do you do in response to that kind of
9     inquiry?
10    A.    I tell them that that's not a current
11    function that Munis handles.  They have an
12    option of putting in an enhancement request, or
13    they can look at changing their internal policy
14    to meet the system capabilities.
15    Q.    Do you have a responsibility as an
16    implementation consultant to encourage one of
17    those two choices, either the enhancement
18    request or changing their internal operations?
19    A.    Nope.  We leave that up to the client to
20    make that decision.
21    Q.    If the client decides they want a new
22    solution, they want to do the enhancement
23    request -- and by the way, is that fair to say
24    new solution enhancement request --
25    A.    Yeah.

Page 53

1    as you're sitting there observing?
2    A.   They are running a payroll.  So maybe this
3    payroll we now have 40 people in the payroll.
4    And they are running through the same steps I
5    did previously, but now they are pushing the
6    buttons and referring to their notes to
7    complete the process.
8    Q.   Is it a real payroll, or is it drawing on
9    simulated data?
10   A.   It's drawing on simulated data.  It could
11   be based upon a previous prior real payroll.
12   We're just not running it in a production
13   environment.
14   Q.   With the training, is that broken out by
15   module?
16   A.   Yes, it usually is.
17   Q.   So typically you would expect that you're
18   training assignment for the week would be to do
19   the payroll module or to do the benefits
20   module, but you wouldn't expect them to be
21   mixed in together?
22   A.   Correct.
23   Q.   Going into a given module of training, how
24   do you know what tasks to confirm the staff
25   knows how to perform?

Page 73

1   A.   With every session, there's an agenda.
2   And the agenda has high-level bullet points of
3   what needs to be accomplished during the
4   session.  And that's our checkpoint list that
5   we use and verify that the client has an
6   understanding of those checkpoints.
7   Q.   And you said that the bullet points are
8   high level.  What type of detail is not
9   included under them that would be more
10  granular?
11  A.   It's not saying click on this button, go
12  to this screen, click here, go there.  It's
13  just saying run a payroll, did the payroll
14  balance, those types of things, but it's not
15  giving you the step-by-step instructions on how
16  to run the payroll.
17  Q.   How is that training agenda set?
18  A.   They are standardized agendas that
19  Tyler -- I'm assuming PMs -- put together.  And
20  then the PMs when it's time for payroll
21  processing training, they go pull that agenda
22  and send that to the client for the upcoming
23  session.
24  Q.   Do you review the agenda prior to showing
25  up for the training?

Page 74

Veritext Legal Solutions
800-336-4000

1  A.  Yes, I do.
2  Q.  Have you ever given any feedback to a PM
3  about an agenda before going to a training?
4  A.  Absolutely.
5  Q.  Can you tell me a little bit about that?
6  A.  If it's a client I've been to on previous
7  occasions and I know we're ahead of where that
8  agenda is, I will let the PM know that we've
9  already covered that in a previous session
10 and/or the reverse.  If they are behind, I'm
11 going to tell the PM they are not ready for
12 this module because we haven't completed the
13 previous module or the previous session that
14 they should have had completed.
15 Q.  In providing that feedback, have you had a
16 PM change the agenda to reflect those issues?
17 A.  Yes.
18 Q.  Have you had PMs refuse to change the
19 agenda despite those issues?
20 A.  I wouldn't say refuse, but I've just had
21 PMs that just don't update the agenda.
22 Q.  So when you are training and you are on
23 one of the agenda items and you decide they
24 have got it or alternatively you decide they
25 are not getting it, how do you decide when to

Page 75

```
 1          move on?
 2          A.   A lot of times the client will actually
 3          make that decision.  They will say:  Can I run
 4          through this again?  Because I need to make
 5          better notes or I'm confused.  And so we just
 6          pause and say:  Well, let's do it again.  And,
 7          you know, let's take a look at your notes and
 8          run through it again.  It's not necessarily my
 9          call.  I ask them how comfortable they are.
10          And they let me know whether they are ready to
11          move on or whether we need to do it again.
12          Q.   Have you ever dealt with a client where
13          they thought they knew how to do it and you
14          knew they didn't?
15          A.   Absolutely.
16          Q.   What do you do in those circumstances?
17          A.   I again ask them and say:  Are you sure?
18          Would you like to do it again to make sure?  I
19          try to rely back on the notes and just say:
20          I'm not going to be here next week.  And you
21          are going to do this next week.  Are your notes
22          sufficient for you to do this without me on
23          site?  And if they answer yes, I can't push the
24          issue.  They are the ones making the call.
25          Q.   So if you complete a training week and you
```

Page 76

```
 1                REPORTER'S CERTIFICATE
 2
     STATE OF MINNESOTA    )
 3                         ) ss.
     COUNTY OF HENNEPIN    )
 4
 5         I hereby certify that I reported the
     deposition of Pamela M. Costner on October 19,
 6   2020, in Maple Grove, Minnesota, and that the
     witness was by me first duly sworn to tell the
 7   whole truth;
 8         That the testimony was transcribed by me
     and is a true record of the testimony of the
 9   witness;
10         That the cost of the original has been
     charged to the party who noticed the deposition,
11   and that all parties who ordered copies have been
     charged at the same rate for such copies;
12
           That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
           That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the
16   action that affects or has a substantial tendency
     to affect my impartiality;
17
           That the right to read and sign the
18   deposition transcript by the witness was reserved.
19
           WITNESS MY HAND AND SEAL THIS 2nd day of
20   November, 2020.
21
22
23   [signature: Dana Anderson]
24   Dana S. Anderson-Linnell
     Notary Public, Hennepin County, MN
25   My commission expires 1/31/2025
```

Page 139