# EXHIBIT 27

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4                          Case No.:  3:19-CV-07647-WHA
 5                              Judge William Alsup
 6   _____
 7   AARON KUDATSKY, Individually and on
 8   behalf of all others similarly situated,
 9         Plaintiffs,
10   vs.
11   TYLER TECHNOLOGIES,
12         Defendant.
13   _____
14
15
16
17       REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF
18                      IAN M. ROTH
19            Taken Tuesday, October 20, 2020
20               Scheduled for 2:30 p.m.
21
22
23
24   REPORTED BY:  DANA S. ANDERSON-LINNELL
25   Job No.:  TX 4297263

                                                   Page 1
```

1    covered.
2    Q.   And can you give me a sense of the level
3    of detail of the outlines you used contained?
4    A.   So we have something called req to check,
5    which is requisition to format a printed check,
6    steps through probably about five different
7    modules or more.  And it got down to the detail
8    of receiving an item -- developing a
9    requisition, receiving an item -- it's very
10   detailed.
11   Q.   So -- and I guess I'm trying to get a
12   sense about this outline, how comprehensive it
13   was in terms of -- was it as comprehensive as:
14   Good morning, we're here for fundamentals
15   review, all the way through:  Have a nice
16   evening, or at the opposite of the spectrum
17   high level:  Make sure you show them how this
18   works, this works and this works, and then
19   underneath it you're doing the tasks based on
20   your training.  So that's the spectrum as best
21   I can articulate it that I'm trying to
22   identify.  How would you describe the way in
23   which the outline guided your activities in
24   between those extremes?
25   A.   So it was never scripted as to:  This is

Page 34

1      the information from the current stateside of
2      the analysis phase?
3      A.   So that goes to:  You're doing it this way
4      now.  Do you want to keep doing it that way, or
5      do you want to do it differently?  A lot of
6      times their current software constrained them
7      to do things a certain way and the
8      functionality of Munis would allow them
9      multiple options beyond what they were allowed
10     to do.  So then they got to consider:  Is this
11     an efficiency?  Is this something we want to
12     embrace?  Do we want to change what we've been
13     doing before?  Do we want to stay the same?
14     Q.   Did you play any role helping them make a
15     decision between the options available in
16     Munis?
17     A.   Yes.
18     Q.   What role did you play?
19     A.   They would ask questions, I would give
20     them answers.  They would --
21     Q.   What do you mean by that?
22     A.   They would say:  Well, if we did it this
23     way, what does that mean?  How would that
24     change things?  And if I saw efficiencies, I
25     would recommend them.  If the client decided

Page 46

1    not to adopt them, that's the client's choice.
2    It was not my place to tell them they had to do
3    it a certain way unless it was a functionality
4    limitation by Munis software.
5    Q.   Were you ever told by Tyler that you were
6    prohibited from making recommendations to a
7    client about one modality versus another for
8    accomplishing tasks in Munis?
9    A.   No.
10   Q.   Would you say making recommendations was a
11   pretty common occurrence to bring your work on
12   the future stateside of analysis?
13   A.   Yes.
14   Q.   Did Tyler encourage you to make any
15   specific types of recommendations between given
16   choices that might be available for a
17   particular task that needs to be performed?
18   A.   No.  Tyler as a business, no.  We did have
19   back and forth between ICs.  We had sessions
20   where we came together and worked through
21   issues.  We shared knowledge, but that's --
22   nothing that the company said:  This is what
23   you need to do.
24   Q.   And when you talk about this
25   knowledge-sharing among ICs, was that through

Page 47

```
 1              If the client is not feeling confident about
 2         the process, it could mean a delay.
 3         Q.   Did you play any role at any point when
 4         you were working as an IC in helping decide
 5         whether or not the client was ready to go live?
 6         A.   No.
 7         Q.   Did you ever make a recommendation to a
 8         project manager that a client was not ready to
 9         go live?
10         A.   No.  If a client wasn't ready to go live,
11         it was very apparent from the prior sessions
12         about the client -- so client acts -- I won't
13         name them.  We have lots of interaction with
14         them.  There is some politics that were going
15         on where one manager was pointing fingers at
16         the other manager.  This was very clear.  It
17         was a commonality that we had seen throughout
18         the process.  It was a known issue.  So it
19         wasn't surprising when the client said:  We
20         can't do this.  And it wasn't my role to push
21         back and say we have to.  But rather my
22         project -- the project's project manager --
23         when I say "project manager," I'm talking about
24         the project's project manager, not mine.
25         Q.   Understood.
```

Page 81

1  A.  So when the client pushed back and said:
2  We need to delay, then it's the project
3  manager -- our -- my -- Tyler project manager
4  that steps in and does what they can do,
5  whatever they feel appropriate.
6  Q.  Throughout the implementation process, did
7  you ever have occasion as an implementation
8  consultant to be providing any recommendations
9  on adjustments to the go-live date?
10 A.  No.
11 Q.  Were you ever told not to make
12 recommendations about adjustments to the
13 go-live date to your project manager?
14 A.  No.  There's a clear delineation about the
15 role of an IC versus a PM.  And we were told
16 that as an IC, you do not directly go to the
17 client's PM, you go to your PM.
18 Q.  And I apologize.  My question was unclear.
19 I was talking about recommendations to change
20 the go-live date to a Tyler PM.  Were you ever
21 told you shouldn't do that?
22 A.  No, not explicitly.
23 Q.  Looking at the full six steps that we've
24 talked about today, how was your work
25 distributed among these steps?  Did you do some

Page 82

1    steps more than others, or were there certain
2    areas where you had more work than others?
3    A.   So on the clients that I did -- I'll call
4    it soup to nuts, the whole start to finish, you
5    spent the time that was allotted that was
6    determined by the contract and the two PMs.
7    For the one-offs or the -- I'm doing three or
8    five weeks here and I'm going to do another six
9    weeks here over there and then I'm going to
10   have one week over here, it's hit or miss.  So
11   I can't say that I spent any more time doing
12   one phase or another because it's just all over
13   the place.
14   Q.   And then looking at implementations
15   generally, not specifically what you were
16   doing, are all of these phases pretty much
17   equal parts of the implementation process, or
18   do some take more work than others?
19   A.   By "more work," do you mean more weeks?
20   Q.   Correct.  More time.
21   A.   Yeah.  It's not five weeks to each of
22   them.  It all depends on what modules they
23   purchased.  It depends on what was negotiated.
24   It depends on the structure of the client.  It
25   varied.

Page 83

```
 1      get an estimate, if you don't know, you don't
 2      know.  My goal is to not be surprised later to
 3      have you show up and say:  Oh, yes, on every
 4      single client I was calling the project manager
 5      five times a day.  So that's what I'm driving
 6      here.  As you sit here today testifying, are
 7      you able to give me an average or something of
 8      that nature telling me how frequently you were
 9      contacting the project manager across your
10      portfolio of work with Tyler?
11      A.   No.
12      Q.   As part of your job as an implementation
13      consultant you completed site reports each
14      week, correct?
15      A.   Correct.
16      Q.   What did that entail?
17      A.   Writing up the -- I'm sorry.  Typically
18      the agendas were one morning agenda, one
19      afternoon agenda.  So you're going through and
20      you're writing up your experiences.  Any
21      decisions that were made by the client, you
22      document that.  Any support calls, you document
23      that.  It's a synopsis of how that week went by
24      half-day segments.
25      Q.   Did you provide any opinions on the status
```

Page 86

```
 1          of the implementation in the site report?
 2       A.   It's more observations and decision
 3       points.
 4       Q.   What do you mean by "decision points"?
 5       A.   If the client saw some sort of
 6       functionality and they changed their mind or
 7       they had to make a decision to be able to
 8       figure out whether they want to go to the right
 9       or to the left, document it.
10       Q.   Did you make any recommendations for the
11       project manager to consider in your site
12       reports?
13       A.   No.
14       Q.   You've talked about agendas a couple of
15       times.  When would you receive the agenda for a
16       given week?
17       A.   Depends on the project manager.
18       Q.   What were the different possibilities?
19       A.   You never receive it.  In which case you
20       know what you're supposed to be working on that
21       week and you go into the library and you grab
22       the generic one and you just do it.
23       Q.   How often did that happen?
24       A.   Too often.  Once is too often.  Some PMs
25       were known to exhibit -- the behaviors of the
```

Page 87

1  A.  No.
2  Q.  Did you have any occasion to observe other
3  ICs performing work on EnerGov?
4  A.  No.
5  Q.  Have you made any effort to calculate the
6  amount of money you believe through this
7  lawsuit Tyler should pay you?
8  A.  No.
9  Q.  As you sit here today, do you have an
10  estimate of how much you believe Tyler should
11  pay you?
12  A.  No.
13  Q.  Have you discussed this lawsuit with
14  anyone besides your attorney?
15  A.  My wife.
16  Q.  Have you discussed this lawsuit with
17  anyone who joined the lawsuit?
18  A.  No.
19  Q.  Have you discussed this lawsuit with
20  anyone who currently works for Tyler?
21  A.  No.
22  Q.  Did you encourage anyone to join this
23  lawsuit?
24  A.  No.
25          MR. CORRELL:  Let's take a

Page 111

```
 1      five-minute break for me to collect my notes,
 2      and then I may just be ready to pass the
 3      witness.
 4                  THE WITNESS:  Okay.
 5                  (Recess 5:12-5:17.)
 6                  MR. CORRELL:  I'm just going to pass
 7      the witness.  I don't know if Mr. Brome has
 8      anything or not.
 9                  MR. BROME:  Yeah, I just have a
10      couple quick things to follow up on.
11                         EXAMINATION
12      BY MR. BROME:
13      Q.   Mr. Roth, earlier today you said that
14      there are a million decisions in putting
15      together Munis.  Do you recall that?
16      A.   Yes, I do.
17      Q.   How many of those decisions are you
18      making?
19      A.   Zero.  These are all the client decisions
20      on how they want the software to work.
21                  MR. BROME:  I have no further
22      questions.
23                      FURTHER EXAMINATION
24      BY MR. CORRELL:
25      Q.   How does the client go about making those
```

Page 112

```
 1              REPORTER'S CERTIFICATE
 2
    STATE OF MINNESOTA    )
 3                        ) ss.
    COUNTY OF HENNEPIN    )
 4
 5         I hereby certify that I reported the
    deposition of Ian M. Roth on October 20, 2020, in
 6  Maple Grove, Minnesota, and that the witness was
    by me first duly sworn to tell the whole truth;
 7
           That the testimony was transcribed by me
 8  and is a true record of the testimony of the
    witness;
 9
           That the cost of the original has been
10  charged to the party who noticed the deposition,
    and that all parties who ordered copies have been
11  charged at the same rate for such copies;
12         That I am not a relative or employee or
    attorney or counsel of any of the parties, or a
13  relative or employee of such attorney or counsel;
14         That I am not financially interested in the
    action and have no contract with the parties,
15  attorneys, or persons with an interest in the
    action that affects or has a substantial tendency
16  to affect my impartiality;
17         That the right to read and sign the
    deposition transcript by the witness was reserved.
18
19         WITNESS MY HAND AND SEAL THIS 1st day of
    November, 2020.
20
21
22
23  [signature: Dana Anderson]

24  Dana S. Anderson-Linnell
    Notary Public, Hennepin County, MN
25  My commission expires 1/31/2025


                                         Page 115
```