Matthew C. Helland, CA State Bar No. 250451
helland@nka.com
Daniel S. Brome, CA State Bar No. 278915
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA  94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Rachhana T. Srey, MN State Bar No. 340133*
srey@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
*Admitted pro hac vice

Benjamin L. Davis, MD Bar No. 29774*
bdavis@nichollaw.com
The Law Offices of Peter T. Nicholl
36 Charles Street, Suite 1700
Baltimore, MD 21201
*Pro hac vice application forthcoming

Attorneys for Plaintiff and those similarly situated

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aaron Kudatsky, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>Tyler Technologies,<br><br>        Defendant. | **Case No.**  **3:19-CV-07647-WHA**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY SETTLEMENT APPROVAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**Date: June 17, 2021, 8:00 a.m.**<br>**Courtroom: 12 – 19th Floor**<br><br>**Judge: Hon. William Alsup** |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ................................................................................. 1

II.     PROCEDURAL HISTORY ................................................................. 1

III.    PLAINTIFFS' CLAIMS ...................................................................... 2

IV.     SETTLEMENT TERMS AND RELIEF OBTAINED .......................................... 4

V.      ARGUMENT ...................................................................................... 8

    A.   The FLSA settlement is a reasonable compromise of a bona fide dispute ................... 8

        i.    Entitlement to Overtime. ........................................................................ 8

        ii.   Challenges to Certification. ................................................................... 8

        iii.  Amount of Overtime. ............................................................................. 9

        iv.   Applicable Statute of Limitations. ....................................................... 9

        v.    Liquidated Damages ............................................................................. 9

    B.   The Settlement is a reasonable compromise of disputed issues and not a result of employer over-reach ..................................................................................................... 10

    C.   The class action Settlement warrants approval .......................................................... 12

    D.   The proposed Settlement is fundamentally fair, adequate, and reasonable ............... 13

        i.    The strengths of Plaintiffs' case .......................................................... 14

        ii.   The risk, expense, complexity, and duration of further litigation .................... 15

        iii.  The risk of maintaining class action status through trial. .............................. 16

        iv.   The amount offered in settlement ........................................................ 16

        v.    The extent of discovery completed and the stage of proceedings .................. 17

        vi.   The experienced views of counsel ...................................................... 17

        vii.  The views of class members ................................................................ 18

    E.   The Court should approve the notice forms ............................................................... 18

    F.   The Court should approve the requested attorneys' fees and costs, administration costs, and service awards ................................................................................................ 18

        i.    The percentage-of-the-benefit method is warranted in this case. ................... 19

|   |   | ii. | The percentage requested by Class Counsel is fair and reasonable. ................ 20 |
|   |   | iii. | The Court should approve costs of up to $20,000 .......................................... 22 |
|   |   | iv. | The Court should preliminarily approve the requested service awards .......... 22 |
| VI. | CONCLUSION ............................................................................................................ 23 |

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3 *Adoma v. University of Phoenix, Inc.*, 913 F. Supp. 2d 964 (E.D. Cal. 2012) ................................ 21

4 *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................... 13

5 *Barbosa v. Cargill Meat Sol. Corp.*, 297 F.R.D. 431 (E.D. Cal. 2013) ................................... 11, 19

6 *Bautista v. Harvest Mgt. Sub LLC*, 2014 WL 12579822 (C.D. Cal. Jul. 14, 2014) ....................... 21

7 *Betorina v. Randstad US, L.P.*, 2017 WL 1278758 (N.D. Cal. Apr. 6, 2017) .............................. 10

8 *Bisaccia v. Revel*, 2019 WL 861425 (N.D. Cal. Feb. 22, 2019)..................................................... 16

9 *Boeing v. Van Gemert*, 444 U.S. 472 (1980)................................................................................. 19

10 *Bratt v. County of Los Angeles*, 912 F.2d 1066 (9th Cir. 1990) ...................................................... 9

11 *Burden v. SelectQuote Ins. Services*, 2013 WL 3988771 (N.D. Cal. Aug. 2, 2013) ...................... 20

12 *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ................................................ 12

13 *Clemens v. Hair Club for Men, LLC*, 2016 WL 3442774 (N.D. Cal. June 23, 2016)..................... 23

14 *Deaver v. Compass Bank*, 2015 WL 8526982 (N.D. Cal. Dec. 11, 2015) .......................... 12, 20, 23

15 *DeLeon v. Ricoh USA, Inc.*, 2020 WL 1531331 (N.D. Cal. Mar. 31, 2020) ................................... 11

16 *Deluca v. Farmers Ins. Exchange*, 2020 WL 5071700 (N.D. Cal. Aug. 24, 2020) ........ 8, 15, 16, 23

17 *Duran v. U.S. Bank, NA*, 59 Cal. 4th 1 (2014) ............................................................................ 15

18 *Etter v, Allstate Ins. Co.*, 2018 WL 5761755 (N.D. Cal. May 30, 2018) ....................................... 23

19 *Glass v. UBS Financial Services, Inc.,* 2007 WL 221862 (N.D. Cal. 2007)................................... 20

20 *Graham v. Daimler Chrysler Corp.*, 34 Cal. 4th 553 (2004) ........................................................ 21

21 *Harris v. Vector Marketing Corp.*, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011)......................... 16

22 *Hensley v. Eckerhart*, 461 U.S. 424 (1983)................................................................................... 20

23 *In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010)................... 19

24 *Jones v. Agilysys, Inc.*, 2014 WL 2090034 (N.D. Cal. May 19, 2014) .......................................... 11

25 *K.H. v. Sec'y of Dep't of Homeland Sec.*, 2018 WL 3585142 (N.D. Cal. Jul. 26, 2018)............... 11

26 *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, (2016) .......................................................... 19, 20

27 *Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19 (2000) ................................................. 20

28 *Lusby v. GameStop Inc.*, 2015 WL 1501095 (N.D. Cal. Mar. 31, 2015) .................................. 13, 23

*Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350 (11th Cir. 1982) ........................................ 8, 10, 11

*Ma v. Covidien Holding*, 2014 WL 360196 (C.D. Cal. Jan. 31, 2014) ............................................. 7

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ................... 13

*Nelson v. Avon Prod., Inc.*, 2017 WL 733145 (N.D. Cal. Feb. 24, 2017) ................................. 12, 17

*Noroma v. Home Point Financial Corp.*, 2019 WL 1589980, (N.D. Cal. Apr. 8, 2019) ............... 11

*Officers for Justice v. Civil Service Commission*, 688 F.2d 615 (9th Cir. 1982) ..................... 12, 14

*Ontiveros v. Zamora*, 2014 WL 3057506 (E.D. Cal. Jul 7, 2014) .................................................. 18

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) ...................................... 19

*Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000) ................................................................... 19, 20

*Richardson v. Interstate Hotels & Resorts, Inc.*, 2019 WL 803746 (N.D. Cal. Feb. 21, 2019) 12, 17

*Satchell v. Federal Express Corp.*, 2007 WL 1114010 (N.D. Cal. Apr. 13 2007) ......................... 10

*Six Mexican Workers v. Az. Citrus Growers,* 904 F.2d 1301 (9th Cir.1990) ................................. 20

*Stovall-Gusman v. Granger, Inc.*, 2015 WL 3776765 (N.D. Cal. June 17, 2015) ......................... 12

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) ........................................................ 19

*Ward v. United Airlines, Inc.*, 9 Cal.5th 732 (2020) .................................................................... 15

**Statutes**

Lab. Code § 203 .............................................................................................................................. 14

Lab. Code § 226(e)(1) ..................................................................................................................... 14

**Rules**

Fed. R. Civ. P. 23(c) ....................................................................................................................... 18

Fed. R. Civ. P. 23(e) ....................................................................................................................... 13

1

### **<u>NOTICE OF MOTION AND MOTION</u>**

2      Please take notice that on June 17, 2021, at 8:00 a.m., or as soon thereafter as the matter may

3 be heard, in Courtroom 12 of the above-captioned Court, Plaintiff Aaron Kudatsky, individually and

4 on behalf of the Opt-in Plaintiffs and the California Rule 23 Class (collectively, "Plaintiffs") will,

5 and hereby does, move this Court for preliminary approval of the Parties' settlement. This Motion

6 is based on this Notice, the Memorandum of Points and Authorities and accompanying declaration,

7 the Court's file in this matter, and such other arguments or evidence as may be presented at the

8 hearing on the Motion.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff Aaron Kudatsky (the Named Plaintiff) seeks preliminary approval of a class and collective action settlement worth $3,150,000, which will provide substantial relief for 295 individual implementation consultants ("ICs"). This settlement covers a conditionally certified collective of 60 Named and Opt-in Plaintiffs asserting claims under the Fair Labor Standards Act ("FLSA"), as well as a class pursuing California state law claims. This settlement provides excellent and substantial value for individuals with challenging claims, provides for prompt and certain payment, and avoids the need for drawn out litigation. The Court should grant preliminary approval so that notice of the settlement may be distributed to the Opt-in Plaintiffs and the Class Members (collectively, "Plaintiffs").

## II.   PROCEDURAL HISTORY

The procedural history has been recently addressed in the Parties' cross-motions for summary judgment (ECF Nos. 115, 116) and Defendant's motion for decertification (ECF No. 117), so only a brief description is included here. Plaintiff Aaron Kudatsky filed this lawsuit on November 20, 2019 seeking unpaid overtime, alleging that Tyler misclassified implementation consultants as overtime exempt in violation of the FLSA and California law. (ECF No. 1, Compl.) Defendant denies that it misclassified Plaintiffs and other ICs as exempt, and denies that that it owes these employees unpaid overtime compensation or penalties. (ECF No. 17, Answer at ¶¶ 39–46.)

The Parties stipulated to conditional certification under the FLSA on May 13, 2020. (ECF No. 39.) Notice was distributed accordingly, and the case currently consists of 59 opt-in Plaintiffs and one Named Plaintiff. On November 16, 2020, Plaintiff filed a motion for class certification (ECF No. 78), which the Court granted in large part on February 25, 2021. (ECF No. 98.)

The parties participated in a settlement conference with Judge Ryu on March 23, 2021, which did not result in a settlement. (ECF No. 103.) The parties returned to Judge Ryu on April 19th for continued negotiations. (ECF No. 106.) At the conclusion of the second settlement conference, Judge Ryu made a mediator's proposal (*see* ECF No. 113), which the Parties accepted the next day. (ECF No. 118.)

During the time between the settlement conference and the Parties' acceptance of the mediator's proposal, the Parties filed cross-motions for summary judgment (ECF Nos. 115, 116) and Defendant filed a motion for decertification (ECF No. 117). Those motions were set to be heard on May 26, 2021, in conjunction with the pre-trial conference. The case was set for a bench trial beginning on June 1, 2021 on the misclassification issue.

Once the mediator's proposal was accepted, the Parties withdrew their dispositive motions (ECF Nos. 121, 122), and requested that the Court stay the trial and pretrial dates (ECF No. 120). The Court granted the Parties' request on April 27, 2021. (ECF No. 122.) Since then, the Parties negotiated and executed a Memorandum of Understanding, and a long-form settlement agreement that is the subject of this motion. (Brome Decl. Ex. A ("Agreement")[1].)

## III.    PLAINTIFFS' CLAIMS

Tyler provides software solutions primarily to public sector clients. When clients purchase these products, they also pay Tyler for implementation work. Plaintiffs worked as ICs for Tyler, providing on-site and remote training, setup, and configuration for Tyler's clients. As explained in Plaintiff's summary judgment motion, Plaintiff contends that Tyler cannot satisfy its burden to show that ICs are administratively exempt, and so Tyler owes backpay for any overtime worked.

There are five causes of action asserted in the Complaint, which are the only claims being settled and released here: unpaid overtime under the FLSA, unpaid overtime under California law, unfair competition under California law, waiting time penalties, and wage statement penalties. There are no claims for unpaid meal periods or PAGA penalties, and the release does not include those claims.

Class Counsel has conducted a detailed damages analysis for all these claims, based on Defendant's records and information provided by Plaintiffs. (Brome Decl. ¶ 5.) The damages model uses dates of employment, by position, for all FLSA Opt-in Plaintiffs and California Rule 23 Class Members from Defendant's records. (*Id.*) The damages model uses Defendant's travel records for

---

[1] The Parties and Counsel have worked cooperatively to finalize the written settlement agreement, with negotiations continuing until the date of this filing; as a result, the Agreement has not yet been fully-executed. However, the Agreement is final and has been signed by Counsel. The Parties will supplement the record as soon as the Agreement is fully-executed.

the California Rule 23 Class Members who were not California residents, but traveled to California during their work. For those individuals, damages were calculated for weekdays in California, exclusive of the date of travel to California. (*Id.*) For example, if someone flew to California on Monday and left on Friday, her damages were calculated for Tuesday through Friday. (*Id.*) The damages model uses Defendant's individual payroll records for Settlement Class Members. (*Id.*) The damages model assumes that all ICs worked ten hours per day (or 50 hours per week) prior to March 12, 2020, when the global COVID-19 pandemic effectively ended travel for ICs, and nine hours per day (or 45 hours per week) thereafter. (*Id.*)

Using these assumptions, Class Counsel calculates that, if Plaintiffs prevailed on all of their pending claims, the maximum recovery would be $7,653,620.09. (*Id.* ¶ 6.) This maximum amount, however, assumes complete success on a number of disputed issues, and does not reflect the risk associated with these claims. When applying reasonable reductions for the likelihood of success on different components of the claims, Class Counsel calculates that a realistic value of the claims here is $2,940,736.01. (*Id.*) This value is determined by assuming that Plaintiffs have a 60% chance of success on each of the following aspects of the claims: 1) establishing FLSA liability; 2) establishing a willful violation and therefore a three-year statute of limitations under the FLSA; 3) defeating Defendant's good faith defense and obtaining liquidated damages under the FLSA; 4) maintaining class certification and obtaining class-wide liability on the California claims; 5) obtaining wage statement and waiting time penalties for California residents; and 6) obtaining waiting time penalties for the non-California residents.[2] (*Id.*) Additionally, that value assigns a 60% chance of success for FLSA Opt-in Plaintiffs as to time worked either a) outside of the ERP division or b) as a senior IC. (*Id.*) While those claims were the subject of Defendant's motion to decertify, they were part of the case at the time the settlement was reached (and are part of the case now); assuming the Court would have decertified those claims, those individuals intended to re-file their claims in separate actions. (*Id.*) However, bringing new cases entails additional work and delay, and those claims face different challenges. As such, it is appropriate to include these claims within this settlement, and to discount

---

[2] These risks have a compounding effect, so even though Class Counsel assigns a 60% chance of success to the relevant variables, the result is much less than 60% of the maximum damages.

them accordingly. (*Id.*) Unlike FLSA Opt-in Plaintiffs, who are currently part of this case even as to this time, the California Rule 23 Class has been limited to exclude time worked outside of the ERP division or as a senior IC; accordingly, California Rule 23 Class Members are not receiving value for—or releasing claims arising from—time worked in those roles.

Of course, there are a range of possible outcomes in a case such as this. If Plaintiffs prevailed and recovered their unpaid overtime wages under state and federal law – defeating Tyler's exemption defense, maintaining class certification, and establishing the hours worked explained above, but without a finding of willfulness, and without liquidated damages or wage statement or waiting time penalties – Class Counsel calculates the total wage loss as $3,857,415.50. (*Id.* ¶ 7.) It is also possible that Plaintiffs could prevail, but that the factfinder could award overtime based on a lower number of hours. In that case, the damages could be significantly lower. For example, if Plaintiffs prevailed, but only established five hours of overtime per week (or nine hours worked per day) for the entire time period, the total wage loss would amount to $1,979,880.58. (*Id.*)

## IV.   SETTLEMENT TERMS AND RELIEF OBTAINED

The general structure and terms of the settlement are standard: following preliminary approval, notice will be distributed. All FLSA Opt-in Plaintiffs who accept their offer (the "Settling Plaintiffs"), and all Rule 23 Class Members who do not opt-out of the settlement (the "Settling Class Members"), will receive their allocation following final approval. Several terms are explained in more detail:

Settlement Amount. Defendant will pay a total settlement amount of $3,150,000.00, which includes settlement payments to all Settlement Class Members, attorneys' fees and costs, and any service awards approved by the Court. The Parties will administer the settlement without a third-party administrator, so no administrative costs are being deducted from the settlement, and Tyler will separately pay the employer share of payroll taxes associated with the settlement payments. (Agreement § 3.)

Scope of the Settlement Class. This settlement includes all Opt-in Plaintiffs who have filed consent to join forms ("FLSA Opt-in Plaintiffs"), and a Rule 23 settlement class, which matches the class definition from the Court's class certification order (ECF No. 98).[3]

Allocation. In consultation with Defendant's Counsel, Class Counsel calculated a reasonable allocation of the settlement amounts for all Class and Collective Members. (Agreement § 3.) This allocation was derived from Class Counsel's individualized damage calculation. (*Id.*) Because the allocation is tied to the damage calculation, each Settlement Class Member's Individual Settlement Amount is proportionate to his or her realistic damages calculation. As described above, the damage calculation was calculated based on multiple datasets produced by Defendant, including travel records, dates of employment, and compensation history, in conjunction with information provided by Plaintiffs. (*Id.*)

The allocation is based on the realistic value of the claims described above ($2,940,736.01).[4] From that value, the settlement is allocated pro rata (after deductions for requested attorneys' fees and costs and service awards, and setting aside a $20,000 contingency fund to address any discrepancies that arise during the notice process) based on each individual's claim. (Brome Decl. ¶ 8.) Additionally, the allocation assumes a $200 minimum allocation (this applies to members of the California Rule 23 Class who only traveled to California for a small number of days within the statutory period). (*Id.*)

For Settling Plaintiffs, the individual settlement payments will be divided evenly between wage and non-wage claims: one half of the individual settlement payment will be reported as wages, and the other half will constitute payment for liquidated damages/interest, and be reported on an IRS form 1099. For Settling Class Members, two-thirds of the settlement payment will be reported as wages for tax purposes with each Settling Class Member receiving an IRS Form W-2, and one-third

---

[3] That order granted certification on the issue of misclassification; the Parties stipulate, for settlement purposes only, that the Rule 23 Settlement Class should also be certified for the claims in this Settlement. (Agreement § 4.)

[4] Again, this figure reflects the following assumptions: 1) ten hours worked per day before 3/12/20 and nine hours per day thereafter and 2) 60% chance of success on FLSA liability, FLSA third-year claims; FLSA liquidated damages; California class liability; California penalty claims; and FLSA Opt-ins Plaintiffs' claims while working as senior ICs or outside the ERP division. (Brome Decl. ¶¶ 5, 6.)

of the settlement payment shall constitute payment for interest and/or penalties and will be reported on an IRS Form 1099. (Agreement § 8.) Tyler will separately pay the employer's portion of all taxes. (*Id.* § 9.)

No Claims Forms and No Revision for Class Members. California Rule 23 Class Members do not need to submit any claim form to participate in the settlement. (Agreement § 7.) If any Rule 23 Class Members opt out of the settlement, amounts allocated to those individuals will not revert to Defendant but will be reallocated to Settling Class Members and Settling Plaintiffs. (*See id.* §§ 6, 9.) If checks remain uncashed after 90 days, those amounts will be donated to Legal Aid at Work as *cy pres* recipient, subject to Court approval. (*Id.* § 10.)

FLSA Opt-Ins' Release of Claim Form. Any FLSA Opt-in who does not submit a valid and timely Release of Claim Form will not receive the portion of his/her individual settlement payment for their FLSA claim.[5] These individuals' FLSA claims will be dismissed without prejudice, and they shall not receive any payment through the Settlement.

Any FLSA Opt-in who is **also** a member of the California Rule 23 Class who does not submit a valid and timely Release of Claim Form will not receive the portion of his/her individual payment for their FLSA claim, and will have their FLSA claim dismissed without prejudice. However, these individuals **will** receive payment for claims brought under California law, and will be subject to the Rule 23 class release. (*Id.* § 5(c).)

Release. The release closely tracks the claims at issue. (*Id.* § 13.) FLSA Opt-Ins release their FLSA overtime claims related to their work with Defendant as ICs, whereas Rule 23 Class members release only the state law claims currently in the case relating to their work as ERP implementation consultants, and will not release FLSA claims. This release is limited to the wage and hour claims

---

[5] The settlement amounts allocated to FLSA Rejecters will be donated to Legal Aid at Work as *cy pres* recipient, subject to Court approval. (*Id.* § 5(a).) If any FLSA Opt-in Plaintiffs fail to respond, those individuals would not release their FLSA claims, and Defendant will not pay amounts allocated to them.

currently in this case, and is not a general release. These releases run to April 19, 2021, the date of the second settlement conference.[6]

Relief Obtained. In Class Counsel's view, this settlement represents an excellent result for the Settlement Class Members. After deduction for attorneys' fees (25%)[7], litigation and administration costs (up to $20,000)[8], the Settlement will distribute $2,342,500 to approximately 295 individuals. This amount represents 80% of the realistic value of the claims in Class Counsel's view. The settlement amount strongly supports approval. *Compare with, e.g., Ma v. Covidien Holding*, 2014 WL 360196, *5 (C.D. Cal. Jan. 31, 2014) (settlement providing "9.1% of the total value of the action [was] 'within the range of reasonableness.'") Moreover, the release is narrowly-tailored to the claims at issue (Agreement § 13.) As explained below, the settlement amount is reasonable in light of the damages calculated for Plaintiffs and the litigation risks. *Id.*

The Settlement is also reasonable considering the individual payments. After applying the agreed-upon calculations and the pro-rata distribution, Individual Settlement Amounts average $7,844.07,[9] and range from $200 (for 35 individuals who are only receiving payment for a small number of days in California) up to $61,442.50. (Brome Decl. ¶ 9.) The settlement covers 295 individuals. Of those, 75 would receive $200 to $1,000, 151 individuals would receive $1,000 to $10,000, and 69 individuals will receive over $10,000. (*Id.*) The allocation is reflected in Exhibit A to the Parties' settlement agreement. (*Id.*) The individuals receiving less than $1,000 are all California Rule 23 Class Members who were not California residents, but instead traveled to

---

[6] It is not uncommon for wage and hour releases to continue until preliminary approval. By ending the release based as of the date of the settlement conference, Plaintiff ensures that only those claims that were valued and negotiated are released, and avoids any dilution from unexpected delays.

[7] Class Counsel has a one-third contingency agreement with their clients, but seeks 25% for this settlement.

[8] To date, Class Counsel has incurred $15,221.94 in costs. Counsel will incur additional costs finalizing and implementing the settlement and obtaining approval. Counsel will provide a detailed explanation of costs in conjunction with the motion for attorneys' fees. (Brome. Decl. ¶ 12.)

[9] The estimated Individual Settlement Payments described herein, and contained in Exhibit A are calculated assuming that the Court approves the requested service awards, and are calculated after setting aside a $20,000 fund that will be used, to the extent necessary, to resolve any challenge by a Settlement Class Member. (Agreement § 3.) Any unapproved service awards or unused contingency funds will be allocated to Settling Class Members and Settling Plaintiffs at final approval, so the actual payments will likely increase slightly.

California to perform work. According to Tyler's travel records, these individuals spent an average of 9.67 days in California. (*Id.* ¶ 10.)

## V.   ARGUMENT

### A.   The FLSA settlement is a reasonable compromise of a bona fide dispute

Settlement of FLSA claims for wages are subject to court approval. *Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1353 (11th Cir. 1982). Court approval is favored "to promote the policy of encouraging settlement of litigation," where the settlement reflects a "reasonable compromise over issues" that are "actually in dispute." *Id.* at 1354. Here, the Settlement is a compromise over numerous issues, so approval is warranted.

#### i.    Entitlement to overtime.

Defendant asserted that Plaintiff and other ICs were and are overtime exempt under the administrative exemptions under state and federal law. (*See* Def. Mtn. for Summary Judgment, ECF No. 116.) As Defendant argued, ICs' "work goes to the very engine of Defendant's clients' operations—shaping at a basic level how they perform non-production operational tasks such as proper tracking of accounts payable and receivable; payroll processing; revenue accounting; procurement activity; recruiting; employee time tracking; and tax and utilities billing, for example." (*Id.* at 20 of 31.) Plaintiff, on the other hand, emphasizes that ICs are not responsible for "formulating policy or setting Tyler's strategic course." (Plf. Mtn. for Summary Judgment, ECF No. 115 at 19 of 30.) Plainly, entitlement to overtime is a disputed issue. Further, even if Plaintiff prevailed on summary judgment, recovery through continued litigation is not a foregone conclusion. *See Deluca v. Farmers Ins. Exchange*, 2020 WL 5071700, at *4 (N.D. Cal. Aug. 24, 2020) (recognizing that, even after summary judgment ruling for plaintiffs, significant risks remain in continued litigation). Defendant has asserted that Plaintiffs cannot show they worked more than forty hours a week through representative testimony. And even if Plaintiffs were awarded damages through trial, Defendant would likely appeal the liability decision following trial.

#### ii.    Challenges to certification.

The Parties reached this settlement while Defendant's motion for partial decertification was pending. (ECF No. 117.) The individual FLSA Opt-in Plaintiffs covered by that motion would have

likely filed a new case or new cases to assert their FLSA claims; those new claims would have faced additional risks (for example, senior ICs performed additional duties compared to non-senior ICs (ECF No. 98 at 5)), and additional delays. The settlement here reflects a fair compromise, by including time worked by Opt-ins Plaintiffs outside the ERP division, or in a senior IC role, but with an additional discount applied to that time. (Agreement § 3.)

### iii.      Amount of overtime.

Even if Plaintiff established entitlement to overtime wages, they would need to demonstrate how much overtime was worked. Proving hours worked is inherently fact-intensive, and would likely require a trial. Defendant does not have exact time records, but it asserts Plaintiffs worked little, if any, overtime. Plaintiffs, on the other hand, asserted that they generally worked many hours of overtime per week. At a damages trial, Plaintiffs would bolster their testimony with Tyler's records and electronically stored information that indicate overtime. The amount of Plaintiffs' hours worked is a *bona fide* dispute. The compromise reflected here—10 hours work per day before the pandemic and 9 hours work per day after—is very reasonable.

### iv.      Applicable statute of limitations.

Assuming that Plaintiffs established that they are entitled to overtime, and proved that they worked overtime hours, the FLSA would only allow two years of damages unless Plaintiffs could show that Tyler's violation was willful. Plaintiffs contend that Tyler's prior litigation concerning the IC position would demonstrate that the violation was willful, and that a three-year statute is therefore appropriate. Tyler asserts that its classification of ICs has been done with the advice of counsel, and that it believed the classification was lawful at all times. The statute of limitations presents a *bona fide* dispute that favors settlement approval. The settlement allocation here assumes a 60% chance of success for the third year.

### v.      Liquidated Damages

The FLSA provides for liquidated damages on unpaid overtime wages, but allows discretion for the Court to reduce or eliminate them if the employer demonstrates a good faith basis for its violation. *See Bratt v. County of Los Angeles*, 912 F.2d 1066, 1071 (9th Cir. 1990). As with the question of willfulness, Tyler will argue that it received legal advice from an outside attorney that

its classification was lawful; Plaintiff disagrees, and contends Tyler's communication with an attorney does not demonstrate good faith since that advice was primarily provided in the context of defending litigation. This presents an additional *bona fide* dispute. The damage calculation that formed the basis for the settlement allocation here assumes a 60% chance of success on liquidated damages on FLSA claims.

### B.  The Settlement is a reasonable compromise of disputed issues and not a result of employer over-reach

At the core of *Lynn's Food* is the concept that FLSA settlements must "reflect a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching." *Lynn's Food Stores*, 679 F.2d at 1354. "Settlements may be permissible in the context of a suit brought by employees under the FLSA for back wages because initiation of the action by the employees provides some assurance of an adversarial context." *Id.* It is clear from the record that this settlement is not a "mere waiver of statutory rights brought about by an employer's overreaching." *Id.*

Where both parties have conducted extensive investigation and discovery to assess the strengths and weaknesses of a case, a court may find that the settlement was reached in an informed, arms-length manner. *See Betorina v. Randstad US, L.P.*, 2017 WL 1278758, *7 (N.D. Cal. Apr. 6, 2017); *Satchell v. Federal Express Corp.*, 2007 WL 1114010, *5 (N.D. Cal. Apr. 13 2007) (preliminary approval of a settlement where settlement was a "result of extensive, arms'—length negotiations between Parties after lengthy and exhaustive litigation, including thorough discovery and extensive motion practice and pre-trial preparation."). Here, the Parties conducted 11 depositions, and exchanged considerable written discovery. (Brome Decl. ¶ 4.) Defendant produced over a million pages of documents. (*Id.*) Class Counsel vigorously litigated this claim, including successfully seeking class certification, filing a motion for summary judgment, and participating in two settlement conferences with Judge Ryu. This adversarial nature of this litigation demonstrates the settlement is not collusive or the result of employer overreach.

In Class Counsel's view, the amount here, $3,150,000.00, is very reasonable, and far exceeds the settlement value in cases that recently received preliminary approval in this district. *E.g.*, *DeLeon*

*v. Ricoh USA, Inc.*, 2020 WL 1531331, *3-4 (N.D. Cal. Mar. 31, 2020) (approving $2,200,000 settlement for field service representatives and technology service technicians that would cover 991 Class Members and 935 FLSA collective members); *Noroma v. Home Point Financial Corp.*, 2019 WL 1589980, (N.D. Cal. Apr. 8, 2019) (granting preliminary approval to a hybrid California class and FLSA collective settlement for loan and mortgage originators, officers, and originators that would distribute $500,000 to 1,392 members in the collective and $1,750,000 to 254 members in the California class).

The settlement here is not employer overreach, but rather a fair compromise on the disputed issues identified above. Plaintiffs' entitlement to overtime, amount of overtime, entitlement to liquidated damages, and the applicable statute of limitations are all disputed; the settlement reflects favorable compromise on these issues. This settlement avoids further expenditures of resources for all parties and the Court, and provides "significant benefit that [Plaintiffs] would not receive if the case proceeded—certain and prompt relief." *Barbosa v. Cargill Meat Sol. Corp.*, 297 F.R.D. 431, 446 (E.D. Cal. 2013). The settlement is also reasonable because the release is narrow, and only requires Settling Plaintiffs to release claims their FLSA overtime claims up to the date of the settlement conference. *Cf., K.H. v. Sec'y of Dep't of Homeland Sec.*, 2018 WL 3585142, at *4 (N.D. Cal. Jul. 26, 2018) (denying approval under *Lynn's Food* standard based on overbroad release and collecting cases).

Most importantly, the settlement provides very good value for Plaintiffs' claims. By any measure, this settlement is very favorable. First, total settlement amount ($3,150,000) is 41% of the maximum value of the claims (assuming 10 hours worked per day before the pandemic and 9 hours worked per day after). (Brome Decl. ¶ 6.) This recovery supports approval. *Deluca*, 2020 WL 5071700, at *4 (granting final approval and describing a settlement worth "approximately 46.6% of the estimated total recovery" that was reached after a summary judgment ruling in plaintiffs' favor as a "very good result"). Second, assuming approval of the requested fees and costs, the settlement will distribute $2,342,500, which represents approximately 80% of the realistic value of the claims according to Class Counsel (*see* Brome Decl. ¶ 6). *See Jones v. Agilysys, Inc.*, 2014 WL 2090034, at *2 (N.D. Cal. May 19, 2014) (settlement that "constitutes between 30% to 60% of recoverable

damages" supports approval). Third, the amount that will be distributed here represents 60.7% of the total **wage loss**, excluding liquidated damages and state law penalties, which would require heightened showing related to Defendant's state of mind. *See Richardson v. Interstate Hotels & Resorts, Inc.*, 2019 WL 803746, at *3 (N.D. Cal. Feb. 21, 2019) (comparing settlement value to the possible "unpaid wages exclusive of interest and penalties" and noting that, while the maximum possible recovery with penalties would be much greater, "these penalties depend on a showing of willfulness, exceedingly difficult to prove here.").

The settlement value here compares favorably to the possible recovery, and strongly supports approval. *See, e.g.*, *Nelson v. Avon Prod., Inc.*, 2017 WL 733145, at *4 (N.D. Cal. Feb. 24, 2017) (settlement that, before deductions, "represents more than 12 to 24 percent of the alleged overtime damages" supports approval); *Stovall-Gusman v. Granger, Inc.*, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (granting final approval of a net settlement amount representing 7.3% of the plaintiffs' potential recovery at trial). Because the settlement represents a fair and reasonable resolution of a *bona fide* dispute over wages, as opposed to employer overreaching, the Court should approve the settlement.

### C. The class action Settlement warrants approval

"Judicial policy strongly favors settlement of class actions." *Deaver v. Compass Bank*, 2015 WL 8526982, at *3 (N.D. Cal. Dec. 11, 2015) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair." *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 628 (9th Cir. 1982). As the Ninth Circuit noted in *Officers for Justice*, "[u]ltimately the amount of the [settlement payments] will be less than what some class members feel they deserve but, conversely, more than the defendants feel those individuals are entitled to. This is precisely the stuff from which negotiated settlements are made." *Id*. The Court should approve the Settlement because the payments to the Settlement Class Members are substantial, and they represent a reasonable compromise of the state law wage and hour claims.

The settlement also reflects compromise in that it avoids the uncertainty of continued litigation. Generally, "unless the settlement is clearly inadequate, its acceptance and approval are

preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004). This settlement avoids expenditures of resources for all parties and the Court, and provides a significant benefit over continued litigation: "prompt, guaranteed recovery." *Lusby v. GameStop Inc.*, 2015 WL 1501095, at *6 (N.D. Cal. Mar. 31, 2015). The Court should grant approval.

The Court has previously held that the requirements of Fed. R. Civ. P. 23 supported certification on the issue of whether ICs were and are misclassified. (*See* ECF No. 98 at 4–14 (finding commonality, predominance, typicality, adequacy, superiority, numerosity, and ascertainability satisfied).) The Court stopped short, however, of certifying the class as to the other claims, explaining that it would "revisit possible certification of the other claims" after a making a determination on the classification issue, and that further proceedings would be needed to determine how to "process the multitudinous and bone-crushing details" required for Plaintiff to prove up the class claims. (*Id.* at 3.) Now that the Parties have reached a settlement, however, such the risk of "intractable management problems" is no longer a barrier, since "the proposal is that there be no trial." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

Here, the California Rule 23 Class is the includes the same Class Members as the Court certified, supporting approval. (Agreement § 4.) Specifically, the California Rule 23 Class does not include time worked outside of the ERP division or as a senior IC. For Class Members who worked for part of their employment as a senior IC, or for part of their employment outside of the ERP division, only the time in a covered position was valued in determining the settlement allocation. Likewise, only claims connected to time in a covered position will be released through the settlement.

### D. The proposed Settlement is fundamentally fair, adequate, and reasonable

While the final analysis of whether the proposed settlement is fair, reasonable, and adequate is typically made after a hearing, Fed. R. Civ. P. 23(e)(1)(c), Plaintiffs provide the Court with an initial assessment of these factors in order to facilitate the approval process. The Ninth Circuit's standard of evaluation of the fairness, adequacy, and reasonableness of a settlement requires this Court to balance several factors: the strength of plaintiffs' case; the risk, expense, complexity, and

likely duration of further litigation; the risk of maintaining class action status throughout the trial' the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. *Officers for Justice*, 688 F.2d at 625; *see also Hanlon*, 150 F.3d at 1026. As outlined below, these factors support preliminary approval of the settlement.

### i.      The strengths of Plaintiffs' case

Plaintiff contends that Defendant incorrectly classified ICs as exempt from federal and state overtime laws. By incorrectly classifying ICs, Defendant failed to pay appropriate overtime compensation, to pay waiting penalties, and to provide accurate wage statements.

As explained above, the applicability of the administrative exemption is hotly contested. (*See* ECF Nos. 115, 116.) Plaintiff maintains that the administrative exemption does not apply, and that a finding of misclassification is more likely than not. Accordingly, in allocating the settlement, Class Counsel calculated the realistic value of the claims by applying a 60% chance of success to the overtime claims under state and federal law. (Brome Decl. ¶ 6.) But even if the Court granted Plaintiff's summary judgment motion, Plaintiffs would still need to prove that they in fact worked over forty hours week; Defendant has challenged whether ICs worked overtime, and whether representative proof can show overtime work *on class and collective basis*. Moreover, even if Plaintiff established that the class and collective worked overtime, the amount of overtime is hotly contested. Any reduction in the hours worked could dramatically reduce the recovery. Likewise, failing to establish a willful violation (which would eliminate a year of FLSA damages) or to defeat Defendant's good faith defense (which would eliminate liquidated damages and cut FLSA damages in half) would cut Plaintiffs' recovery substantially. By way of example, if Plaintiffs recovered based on a two-year (non-willful) statute of limitations, without liquidated damages, based on an average of 45 hours per week before and after the pandemic, the total recovery would be $1,979,880.58 – significantly less than the value of the settlement here. (Brome Decl. ¶ 7.) These risks support approval of the settlement.

Liability for the California Rule 23 Class Members who did not reside in California involves additional challenges, including showing that the Labor Code applies to workers based out of state who temporarily work in California. *See Ward v. United Airlines, Inc.*, 9 Cal.5th 732 (2020). The travel group would also face challenges proving damages, because employees worked in California for various amounts of time, and Tyler's travel records show <u>presence</u> in California, but additional evidence might be needed to show <u>work</u> in California.

Plaintiffs' derivative claims also face challenges. For example, Tyler has argued that the wage statement and waiting time penalty claims will fail because any violations were not "knowing and intentional" (Lab. Code § 226(e)(1)) or not willful (Lab. Code § 203). As with establishing a willful violation under the FLSA, Plaintiffs will face complications in proving these violations because Tyler will assert that, based on the advice of counsel, it always believed its classification of ICs was lawful.

Given the risks inherent in litigation, both on the merits and damages, the Court should approve the settlement.

>            ***ii.***        ***The risk, expense, complexity, and duration of further litigation***

Continued litigation of this action would likely be expensive and protracted. This case has already been pending for a year and a half, and has seen numerous contested motions and extensive nationwide discovery. Absent this settlement, the next steps would have been a summary judgment ruling and possibly a bench trial on the misclassification issue, followed by a renewed class certification motion, and then further merits proceedings, and a likely appeal. Defendant and Defense Counsel are experienced, effective litigators. Further litigation would inevitably cause the Parties and the Court to expend substantial time and resources.

Even if Plaintiffs got to trial as a class, wage and hour trials are "complex and expensive." *Deluca*, 2020 WL 5071700, at *4. They are also unpredictable. By way of example, a wage and hour case against U.S. Bank, filed in December 2001, resulted in a substantial verdict for the plaintiffs in September 2008, which was reversed almost six years later by the California Supreme Court. *See Duran v. U.S. Bank, NA*, 59 Cal. 4th 1, 14 (2014). There is no quick and easy route to payment for Class Members absent this settlement. This factor therefore supports approval of the settlement.

### iii.    *The risk of maintaining class action status through trial*

As noted above, the Court certified this class on the issue of whether ICs are misclassified, but not on the claims, and Defendant would certainly challenge continued class treatment. *See Harris v. Vector Marketing Corp.*, 2011 WL 1627973, at *15 (N.D. Cal. Apr. 29, 2011) (at the time motion for preliminary settlement approval was filed the class had been certified and the court considered Defendant's possible future challenges to certification). The Parties agree that this case is appropriate for settlement on a class-wide basis, but getting to a final judgment on a class basis is far from certain. In fact, the Court previously indicated that doing so could entail "multitudinous and bone-crushing details." (ECF No. 98 at 3.) Given this guidance, the risk of maintaining class action status through trial appears high. This settlement provides substantial relief to class members which could otherwise be unavailable. The Court should approve the settlement.

### iv.    *The amount offered in settlement*

The settlement amount, $3,150,000.00, will bring substantial relief to the class members. Settlement payments range from $200, for employees who are only receiving pay as California Travel Class Members, up to $61,442.50. (Brome Decl. ¶ 9.) Out of the 295 total individuals covered by the settlement, 75 would receive $200 to $1,000, 151 individuals would receive $1,000 to $10,000, and 69 individuals will receive over $10,000.[10] (*Id.*)

While the allocation reflects a wide range of individual payments, those amounts are proportionate to what Settlement Class Members would have received if the case proceeded to a favorable resolution. This allocation "is fair and reasonable because it will be done *pro rata* based on damages calculations which were determined based on [Defendant's] payroll records . . ." *Deluca*, 2020 WL 5071700, at *4. "This method tracks what Opt-in Plaintiffs and Class Members would stand to receive if the case proceeded to trial and they obtained judgment in their favor." *Id.* (citing *Bisaccia v. Revel*, 2019 WL 861425 (N.D. Cal. Feb. 22, 2019) (granting preliminary approval where "settlement payments will be calculated proportionately based on individualized damages calculations using payroll data provided by Defendant").) The settlement allocation is fair and

---

[10] These allocation amounts will likely increase, because the initial allocation amounts set aside a $20,000 contingency fund to address any issues that arise during the notice process.

reasonable because it reflects a very good result compared to possible results in litigation, and fairly distributes the funds among Class Members, because it gives the greatest payment to workers with the largest potential claims.

Importantly, Class Counsel reviewed and analyzed payroll data, employment history data, and travel data for Rule 23 Class Members and FLSA Opt-Ins. (Brome Decl. ¶ 6.) Using this data, Class Counsel was able to analyze potential damages in conjunction with the risk of loss to Class Members. Assuming the Court approves Class Counsel's request of 25% of the settlement fund for fees plus costs, the Settlement will distribute approximately $2,342,500 to participating class members. This is a substantial sum that adequately recognizes Class Members' damages, and compensates them appropriately. The settlement distributes—after fees and costs—approximately 80% of the realistic value, which strongly supports approval.

### v.        The extent of discovery completed and the stage of proceedings

The Parties have completed substantial discovery throughout this litigation through written discovery requests and responses, and through a significant number of depositions. Among other things, there have been 11 deposition, and Defendant has produced over one million pages of documents. (Brome Decl. ¶ 4.) This discovery provided both Parties with enough evidence to evaluate the strengths of the case, calculate detailed damages models, and to value the settlement appropriately. The extent of formal discovery and the damages calculations based thereon strongly support the finding that the Settlement is fair and reasonable. *See Nelson*, 2017 WL 733145, at *4 (noting that formal discovery is not required, and finding class counsel was "in a strong position to evaluate their case and conclude that settlement was the best way forward" where counsel had "obtained Avon's payroll information for a portion of the Class"). In addition to the discovery conducted, the Parties litigated a contested class certification motion and filed cross-motions for summary judgment. Finally, the Parties participated in two settlement conferences with Judge Ryu, and then "accepted Judge Ryu's [mediator's] proposal, which indicates the lack of collusion in arriving at the settlement." *Richardson*, 2019 WL 803746, at *3.

### vi.       The experienced views of counsel

Class Counsel has extensive experience in nationwide wage and hour litigation. (*See* ECF

No. 78-2 at 12–49.) Counsel for all parties agrees that the settlement is fundamentally fair, adequate, and reasonable. This settlement agreement is the result of arms-length negotiations, between experienced counsel representing the interests of the Plaintiffs and Defendant, facilitated by an experienced Magistrate Judge, after thorough factual and legal investigation and adversarial litigation.

### vii.  *The views of class members*

This factor is best addressed following the distribution of the Notice, once the Class Members have received information about the settlement.

### E.  **The Court should approve the notice forms**

The Court must also direct "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2). Here, Class Counsel will mail and email notice to all potential class members. (Agreement § 9.) The proposed notice forms are submitted with the accompanying declaration. (Brome Decl. Exs. B–D.) The Agreement also provides that, if a notice is returned, Class Counsel will perform a skip trace and take any other reasonable steps ensure the notice is received. (Agreement §§ 5, 9.) This procedure has been found to satisfy the Rule 23 notice requirements. *Ontiveros v. Zamora*, 2014 WL 3057506, at *11 (E.D. Cal. Jul 7, 2014). The notice forms "clearly identif[y] the options available to putative class members . . . and comprehensively explain the nature and mechanics of the settlement." *Id.* Additionally, the notices to class members include the information and language recommended in the Northern District's Procedural Guidance on Class Action Settlements.[11] (Brome Decl. ¶ 14.) Accordingly, Plaintiffs request that the Court approve the notice distribution procedures and the forms provided with the Settlement Agreement.

### F.  **The Court should approve the requested attorneys' fees and costs, administration costs, and service awards**

In the Ninth Circuit, the typical range of attorneys' fee awards from a common fund recovery is 20 to 33.3 percent, with 25 percent considered the benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). "[I]n most common fund cases, the award exceeds that benchmark." *Knight*,

---

[11] Paragraph 14 of the accompanying declaration addresses other information requested in the Northern District's Procedural Guidance.

2009 WL 248367, at *3. California courts routinely approve fee awards in common fund cases at or above 30%. *Barbosa*, 297 F.R.D. at 450 (approving fee award of 33%, and collecting nine recent wage and hour cases approving fee awards of 30-33.3%).

Plaintiffs will provide detailed briefing on their request for attorneys' fees in a separate motion. *See In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010). Here, Class Counsel seeks attorneys' fees from the common fund at the benchmark amount of 25%, pursuant to the Parties' Settlement Agreement. Given that Class Counsel seeks fees at the benchmark percentage, Plaintiffs respectfully request that the Court defer a detailed attorneys' fee analysis until the motion for attorneys' fees that will follow. This is appropriate since the factors considered in assessing whether the fee award is fair and reasonable (the results obtained, the risk of litigation, the skill required, the quality of the work performed, the contingent nature of the fee, and awards in similar cases) partially depend on Settlement Class Members' responses to the notice of settlement. Class Counsel provides a summary of this analysis to facilitate approval.

### i.      The percentage-of-the-benefit method is warranted in this case.

The overwhelming majority of federal and state courts hold that when class action litigation establishes a monetary fund for the benefit of the class members, the court may determine the amount of a reasonable fee based on an appropriate percentage of the fund created. *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 503 (2016). In group litigation, many class members benefit from the ultimate settlement, but they may not have played a large role in the litigation that led to the payment. *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980). The common fund approach "thus spread[s] fees proportionately among those benefited by the suit." *Id.* Awarding a percentage of the total fund is routinely approved as a fair way to calculate a reasonable fee when contingency fee litigation has produced a common fund. *See*, *e.g.*, *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002).

Trial courts have the discretion to conduct a lodestar cross-check on a percentage fee, but also retain the discretion to forego a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee. *Laffitte*, 1 Cal. 5th at 506; *see also Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 30 (2000). A lodestar cross-check is not required in this circuit,

and in some cases is not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.,* 2007 WL 221862, at *16 (N.D. Cal. 2007).

### ii.   The percentage requested by Class Counsel is fair and reasonable.

While the Ninth Circuit endorsed a benchmark of 25 percent, *Powers*, 229 F.3d at 1256, the actual percentage of fees awarded varies depending on the facts of each case, and common fund cases often make an award that exceeds the 25 percent benchmark. *Knight*, 2009 WL 248367 at *3. Courts within this district regularly award common fund attorneys' fees above the 25% benchmark in wage and hour cases. *E.g.*, *Burden v. SelectQuote Ins. Services*, 2013 WL 3988771, at **4–5 (N.D. Cal. Aug. 2, 2013) (awarding 33% of common fund in attorneys' fees in an overtime misclassification case).

Courts consider several factors to determine whether to depart from this benchmark: (1) the results achieved; (2) the risk of litigation; (3) the skill required; (4) the quality of work performed; (5) the contingent nature of the fee and the financial burden; and (6) the awards made in similar cases. *Six Mexican Workers v. Az. Citrus Growers,* 904 F.2d 1301 (9th Cir.1990). Here, these factors support an award of fees at the 25% benchmark.

### a.   The Result Obtained for the Class and Similar Awards

The result obtained for the class is a significant factor to be considered by the Court in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("the most critical factor is the degree of success obtained"). Even a limited comparison to other actions for unpaid overtime highlights the success achieved here. *See, e.g.*, *Deaver*, 2015 WL 8526982, at **7, 11 (approving 33% of the fund in attorneys' fees based on "very favorable" results where the total settlement fund equaled "10.7 percent of the total potential liability exposure, before any deductions for fees, costs, or incentive awards.") Here, the total net settlement fund equals approximately 80% of the realistic value of the claims, or 41% of the maximum recovery.

### b.   Class counsel's experience and skill and complexity of issues

This case involved overlapping issues of overtime exemptions under state and federal law, and facts particular to a traveling workforce. Counsel's experience in vigorously litigating class/collective wage and hour actions, plus their experience with the administrative exemption

---

(Nichols Kaster has represented workers alleging misclassification based on the administrative exemption in multiple industries, and has represented workers alleging California claims who travel to California to perform work) were essential in obtaining this favorable result. Counsel litigated the case efficiently and effectively, negotiating an agreement with Defendant to stipulate to conditional certification, and pursuing discovery to position the case for class certification and summary judgment motions. These efforts led to this favorable settlement without delaying resolution through further drawn out litigation. These factors favor approval. *See Adoma v. University of Phoenix, Inc*., 913 F. Supp. 2d 964, 983 (E.D. Cal. 2012) ("[T]he court believes that an award of 29% of the common fund . . . is appropriate. It is important that labor and employment attorneys be rewarded for pursuing novel claims (so long as they are meritorious) and for litigating these claims with tenacity, rather than cherry-picking simple cases or settling difficult cases for small amounts.").

c.   Risk of litigation and contingent fees

"Courts consistently recognize that the risk of non-payment or reimbursement of expenses is a factor in determining the appropriateness of counsel's fee award." *Bautista v. Harvest Mgt. Sub LLC*, 2014 WL 12579822, at *13 (C.D. Cal. Jul. 14, 2014). The contingent nature of the work performed by class counsel and the risk taken in advancing costs, also weigh in favor of determining a higher percentage fee. *See Graham v. Daimler Chrysler Corp.*, 34 Cal. 4th 553, 580 (2004) ("A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services."). Class Counsel handled this case on a contingency basis. (Brome Decl. ¶ 11.) Class Counsel did not receive any payment for their time spent litigating the case, nor did they receive reimbursement for their out-of-pocket litigation costs. (*Id.*) Class Counsel alone undertook the financial risk of unsuccessful litigation. (*Id.*) This factor favors approval.

d.   Reaction of the Class

This factor is best addressed following the distribution of the Notice, once the Class Members have had an opportunity to review and join the settlement. As discussed above, each Settlement Class Member will receive a Notice informing them of their rights under the terms of the Settlement Agreement, which will also state the requested attorneys' fees.

1

### iii. The Court should approve costs of up to $20,000

2      Class Counsel also requests approval of up to $20,000 in out-of-pocket litigation costs.

3 Payment of these costs is already factored into the allocation. Class Counsel has already incurred

4 $15,221.94 in unreimbursed costs during this litigation, which it advanced on behalf of Plaintiffs.

5 (Brome Decl. ¶ 12.) Class Counsel will incur additional costs in finalizing and administering the

6 settlement. Class Counsel will provide details of these costs in subsequent briefing. Class Counsel

7 therefore requests, and Defendant does not oppose, reimbursement of up to $20,000 in costs. To the

8 extent total costs are less than $20,000, any unexpended costs will be included in the final settlement

9 allocations for Settling Plaintiffs and Settling Class Members. This amount is also appropriate

10 because Class Counsel's private agreements with their clients (the Opt-in Plaintiffs) provide for

11 reimbursement of litigation costs in addition to payment of attorneys' fees. (*Id.*) The Court should

12 approve reimbursement of costs.

13

### iv. The Court should preliminarily approve the requested service awards

14      Plaintiffs and Class Counsel are mindful of this Court's views on service awards for Named

15 Plaintiffs. Plaintiffs note, however, that the duties and responsibilities and role played by a Named

16 Plaintiff is fundamentally different from the role played by an absent class member, and that it is

17 appropriate to recognize this. Here, the Named Plaintiff Aaron Kudatsky was the sole named

18 plaintiff in this action. He brought this action on behalf of a group of workers so that all of Tyler's

19 ERP ICs could benefit from him stepping forward. He was actively involved throughout the

20 litigation, from reviewing and providing valuable feedback on the initial complaint, responding to

21 written discovery requests Defendant propounded, sitting for a full day deposition, and attending

22 two settlement conferences. (Brome Decl. ¶ 13.) Additionally, Mr. Kudatsky remained responsive

23 throughout the litigation and provided assistance and answers to questions when needed. (*Id.*) Mr.

24 Kudatsky took on his responsibility seriously despite the risks of possible stigma and reputational

25 harm. *Deaver*, 2015 WL 8526982, at *15 (enhancement award of $7,500 "is particularly appropriate

26 in this wage and hour class action, where Plaintiff undertook a significant 'reputational risk' in

27 bringing this action against her former employer."). All these facts support awarding incentive

28 awards to the Named Plaintiff. *See Staton*, 327 F.3d at 977.

Plaintiffs seek a Named Plaintiff service enhancement in the amount of $5,000.00. "In this district, a $5,000 payment is presumptively reasonable." *Deaver*, 2015 WL 8526982, at *15 (collecting cases). Additionally, Plaintiffs seek approval of enhancements of $500 for each of seven Opt-in Plaintiffs who provided deposition testimony. This testimony was crucial for Plaintiff's class certification and summary judgment motions. Courts regularly approve service awards for deponents in such cases. *E.g.*, *Deluca*, 2020 WL 5071700, at *9 ("the $1,000 service payments for plaintiffs who were deposed are reasonable."). If approved, the total of these awards would amount to 0.27% of the total settlement amount. *See id.* (enhancements amounting to 0.48% of total settlement "are extremely small in relation to the total Settlement amount"). In other words, the awards "will not significantly reduce the amount of settlement funds available to the rest of the class." *Lusby*, 2015 WL 1501095, at *5 (approving a total of $30,000 in enhancement awards out of a $750,000 settlement, or 4% of the total.).

The agreement is very clear that "approval of enhancement awards in the amounts sought is not a material term of this Agreement," and any "requested amounts that are not approved by the Court will be apportioned to the Individual Settlement Allocations on a pro rata basis." (Agreement ¶ 3.) Further, the proposed notices specifically identify the requested service enhancement awards, providing class members complete information about what is being sought. (Brome Decl. Exs. B, C, D.) Plaintiffs will provide additional information and briefing on the requested awards in conjunction with the upcoming motions for attorneys' fees and for final approval. *See, e.g.*, *Etter v, Allstate Ins. Co.*, 2018 WL 5761755, at *2 (N.D. Cal. May 30, 2018) (finding preliminary approval appropriate where proposed agreement did not provide an automatic incentive award, request had not yet been made, and agreement was not continent on outcome of the request); *Clemens v. Hair Club for Men, LLC*, 2016 WL 3442774, at *3 (N.D. Cal. June 23, 2016) (granting preliminary approval and noting that the propriety of enhancement awards would be ultimately determined after notice).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant preliminary approval and order the distribution of notice so that Class and Collective Members can learn about the settlement,

---

1  and ultimately receive compensation for their claims.

2

3

4  Dated: April 19, 2021                    **NICHOLS KASTER, LLP**

5                                           By:    s/Daniel S. Brome_____

6                                                  Matthew C. Helland
                                                   Daniel S. Brome
7                                                  Rachhana T. Srey

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28